UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------X

THE CITY OF NEW YORK,

                         Plaintiff,

                v.

DONALD TRUMP, in his official capacity as President of
the United States;

U.S. DEPARTMENT OF THE TREASURY;

SCOTT BESSENT, in his official capacity as Secretary of
the Treasury;

PATRICIA COLLINS, in her official capacity as Treasurer
of the U.S.;

U.S. FEDERAL EMERGENCY MANAGEMENT
AGENCY;

CAMERON HAMILTON, in his official capacity as
Senior Official Performing the Duties of the
Administrator, U.S. Department of Homeland Security,
Federal Emergency Management Agency;

U.S. DEPARTMENT OF HOMELAND SECURITY;

KRISTI NOEM, in her official capacity as Secretary of the
U.S. Department of Homeland Security;

U.S. DEPARTMENT OR AGENCY OF UNKNOWN
IDENTITY;

JOHN OR JANE DOE, in his or her official capacity as
head of U.S. Department or Agency of Unknown Identity;

                      Defendants.

**COMPLAINT**

-------------------------------------------------------------------------X

Plaintiff The City of New York (the "City"), by its attorney, Muriel Goode-Trufant, Corporation Counsel of the City of New York, alleges upon personal knowledge as to itself and upon information and belief as to all other matters:

## INTRODUCTION

1.      On Tuesday, February 11, 2025, at 4:03 pm, the long arm of the federal government reached into a central bank account of the City of New York (the "City") and grabbed $80,481,861.42. It took these funds from the City without any advance notice that it would be doing so and without communicating any decision or rationale to the City.

2.      Defendant U.S. Federal Emergency Management Agency ("FEMA") took back the funds it paid the City on February 4, 2025, even though it had thoroughly reviewed and analyzed the extensive supporting documentation submitted by the City and approved payment as reimbursement for eligible and compliant expenditures under two federal grants awarded under the Shelter and Services Programs ("SSP").

3.      Indeed, FEMA offered and awarded the grants and reviewed and approved the payment to the City, to offset allowable costs the City incurred for shelter and services it provided to noncitizen migrants who were processed and released into the community by defendant the U.S. Department of Homeland Security ("DHS"). FEMA's stated purpose in offering the grants—to "reliev[e] overcrowding in short-term holding facilities of U.S. Customs and Border Protection"—is the exact purpose for which the City used the funds.

4.      These funds were appropriated by Congress for the purpose of making SSP grants available nationwide to local governments and non-profit organizations in border states, such as Texas and Arizona, and other locales, like New York City, receiving the largest influxes of migrants released by DHS.

5.      Before FEMA transferred these funds to the City on February 4, FEMA had already reviewed the City's grant applications and awarded the grants, reviewed and approved the City's budget for each grant, and reviewed and approved the City's reimbursement request, which included extensive detail as to each migrant who received services and back-up documentation validating the costs incurred.

6.      Despite the fact that FEMA had reviewed and approved the City's request, and issued payment, Defendants grabbed the money back without any administrative process whatsoever. Indeed, as of the morning of February 18, 2025, FEMA's platform for grant making and administration, entitled "FEMA GO" (an acronym for "FEMA Grant Operations"), continued to indicate that the City's approved request for $80,481,861.42 was disbursed to the City.

7.      Defendants have made it clear in contemporaneous public statements that they opposed the very purpose for which SSP funds were appropriated by Congress and approved by FEMA and that they intended to make sure the funds were recouped and never paid.

8.      For example, defendant Cameron Hamilton, Senior Official Performing the Duties of the FEMA Administrator posted on February 10, 2025, the day before the money grab: "@USCongress should have never passed bills in 2023 and 2024 asking FEMA to do this work. . . . This stops now." https://x.com/FEMA_Cam/status/1888923672523489649.

9.      Likewise, defendant DHS Secretary Kristi Noem, in announcing the previous day's money grab, posted on February 12, 2025: "I have clawed back the full payment that FEMA deep state activists unilaterally gave to NYC migrant hotels." https://x.com/KristiNoem/status/1889745752924074088.

10.    The statements could not be clearer: Defendants' purpose for grabbing back the funds was not related to the City's specific expenditures at all, but to thwart the very purpose of the SSP.

11.    No lawful procedure permits Defendants—as they did here—to take back grant funds previously approved and paid without legitimate basis and without first following and complying with the steps required under the applicable rules, grant terms and conditions. Defendants have acted lawlessly, but have attempted, after the fact, to mask this fact with a semblance of following procedure.

12.    First, several hours after grabbing the funds back from the City, Defendants, including DHS and FEMA, filed papers in a federal court proceeding in Rhode Island requesting that court's confirmation that Defendants may permissibly "withhold" FEMA funding, and represented to that court that they intended to provide "notice to New York City regarding the funding pause and will provide the information and process required by regulation and the terms and conditions of the award." Defs.' Emergency Motion, *New York v. Trump*, No. 1:25-cv-00039 (D.R.I. Feb. 11, 2025), ECF No. 102. FEMA did not tell the Court that, far from merely "withholding" funds, it had already, just hours earlier, taken back from the City funds that it had previously approved and paid.

13.    Further, having stated publicly that it was opposed to spending the funds altogether, and having taken the funds without following any lawful process whatsoever, FEMA nonetheless represented to the Court that it sought to "withhold" funding solely "on the basis of the applicable authorizing statutes, regulations, and terms." *Id.* Yet at that point, FEMA had not complied with any applicable statutes, regulations, and grant terms and conditions and had taken back funds in violation of the same.

14.    Next, a week later, in a *post hoc* effort to adorn defendants' lawless money grab with a veneer of administrative process, Administrator Hamilton sent the City's Office of Management and Budget ("City OMB"), which administers the FEMA grants for the City, a "Remedy for Noncompliance Letter" dated February 18, 2025 ("noncompliance" letter) that purports to set forth "Findings" of significant concern that the SSP funds are going towards "illegal activities." FEMA sent this letter just days after the City publicly announced its intention to sue over the money grab.

15.    Simply put, the "noncompliance" letter is pretextual, a cover for Defendant's real intent, which—as they've stated publicly—is to withhold the funds permanently because they oppose the purposes for which the funds were appropriated, awarded, approved, and paid. The letter, relying only on unsubstantiated characterizations of "media reports," makes allegations of crime and gang activity at the Roosevelt Hotel—one of the many locations for which FEMA reimbursed the city for shelter and services. Tellingly, the letter omits any mention that FEMA officials twice visited the Roosevelt Hotel in September 2024 and that those visits did not lead to any findings of alleged criminal activity. In addition, Defendants fail to cite any regulatory authority that supports denying funding to the City under the SSP based on purported criminal activity by those released by DHS into the community when the City has been assisting DHS in providing shelter.

16.    Further, the letter makes a show of requesting information to further a purported review of the City's SSP awards for 2024 and 2023 ("SSP24" and "SSP23", and collectively "SSP awards"), but mainly seeks information that OMB previously provided to FEMA,  and that FEMA already reviewed and approved in order to determine that the claimed reimbursements were allowable. Indeed, while the letter alleges the City is somehow encouraging illegal

immigration, FEMA already confirmed in approving and issuing the payment that all funds were used to provide services to individuals who DHS had released from its custody into the community.

17.    The letter does not identify any applicable rules or grant terms or conditions with which it alleges the City might not have complied. Instead, the letter effectively - and improperly - adds new terms and conditions. The letter is meant to look like it affords the requisite administrative process when, in fact, the decision has already been made to deny payment to the City because Defendants do not want to pay the City for providing the very services to the very people for the very purposes that Congress appropriated the funds and FEMA awarded the grants and approved and made the payments.

18.    This lawsuit challenges two actions by Defendants based on two core contentions. First, Defendants' money-grab—after FEMA review, approval, and actual payment, without notice or process of any kind—was, simply put, lawless. It violated federal regulations and grant terms, was contrary to law and in excess of authority, and contrary to their obligations to implement Congressional appropriations.

19.    Second, Defendants February 18, 2025 withholding letter likewise violates the law. Indeed, despite Defendants' representations to the federal court in Rhode Island that they were withholding FEMA funding from the City in accordance with applicable rules, grant terms and conditions, and not pursuant to a "funding freeze" or "pause" of the type that is temporarily restrained in that case, they are using the *post hoc* pretense of regular administrative procedure to mask that they are in fact acting pursuant to a broad "freeze" or "pause" on SSP funding. This appears to be part of an overarching strategy of finding ways to get around the TRO in *New York*

*v. Trump* and refuse to spend funds specifically authorized by Congress for this express purpose even after those funds were previously approved and actually paid by the very same agency.

20.     Because Defendants took the extraordinary and lawless measure of seizing money from the City's bank account—by surprise, and without notice—the City seeks the extraordinary remedy of mandatory injunctive relief to compel Defendants to return the money to the City, restoring the status quo ante. Such remedy is necessary because funds paid through Congressional appropriation are not fungible—if not disbursed, they can be reappropriated, or the appropriation may expire before this case is resolved, leaving the City without recourse. Defendants, notwithstanding the *post hoc* pretense of administrative process, have made it abundantly clear that they intend to withhold permanently every dime FEMA previously awarded, approved for reimbursement, and paid to the City.

