UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------

THE CITY OF NEW YORK,

                                        Plaintiff,

                    v.

DONALD TRUMP, in his official capacity as President of
the United States; *et al*.

                                        Defendants.

------------------------------------------------------------------------

Case No. 25-cv-1510


**PLAINTIFF CITY OF NEW YORK'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND A TEMPORARY
RESTRAINING ORDER UNDER FEDERAL RULE OF CIVIL PROCEDURE 65**


Dated: New York, New York
    February 21, 2025

MURIEL GOODE-TRUFANT
Corporation Counsel of
 the City of New York
100 Church Street
New York, New York 10007
(212) 356-1000

*Attorney for Plaintiff*

## TABLE OF CONTENTS

Table of Authorities ................................................................................................ iii

Preliminary Statement ............................................................................................. 1

Facts ........................................................................................................................ 2

    A.    Congressional Authorization for SSP Funding ....................................... 3

    B.    The City's Awarded SSP Grants .......................................................... 3

    C.    Information Provided to FEMA by the City .......................................... 4

    D.    Defendants' Money Grab ..................................................................... 5

    E.    Defendants' Statements About the Money Grab ................................. 5

    G.    The "Noncompliance" Letter ............................................................... 8

    H.    Harm to the City .................................................................................. 9

Argument ............................................................................................................... 10

    A.    This Court Should Preliminarily Enjoin Defendants and Grant a Temporary Restraining Order Directing Defendants to Restore the Funds and Enjoining Them From Taking Back City Funds in the Future ................................ 10

    B.    Plaintiff has a Clear and Substantial Likelihood of Success on the Merits .......... 11

    C.    The City Will Suffer Irreparable Harm in the Absence of Injunctive Relief ......... 19

    D.    The Public Interest and the Equities Strongly Favor the City .............................. 21

Conclusion ............................................................................................................. 22

Certificate of Compliance with Local Rule ........................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AFA Dispensing Group B.V. v. Anheuser-Busch, Inc.*,
  740 F. Supp. 2d 465 (S.D.N.Y. 2010)....................................................................11

*Bowen v. Georgetown Univ. Hosp.*,
  488 U.S. 204 (1988)..........................................................................................14

*City of Houston v. Dep't of Hous. & Urban Dev.*,
  24 F.3d 1421 (D.C. Cir. 1994)..........................................................................19

*Cty. of Nassau v. Leavitt*,
  No. 07-816, 2009 U.S. Dist. LEXIS 142104 (E.D.N.Y. Mar. 31, 2009)................19

*Cty. of Suffolk v. Sebelius*,
  605 F.3d 135 (2d Cir. 2020)..............................................................................19

*Dep't of Commerce v. New York*,
  588 U.S. 752 (2019)..........................................................................................12

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020)..............................................................................................22

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021)..........................................................................................12

*Jacksonville Port Auth. v. Adams*,
  556 F.2d 52 (D.C. Cir. 1977)........................................................................20, 21

*Jones v. Wolf*,
  467 F. Supp. 3d 74 (W.D.N.Y. 2020)..................................................................20

*Landgraf v. USI Film Prods.*,
  511 U.S. 244 (1994)..........................................................................................14

*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016)..............................................................................21

*Libertarian Party v. Lamont*,
  977 F.3d 173 (2d Cir. 2020)..............................................................................11

*Loper Bright Enterprises v. Raimondo*,
  603 U.S. 369 (2024)..........................................................................................14

*Mastrovincenzo v. City of New York,*
    435 F.3d 78 (2d Cir. 2006)................................................................................11

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)..........................................................................................12

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012)........................................................................................17

*New York v. Trump,*
    No. 25-cv-39-JJM-PAS, 2025 U.S. Dist. LEXIS 17593 (D.R.I. Jan. 31, 2025).................9, 14

*New York v. U.S. Dep't of Homeland Sec.,*
    969 F. 3d 42 (2d Cir. 2020)...................................................................11, 18, 21

*Nken v. Holder,*
    556 U.S. 418 (2009)........................................................................................11

*Office of Pers. Mgmt. v. Richmond,*
    496 U.S. 414 (1990)........................................................................................20

*Pennhurst State Sch. & Hosp. v. Halderman,*
    451 U.S. 1 (1981)............................................................................................17

*Pharaohs GC, Inc. v. U.S. SBA,*
    990 F.3d 217 (2d Cir. 2021)............................................................................11

*Rochester Pure Waters Dist. v. EPA,*
    960 F.2d 280 (D.C. Cir. 1992)..................................................................19, 20

*Tom Doherty Assocs. v. Saban Entm't, Inc.,*
    60 F.3d 27 (2d Cir. 1995)................................................................................11

*Train v. City of New York,*
    420 U.S. 35 (1975)..........................................................................................16

*Trump v. Int'l Refugee Assistance Project,*
    137 S. Ct. 2080 (2017)....................................................................................21

*Trump v. U.S.,*
    603 U.S. 593 (2024)........................................................................................16

*West Virginia v. EPA,*
    597 U.S. 697 (2022)........................................................................................16

*Winter v. NRDC, Inc.,*
    555 U.S. 7 (2008)....................................................................................11, 18

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) (Jackson, J., concurring)........................................................................16

**Statutes**

5 U.S.C. § 702........................................................................................................................18

5 U.S.C. § 706..........................................................................................................1, 12, 14, 15

Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*............................................................11

Department of Homeland Security Appropriations Act, 2023, Pub. L. No. 117-
    328, 136 Stat. 4730 (2022)....................................................................................................3