21.     Defendants also seek relief to make sure that Defendants do not improperly grab more money from the City and do not improperly withhold funds that the City is entitled to receive.

22.     Therefore, the City brings this suit for a declaration that the money grab and the withholding of SSP24 and SSP23 funds are each arbitrary and capricious, contrary to law, ultra vires and in excess of authority, without observance of lawful procedures, and each violates the Due Process Clause, the separation of powers doctrine, and the Spending Clause. The City also seeks relief (1) ordering Defendants to reverse the FEMA money grab by returning the $80 million to the City's bank account; (2) enjoining Defendants from taking any further money from any City bank account in connection with the SSP24 and SSP23 FEMA grants; and (3) enjoining them from implementing the withholding of SSP24 and SSP23 funds.

## PARTIES

23.     Plaintiff the City of New York is a municipal corporation organized and existing under the laws of the State of New York.

24.     Defendant Donald J. Trump is the President of the United States. He is responsible for the actions and decisions that are being challenged by Plaintiffs in this action and is sued in his official capacity.

25.     Defendant United States Federal Emergency Management Agency ("FEMA") is part of the United States Department of Homeland Security, a cabinet agency within the executive branch of the United States government. 6 U.S.C. § 313.

26.     Defendant Cameron Hamilton is the Senior Official Performing the Duties of the Administrator (hereinafter, "Acting Administrator") of FEMA and that agency's highest ranking official. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity. 6 U.S.C. §§ 313, 314.

27.     Defendant United States Department of Homeland Security is a cabinet agency within the executive branch of the United States government. 6 U.S.C. § 111.

28.     Defendant Kristi Noem is the Secretary of the United States Department of Homeland Security and that agency's highest ranking official. She is charged with the supervision and management of all decisions and actions of that agency. She is sued in her official capacity. 6 U.S.C. § 112.

29.     Defendant United States Department of the Treasury is a cabinet agency within the executive branch of the United States government. 31 U.S.C. § 301. The Department of the Treasury is responsible for ensuring the financial security of the United States. FEMA grant

payments are transferred to the City's account by the Federal Reserve Payment System, with the participation of the Treasury Department.

30.     Scott Bessent is the Secretary of the Department of the Treasury and responsible for the operations of the Department of the Treasury, and management of the finances of the United States. He is sued in his official capacity. 31 U.S.C. § 301.

31.     Patricia Collins is the Treasurer of the United States and responsible for the management of the finances of the United States. She is sued in her official capacity. 31 U.S.C. § 301.

32.     Defendant U.S. Department or Agency of Unknown Identity is an as-yet unidentified department, agency, or other unknown entity of the United States with the ability and/or authority to return $80 million in unlawfully grabbed funding to the City's bank account, and is named here for the purposes of ensuring that complete relief may be obtained.

33.     Defendant John or Jane Doe Official is an official of the United States with the ability and/or authority to return $80 million in unlawfully grabbed funding to the City's bank account, and is named here in their official capacity for the purpose of ensuring that complete relief may be granted.

## JURISDICTION & VENUE

34.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 2201(a) because this action arises under federal law. Jurisdiction is also proper under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 702.

35.     Venue is proper in this district pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. §§ 1391(b)(2) & (e)(1). Defendants are United States agencies or officers sued in their official

capacities. Plaintiff is the City of New York, and a substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur within the City of New York.

## FACTS

**A. Congress Appropriated Funds for Local Governments to Assist in Providing Shelter and Services to Migrants Released by DHS into the Community**

36.     In 2019, as part of the federal government's response "to the significant rise in aliens at the southwest border," Congress authorized FEMA to provide grants to local government and nonprofit organizations assisting migrants encountered by DHS at the southern border and released into the community. These grants were only available to "jurisdictions or local recipient organizations serving communities that have experienced a significant influx" of migrants and covered the provision of food, shelter, basic medical care, and transportation. These grants were provided through FEMA's Emergency Food and Shelter Program Humanitarian ("EFSP-H"). *See* Emergency Supplemental Appropriations for Humanitarian Assistance and Security at the Southern Border Act, Pub. L. No. 116-26, Title III, 133 Stat. 1020-21 (2019). This program continued into the Biden Administration. *See* Department of Homeland Security Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4740 (2022).

37.     In 2023, Congress authorized FEMA and U.S. Customs and Border Protection ("CBP") to establish SSP. *See* Department of Homeland Security Appropriations Act, 2023, Pub. L. No. 117-328, Title II, 136 Stat. 4730 (2022). The stated purpose of SSP is to relieve overcrowding in short-term CBP holding facilities. To that end, the program reimburses non-federal entities providing shelter and related services to noncitizen migrants following their release from DHS.

38.     In 2024, Congress, through the Department of Homeland Security Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 598 (the "DHS Appropriations Act"), authorized continued funding for SSP. Title II of that Act, entitled Security, Enforcement, and Investigations, provides that $650 million "shall be transferred to 'Federal Emergency Management Agency—Federal Assistance' to support sheltering and related activities provided by non-Federal entities, in support of relieving overcrowding in short term holding facilities of the U.S. Customs and Border Protection."[1]

## B. The SSP24 Grants

39.     On April 12, 2024, FEMA issued two Notices of Funding Opportunity ("NOFO") for the *Fiscal Year 2024 Shelter and Services Program.* One NOFO announced an allocation grant, meaning that the amount the City and other localities could apply for were pre-determined on an allocation basis ("SSP-A Grant"). The other NOFO announced a competitive grant—that is, the City's application would compete with others for an award from a limited set of funds

---

[1] *See also* FEMA, *Shelter and Services Program,* https://www.fema.gov/grants/shelter-services-program (last visited Feb. 13, 2025) ("SSP provides financial support to non-federal entities to provide sheltering and related activities to noncitizen migrants following their release from the Department of Homeland Security (DHS). The intent is to support CBP in the safe, orderly, and humane release of noncitizen migrants from short-term holding facilities.").

("SSP-C Grant") (collectively, the SSP24 Grants").[2] FEMA issued an amended SSP-A NOFO on
August 28, 2024 and an amended SSP-C NOFO on October 21, 2024.[3]

40.    Both SSP grants have an expected period of performance of 36 months, from
October 1, 2023 to September 30, 2026.

41.    The NOFOs described the SSP as follows:

> As directed by Congress, SSP makes federal funds available to enable non-
> federal entities to off-set allowable costs incurred for services associated with
> noncitizen migrants recently encountered and released by DHS. As stated in
> the FY 2024 appropriation, the primary purpose of SSP is to "reliev[e]
> overcrowding in short-term holding facilities of [CBP]." ....

> The Department of Homeland Security (DHS) has committed to bolstering the
> capacity of non-federal entities to receive noncitizens after they have been
> processed by U.S. Customs and Border Protection (CBP) and released from a
> DHS facility. DHS is committed to ensuring appropriate coordination with
> and support for state, local, and community leaders to help mitigate increased
> impacts to their communities as outlined in the DHS Plan for Southwest
> Border Security and Preparedness, issued on April 26, 2022, and updated on
> December 13, 2022.

SSP-A NOFO at 5, SSP-C NOFO at 5.

---

[2] The grant identification number is DHS-24-GPD-141-00-98. The SSP-A NOFO may be
accessed at https://www.fema.gov/print/pdf/node/676489 or
https://www.fema.gov/grants/shelter-services-program/ssp-a/fy-24-nofo. *See also*
https://www.grants.gov/search-results-detail/353512; FEMA Grant Programs Directorate
Information Bulletin No. 505 (Apr. 12, 2024),
https://www.fema.gov/sites/default/files/documents/fema_gpd-ib-505.pdf.

[3] The amended SSP-A NOFO may be accessed at https://www.fema.gov/print/pdf/node/683858
or https://www.fema.gov/grants/shelter-services-program/ssp-a/fy24-ssp-a-amended-reserve-
funding-nofo. *See also* FEMA, Grant Programs Directorate Information Bulletin No. 518 (Aug.
28, 2024), https://www.fema.gov/sites/default/files/documents/fema_ib-fy24-ssp-a-round-2.pdf;
https://www.fema.gov/grants/shelter-services-program/ssp-a/fy-24-ssp-a-reserve-funding-faqs.

42.    The NOFOs described the goals of SSP as "the safe, orderly, and humane release of noncitizen migrants from DHS short-term holding facilities." The objectives of the program include providing funding for non-federal entities that serve "noncitizen migrants recently released from DHS custody" to "temporarily provide shelter, food, transportation, acute medical care, [and] personal hygiene supplies."