Department of Homeland Security Appropriations Act, 2024, Pub. L. No. 118-47,
    138 Stat. 598 (2024)....................................................................................3, 15, 16, 17

**Other Authorities**

2 C.F.R § 200.100 *et seq.*..................................................................................7, 14, 15, 17

2 C.F.R. § 200.208................................................................................................................15

2 C.F.R. § 200.339................................................................................................................15

2 C.F.R. § 200.342................................................................................................................15

2 C.F.R. § 200.345................................................................................................................15

U.S. Const. Art. I, Sec. 1......................................................................................................16

U.S. Const. Art. I, Sec. 8, clause 1......................................................................................17

## PRELIMINARY STATEMENT

On February 11, 2025, Defendants removed over $80 million in grant funds from the City of New York's ("City") bank account without any notice whatsoever. Those funds were reimbursement for expenditures the City incurred, under the Federal Emergency Management Agency's ("FEMA") Shelter and Services Program ("SSP"), to provide shelter and other services to non-citizens that the United States Department of Homeland Security ("DHS") released from detention and into the community. Moreover, FEMA awarded and paid the funds in accordance with Congressional authorization, whose purpose was to allow DHS to reduce crowding in its detention facilities by providing financial support to border communities that provided services to migrants, including cities in Texas and Arizona, and other locales that experienced large influxes of migrants, including the City. In sum, without any authority, Defendants deprived the City of funds to which it was in every respect entitled.

This money grab was a lawless agency action that failed to comply in any respect with the procedural and substantive requirements of the Administrative Procedure Act, 5 U.S.C. § 706. It is the very definition of government action that is arbitrary and capricious, an abuse of discretion, and contrary to law. Defendants acted in excess of any plausible statutory authority and indeed in violation of due process, the separation of powers doctrine, and the Spending Clause. They acted as if they were not governmental actors at all.

A preliminary injunction and temporary restraining order are thus essential—and amply warranted—to direct Defendants to return the money and to prevent them taking the same lawless action again. The grab-back is causing the City immediate and irreparable harm, in the loss of over $80 million in funds appropriated by Congress and approved for the City's use by FEMA. If the funds are not promptly restored to the City, they may well be unrecoverable at all because

they cannot be recovered in an action for compensatory money damages and the appropriated funds—the only source for recovery—may be exhausted, rescinded, or lapse before this action is determined. The balance of the equities weighs overwhelmingly in Plaintiff's favor: the City has a clear and substantial likelihood of success on the merits of its claims, and, without a mandatory preliminary injunction requiring the return of the money, it faces the prospect of having no available mechanism to recoup the funds. In the event Defendants are successful in their defense of this action, on the other hand, they will be able to recover the funds from the City.

An injunction also serves the public interest. Congress specifically appropriated funds to FEMA to relieve overcrowding at the border and this is exactly what the FEMA funds provided to the City were intended to do; they enabled the City to provide shelter and services to migrants released by DHS, who made their way to the City. These grant funds were also paid after FEMA had approved the City's intended use of the funds and the actual documented expenditures. While the City is acting in the public interest, Defendants most definitively are not—in grabbing back these allocated and approved funds, they are intentionally thwarting Congress's intent.

Plaintiff thus respectfully requests that this Court schedule a hearing on this matter as soon as counsel may be heard and that pursuant to Federal Rule of Civil Procedure 65, grant the City a preliminary injunction pending the determination of the merits of this action and for the issuance of a temporary restraining order pending the hearing on the motion, ordering Defendants to reverse their removal of over $80 million from the City's bank account and enjoining Defendants from taking any further grant money from the City's bank account.

## FACTS

The relevant facts are set forth in the accompanying Declaration of Jacques Jiha, Director of the New York City Office of Management and Budget ("City OMB"), dated Feb. 21, 2025

("Jiha Decl.") and Declaration of Joshua Rubin, dated Feb. 20, 2025 ("Rubin Decl.") and are summarized below.

### A. Congressional Authorization for SSP Funding

In 2023, Congress authorized FEMA and U.S. Customs and Border Protection ("CBP") to establish SSP. Department of Homeland Security Appropriations Act, 2023, Pub. L. No. 117-328, Title II, 136 Stat. 4730 (2022). Congress authorized continued funding for the program in 2024 of $650,000,000 through the Department of Homeland Security Appropriations Act (the "DHS Appropriations Act"). DHS Appropriations Act, Pub. L. No. 118-47, 138 Stat. 598 (2024) The stated purpose of SSP is "to support sheltering and related activities provided by non-Federal entities, in support of relieving overcrowding in short-term holding facilities of U.S. Customs and Border Protection." *Id*. To that end, the program reimburses non-federal entities providing shelter and related activities to noncitizen migrants following their release from DHS. *Id.*

### B. The City's Awarded SSP Grants

On June 12, 2023, FEMA issued a Notice of Funding Opportunity ("NOFO") for SSP funding for Fiscal Year 2023 (the "SSP23 NOFO"). Jiha Decl. ¶ 6. FEMA awarded the City $106.9 million under this grant and to date, the City has received $70.6 million in reimbursement from FEMA under this grant and may seek $36.3 million more. *Id.* ¶ 18; *see also id.*, Exs. 4 (FY23 SSP Award Letter) & 5 (FY23 SSP Award Letter Amendment).