43.    The NOFOs specify the allowable (i.e., reimbursable) activities under the SSP, including providing shelter at hotels and motels and providing food, medical supplies, clothes and personal hygiene products. SSP-A NOFO at 69 *et seq.*; SSP-C NOFO at 64 *et seq.*

44.    As noted above, the FY 2024 SSP appropriation provided $650 million for SSP, including FEMA administration costs. The SSP-A funds were allocated to grantees in two rounds, with allocations based on release and destination data received from CBP. The NOFO released on April 12, 2024 announced $300 million in round 1 allocations and the amended NOFO released on August 28, 2024 announced round 2 (Reserve Fund) allocations. New York City was allocated $38.86 million for round 1 and $20.4 million for round 2.

45.    Millions of dollars were also allocated for non-profit organizations and local governments across the country, including more than $60 million for specified cities, counties, and not-for-profits in Texas, $10.8 million for Fulton County, Georgia, $11.6 million to Maricopa County, Arizona, and $21.8 million to Pima County, Arizona.

46.    The remaining $340.9 million was released through SSP-C grants. *See* SSP-A NOFO at 5; SSP-C NOFO at 7. These grants were awarded on a competitive basis, to local governments and nonprofit organizations that submitted grant proposals evaluated by FEMA. In addition, "$9.1 million was set aside for FEMA management and administrative costs." SSP-A NOFO at 5.

47.     The SSP-A NOFO lists the "Performance Measures for SSP awardees" as:

- Number of meals provided.
- Number of nights of lodging provided.
- Number of noncitizen migrants transported.
- Number of acute medical care items provided, by type.
- Number of personal hygiene supplies provided, by type.
- Number of hours of labor paid to manage cases to provide these services.
- Number of clothing items provided.
- Number of noncitizen migrants served through translation services.
- Number of noncitizen migrants served through outreach activities.
- Number of renovation or modifications to existing facilities projects completed.

SSP-A NOFO at 7; SSP-C NOFO at 6.

48.     FEMA "calculate[s] and analyze[s] the [enumerated] metrics through a review of performance progress reports and award monitoring to ensure that the funds are expended for their intended purpose and achieve the stated outcomes in the grant application." *Id.*

49.     To complete an SSP-A or SSP-C application, applicants must submit budget information, standard assurances, and worksheets, with program-specific certifications and budget instructions. SSP-A NOFO at 28-29; SSP-C NOFO at 18-19. The applicant must also agree to the terms and conditions of the award. SSP-A NOFO at 11; SSP-C NOFO at 11.

50.     To obtain FEMA's approval to draw down funds, grantees must submit for FEMA's review additional information and documentation, including "[a] summary list reporting A[lien]-Numbers, names, corresponding DHS release dates of the served population, and corresponding service dates of the served population." SSP-A NOFO at 29; SSP-C NOFO at 19. "For each requested allowable activity service category" the grantee must "provide one example

of proof of payment (e.g., canceled check, credit card statement, etc.) and a receipt reflecting the purchase." *Id.* Additional documentation requirements apply for reimbursement of purchases above $5,000. *Id.*

51.    The SSP grants provide for reimbursement only for shelter and services provided to migrants who DHS determined to release into the United States. For that reason, grantees must submit the name, valid Alien Registration Number, or "A-Number," and corresponding DHS release date for every person for whom the grantee seeks FEMA reimbursement. SSP-A NOFO at 29; SSP-C NOFO at 19. Thus, FEMA provides reimbursement for shelter and services provided to a given individual only after FEMA verifies that the individual has a valid A-Number and was released by DHS into the community.

52.    The NOFOs specify that all funds for which the applicant sought reimbursement "must comply with applicable statutes, rules and regulations, and policies, this NOFO, and the terms and conditions of the federal award. They must also comply with the Uniform Administrative Requirements, Cost Principles, and Audit Requirements at 2 C.F.R. Part 200." SSP-A NOFO at 30, SSP-C NOFO at 21. The NOFOs also incorporate by reference the FY 2024 DHS Standard Terms and Conditions. SSP-A NOFO at 38; SSP-C NOFO at 32.

### i.    *The Grant Awards*

53.    On April 24, 2024, the City, acting through its Office of Management and Budget ("City OMB") submitted an application to FEMA for an SSP-A grant for $38,864,884.00, the maximum amount then allocated to New York City as set forth in the SSP-A NOFO prior to amendment. On June 11, 2024, City OMB submitted an application to FEMA for an SSP-C grant for $34,090,000, the maximum amount permitted for a single applicant.

54.    The City's applications included detailed budget worksheets for FEMA's review. All costs are budgeted on a per diem basis, with separate line items for, among other things,

meals, security, case coordination, and medical. For example, the budgeted per diem cost submitted by the City for a night of hotel lodging is $62.19.

55.    On July 8, 2024, the City received its award letter for round 1 of SSP-A funding, for $38.86 million ("SSP-A Award Letter"). Subsequently, on September 11, 2024, FEMA approved an additional $20.4 million in round 2 funds for the City.

56.    On September 17, 2024, the City received its award letter for SSP-C funding, for $22 million ("SSP-C Award Letter" and collectively with the SSP-A Award Letter, "Award Letters").

57.    To accept the SSP-A and SSP-C grants funds, the City was required to agree to the terms set forth in the NOFOs and Award Letters. *See* SSP-A Award Letter at 1, SSP-C Award Letter at 1.

58.    The Award Letters further incorporated by reference the terms of 2 C.F.R. Part 200 and the NOFOs. SSP-A Award Letter, Arts. 2, 28; SSP-C Award Letter Arts. 2, 28. Additionally, the Award Letters provide that FEMA must inform the grantee in writing if an "error has been made [in a grant package], or if an administrative change must be made" to a grant. SSP-A Award Letter, Art. 44; SSP-C Award Letter Art 44.

59.    The City opted to receive grant payments on a reimbursement basis, meaning that the grantee must obtain FEMA's approval of a grant budget—namely the line items of expected expenditures for which reimbursement will be made—and only following budget approval, the grantee may submit a documented request for reimbursement for approved expenditures that have already been made.

60.    The Award Letters were issued with a funding hold; as set forth in the NOFOs, in order to obligate or draw down SSP grant funds, the City is required to submit a "detailed cost breakdown and justification." SSP-A Award Letter Art. 48; SSP-C Award Letter Art. 48.

### ii.  FEMA's Approval of the City's Grant Budgets and Payment of Reimbursements

61.    On November 27, 2024, City OMB submitted to FEMA the detailed cost breakdown and justification required in support of a future reimbursement request for both the SSP-A and SSP-C grants.

62.    Following a review process, FEMA approved the City's SSP24 grant budgets on January 8 and 10, 2025, respectively.

63.    On January 14, 2025, City OMB submitted to FEMA a request for reimbursement of $22,169,838.00 of expenditures for its Fiscal Year 2024 SSP-C grant and on January 15, 2025, City OMB submitted to FEMA a request for reimbursement of costs in the amount of $59,302,125.07 for its Fiscal Year 2024 SSP-A grant, together representing the entirety of the SSP grant awards to the City for Fiscal Year 2024.

64.    In support of the payment requests, City OMB submitted all of the documentation required by FEMA including the name and A-Number for each individual, and invoices and other documentation of expenditures.

65.    On January 31, 2025, following its review of the City's submissions, FEMA informed the City that the reimbursement for the SSP grants would need to be reduced slightly to account for an error rate of roughly 1.22% in matching the A-Numbers to eligibility for reimbursement and indicated that it would approve and make payment upon a request for the reduced amount.

66.    The City resubmitted to FEMA revised payment requests for the two grants in the amounts of $58,581,446.08 and $21,900,415.34, respectively, as pre-authorized by FEMA. The amounts in the revised payment requests reflected a reduction of 1.22% from the City's initial payment requests to account for FEMA's 1.22% error rate finding. The remaining balance—roughly $1 million between the two grants—remains available for future reimbursement of allowable expenses based on a subsequent submission.

67.    On February 4, 2025, the City received payments by ACH wire transfer to the City's central treasury account of $58,581,446.08 and $21,900,415.34, the full amount that FEMA had approved for reimbursement to the City.

68.    FEMA's approval and payment of these amounts constitutes FEMA's determination—after thoroughly reviewing budget details, expenditure documentation, and personal information of migrants—that the funds FEMA approved and disbursed were allowable under the grant terms and conditions.

**C. FEMA Grabs Back $80 Million without Notice**

69.    Seven days after the City received payment, on February 11, 2025 at 4:03 pm, FEMA removed $80,481,861.42 from the City's central treasury account, the entire amount that FEMA had approved for reimbursement and disbursed to the City for the SSP-A and SSP-C grants combined.

70.    FEMA did not provide any advance notice to the City of the money grab. FEMA did not follow any of the measures set forth in the grant terms and conditions or the regulations relevant to the grant. In fact, FEMA does not appear to have followed any administrative process at all in grabbing the SSP funds.

71.     Nor did FEMA provide any advance notice of any reason or basis to the City for the money grab. Indeed, it did not communicate with the City at all before taking the funds.