On April 12, 2024, FEMA issued two NOFOs for localities to apply for SSP funding for Fiscal Year 2024, an an allocation grant (the "SSP-A NOFO") and a competitive grant (the "SSP-C NOFO"). *See id.* ¶ 8. FEMA awarded the City a total of $ 81,471,963.07. For the SSP-A grant, the City was awarded $59,302,125.07 and for the SSP-C grant, the City was awarded $22,269,838. *Id.* ¶¶ 29-30; *see also id.*, Exs. 10 (SSP-A Award Notice) & Ex. 13 (SSP-C Award Notice). On

February 4, 2025, the City received payments under both grants for a total of approximately $80.4 million, leaving approximately $1 million from which the City may seek additional reimbursements. *Id.* ¶ 38.

### C. Information Provided to FEMA by the City

In connection with its SSP grant applications, the City through its Office of Management and Budget ("OMB") submitted documentation including a budget specifying the costs for which the City would seek reimbursement under the grants. These costs encompassed lodging, meals, medical costs, case coordination, and security. *Id.* ¶¶ 18, 20-26. The City specified the rate of reimbursement sought for each cost, including $62.19 per person per night for lodging at hotels under the SSP24 grant. *Id.* ¶ 25. The City also specified the number of noncitizen migrants it anticipated serving and identified each hotel, motel, and facility that the City intended to use, including a location called the Roosevelt Hotel. *Id.* ¶ 26. FEMA approved the budget.

In September 2024 FEMA conducted a joint financial and programming site visit. Jiha Decl. ¶ 21-22. As part of the visit, officials from FEMA and the CBP toured the Roosevelt Hotel and another facility. FEMA officials also visited the Roosevelt Hotel on September 26, 2024. *Id.* The site visits did not produce any objection to the City's use of the hotel. *Id.*

In requesting reimbursement under the SSP grants, City OMB provided FEMA with even more documentation, including a detailed cost summary, proof of expenditures including invoices and proofs of payment, and the names, A-Numbers, and DHS release dates for the individuals for whom the City provided shelter and services. *Id.* ¶ 15, 35

FEMA's decision to award funding to the City and its subsequent payments—made following its review of the City's detailed submissions—constituted a determination that the costs, the City incurred in providing shelter and services to noncitizen migrants released by DHS were

indeed eligible for reimbursement.

### D. Defendants' Money Grab

On Wednesday, February 12, 2025, City OMB learned from the City's Department of Finance that at 4:03 pm on February 11, 2025, $80,481,861.42 had been removed from the City's central treasury account where the SSP funds had been deposited on February 4, 2025. *Id.* ¶ 41. The amount removed constitutes the entire amount that FEMA had approved for reimbursement and disbursed to the City for the SSP-A and SSP-C grants combined. *Id.* ¶ 42. Prior to removing the funds, FEMA did not follow any of the requirements in the NOFOs or the regulations set forth in 2 C.F.R 200.100 *et seq.*, which are incorporated into the grant documents by reference. *See* Jiha Decl. Ex. 2 (SSP-A NOFO) at 50; *id.*, Ex. 3 (SSP-C NOFO) at 45. Those requirements not only include providing notice but an opportunity to object. *See e.g.* 2 C.F.R. §§ 200.208 (d); 200.342.

### E. Defendants' Statements About the Money Grab

Outside the grant administration process, however, Elon Musk ("Musk"), who is purportedly leading the Department of Government Efficiency ("DOGE"), Defendant Kristi Noem, the Secretary of the Department of Homeland Security, and Defendant Cameron Hamilton, the Senior Official Performing the Duties of the FEMA Administrator ("Administrator Hamilton"), made public statements opposing the SSP and touting the money grab.

On February 10, 2025, both Musk and Administrator Hamilton posted messages on the social media platform "X" stating that there would be a "clawback demand" for the City's SSP funds because the funds were used to provide shelter for "illegal migrants" at "high end hotels" "in violat[ion] of the law." Rubin Decl. ¶¶ 6-7. All of these assertions were unsupported. As noted above, *supra* Parts A-D, the City's SSP funds were used to shelter non-citizen migrants released into the community by DHS. FEMA had approved the per diem rates in advance of the City seeking

reimbursement. And FEMA awarded the money to the City in accordance with the authority given to it by Congress to provide funds to "non-federal" entities as part of SSP.

Administrator Hamilton acknowledged as much in a subsequent "X" post, stating that "Congress should never have passed bills asking FEMA to do this work. This stops now." *Id.* ¶ 8. But he offered no basis on which FEMA could refuse to abide by Congress's legislation creating the grant program and appropriating funds for it—let alone on what basis FEMA could simply grab funds out of the City's bank account, without any process or findings, where FEMA had previously paid those amounts to the City after it reviewed and approved the City's expenditures for reimbursement.

### F.  FEMA "Pause[s]" SSP without Lawful Basis, but Claims in Federal Court Filings to Be Following "Applicable" Laws and Procedures

Defendants openly articulated their hostility to SSP, their unwillingness to administer the program, and their intention to take back the SSP funding. However, Defendants are subject to a temporary restraining order ordering them not to "pause, freeze, impede, block, cancel, or terminate Defendants' compliance with awards and obligations to provide federal financial assistance …except on the basis of the applicable authorizing statutes, regulations, and terms" and to "comply with all notice and procedural requirements in the award, agreement, or other instrument relating to decisions to stop, delay, or otherwise withhold federal financial assistance programs." *New York v. Trump*, No. 25-cv-39-JJM-PAS, 2025 U.S. Dist. LEXIS 17593 (D.R.I. Jan. 31, 2025) , ECF No. 50 (the "TRO"). That TRO was entered in a case filed by 22 states (including New York) seeking to temporarily restrain and enjoin the across-the-board pause on federal funding disbursement implemented by the Trump administration. *See generally New York v. Trump*, No. 25-cv-39-JJM-PAS (D.R.I. filed Jan. 28, 2025) (hereinafter "*New York v. Trump*").