### D. Federal Officials Make Public Statements Opposing SSP

72.     While FEMA did not communicate directly with City OMB before or immediately after its money grab either to warn that it intended to take the money or to provide any reasons why, outside the grant administration process, various federal officials—including Elon Musk, an unelected and unconfirmed individual who appears to be leading the Department of Government Efficiency ("DOGE"), defendant Kristi Noem, the Secretary of the Department of Homeland Security, and defendant FEMA Acting Administrator Cameron Hamilton—made public statements condemning SSP and touting the FEMA money grab on social media, in press releases, and in court proceedings to which the City is not a party. These statements make unsupported claims regarding the FEMA funding received by the City and do not identify any lawful ground for FEMA to ignore Congress's intent and the applicable rules and grant terms and conditions and grab back the money it awarded, approved, and paid to the City.

73.     On Monday, February 10, 2025 at 5:03 am, Elon Musk, in a post filled with inaccuracies, posted that DOGE had "discovered" a $59 million payment from FEMA to the City "to house illegal immigrants," that a "demand" would be made for the return of the funds, that the funds were meant for disaster relief and that "sending this money violated the law":



**Elon Musk** ✓ 🖸
@elonmusk

**Subscribe**  🅧  ···

The @DOGE team just discovered that FEMA sent $59M LAST WEEK to luxury hotels in New York City to house illegal migrants.

Sending this money violated the law and is in gross insubordination to the President's executive order.

That money is meant for American disaster relief and instead is being spent on high end hotels for illegals!

A clawback demand will be made today to recoup those funds.

5:03 AM · Feb 10, 2025 · **66.2M** Views

💬 40K          ⟲ 129K          ♡ 647K          🔖 28K          ⬆

https://x.com/elonmusk/status/1888891512303263815.

74.    Far from being diverted from an approved purpose of "disaster relief," the funds were approved and disbursed pursuant to SSP, exactly as authorized and intended by Congress and awarded, approved, and paid by FEMA.

75.    Contrary to Musk's post, the funds were not used to pay for "luxury hotels," but rather to pay the FEMA-approved rate of $62.19 per person for lodging in any of the more than 220 hotels, motels, or other facilities that FEMA reviewed and approved. Further, FEMA paid only for shelter and service to migrants who FEMA confirmed before making payment had a DHS-issued A-Number and who DHS released from its custody into the community.

76.    Two hours after Musk's post, at 7:01 a.m., Acting Administrator Hamilton reposted it and added: "I want to thank the @DOGE team for making me aware of this. Effective

yesterday these payments have all been suspended from FEMA. Personnel will be held accountable." https://x.com/FEMA_Cam/status/1888921176199635266.  Acting Administrator Hamilton here appears to be instituting a "pause" or "suspension" of the FEMA payments— via a post on X—on Monday February 10 (purportedly "[e]ffective yesterday", i.e. Sunday, February 9). City OMB was not notified of this, and on information and belief, neither was any other grantee. Further, the funds FEMA approved for reimbursement to the City had already been paid to the City six days earlier.

77.    Acting Administrator Hamilton followed up ten minutes later at 7:11 a.m. with another post acknowledging that the SSP funds provided to the City were in fact appropriated by Congress for the very purpose for which the City used them, stating: "@USCongress **should have never passed bills in 2023 and 2024 asking FEMA to do this work.**" (Emphasis added.) Notwithstanding his acknowledgment of Congress' express appropriation, Acting Administrator Hamilton stated: "**This stops now**." https://x.com/FEMA_Cam/status/1888923672523489649.



**Cameron Hamilton** ✔ @FEMA_Cam · Feb 10

I want to thank the @DOGE team for making me aware of this. Effective yesterday these payments have all been suspended from FEMA. Personnel will be held accountable.

@elonmusk

> **Elon Musk** ✔ ✖ @elonmusk · Feb 10
>
> The @DOGE team just discovered that FEMA sent $59M LAST WEEK to luxury hotels in New York City to house illegal migrants.
>
> Sending this money violated the law and is in gross insubordination to the President's executive order. ...
>
> Show more

💬 997        ↻ 3.1K        ♡ 10K        �ılı 547K        🔖    ⬆

**Cameron Hamilton** ✔
@FEMA_Cam

@USCongress should have never passed bills in 2023 and 2024 asking FEMA to do this work. This stops now.

7:11 AM · Feb 10, 2025 · **78K** Views

💬 217        ↻ 645        ♡ 4K        🔖 60        ⬆

78.     The statement could not be clearer: Defendants' purpose for grabbing back the funds was to stop the SSP program entirely. It was not related to the City-specific costs or compliance issues, but was designed to thwart the very purpose for which Congress appropriated the funds and FEMA awarded, approved, and disbursed them.

79.     On Tuesday February 11, 2025, DHS announced that it had fired four FEMA employees, including the chief financial officer, "for circumventing leadership to unilaterally make egregious payments for luxury NYC hotels for migrants."

21

https://www.dhs.gov/news/2025/02/11/statement-dhs-spokesperson-termination-4-fema-employees-who-made-payments-luxury; *see also* Luis Ferré-Sadurní, *Top FEMA Official Is Fired Over Payments for N.Y.C. Migrant Shelters*, N.Y. Times (Feb. 11, 2025), https://www.nytimes.com/2025/02/11/nyregion/fema-fired-nyc-migrant-hotels.html.

### E. FEMA "Pause[s]" SSP without Lawful Basis, but Claims in Federal Court Filings to Be Following "Applicable" Laws and Procedures

80.      Defendants openly articulated their hostility to SSP, their unwillingness to administer the program, and their intention to take back the SSP funding. However, Defendants are subject to at least one temporary restraining order ordering them not to "pause, freeze, impede, block, cancel, or terminate Defendants' compliance with awards and obligations to provide federal financial assistance …except on the basis of the applicable authorizing statutes, regulations, and terms" and to "comply with all notice and procedural requirements in the award, agreement, or other instrument relating to decisions to stop, delay, or otherwise withhold federal financial assistance programs." *New York v. Trump*, No. 25-cv-39-JJM-PAS, 2025 U.S. Dist. LEXIS 17593 (D.R.I. Jan. 31, 2025) , ECF No. 50 (the "TRO").

81.      That TRO was entered in a case filed by 22 states (including New York) seeking to temporarily restrain and enjoin the across-the-board pause on federal funding disbursement implemented by the Trump administration. *See generally New York v. Trump,* No. 25-cv-39-JJM-PAS (D.R.I. filed Jan. 28, 2025) (hereinafter "*New York v. Trump*").

82.      In granting the TRO, the Rhode Island court noted that the Defendants identified no authority allowing them to unilaterally suspend the payment of federal funds or to impose conditions on appropriated funds beyond what Congress had authorized, and that the Court was not otherwise aware of any. TRO at 5; 2025 U.S. Dist. LEXIS 17593, at *11.

83.     Subsequently on February 10, 2025, the Rhode Island court granted the Plaintiff

States' Motion for Enforcement of the Temporary Restraining Order, stating as follows:

> The States have presented evidence in this motion that the Defendants in some
> cases have continued to improperly freeze federal funds and refused to resume
> disbursement of appropriated federal funds. The Defendants now plead that
> they are just trying to root out fraud. But *the freezes in effect now were a
> result of the broad categorical order, not a specific finding of possible fraud*.
> The broad categorical and sweeping freeze of federal funds is, as the Court
> found, likely unconstitutional and has caused and continues to cause
> irreparable harm to a vast portion of this country. These pauses in funding
> violate the plain text of the TRO. In response to the Defendants' arguments,
> they can request targeted relief from the TRO from this Court where they can
> show *a specific instance where they are* acting in compliance with this Order
> but *otherwise withholding funds due to specific authority*.

*New York v. Trump*, No. 25-cv-39-JJM-PAS, 2025 U.S. Dist. LEXIS 26334, at *12, 2025 WL

440873 (D.R.I. Feb. 10, 2025), ECF No. 96 (citations and footnotes omitted).

84.     To evade these obligations and create cover for the money grab, at approximately

7 p.m. on February 11, 2025—three hours after FEMA had already grabbed $80M from the

City's bank account without notice—some of the defendants here filed a motion in *New York v.

Trump* entitled, "Emergency Motion. . . for Permission to Continue Withholding FEMA and

Other Funding."

85.     The emergency motion purported to seek confirmation that a "withholding" of

FEMA funding to the City did not violate the TRO.

86.     Without mentioning that FEMA had already taken from the City funds that FEMA

had approved and transferred to the City a full week earlier, the emergency motion stated that

"FEMA *seeks to withhold* Shelter and Services Program (SSP) funding based on concerns

regarding the program" and "respectfully *requests* confirmation that Defendants may permissibly

withhold certain FEMA funding, i.e., as 'a specific instance where they are acting in compliance with this Order but otherwise withholding funds due to specific authority.'" *Id.* (emphasis added).