On the evening of February 11, 2025, just hours after the money grab, several Defendants

here filed an "Emergency Motion . . . for Permission to Continue Withholding FEMA and Other Funding" in *New York v. Trump,. See* Rubin Decl., Ex. C ("Emergency Mot."). The emergency motion purported to seek confirmation that a "withholding" of FEMA funding to the City did not violate the TRO.  Without mentioning that FEMA had already taken SSP funds from the City, the emergency motion stated that "FEMA ***seeks*** to withhold Shelter and Services Program (SSP) funding based on concerns regarding the program" and "respectfully ***requests*** confirmation that Defendants may permissibly withhold certain FEMA funding, i.e., as 'a specific instance where they are acting in compliance with this Order but otherwise withholding funds due to specific authority.'" Rubin Decl., Ex. C  at 2-3 (emphasis added).

In his accompanying declaration, Administrator Hamilton omitted any mention of the money-grab and stated that the SSP funds were being "paused" because Defendants believed—based on media reports from October and November 2024 describing alleged illegal acts by people staying at hotels, in particular the Roosevelt Hotel—that the funds were being used for "illegal" activity. Declaration of Cameron Hamilton ("Hamilton Decl.") ¶ 11, *New York v. Trump*, No. 1:25-cv-00039 (D.R.I. Feb. 11, 2025), ECF No. 102-1. The Hamilton Declaration did not disclose that FEMA officials twice visited that the Roosevelt in September 2024 nor that the media articles cited in the declaration pre-dated FEMA's approval of the City's SSP grants. The Hamilton Declaration did not identify any activity by the City that was inconsistent with the terms of the SSP or unlawful, except for vague allegations of encouraging aliens to reside in the U.S., transporting illegal aliens, harboring, or aiding and abetting. *Id.* ¶ 10.  Since all the migrants for whom FEMA reimbursed the City were released into the community by DHS with an A-number and the reimbursement was for the express purpose of relieving DHS of the burden of maintaining these individuals in DHS custody, these assertions are without merit.

The Hamilton Declaration also cited news articles concerning misuses of funds by non-governmental organizations ("NGOs"), *id.* ¶ 10, and attached a January 28, 2025 Memorandum for Component and Office Heads from DHS Secretary Kristi Noem concerning funding for NGOs and directing that "all Department grant disbursements . . . that . . . touch in any way on immigration, are on hold pending review," including "the Shelter and Services Program, and any similar program." Rubin Decl., Ex. E. None of the material cited reported misuse of funds by the City.

The day after the filing of the Emergency Motion, on February 12, 2025, at 1:37 pm, Defendant DHS Secretary Kristi Noem repeated the statements in the Hamilton Declaration, that persons residing in hotels the City used to temporarily shelter non-citizen migrants committed crimes and that approved SSP funds were grabbed back from "NYC migrant hotels." Rubin Decl. ¶ 16.

### G. The "Noncompliance" Letter

More than a week after the money grab, Defendants began to manufacture a veneer of the procedural compliance that Administrator Hamilton had represented in court filings they were following. On February 19, 2025, City OMB, received a letter, dated February 18, 2025, from FEMA Administrator Hamilton with the subject-line "Remedy for Noncompliance Letter, Shelter and Services Program (SSP)." Jiha Decl., Ex. 20. The letter referenced both the SSP23 and the SSP24 grants, appearing to indicate that it was about SSP grants the City received for both years. In the letter, Administrator Hamilton purports to "notify [City OMB] that DHS/FEMA is temporarily withholding payments to [City OMB]." *Id.* at 1. The letter admits that FEMA grabbed back the SSP24 grant awards paid to the City, stating that FEMA "recovered two payments

completed via direct deposit on February 4, 2025, totaling $80,481,861.42." *Id.* The letter claims that the money grab "constitutes a part of this temporary withholding." *Id.*

The letter states that DHS "has significant concerns that SSP funding is going to entities engaged in or facilitating illegal activities." *Id.* But it does not allege any purported illegal activities committed by any entity that might have been paid with funds for which the City obtained reimbursement. Instead, the letter alleges—citing and exaggerating the same media reports that defendant Hamilton cited in his declaration a week earlier—"[f]or example, a substantial portion of your award goes to funding alien housing at the Roosevelt Hotel in New York City." *Id.*

The "noncompliance" letter goes on to allege:

> According to media reports, the vicious Venezuelan gang Tren De Aragua has taken over the hotel and is using it as a recruiting center and base of operations to plan a variety of crimes.1 According to these same reports, these crimes include gun and drug sales as well as sex trafficking, which can reasonably be presumed to be conducted in the hotel itself.

*Id.*

The letter also expresses "concern" that

> entities receiving payment under this program may be guilty of encouraging or inducing an alien to come to, enter, or reside in the United States in violation of law, 8 U.S.C. § 1324(a)(1)(A)(iv); transporting or moving illegal aliens, id. § 1324(a)(1)(A)(ii); harboring, concealing, or shielding from detection illegal aliens, id. § 1324(a)(1)(A)(iii); or applicable conspiracy, aiding or abetting, or attempt liability respecting these statutes.

*Id.* Defendants have not offered any other basis for the money-grab.