87.    In a declaration accompanying the emergency motion, FEMA Acting Administrator Hamilton represented that FEMA had "paused" SSP funding because of concerns the funds were being mis-used by the City and that FEMA would follow all applicable processes under the SSP grant and applicable laws and regulations. Specifically, Administrator Hamilton made the following representations:

- "As of today, the Department has paused funding to the Shelter and Services Program based on significant concerns that the funding is going to entities engaged in or facilitating illegal activities."

- "For example, a substantial portion of Shelter and Services Program money goes to funding alien housing at the Roosevelt Hotel in New York City. According to media reports, the vicious Venezuelan gang Tren De Aragua has taken over the hotel and is using it as a recruiting center and base of operations to plan a variety of crimes."

- "FEMA is in the process of requesting information from New York City to further investigate this matter to ensure that federal funds are not being used for illegal activities."

- "FEMA will begin the process of providing notice to New York City regarding the funding pause and will provide the information and process required by regulation and the terms and conditions of the award. *See* 2 C.F.R. § 200.242."

Declaration of Cameron Hamilton, *New York v. Trump*, Feb. 11, 2025, ECF No. 102-1 ("Hamilton Declaration") ¶¶ 6, 7, 12, 13.

88.    The Hamilton Declaration also attached a memo from DHS Secretary Kristi Noem, stating that all funding to non-governmental organizations ("NGOs") for services that "touch in any way on immigration" including SSP were "paused." Kristi Noem, Mem. for Component and Office Heads (Jan. 28, 2025) ("Noem Memo"), available as ECF No. 102-2 in *New York v. Trump*. The Noem Memo explained that, in Noem's view, the "[DHS] has spent

billions of dollars funding illegal immigration," including by funding NGOs that "purport[] to provide a variety of services to illegal aliens." In pausing the NGO funding for SSP, Secretary Noem makes clear her opposition to the program itself.

89.    The Hamilton Declaration relied on "media reports," rather than on any fact-based analysis. It did not identify any activity by the City that was inconsistent with SSP24 grant conditions or unlawful, except for vague allegations of encouraging aliens to reside in the U.S., transporting illegal aliens, harboring, or aiding and abetting. Since all of the migrants for whom FEMA reimbursed the City were released into the community by DHS with an A Number, and the reimbursement was for the express purpose of relieving DHS of the burden of maintaining these individuals in DHS custody, these assertions are misleading and without merit.

90.    The Hamilton Declaration did not inform the court that FEMA had already, three hours before the emergency motion was filed, grabbed back $80 million in SSP funds from the City without complying with any of the notice or procedural requirements in the SSP Award Letters, NOFOs or the applicable federal regulations.

91.    The Hamilton Declaration cites 2 C.F.R. § 200.242, but that provision does not exist. 2 C.F.R. § 200.342, however, requires that an agency that "initiat[es] a remedy for noncompliance (for example, disallowed costs, a corrective action plan, or termination)… must provide the recipient with an opportunity to object and provide information challenging the action." No such opportunity was provided before FEMA took the money.

92.    The Court denied the emergency motion on February 12, 2025, stating:

> As to FEMA funds to New York City, the Defendants represent that they intend to provide 'notice to New York City regarding the funding pause and will provide the information and process required by regulation and the terms and conditions of the award.' ECF No. 102-1 at ¶ 13. Because the Defendants are seeking to terminate *funding 'on the basis of the applicable authorizing*

*statutes, regulations, and terms,'* ECF No. 50 at 12 (emphasis added), the
Court sees no need for further clarification.

Order, *New York v. Trump*, Feb. 12, 2025, ECF No. 107.

93.     The District Court of Rhode Island thus relied on Defendants' representation that

they were seeking to "pause" funding "on the basis of the applicable authorizing statutes,

regulations and terms" when, in fact, far from merely pausing funding, Defendants had already

grabbed back funds that had been paid to the City, and had done so without providing notice to

the City and without following any of the applicable statutes, regulations and terms.

94.     The day after the filing in the Rhode Island case, on February 12, 2025, at 1:37

pm, defendant DHS Secretary Kristi Noem repeated the unsupported statements in the Hamilton

Declaration, that persons residing in hotels the City used to temporarily shelter non-citizen

migrants committed crimes and that approved SSP funds were grabbed back for that reason.

https://x.com/KristiNoem/status/1889745752924074088.



**Kristi Noem** ✓
@KristiNoem

I have clawed back the full payment that FEMA deep state activists
unilaterally gave to NYC migrant hotels.

FEMA was funding the Roosevelt Hotel that serves as a Tren de Aragua
base of operations and was used to house Laken Riley's killer.

Mark my words: there will not be a single penny spent that goes against
the interest and safety of the American people.

1:37 PM · Feb 12, 2025 · **1.4M** Views

⬤ 5.9K          ⬆ 21K          ♡ 130K          🔖 1.3K          ⬆

### F. FEMA Issued a "Noncompliance Letter" in a Pretense of Procedural Compliance

95.     More than a week after the money grab, Defendants began to manufacture a veneer of the procedural compliance that Administrator Hamilton had represented in court filings they were following. On February 19, 2025, Neil Thompson, the Deputy Assistant Director at City OMB, received a letter, dated February 18, 2025, from FEMA Acting Administrator Hamilton with the subject line "Remedy for Noncompliance Letter, Shelter and Services Program (SSP)."

96.     In the letter, Administrator Hamilton purports to "notify [City OMB] that DHS/FEMA is temporarily withholding payments to [City OMB]" for three grant awards: the FY24 SSP-A grant award of $59,302,125.07, the FY24 SSP-C grant award of $22,169,838.00, and an SSP grant award the City received for FY23 in the amount of $106,879,743.00 ("SSP23 Grant"). The letter admits that FEMA had already grabbed back the SSP-A and SSP-C grant awards paid to the City, stating that FEMA "recovered two payments completed via direct deposit on February 4, 2025, totaling $80,481,861.42." The letter claims that the money grab "constitutes a part of this temporary withholding."

97.     The letter states that DHS/FEMA is withholding funds pursuant to 2 C.F.R. § 200.339(a), which states that "[w]hen [a] Federal agency . . . determines that noncompliance cannot be remedied by imposing specific conditions, the Federal agency . . . may . . . (a) temporarily withhold payments until the recipient or subrecipient takes corrective action." But the letter also states, inconsistently with the above, that FEMA "is instituting specific conditions on [the City's] award pursuant to 2 C.F.R. § 200.208." As noted above, 2 C.F.R. § 200.208 allows federal agencies to adjust specific conditions in the Federal award based on analysis of the following factors:

(1) Review of OMB-designated repositories of government-wide data (for example, *SAM.gov*) or review of its risk assessment (See § 200.206);

(2) The recipient's or subrecipient's history of compliance with the terms and conditions of Federal awards;

(3) The recipient's or subrecipient's ability to meet expected performance goals as described in § 200.211; or

(4) A determination of whether a recipient or subrecipient has inadequate financial capability to perform the Federal award.

98.     The letter fails to note, however, that FEMA may not initiate a remedy for "noncompliance," such as withholding funds, without providing notice to the City and an opportunity to object and provide information challenging the action. 2 C.F.R. § 200.342. Ignoring that rule, FEMA not only instituted a withholding, it took back funds it had already awarded, approved, and paid before commencing any administrative process whatsoever.

99.     The letter also omits reference to regulations providing that "payments for allowable costs ***must not be withheld at any time during the period of performance*** unless required by Federal statute, regulations," or "The recipient … has failed to comply with the terms and conditions of the Federal award; or… is delinquent in a debt." CFR § 200.305(b)(6) (emphasis added). If "such conditions" are met, "the Federal agency… may, ***after providing reasonable notice***, withhold payments to the recipient… until the conditions are corrected." *Id*. And in the event payments are withheld for noncompliance, they must be released "upon subsequent compliance." 2 CFR § 200.305(b)(7).

100.     Here, FEMA has not identified any federal statute or regulation that requires withholding of SSP grant funds, nor has it identified any grant terms or conditions with which Defendants allege the City has not complied. Whatever the supposed violation, Defendants have not made a final determination following notice and opportunity to be heard.

101.    Instead, even taking the letter at face value, the stated reasons for withholding funds are based on specious and unsubstantiated allegations unrelated to any grant terms or conditions.

102.    The "noncompliance" letter announces purported "Findings," which are expressed as no more than "concerns" and which are, in any event, facially pretextual.

103.    First, the letter states that DHS "has significant concerns that SSP funding is going to entities engaged in or facilitating illegal activities." But it does not allege any purported illegal activities committed by any entity that might have been paid with funds for which the City obtained reimbursement. Instead, the letter alleges—citing and exaggerating the same news reports that defendant Hamilton cited in his declaration a week earlier:

> According to media reports, the vicious Venezuelan gang Tren De Aragua has taken over the hotel and is using it as a recruiting center and base of operations to plan a variety of crimes. According to these same reports, these crimes include gun and drug sales as well as sex trafficking, which can reasonably be presumed to be conducted in the hotel itself.