**H. Harm to the City**

The over $80 million grabbed back by Defendants is reimbursement for amounts that the City already expended in reliance on the SSP's terms, and that FEMA awarded, reviewed in detail,

approved for payment, and paid to the City. Because of Defendants' money grab, the City is at risk of losing this funding permanently even if it prevails in this lawsuit.  SSP funds could become unavailable to the City during the time it takes to decide this lawsuit, if the SSP appropriation is fully obligated (i.e. the City's funds are redistributed to other recipients) and thus exhausted; the appropriation expires; or if the appropriation is rescinded by Congress. Defendants have articulated their hostility to SSP and their desire to stop disbursing SSP funds, even if disbursement is consistent with Congressional purpose. The City, even if ultimately successful here, risks a permanent loss of these funds because of Defendants' $80 million money grab.  In addition, given that the noncompliance letter references the SSP23 grant funds for which the City was previously reimbursed, Defendants may attempt to unlawfully execute another money grab for the SSP23 funds.  Hence the City seeks an injunction to require the repayment of the $80 million in SSP24 funds and an injunction to prevent Defendants from another money grab of the SSP23 funds.

## **ARGUMENT**

**A. This Court Should Preliminarily Enjoin Defendants and Grant a Temporary Restraining Order Directing Defendants to Restore the Funds and Enjoining Them From Taking Back City Funds in the Future**

To obtain a preliminary injunction, the movant must demonstrate (1) a likelihood of success on the merits; (2) that the movant will suffer irreparable harm in the absence of preliminary injunctive relief; (3) a balance of the equities in the movant's favor; and (4) a public interest served by issuance of a preliminary injunction. *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008); *New York v. U.S. Dep't of Homeland Sec.*, 969 F. 3d 42, 58-59 (2d Cir. 2020). The final two factors—the balance of equities and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Where, as here, the court is asked to enter a mandatory preliminary injunction against the government—commanding a positive act,

rather than seeking to maintain the status quo—the first prong of the test for injunctive relief is more exacting, requiring a showing of a 'clear' or 'substantial' likelihood of success on the merits. *Pharaohs GC, Inc. v. U.S. SBA*, 990 F.3d 217, 225 (2d Cir. 2021); *Libertarian Party v. Lamont*, 977 F.3d 173, 176-77 (2d Cir. 2020); *Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir. 2006).[1]

The standards for granting a temporary restraining order are the same as those governing preliminary injunctions. *AFA Dispensing Group B.V. v. Anheuser-Busch, Inc.,* 740 F. Supp. 2d 465 (S.D.N.Y. 2010).

**B. Plaintiff has a Clear and Substantial Likelihood of Success on the Merits**

In grabbing back funds that were used for the purposes Congress intended and that were reviewed, analyzed and determine allowable by FEMA, without providing notice or an opportunity to be heard, Defendants thumb their nose entirely at the most basic requirements for agency action under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* ("APA"). The action must be set aside as unlawful because it was plainly arbitrary and capricious and contrary to law, in violation of 5 U.S.C. § 706(2)(A). Further, it was in excess of Defendants' statutory authority and *ultra vires*. It was done without complying with any of the procedures set out in the governing grant regulations and terms and conditions. *Id.* §§ 706(A), (B), (C). Defendants grabbed back SSP funds that were used for their intended purposes because Defendants wished to thwart the Congressional purpose of the program. In doing so, Defendants violated the Separation of Powers

---

[1] This same stringent test also applies where the requested injunction would provide the plaintiff with "all the relief that is sought," and where the mandated action could not be undone by a judgment for defendant on the merits and would effectively irreversibly affect the rights of the parties. *Lamont*, 977 F.3d at 177; *Mastrovincenzo*, 435 F.3d at 90; *Tom Doherty Assocs. v. Saban Entm't, Inc.,* 60 F.3d 27, 33–34 (2d Cir. 1995). The mandatory relief the City seeks would not have that effect because the City seeks additional relief in the Complaint, i.e. to enjoin the "pause" of its SSP funding, and in the event Defendants ultimately prevail they could seek recovery of any portion of the SSP grant through lawful means.

of the United States Constitution. And, by imposing new, retroactive grant conditions, Defendants violated the Spending Clause. The Court should exercise its equitable power to enjoin federal officials who act far, far beyond the limitations imposed by federal law and the United States Constitution.

1. **Arbitrary and Capricious and Abuse of Discretion**. An agency action is arbitrary and capricious when it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The explanation must show "a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal citation omitted). The purpose of this requirement is to ensure that agencies "offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 758 (2019). Moreover, "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 50.

Defendants have offered no "genuine," "reasonable and reasonably explained" justification for their actions. Instead, federal officials have made various sensational and inaccurate statements on social media, in press releases, and in a lawsuit to which the City is not a party. *See supra*, describing statements by Elon Musk and defendant Hamilton (a "clawback demand" is required because SSP funds were "used to provide shelter for "illegal migrants" at "high end hotels" "in violat[ion] of the law"); the Hamilton Declaration (SSP funds must be paused because noncitizen migrants released by DHS committed crimes at hotel FEMA approved for lodging); and statements by Secretary Noem ("I have clawed back the full payment" to the City because noncitizen migrants released by DHS committed crimes at hotel FEMA approved for lodging). The FEMA "noncompliance" letter repeated some of the same unsupported

assertions and is no more solid than Defendants' previous public statements. None of these statements provide a legitimate basis for the money-grab, and most amount to no more than wildly inaccurate, ad hoc and/or post-hoc rationalizations,

FEMA's assertion in the "noncompliance letter" that the money-grab is justified by media reports of alleged criminal activity at a hotel that FEMA approved for lodging is particularly confounding because the media reports cited in the letter, from October and November 2024, pre-date FEMA's decision to approve and disburse the City's SSP funds on February 4, 2025; FEMA toured the hotel in question twice and did not report to the City any concerns about criminal activity, *see* Jiha Decl. ¶ 22; and no grant conditions or requirements are implicated by FEMA's supposed concern.  To the extent the "noncompliance" letter raises vague allegations of encouraging aliens to reside in the United States, transporting illegal aliens, harboring, or aiding and abetting, these assertions are unsupported: all of the migrants for whom FEMA reimbursed the City were processed and released into the United States by DHS, not the City, and the City has provided FEMA with all the required information about them under the SSP grant terms, including their names and A-Numbers.