104.    The letter asserts that "DHS/FEMA has a responsibility to ensure that it does not make payments that fund criminal activity" but, as FEMA knows, the grant does provide "financial support to non-federal entities to provide sheltering and related activities to noncitizen migrants following their release from the Department of Homeland Security." FEMA, *Shelter and Services Program,* https://www.fema.gov/grants/shelter-services-program (last visited Feb. 13, 2025).

105.    A further "finding" is FEMA's purported "concern" that

> entities receiving payment under this program may be guilty of encouraging or inducing an alien to come to, enter, or reside in the United States in violation of law, 8 U.S.C. § 1324(a)(1)(A)(iv); transporting or moving illegal aliens, id. § 1324(a)(1)(A)(ii); harboring, concealing, or shielding from

detection illegal aliens, id. § 1324(a)(1)(A)(iii); or applicable conspiracy, aiding or abetting, or attempt liability respecting these statutes.

106.    As FEMA knows, this is a patently false "concern" because the grants fund only those costs for shelter and services that are provided to individuals that DHS determined to release from its custody into the community. That is, the individual was already in the United States, in DHS custody, and then released by DHS to the community—facts that FEMA confirmed for each individual before, and as a condition of, making payment.

107.    The "noncompliance" letter claims that "[b]ased on the concerns described . . . , DHS/FEMA will conduct additional monitoring and review of" the FY23 and FY24 SSP awards "as permitted by the terms and conditions of the award(s) to ensure compliance with all terms and conditions of [the] award(s)." The letter reiterates that "[d]uring this time, payments under the grant award(s) will be temporarily held. This action includes the amount of funding . . . that DHS/FEMA recently clawed back." The "noncompliance" letter adds that "[u]pon the conclusion of that monitoring, FEMA will notify you of the results and any other remedies for noncompliance or specific conditions, as appropriate."

108.    The "noncompliance" letter makes a show of requesting information that would somehow assist FEMA in making a final determination. But the information requested is largely information that FEMA not only has, but has already reviewed in determining to make payment to the City. The letter seeks:

> All documents regarding the aliens with whom your organization and your subrecipients and contracts interacted with in carrying out the scope of your SSP award, including their names and contact information; and a detailed and descriptive list of specific services provided, and proof of provision of these services; or
>
> A written statement that your organization has already submitted all of the information identified in No. 1, above, to DHS/FEMA.

109.     As noted above, the City supplied the name and A-Number for individuals for whom the City sought reimbursement, as well as proof of services rendered—all of which FEMA reviewed and approved for payment. Further, none of the information requested is in any way related to the letter's stated central "concern": allegations of criminal activity. It is a charade of a request for information, not a meaningful request.

## G. The "Noncompliance" Letter Wrongly Implicates the Fiscal Year 2023 SSP Award

110.     The "Noncompliance Letter" references the SSP23 grant, though it is unclear whether and to what extent FEMA's "findings" concern that grant. Indeed, FEMA already conducted a "Compliance Review" with respect to the SSP23 Grant and made findings, a fact omitted from the "Noncompliance Letter." Despite having conducted a financial and programmatic site visit—including at the Roosevelt Hotel—FEMA did not identify in its Compliance Review Findings any of the matters now set forth in the "noncompliance" letter.

111.     As background: FEMA awarded the City $106.9 million under the SSP23 grant and, to date, has reimbursed the City $70.6 million for allowable costs under the grant.

112.     As with the SSP24 Grants, FEMA's stated purpose in offering the SSP23 Grant was:

> To provide funding to non-federal entities that serve noncitizen migrants recently released from DHS custody to temporarily provide shelter, food, transportation, acute medical care, personal hygiene supplies, and labor necessary to manage cases to provide these services; and,

> To provide funding to non-federal entities to increase their capacity to temporarily shelter noncitizen migrants recently released from DHS custody, including renovations and modifications to existing facilities.

The SSP23 NOFO further states FEMA's "priority" of the "safe, orderly, and humane release of noncitizen migrants from DHS short-term holding facilities."

113.    The City applied for the SSP23 Grant on July 12, 2023. FEMA initially awarded the City a grant of $104.7 million by notice effective August 11, 2023, which it increased to $106.9 million on September 28, 2023. As with the applications for the SSP24 Grants, the City's application for the SSP23 Grant included a list of all the locations for which the City indicated it might seek reimbursement, including the Roosevelt Hotel.

114.    OMB submitted two requests for partial reimbursement under the SSP23 Grant. FEMA approved the City's first reimbursement request in the amount of $25.5 million on July 25, 2024. FEMA approved the City's second reimbursement request in the amount of $45.1 million on January 7, 2025. To date, the City has received $70.6 million in reimbursement from FEMA under the SSP23 Grant. Under the grant terms, $36.3 million remains available for claiming reimbursement of allowable costs.

115.    As with the FY24 SSP-A and SSP-C Grants, OMB submitted to FEMA the name, A-Number, and other information for each individual for whom the City's cost of providing shelter and services was included in the reimbursement request. In addition, for the SSP23 Grant, OMB was required to include the DHS Release Date (the date DHS released each individual from DHS custody) because, per the grant terms, FEMA would only reimburse for shelter and services provided within 45 days of release. FEMA reviewed all of this information in determining that the City's reimbursement request was for allowable costs and in determining to make the payment.

116.    In stark contrast with the *post hoc* pretextual process around FEMA's money grab, FEMA had previously initiated a compliance review audit of the first payment made under the SSP23 Grant that included a "joint financial and programming site visit." As part of the visit, officials from FEMA and the Customs and Border Protection toured the Roosevelt Hotel and

another facility on September 9, 2024. Apart from the Compliance Review, FEMA officials visited the Roosevelt Hotel on September 26, 2024.

117.    On November 29, 2024, FEMA provided its findings to OMB by letter. FEMA made findings in three areas: (1) data privacy protections for A Numbers, (2) contract provisions, and (3) certain financial management issues. Having visited the Roosevelt Hotel twice, FEMA did not identify any purported gang or illegal activities at the Roosevelt Hotel in its Compliance Review Findings.

118.    FEMA has conducted zero additional visits to the Roosevelt Hotel. The recent "noncompliance" letter provides no first-hand account in support of FEMA's allegations of criminal activity and instead relies solely on characterizations of unsubstantiated media reports. That is not a proper process and is indicative that Defendants have determined not to fund the City's SSP grants under any circumstances and are seeking to create a paper trail to mask the fact that the determination is not related to "noncompliance" or to any proper grounds for withholding funds.

## H. FEMA is Bound by Extensive Rules and Procedures, Including in the Grant Terms and Conditions

119.    By grabbing back funding from the City, and suspending further funding under SSP24 and SSP23, FEMA has acted contrary to the applicable rules and grant terms. There is nothing in the NOFOs, Award Letters, nor the applicable regulations, that allows Defendants to "recover" funds by taking them out of the City's bank account before going through an administrative process that includes notice and an opportunity to object.

120.    Furthermore, Defendants' supposed administrative determination to suspend SSP24 and SSP23 funding is plainly pretextual, as it does not identify any legitimate basis for withholding SSP funding – let alone for having taken back funds that were previously approved

and paid. Instead, it makes specious allegations unrelated to the grant terms, asks for submission of information that City OMB already provided and that FEMA already reviewed in detail, and fails to cite any grant term with which the City has not complied.

### I. The Money Grab Violates Federal Rules and Grant Terms and Conditions

121.    As described above, FEMA did not provide any notice to City OMB before the money grab.

122.    The money grab was made in total disregard of the fact that FEMA awarded the grant and then reviewed, approved, and paid the reimbursement.

123.    No lawful grounds exist—and none have been asserted—for the money grab, and no lawful procedure was followed. Instead, defendants have made clear that their true intent is to halt the program entirely because they do not like it, and have commenced a *post hoc* "procedure" to give legal gloss to their unlawful determination and action. The money grab must be reversed and defendants prevented from engaging in unlawful money grabs in the future.

### J. The City Faces Irreparable Harm

124.    The over $80 million grabbed back by Defendants is reimbursement for amounts that the City already expended in reliance on the SSP's terms, and that FEMA awarded, reviewed in detail, approved for payment, and paid to the City.

125.    Because of Defendants' money grab, the City is at risk of losing this funding permanently even if it prevails in this lawsuit. SSP funds could become unavailable to the City during the time it takes to decide this lawsuit, if the SSP appropriation is fully obligated (i.e. the City's funds are redistributed to other recipients) and thus exhausted; the appropriation expires; or if the appropriation is rescinded by Congress. Defendants have articulated their hostility to SSP and their desire to stop disbursing SSP funds, even if disbursement is consistent with

congressional purpose. The City, even if ultimately successful here, risks a permanent loss of these funds because of Defendants' $80 million money grab.