To the extent Defendants' reason for the money-grab is their opposition to any spending under the SSP, as demonstrated in statements by defendant Hamilton in his tweets ("Congress should never have passed bills asking FEMA to do this work. This stops now") and defendant Noem ("all Department grant disbursements [to NGOs] . . . that . . . touch in any way on immigration, are on hold pending review," including SSP) that is a matter to take up with Congress, which authorized the spending, and is not a basis to take back duly approved SSP disbursements.

By no standard can any of Defendants' rationalizations be construed as a reasoned

explanation for taking back $80 million in FEMA grants from the City. Indeed, the money-grab disregarded FEMA's own review and approval of the City's grant, including its review of the grant application and budget, which specified how and for whom the grant would be used and the hotels the City would use to provide shelter and the subsequent documentation submitted by the City, which reflected actual expenditures and identified the names, A-numbers, and DHS release dates of the persons served.

The grab-back was entirely arbitrary and capricious and, to the extent Defendants had any discretion to exercise in grabbing grant funds, it was a serious abuse of discretion.

**2. <u>Contrary to Law</u>**. Defendants have no legal authority to grab back SSP funds from the City. Agency action that is contrary to "constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" is unlawful and must be set aside. 5 U.S.C. § 706(B)-(C). Agency interpretations of statutes or the Constitution are not entitled to deference. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 391 (2024) (*quoting U.S. v. Morton Salt,* 338 U.S. 632, 644 (1950)).

Congress has not delegated any authority to Defendants grab back, SSP funds that were duly approved and disbursed by the grantmaking agency in accordance with the requirements of the program. Indeed, Defendants are enjoined by TRO from withholding grant funds, including SSP grant funds, unless they follow the specific requirements of the grant. *New York v. Trump*, 2025 U.S. Dist. LEXIS 17593, at *9. Defendants have acknowledged this in their filings in *New York v. Trump*. *See* generally Rubin Decl., Ex. C ("Emergency Mot."). But, neither the SSP grant Awards, the NOFOs, nor the federal regulations applicable to the grant (2 C.F.R. §§ 200.100 *et seq*.,) permit Defendants to grab-back disbursed grant funds by reaching into the City's bank account and taking them.

To the extent the money grab was based on Defendants' professed opposition to the SSP program itself, as articulated by Administrator Hamilton in his tweets ("Congress should never have passed bills asking FEMA to do this work. This stops now.") and DHS Secretary Noem in her memo ("all Department grant disbursements [to NGOs] . . . that . . . touch in any way on immigration, are on hold pending review," including SSP), the money grab not only lacked statutory authority, it is a disfavored retroactive action that impaired rights the City possessed with respect to the SSP grants. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988); *Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994). The City applied for and was granted the SSP funding to provide shelter and other services to noncitizens encountered and released by DHS into the community under a clear set of requirements and procedures, with which it has complied.

No statute gives Defendants the authority to retroactively reverse grants based on a new policy preference or outside of the prescribed processes for recovering grant funds.

**3. <u>Procedural Violations and Due Process</u>.** The FEMA money grab was lawless agency action, implemented without any adherence to "procedure required by law." 5 U.S.C. § 706(2)(D). There is no "procedure" under applicable law—not the DHS Appropriations Act, the SSP Award Letters, the NOFOs, nor 2 C.F.R. 200.100 *et seq.*—that would enable Defendants to reach in to the City's bank account and take funds that were already approved and disbursed by FEMA to the City pursuant to and in accordance with the SSP grants' terms and conditions, without any notice or opportunity to contest the action. Defendants simply did it.

The February 19, 2025 "noncompliance" letter was not the required notice, with opportunity to contest; it was a pretextual attempt to salvage Defendants' lawless action. Not only did the letter fail to identify any actual "noncompliance," or even any genuine concerns of noncompliance, *see supra*, it also failed to cite any authority that would permit a money grab

like this.  Instead, the letter falsely characterized the grab-back of $80 million as a "withholding" of funds and cited various provisions of the Code of Federal Regulations that permit temporary withholdings and suspensions of funding.  *See* Jiha Decl., Ex. 20 (Noncompliance Letter) at 1, citing 2 C.F.R. 2 C.F.R. §§ 200.208, 200.339(a), 200§ 200.342.  But, a grab-back of funding that has already been approved and disbursed into a grantees bank account is not the same as withholding funds that have not yet been approved and disbursed.  And Defendants cite no authority at all to justify their money-grab.

Defendants eschewed the use of any lawful procedures and took over $80 million from the City without warning, in violation of the procedural requirements of the APA. For the same reasons the Defendants' conduct violated the APA, it also violates the Due Process Clause of the United States Constitution.

**4. <u>Separation of Powers</u>**. Defendants are not authorized to grab back SSP funds from the City simply because they disagree with the goals of the program. This violates the Separation of Powers doctrine and runs roughshod over the authority of Congress.