126.    In addition, given that the noncompliance letter references the SSP23 grant funds for which the City was previously reimbursed, Defendants may attempt to unlawfully execute another money grab for the SSP23 funds.  Hence the City seeks an injunction to require the repayment of the $80 million in SSP24 funds, and an injunction to prevent Defendants from another money grab of the SSP23 funds.

127.    The illegitimate suspension of the SSP24 and SSP23 grants on pretextual grounds also harms the City, as there remain additional funds from which the City may draw down, if it submits eligible costs for reimbursement. The SSP24 grants awarded to the City include an additional $1 million; while the SSP23 grant includes an additional $36.3 million. Denial of those funds to the City on grounds, conditions, or terms other than those provided in the SSP grant Award Letters and NOFOs would likewise result in harm to the City, its budget, and its finances.

128.    Defendants' conduct as described above, including the money grab and the funding pause based on a pretextual administrative "noncompliance" letter, demonstrate the futility of pursuing an administrative appeal of the "noncompliance" letter.

## CLAIMS FOR RELIEF

### Count I
### Substantive APA Violation
### Arbitrary and Capricious; Abuse of Discretion
### (Against Agency Defendants)

129.    The City repeats and realleges all paragraphs above as if fully set forth herein.

130.    Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

131.    The FEMA money grab is agency action subject to review under the APA.

132.    The withholding of SSP24 and SSP23 funding is an agency action subject to review under the APA.

133.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

134.    An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up).

135.    The "reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). Agencies may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decision-making process." *Id.*

136.    Moreover, "courts may not accept … counsel's post hoc rationalizations for agency action" or otherwise "supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 50. Rather, "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Id.*

137.    Here, Defendants have provided the City no reason or basis at all for grabbing $80 million from the City's bank account for costs FEMA has already confirmed through review of extensive documentation were eligible for reimbursement under the SSP grants. Likewise,

Defendants have not offered any lawful basis for withholding the SSP24 and SSP23 grants. Defendants have not identified any costs that are not reimbursable under the SSP grants.

138.    To the extent FEMA officials and other federal officials offered rationales for the money grab on social media, in public statements, and in lawsuits to which the City is not a party, these rationales are unsupported, and offer no legitimate basis for FEMA's action.

139.    To the extent the "noncompliance" letter purports to offer further rationales for the money grab and/or the withholding, it does not add anything, is pretextual,  unsupported, and offer no legitimate basis for FEMA's action.

140.    Furthermore, all the rationales offered are inconsistent with and directly contrary to the statutory text of the DHS Appropriations Act and the stated goals of the SSP, which include providing funds to local governments that provide food, shelter and other services for migrants recently released by DHS into the community, in order to facilitate the safe, orderly, and humane release of noncitizen migrants from DHS short-term holding facilities.

141.    An action is also arbitrary and capricious if the agency "failed to consider . . . important aspects of the problem" before it. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 25 (2020) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43). Here, Defendants demonstrated no consideration of the City's substantial reliance interests in receiving funds to reimburse the City for monies already spent housing and providing services to non-citizen migrants in compliance with the grant terms and requirements. Where, as here, "an agency changes course ... it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *Id.* (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016)); *see also Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 106 (2015) ("[T]he APA requires an agency to provide more substantial justification when its

new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account.")

142.     Under 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the FEMA money grab violates the APA because it is arbitrary and capricious.

143.     Under 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that FEMA's withholding of SSP24 and SSP23 funding violates the APA because it is arbitrary and capricious.

144.     In addition, Plaintiff is entitled to additional appropriate relief under 5 U.S.C. § 705 including (1) ordering Defendants to reverse the FEMA money grab by returning the $80 million to the City's bank account; (2) enjoining Defendants from taking any further money from any City bank account in connection with the SSP24 and SSP23 FEMA grants; and (3) enjoining Defendants from implementing the withholding of SSP24 and SSP23 funds. Plaintiff seeks preliminary relief with respect to (1) and (2).

## Count II
### Substantive APA Violation
### Contrary to Law, Ultra Vires, and in Excess of Statutory Authority
### (Against Agency Defendants)

145.     The City repeats and realleges all paragraphs above as if fully set forth herein.

146.     Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

147.     The FEMA money grab is agency action subject to review under the APA.

148.     The withholding of SSP24 and SSP23 funding is agency action subject to review under the APA.

149.     Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity,"

or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(B) – (C).

150.    Neither the President nor an agency can take any action that exceeds the scope of their constitutional and/or statutory authority.

151.    Congress enacted the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *U.S. v. Morton Salt*, 338 U.S. 632, 644 (1950)). Moreover, "Section 706 makes clear that agency interpretations of statutes—like agency interpretations of the Constitution—are *not* entitled to deference." *Id.* at 392 (emphasis in original). Rather, it "remains the responsibility of the court to decide whether the law means what the agency says." *Id.* (quoting *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 109 (2015) (Scalia, J., concurring in judgment)).

152.    The DHS Appropriations Act authorizing the SSP grants appropriated funds for the purpose of providing monies to local governments that provide food, shelter and other services for migrants recently released by DHS into the community, in order to facilitate the safe, orderly, and humane release of noncitizen migrants from DHS short-term holding facilities. Defendants cannot unilaterally grab back or refuse to disburse funds appropriated by Congress contrary to congressional intent and directive.

153.    Moreover, the Impoundment Control Act of 1974 requires the Executive to make appropriated funds "available for obligation," subject to only two exceptions: rescissions and deferrals. 2 U.S.C. §§ 683-84. Deferrals may not be made for policy reasons, and rescissions are subject to congressional approval. *Id.* § 684(b).

154.    The FEMA money grab is neither a lawful rescission nor a lawful deferral under the Impoundment Control Act. It is not a lawful rescission because lawful rescissions are subject to congressional approval, *id.* § 684(b), and the President has not sought congressional approval. It is not a lawful deferral because Defendants made clear that the FEMA money grab was motivated by a policy disagreement with the SSP. As the D.C. Circuit has explained, the Executive lacks the statutory authority to engage in policy-based deferrals that would "negate the will of Congress." *City of New Haven v. United States*, 809 F.2d 900, 901 (D.C. Cir. 1987).

155.    Likewise, FEMA's withholding of SSP24 and SSP23 funding is neither a lawful rescission nor a lawful deferral under the Impoundment Control Act. It is not a lawful rescission because lawful rescissions are subject to congressional approval, and the President has not sought congressional approval. It is not a lawful deferral because Defendants made clear that it was motivated by their hostility to the stated purpose of the congressional appropriation and their determination not to make SSP payments.

156.    Under 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the FEMA money grab violates the APA because it is contrary to law, ultra vires, and in excess of statutory authority.

157.    Under 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that FEMA's withholding of SSP24 and SSP23 funding violates the APA because it is contrary to law, ultra vires, and in excess of statutory authority.

158.    In addition, Plaintiff is entitled to additional appropriate relief under 5 U.S.C. § 705 including (1) ordering Defendants to reverse the FEMA money grab by returning the $80 million to the City's bank account; (2) enjoining Defendants from taking any further money from any City bank account in connection with the SSP24 and SSP23 FEMA grants; and (3) enjoining

Defendants from implementing the withholding of SSP24 and SSP23 funds. Plaintiff seeks preliminary relief with respect to (1) and (2).

**Count III**
**Procedural APA Violation**
**Without Observance of Procedure Required by Law**
**(Against Agency Defendants)**

159.    The City repeats and realleges all paragraphs above as if fully set forth herein.

160.    Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

161.    FEMA's withholding of SSP24 and SSP23 funding is agency action subject to review under the APA.

162.    The FEMA money grab is agency action subject to review under the APA.

163.    Under the APA, a court "shall . . . hold unlawful and set aside agency action, findings and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

164.    Neither the DHS Appropriations Act, the SSP grant Award Letters, the NOFOs nor the Code of Federal Regulations, incorporated into the SSP grant documents, permit Defendants to grab back funds duly disbursed by FEMA to the City pursuant to and in accordance with the SSP grants' terms and conditions. Neither do they allow Defendants to withhold payment of funds that were approved pursuant to and in accordance with the SSP grants' terms and conditions.

165.    To the extent Defendants may have had any legitimate concerns about the City's performance under the SSP grants , they were required to follow the procedures available under the SSP Grant Award Letters, the NOFOs and the Code of Federal Regulations, incorporated into the grant documents. But they did not do so.

166.    Prior to grabbing back $80 million, Defendants did not provide the City with notice of any agency determination of non-compliance, any specific conditions to be applied to the City SSP grants, nor any grant suspension, pause or termination. 2 C.F.R. §§ 200.208, 200.243; 200.305; 200.339 – 200.342. Nor did FEMA offer the City any opportunity to contest any agency determinations. *Id*. § 200.342.