Article I, Section 1 of the Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives." U.S. Const. Art. I, Sec. 1. The Constitution exclusively grants the power of the purse to Congress, not the President, with the executive branch possessing only such authority in relation to Federal funding that Congress has chosen to give it. The separation of powers doctrine represents perhaps the central tenet of our constitution, *see, e.g., Trump v. U.S.*, 603 U.S. 593, 637-38 (2024); *West Virginia v. EPA*, 597 U.S. 697, 723-24 (2022), and consistent with these principles, the executive acts at the lowest ebb of his constitutional authority and power when he acts contrary to the express or implied will of Congress. *Youngstown Sheet & Tube Co.*

16

*v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

Defendants have expressed hostility to the SSP and openly acknowledged that they do not see Congressional authorization of SSP as a barrier to stopping payments under the grant. FEMA Acting Administrator Hamilton posted: "Congress should never have passed bills asking FEMA to do this work. This stops now." Defendant Noem similarly directed DHS to "pause" all funding for NGOs through the SSP. Rubin Decl. Ex. E. Defendants have no authority to ignore and disregard Congressional enactments, including the DHS Appropriations Act, but in grabbing back $80 million in funding from the City that was disbursed for the purposes specified by Congress, and in accordance with all applicable grant requirements, laws, and regulations, Defendants are doing just that.

**5**. **Spending Clause**. Defendants cannot unilaterally change the terms and requirements of SSP grants in order to grab-back previously approved funding disbursed to the City. The Spending Clause of the Constitution provides that Congress—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. Art. I, Sec. 8, clause 1. "Congress' power to legislate under the spending power is broad," but conditions on funding must be "unambiguous[]" and they cannot "surprise[] participating States [or localities] with post acceptance or 'retroactive' conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981). States and localities must have fair notice of conditions on funding and once funds have been accepted pursuant to a federal spending program, however, the Federal government cannot alter the conditions attached to those funds so significantly as to "accomplish[ ] a shift in kind, not merely degree." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 583-84 (2012). The Second Circuit has held that advance notice of grant conditions may be provided by the

federal grant-making agency, rather than Congress, "as long [as] they were grounded in statutory provisions, regulations, and other guidelines provided by the Department at the time of the grant." *New York v. United States DOJ*, 951 F.3d 84, 110 (2d Cir. 2020).

Defendants have articulated various purported reasons for their money grab, *see supra*, but none of them explain why they are entitled to grab back $80 million from the City pursuant to the DHS Appropriations Act, the SSP Award Letters, the NOFOs, or 2 C.F.R. 200.100 et seq. (Indeed, the City's use of SSP funds was entirely consistent with each of these.) The "noncompliance" letter effectively places additional conditions on the City's SSP funding, by manufacturing pretexts—not based on the SSP grant terms and conditions, with which the City complied—to reverse FEMA's decision to award and disburse funds to the City. This violates the Spending Clause and is unlawful.

Furthermore, to the extent Defendants are imposing conditions to undermine SSP because they do not believe the federal government should use its resources to provide services noncitizen migrants, *see infra* (statements by Musk and defendant Hamilton concerning "house[ing] illegal immigrants" and Secretary Noem referring to "NYC migrant hotels"), this also violates the Spending Clause. Grant conditions must be rationally related to the purpose of the grant. *New York v. United States*, 505 U.S. 144, 172 (1992) (*citing Mass. v. United States*, 435 U.S. 444 (1978)). Here, the purpose of the SSP is to provide reimbursement to the City, among others, for providing shelter and other services to migrant noncitizens released from detention by DHS, to relieve DHS the burden of maintaining them. Defendants cannot impose new requirements on SSP that undermine the grant's very purpose.

In sum, the City has a clear, substantial likelihood of success on its claims that the grab-back was arbitrary and capricious and contrary to law, ultra vires, and in violation of due process,

separation of powers, and Spending Clause strictures.

## C. The City Will Suffer Irreparable Harm in the Absence of Injunctive Relief

The City will suffer irreparable harm absent injunctive relief. 555 U.S. at 20. Irreparable harm exists where it involves an "injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020) (*citing New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015)).

The injury caused by the grab-back here is neither remote, nor speculative. Rather, Defendants' surreptitious grab of over $80 million from the City's bank account constitutes a clear, significant harm: in an instant, without notice, warning, or opportunity to be heard, the City was deprived of over $80 million in funds that it reasonably and properly relied on as reimbursement to the City for its own previous expenditures.

The injury suffered is also, without question, irreparable, because the funds cannot be recovered in an action for compensatory money damages. The loss of funding can be remedied only by an action to restore the funds themselves under the APA. As the Second Circuit has pointed out, "[B]ecause money damages are prohibited in APA actions, they are irreparable." *U.S. Dep't of Homeland Sec.,* 969 F.3d at 86; *see* 5 U.S.C. § 702.

The unavailability of money damages poses an even more heightened risk where, as here, the funds were granted under an appropriation that may be exhausted, lapse, or be rescinded before this action is decided. "Funds appropriated for an agency's use can become unavailable in three circumstances: if the appropriation lapses; if the funds have already been awarded to other recipients; or if Congress rescinds the appropriation." *City of Houston v. Dep't of Hous. & Urban Dev.,* 24 F.3d 1421, 1426 (D.C. Cir. 1994). At any moment, whether through the allocation or

reallocation by FEMA of all of the available appropriated funds (including the seized funds), the expiration of the Congressional appropriation for the funds, or by virtue of Congressional action to rescind the appropriation before it expires, the City can be deprived of the ability to obtain any remedy whatsoever.