167.    FEMA represented to the Rhode Island District Court as of February 11, 2025 that FEMA was already "in the process of requesting information from New York City to further investigate this matter" and would "provide[] notice" to the City and "provide the information and process required by regulation and the terms and conditions of the award." Hamilton Declaration at ¶¶ 12, 13. But at the time of their filing, FEMA had already grabbed the $80 million from New York City without providing notice, without requesting any information, without announcing any findings, and without following any required process.

168.    By letter dated February 18, 2025, Defendants provided the City a "noncompliance" letter concerning a "withholding" of funds that did not identify any noncompliance by the City. Rather, it announced purported "Findings," expressed as no more than "concerns" and which are, in any event, facially pretextual and unsupported. The "noncompliance" letter requests information that is not related to the asserted concerns and seeks information that, for the most part, has already been provided by the City, reviewed by FEMA, and determined to be sufficient for payment. The letter advises City OMB of "the right to appeal" within 60 days. This pretextual "noncompliance" letter does not provide the City with the procedural protections to which it is entitled.

169.    Under 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the FEMA money grab violates the APA because it is without observance of procedure required by law.

170.    Under 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that FEMA's withholding of SSP 24 and SSP23 funding violates the APA because it is it is without observance of procedure required by law.

171.    In addition, Plaintiff is entitled to additional appropriate relief under 5 U.S.C. § 705 including (1) ordering Defendants to reverse the FEMA money grab by returning the $80 million to the City's bank account; (2) enjoining Defendants from taking any further money from any City bank account in connection with the SSP24 and SSP23 FEMA grants; and (3) enjoining Defendants from implementing the withholding of SSP24 and SSP23 funds. Plaintiff seeks preliminary relief with respect to (1) and (2).

**Count IV**
**Violation of Due Process**
**(Against All Defendants)**

172.    The City repeats and realleges all paragraphs above as if fully set forth herein.

173.    Under the Due Process Clause of the Fifth Amendment of the United States Constitution, the government may not deprive a person or entity of a protected property interest without due process of law.

174.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).

175.    The City has a protected property interest in the $80 million that Defendants grabbed back from the City's bank account and in the SSP23 funds it has been awarded and which have been disbursed to the City.

176.    Defendants' conduct in implementing the FEMA money grab deprived the City of its property interest without providing notice or a pre-deprivation opportunity to be heard.

177.    While a post-deprivation opportunity to be heard would not be sufficient under the circumstances, Defendants have not in fact provided a genuine post-deprivation opportunity to be heard because the process being offered is pretextual and illusory. For example, while the "noncompliance" letter requests more information, that information is largely identical to the information that FEMA already reviewed and approved in connection with approving disbursements to the City for the SSP24 and SSP23 grants. Additionally, the information requested does not speak to the purported "concerns" articulated in the letter.

178.    Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the FEMA money grab and the withholding of SSP24 and SSP23 funding are contrary to law.

179.    In addition, Plaintiff is entitled to additional appropriate relief including (1) ordering Defendants to reverse the FEMA money grab by returning the $80 million to the City's bank account; (2) enjoining Defendants from taking any further money from any City bank account in connection with the SSP24 and SSP23 FEMA grants; and (3) enjoining Defendants from implementing the withholding of SSP24 and SSP23 funds. Plaintiff seeks preliminary relief with respect to (1) and (2).

### Count V
### Separation of Powers
### (Against All Defendants)

180.    The City repeats and realleges all paragraphs above as if fully set forth herein.

181.    Article I, Section 1 of the United States Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives." U.S. Const. Art. I, Sec. 1.

182.    "As Chief Justice Marshall put it, this means that 'important subjects . . . must be entirely regulated by the legislature itself,' even if Congress may leave the Executive 'to act under such general provisions to fill up the details.'" *West Virginia v. EPA*, 597 U.S. 697, 737 (2022) (Gorsuch, J., concurring) (quoting *Wayman v. Southard*, 10 Wheat. 1, 42-43, 6 L.Ed. 253 (1825)).

183.    The separation of powers doctrine thus represents perhaps the central tenet of our constitution. *See, e.g., Trump v. United States*, 603 U.S. 593, 637-38 (2024); *West Virginia v. EPA*, 597 U.S. at 723-24. Consistent with these principles, the executive acts at the lowest ebb of his constitutional authority and power when he acts contrary to the express or implied will of Congress. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

184.    FEMA's money grab and withholding of SSP24 and SSP23 funds violates the separation of powers because the executive branch has overridden the careful judgments of Congress by taking back funding and withholding funding, without legitimate basis or justification, that was specifically authorized and appropriated under the DHS Appropriations Act and was used by the City for the purposes set forth in that Act. Indeed, FEMA officials have acknowledged that they are refusing and will continue to refuse to effectuate the DHS Appropriations Act, thus acting contrary to law.

185.    Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the FEMA money grab and the withholding of SSP24 and SSP23 funding are contrary to law.

186.    In addition, Plaintiff is entitled to additional appropriate relief including (1) ordering Defendants to reverse the FEMA money grab by returning the $80 million to the City's bank account; (2) enjoining Defendants from taking any further money from any City bank account in connection with the SSP24 and SSP23 FEMA grants; and (3) enjoining Defendants from implementing the withholding of SSP24 and SSP23 funds. Plaintiff seeks preliminary relief with respect to (1) and (2).

### Count VI
### Spending Clause
### (Against All Defendants)

187.    The City repeats and realleges all paragraphs above as if fully set forth herein.

188.    The Spending Clause provides that Congress—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . . ." U.S. Const. Art. I, Sec. 8, clause 1.

189.    "Congress' power to legislate under the spending power is broad," but conditions on funding must be "unambiguous[]" and they cannot "surprise[] participating States [or localities] with post acceptance or 'retroactive' conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981). States and localities must have fair notice of conditions, and once funds have been accepted pursuant to a federal spending program, the Federal government cannot alter the conditions attached to those funds so significantly as to "accomplish[ ] a shift in kind, not merely degree." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 583-84 (2012).

190.    Furthermore, conditions must be "reasonably related to the purpose of the expenditure." *New York v. United States*, 505 U.S. 144, 172 (1992) (*citing Mass. v. United States*, 435 U.S. 444 (1978)).

191.    FEMA's money grab and withholding violate the Spending Clause because the executive branch has overridden the careful judgments of Congress by imposing purported new conditions and requirements on SSP funding that are inconsistent with the DHS Appropriations Act, the SSP Award Letters, the NOFOs and the Code of Federal Regulations as incorporated by reference into the SSP grant documents.

192.    Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the money grab and the withholding of SSP24 and SSP23 funding are contrary to law.

193.    In addition, Plaintiff is entitled to additional appropriate relief including (1) ordering Defendants to reverse the FEMA money grab by returning the $80 million to the City's bank account; (2) enjoining Defendants from taking any further money from any City bank account in connection with the SSP24 and SSP23 FEMA grants; and (3) enjoining Defendants from implementing the withholding of SSP24 and SSP23 funds. Plaintiff seeks preliminary relief with respect to (1) and (2).

## **PRAYER FOR RELIEF**

**WHEREFORE**, the City demands judgment against Defendants:

   (a) Declaring unlawful and setting aside the SSP24 $80 million money grab as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A); as contrary to constitutional right, power, privilege, or immunity under 5 U.S.C. § 706(2)(B); as in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C.

§ 706(2)(C); and without observance of procedure required by law under 5 U.S.C

§ 706(2)(D) and a violation of the Due Process Clause, the separation of powers,

and the Spending Clause of the United States Constitution;

(b) Issuing a temporary restraining order and preliminary and permanent injunction

ordering Defendants to reverse the SSP24 $80 million money grab by returning

the $80 million to the City's bank account;

(c) Issuing a temporary restraining order and preliminary and permanent injunction

enjoining Defendants and their officers, employees, and agents from taking any

further grant money from any City bank account in connection with SSP24 and

SSP23 FEMA grants;

(d) Declaring unlawful and setting aside the February 18, 2025 FEMA Remedy for

Noncompliance Letter withholding funding as arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A);

as contrary to constitutional right, power, privilege, or immunity under 5 U.S.C.

§ 706(2)(B); as in excess of statutory jurisdiction, authority, or limitations, or

short of statutory right under 5 U.S.C. § 706(2)(C); and without observance of

procedure required by law under 5 U.S.C § 706(2)(D) and a violation of the Due

Process Clause, the separation of powers, and the Spending Clause of the United

States Constitution;

(e)  Awarding Plaintiff its costs and attorneys' fees in this action, and other

disbursements as appropriate; and

(f)  Granting such other relief as this Court may deem just and proper.

Dated:          New York, New York
                February 21, 2025

> **MURIEL GOODE-TRUFANT**
> Corporation Counsel of
>   the City of New York
> *Attorney for Plaintiff The City of New York*
> 100 Church Street
> New York, NY 10007
> (212) 356-1000
>
>
> By: _____
>         Joshua Rubin
>         Doris Bernhardt
>         Melanie Ash
>         June R. Buch
>         Aatif Iqbal
>         Gail Rubin
>         Elizabeth Slater
>
>         Assistant Corporation Counsels