In fact, the very precariousness of litigation concerning Congressionally appropriated funds creates irreparable harm, leading courts to rule, for example, that "to avoid having its case mooted [due to the unavailability of a remedy], a plaintiff must both file its suit before the relevant appropriation lapses and seek a preliminary injunction preventing the agency from disbursing those funds." *Id*. at 1427 ("[W]hen an appropriation has lapsed or has been fully obligated, federal courts cannot order the expenditure of funds that were covered by that appropriation."). Thus, the Second Circuit has held that in order to preserve the funds, the plaintiff must not only seek a preliminary injunction before the relevant appropriation is exhausted—it must also obtain the injunction. *Cty. of Suffolk v. Sebelius*, 605 F.3d 135, 142 (2d Cir. 2020); *see also Rochester Pure Waters Dist. v. EPA*, 960 F.2d 280 (D.C. Cir. 1992); *Cty. of Nassau v. Leavitt*, No. 07-816, 2009 U.S. Dist. LEXIS 142104 (E.D.N.Y. Mar. 31, 2009). The same logic applies here, where the funds could become unavailable through exhaustion, lapse or recission.

Injunctive relief is thus required to ensure that there are remedies available to the City in this litigation and that its ability to be made whole does not disappear while the Court considers its claims.  In order to preserve the availability of remedies here, the over $80 million in grabbed back funds must be ordered returned to the City's accounts immediately through mandatory injunctive relief, before they effectively disappear through the exhaustion of the funds, or the lapse or rescission of the appropriation by Congress. Once any of those take place, the funds will be forever lost to the City, unreachable even by this Court.  In fact, the court's failure to preserve

a plaintiff's rights unequivocally with a TRO, in the face of the potential impossibility of recovery, constitutes an abuse of discretion. *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 57-58 (D.C. Cir. 1977) (holding that a TRO should have been issued due to the pending expiration of an agency's ability to obligate appropriated funds); *Rochester,* 960 F.2d at 184 ("It is beyond dispute that a federal court cannot order the obligation of funds for which there is no appropriation. Nor can it be contended that a court may appropriate funds from which an obligation may be made."); *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990).

Given that the "noncompliance" letter references the SSP23 grant, for which the City was previously reimbursed, the Defendants must also be barred from unlawfully executing another money-grab.

**D.  The Public Interest and the Equities Strongly Favor the City**

As noted above, when the government is a party, "the final two factors in the temporary restraining order analysis—the balance of the equities and the public interest—merge." *Jones v. Wolf*, 467 F. Supp. 3d 74, 93-94 (W.D.N.Y. 2020) (*citing Planned Parenthood of N.Y.C., Inc. v. U.S. Dep't of Health & Hum. Servs.,* 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018))*; U.S. Dep't of Homeland Sec.*, 969 F.3d at 86. The purpose of interim equitable relief "is not to conclusively determine the rights of the parties . . . but to balance the equities as the litigation moves forward," bearing in mind "'the overall public interest.'" *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017) (quoting *Winter,* 555 U.S. at 26). These factors weigh overwhelmingly in the City's favor.

It is evident that "[t]here is generally no public interest in the perpetuation of an unlawful agency action. To the contrary, there is a substantial public interest in having government agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of*

*U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citation and internal quotations omitted). With respect to appropriated funds, where Congress has made purposeful choices about what should be funded, "there is an overriding public interest both in the particular facet determined by Congress, in the evenhanded distribution of the . . . funds, and in the general importance of an agency's faithful adherence to its statutory mandate." *Jacksonville Port Auth. v. Adams*, 556 F.2d at 59.

This same public interest applies in the instant case. Congress made a considered decision to appropriate funds to reimburse localities for the provision of shelter and necessary services to non-citizen migrants recently encountered and released by DHS into the community. FEMA adhered to that mandate in awarding funds to the City, all of which was in furtherance of the public interest, as determined by Congress, in ensuring that the released migrants received basic care and services for a limited period following their release by DHS into the community. In contrast, the public interest is most assuredly not served by Defendants' abrupt, baseless reversal of $80 million intended to reimburse the City for approved, documented expenditures. The public has no interest in an agency action taken without rhyme or reason or due notice and process. Nor does the public interest lie where such agency action leads to an unrecoverable shortfall in funding for services the City provided to DHS.

## **CONCLUSION**

"[P]articularly when so much is at stake, [] 'the Government should turn square corners in dealing with the people.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 24 (2020) (quoting *St. Regis Paper Co. v. U.S.*, 368 U.S. 208, 229 (1961) (Black, J., dissenting)). Here, the executive branch of the Federal government has overstepped the bounds of its authority through arbitrary and capricious, unmoored decision-making, to the City's great harm. For these

reasons, Plaintiff respectfully requests a temporary restraining order and entry of a mandatory preliminary injunction pending the judgment in this action.

Respectfully submitted,

**MURIEL GOODE-TRUFANT**
Corporation Counsel of
   the City of New York
*Attorney for Plaintiff The City of New York*
100 Church Street
New York, NY 10007
(212) 356-1000


By:        *s/Doris Bernhardt*
        Joshua Rubin
        Doris Bernhardt
        Melanie Ash
        June R. Buch
        Aatif Iqbal
        Gail Rubin
        Elizabeth Slater

        Assistant Corporation Counsels

### <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE</u>

As required by Local Civil Rule 7.1(c), I certify that the document contains 7134 words, excluding the parts of the document that are exempted by Local Civil Rule 7.1(c) ("These limits do not include the caption, any index, table of contents, table of authorities, signature blocks, or any required certificates, but do include material contained in footnotes or endnotes.").

*s/Doris Bernhardt*
Doris Bernhardt