**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| THE CITY OF NEW YORK,<br><br>                    *Plaintiff*,<br><br>        v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>                    *Defendants*. |

Case No. 1:25-cv-01510-JHR

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR**
**PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................**Error! Bookmark not defined.**

BACKGROUND ........................................................................**Error! Bookmark not defined.**

    I.   The Shelter and Services Program. ..................................**Error! Bookmark not defined.**

    II.   The Roosevelt Hotel ...................................................................................... 5

    III.   Plaintiff's Award and FEMA's Temporary Withholding of Funds. ................................... 5

    IV.   This Lawsuit. ...................................................................................... 8

LEGAL STANDARDS ...................................................................................... 8

ARGUMENT ...................................................................................... 9

    I.   Emergency Relief Is Not Warranted Because Plaintiff Makes No Showing, Much Less a Strong Showing, of Irreparable Harm. ............................................................. 9

    II.   Plaintiff Is Not Substantially Likely to Succeed on the Merits. ..... **Error! Bookmark not defined.**

        A.   Plaintiff's Claims Are Not Cognizable Under The APA ............. **Error! Bookmark not defined.**

        B.   Plaintiff Does Not Challenge Final Agency Action .......**Error! Bookmark not defined.**

        C.   Plaintiff's APA and Due Process Claims Are Not Likely to Succeed.**Error! Bookmark not defined.**

        D.   Plaintiff's Constitutional Claims Are Not Likely to Succeed ...... **Error! Bookmark not defined.**

    III.   The Equities Weigh Against Emergency Relief. ..............**Error! Bookmark not defined.**

    IV.   Relief Against The President Is Improper. ......................**Error! Bookmark not defined.**

    V.   If the Court Grants Relief, It Should Issue a Preliminary Injunction, Stay the Order, and Require Plaintiff to Submit a Bond as Security...........**Error! Bookmark not defined.**

CONCLUSION...........................................................................**Error! Bookmark not defined.**

# TABLE OF AUTHORITIES

**Cases**

*Abbot Labs v. Gardner,*
  387 U.S. 136 (1967)...................................................................................................... 16

*Am. Cyanamid Co. v. Roudebush,*
  411 F. Supp. 1220 (S.D.N.Y. 1976) ............................................................................... 15

*Ass'n of Proprietary Colleges v. Duncan,*
  107 F. Supp. 3d 332 (S.D.N.Y. 2015) ............................................................................ 19

*Bennett v. Spear,*
  520 U.S. 154 (1997)........................................................................................................ 15

*Benson v. Sebelius,*
  771 F. Supp. 2d 68 (D.C. Cir. 2011) .............................................................................. 19

*Catanzaro v. Weiden,*
  188 F.3d 56 (2d Cir. 1999) ............................................................................................. 20

*Callahan v. Carey,*
  N.Y.L.J. Dec. 11, 1979 (N.Y. Sup. Ct. Dec. 11, 1979)................................................. 14

*City of Houston v. Dep't of Hous. & Urb. Dev.,*
  24 F.3d 1421 (D.C. Cir. 1994) ................................................................................... 11, 12

*City of Los Angeles v. Lyons,*
  461 U.S. 95 (1983).......................................................................................................... 13

*City of Newburgh v. Sarna,*
  690 F. Supp. 2d 136 (S.D.N.Y. 2010) ............................................................................. 9

*Cnty. of Suffolk v. Sebelius,*
  605 F.3d 135 (2d Cir. 2010) ........................................................................................... 12

*Cnty. of Westchester v. U.S. Dep't of Hous. & Urb. Dev.,*
  802 F.3d 413 (2d Cir. 2015) ...................................................................................... 10, 12

*Dalton v. Spencer,*
  511 U.S. 462 (1994)........................................................................................................ 22

*Dep't of Commerce v. New York,*
  588 U.S. 752 (2019)........................................................................................................ 21

*Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Local Lodge 207 v. Ctr. for
  Biological Diversity,*
  18 F.4th 38 (1st Cir. 2021) ............................................................................................. 25

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ........................................................................................ 20

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ........................................................................................ 26

*Freedom Holdings, Inc. v. Spitzer*,
    408 F.3d 112 (2d Cir. 2005) ........................................................................ 9, 12

*Holy Spirit Ass'n for the Unification of World Christianity v. Town of New Castle*,
    480 F. Supp. 1212 (S.D.N.Y. 1979) ................................................................ 9

*Larson v. United States*,
    888 F.3d 578 (2d Cir. 2018) .......................................................................... 15

*Ledbetter v. Shalala*,
    986 F.2d 428 (11th Cir. 1993) ....................................................................... 18

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
    591 U.S. 657 (2020) ........................................................................................ 20

*Lopez Bello v. Smith*,
    651 F. Supp. 3d 20 (D.D.C. 2022) .................................................................. 20

*Maine Cmty. Health Options v. United States*,
    590 U.S. 296 (2020) ........................................................................................ 10

*Mallory v. Norfolk S. Ry. Co.*,
    600 U.S. 122 (2023) .......................................................................................... 4

*Maryland v. King*,
    567 U.S. 1301 (2012) ...................................................................................... 25

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ........................................................................................ 17

*McGee v. Mathis*,
    71 U.S. 143 (1866) .......................................................................................... 23

*Mississippi v. Johnson*,
    71 U.S. 475 (1866) .......................................................................................... 26

*Missouri v. Biden*,
    142 S. Ct. 647 (2022) ...................................................................................... 21

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
    883 F.3d 32 (2d Cir. 2018) .............................................................................. 9

*New York ex rel. Schneiderman v. Actavis PLC*,
   787 F.3d 638 (2d Cir. 2015) ............................................................................... 9

*New York v. DOJ*,
   951 F.3d 84 (2d Cir. 2020) .......................................................................... 23, 24

*Newdow v. Roberts*,
   603 F.3d 1002 (D.C. Cir. 2010) ....................................................................... 26

*Nevin v. United States*,
   43 Fed. Cl. 151 (1999) ...................................................................................... 14

*Nken v. Holder*,
   556 U.S. 418 (2009)........................................................................................... 27

*Nokia Corp. v. InterDigital, Inc.*,
   645 F.3d 553 (2d Cir. 2011) ............................................................................. 27

*Northrop Grumman v. United States*,
   46 Fed. Cl. 622 (2000) ...................................................................................... 23

*Pennhurst State Sch. & Hosp. v. Halderman*,
   451 U.S. 1 (1981)........................................................................................... 4, 23

*Plotnick v. City of New York*,
   539 N.Y.S.2d 395 (2d Dep't 1989) ................................................................... 14

*Rason v. Nicholson*,
   562 F. Supp. 2d 153 (D.D.C. 2008) .................................................................. 20

*Seafarers Int'l Union of N. Am., AFL-CIO v. U.S. Coast Guard*,
   736 F.2d 19 (2d Cir. 1984) ............................................................................... 16

*S. Dakota v. Dole*,
   483 U.S. 203 (1987)........................................................................................... 23

*Sterling v. Deutsche Bank Nat'l Trust Co.*,
   368 F. Supp. 3d 723 (S.D.N.Y. 2019) ................................................................ 8

*Tennessee v. Becerra*,
   117 F.4th 348 (6th Cir. 2024)............................................................................ 23

*Trudeau v. FCC*,
   384 F. Supp. 2d 281 (D.D.C. 2005) .................................................................. 13

*Trump v. United States*,
   603 U.S. 593 (2024)........................................................................................... 26

*Westchester v. U.S. Dep't of Hous. & Urb. Dev.*,
  778 F.3d 412 (2d Cir. 2015) ................................................................................ 11

*Winter v. NRDC, Inc.*,
  555 U.S. 7 (2008) ................................................................................................... 8

**Statutes**

5 U.S.C. § 704 ........................................................................................................... 15

5 U.S.C. § 706 ........................................................................................................... 18

8 U.S.C. § 1225(b) ................................................................................................ 4, 14

8 U.S.C. § 1324(a)(1)(A) ............................................................................................. 7

28 U.S.C. § 1291(a)(1) .............................................................................................. 26

28 U.S.C. § 1491(a)(1) .............................................................................................. 14

31 U.S.C. § 1301(a) ..................................................................................................... 9

31 U.S.C. § 1301(c) ..................................................................................................... 9

31 U.S.C. § 1552(a) ................................................................................................... 11

31 U.S.C. § 1553(a) ................................................................................................... 11

Pub. L. No. 117-328, 136 Stat. 4459 (2022) ............................................................... 2

Pub. L. No. 118-47, 138 Stat. 460 (2024) ............................................................ 2, 10

**The Constitution**

U.S. Const. art. I, § 8, cl. 1 ........................................................................................ 23

**Rules**

Fed. R. App. P. 8(a) ................................................................................................... 27

Fed. R. Civ. P. 1 ........................................................................................................ 26

Fed. R. Civ. P. 65(c) ................................................................................................. 27

**Regulations**

2 C.F.R. Part 200 ................................................................................................... 4, 17

2 C.F.R. § 200.208 .................................................................................................... 24

2 C.F.R. § 200.208(b)(2) ..................................................................................... 21, 22

2 C.F.R. § 200.300 ................................................................................................. 17

2 C.F.R. § 200.300(a) .............................................................................................. 4

2 C.F.R. § 200.342 ................................................................................................. 19

2 C.F.R. § 200.345(a)(1) ................................................................................... 14, 15

2 C.F.R. § 200.339 ........................................................................................... 13, 17

2 C.F.R. § 200.339(a) ............................................................................................ 24

2 C.F.R. § 3002.10 .................................................................................................. 4

31 C.F.R. § 210.3(c) .............................................................................................. 18

## INTRODUCTION

Tren De Aragua is a vicious transnational gang currently designated by the U.S. government as a foreign terrorist organization.[1]  Tren De Aragua is so dangerous to the United States that Secretary of Homeland Security Kristi Noem has referred to its members as the "worst of the worst" and has prioritized space at Guantanamo Bay for its members.[2]  On its merits, this case involves a question of whether, if a federal grantee providing housing for illegal aliens allows that housing to be taken over by a terrorist organization and used as a base of operations for serious illegal activity, the federal government may pause that grantee's funding until it assures itself that the funds are not being used for or facilitating illegal activity.

The pending motion presents an even narrower question, which is whether the case should be resolved in an emergency posture that would upend the status quo.  The answer is plainly no.  This case presents no emergency and does not warrant an extraordinary remedy.  Rather, it involves the simple issue of an agency—pursuant to applicable regulations and the governing instruments—temporarily withholding funding from a grantee and acting to reverse an unauthorized payment.  That the latter action resulted in approximately $80 million being transferred from the plaintiff in this case, the City of New York, to its rightful holder, the federal government, does not an emergency make.

Indeed, that money was a reimbursement for expenditures that Plaintiff has already incurred and under fundamental principles of appropriations law, there is no realistic probability that the money will be unavailable to be disbursed to Plaintiff at the conclusion of this lawsuit in the event the city ultimately prevails, so there is no harm here.  And in any event the proper venue

---

[1] https://www.federalregister.gov/documents/2025/02/20/2025-02873/foreign-terrorist-organization-designations-of-tren-de-aragua-mara-salvatrucha-cartel-de-sinaloa.

[2] https://abcnews.go.com/Politics/1st-migrant-flight-heads-guantanamo-bay-carrying-worst/story?id=118456073; https://www.cnn.com/2025/02/21/americas/venezuelan-migrants-deported-guantanamo-bay-intl-hnk/index.html.

for any claim to reimbursement Plaintiff has is in the Court of Federal Claims.  For now, though, the only question is where the $80 million needs to reside for the duration of this case.  Because the answer to that question is plainly not with the Plaintiff, the Court should deny Plaintiff's motion for a temporary restraining order and preliminary injunction.

Plaintiff's fundamental inability to demonstrate irreparable harm is not its only problem. Plaintiff also fails to present a ripe dispute.  Indeed, it challenged a preliminary agency decision from the Federal Emergency Management Agency ("FEMA") that only pauses its receipt of the federal grant funds at issue in this lawsuit—not the kind of final agency action that is reviewable under the Administrative Procedure Act ("APA").  Plaintiff also seeks a mandatory injunction that would provide them with the ultimate relief they seek—the return of the money at issue.  That kind of request is subject to a heightened standard, and Plaintiff does not show it has a clear and substantial likelihood of prevailing on the merits.  At bottom, Plaintiff's claims fail for the central reason that FEMA has the authority to take the actions that Plaintiff challenges in this lawsuit, including reversing an erroneous payment of federal grant funds, while it looks into whether a release of those funds would be facilitating illegal activities in violation of the terms of the grant.

The Court should deny Plaintiff's motion.

## BACKGROUND

### I.     The Shelter and Services Program.

In 2023 and 2024, Congress appropriated funds to the Department of Homeland Security ("DHS") "to support sheltering and related activities provided by non-Federal entities, including facility improvements and construction, in support of relieving overcrowding in short-term holding facilities of [CBP]."  Dep't of Homeland Sec. Appropriations Act, 2023, Pub. L. No. 117-328, Div. F, 16 Stat. 4459, 4730 (2022); *see* Dep't of Homeland Sec. Appropriations Act, 2024, Pub. L. No.

118-47, Div. C, 138 Stat. 460, 598 (2024) (similar language).  As FEMA has explained, this "Shelter and Services Program," or "SSP," "makes available federal funds to eligible recipients and subrecipients for costs associated with providing shelter and other eligible services to noncitizens migrants who have been encountered and released by DHS."  Ex. 1 at 6, ECF No. 9-1.  And as DHS has further explained, these grants were a part of the Department's overall "efforts to manage and secure our borders in a safe, orderly, and humane way[, which] include support for communities."[3]  The federal government, through these grants, provided financial assistance to the grantees for certain services, and that agreement—funding for services—was memorialized in a grant agreement.

Like most federal grant funds, SSP grants are subject to the recipient's acceptance of certain terms and conditions.  In soliciting applicants for SSP funds, FEMA made clear that all such applicants "agree to comply with the requirements of this [Notice of Funding Opportunity] and the terms and conditions of the award."  *E.g.*, Ex. 2 at 21, ECF 9-2 at 21; *see also* Ex. 2  at 37, ECF No. 9-2 (requiring that recipients "accept all conditions in this [Notice of Funding Opportunity] as well as any specific terms and conditions in the Notice of Award to receive an award under this program").  SSP grant recipients must generally provide "financial and programmatic reports as a condition of award acceptance," *id*. at 41, submit to regular monitoring and oversight, *id*. at 46-48, and comply with various audit requirements, *id*. at 65-67.  And they agree that funds made available through an SSP award "may be used for the purposes set forth in this [Notice of Funding Opportunity] and the terms and conditions of the award and must be consistent with the statutory authority for the award."  *Id*. at 30.  A grant by the United States upon conditions, and the acceptance of that grant by the recipient, constitutes a contract.  *See McGee vs. Mathis*, 71 U.S.

---

3 https://www.dhs.gov/archive/news/2024/04/12/department-homeland-security-announces-300-million-direct-funding-communities.

143, 154 (1866); *cf. Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 146 (2023) (standing for the proposition that old law is still law). In accepting those federal funds, the City agreed to abide by the conditions of the grant. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). And the federal government received something of value—the City agreed to house aliens who DHS would otherwise detain under the immigration laws, *see* 8 U.S.C. § 1225(b), allowing DHS to then more efficiently use its limited resources to satisfy its obligations under the immigration laws.

The grants are also made subject to DHS Standard Terms and Conditions, which require compliance with the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards. *Id.*; *see* 2 C.F.R. Part 200 (adopted by DHS at 2 C.F.R. § 3002.10). Those regulations require agencies administering all federal award programs— including SSP—to "ensure that Federal funding is expended and associated programs are implemented in full accordance with the U.S. Constitution, applicable statutes and regulations . . . and the requirements of [2 C.F.R. Part 200]." 2 C.F.R. § 200.300(a); *see also id.* § 200.303(b) (requiring grant recipients to "[c]omply with the U.S. Constitution, Federal statutes, regulations, and the terms and conditions of the Federal award"). They also require recipients to retain records relevant to the federal award and make them available to the administering agency; and they establish a broad set of remedies that the agency can take in the event of noncompliance "with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award," *id.* § 200.339(a), including terminating the federal award, temporarily withholding funds, disallowing costs, and pursuing other legally available remedies. *See id.* §§ 200.339-200.343. As explained in the relevant notices of funding opportunities, in the event of noncompliance, FEMA may initiate

actions to "disallow costs" and "recover funds," including recovering any "improper payments." Ex. 2 at 64-65, ECF No. 9-2.

## II.     The Roosevelt Hotel

"A substantial portion of SSP money paid to New York City goes to funding alien housing at the Roosevelt Hotel in New York City," by way of a contract with the nonprofit New York City Health and hospital Corporation.  Decl. of Cameron Hamilton, Senior Official Performing the Duties of the FEMA Administrator ¶ 6 ("Hamilton Decl.," attached hereto as Ex. A).  According to media reports, Tren De Aragua has "taken over the Roosevelt Hotel and is using it as a recruiting center and base of operations to plan a variety of crimes," including "gun and drug sales as well as sex trafficking, which can reasonably be presumed to be conducted in the hotel itself."  *Id*.  And "the alien who murdered Laken Riley stayed at this hotel."  *Id*.

In addition there are "criminal investigations into many of these activities" at the Roosevelt Hotel, but the "details are law enforcement sensitive and should not be shared in a public declaration."  *Id*. ¶ 7.

## III.    Plaintiff's Award and FEMA's Temporary Withholding of Funds.

Plaintiff applied for and received SSP funding for both Fiscal Year 2023 and Fiscal Year 2024.  *See* Pl.'s Mem. of Law in Supp. of Mot. for Prelim. Inj. & TRO at 3-4, ECF No. 10 ("PI Mem.").  For 2024, FEMA approved Plaintiff for two different awards, one for $59,302,125.07, Ex. 12 at 1, ECF No. 9-12, and the other for $22,169,838, Ex. 13 at 1, ECF No. 9-13, totaling $81.4 million.  Both awards incorporate the terms of the Notices of Funding Opportunities through which Plaintiff applied and set forth standard "agreement articles," which, among other things, reaffirm the requirement that Plaintiff comply with federal grant regulations, provide DHS access to records, accounts, documents, information, facilities, and staff, and cooperate with DHS

compliance reviews and investigations.  *See* Ex. 12 at 15, ECF No. 9-12; Ex. 13 at 14, ECF No. 9-13.

Since being sworn in on January 25, 2025, the Secretary of Homeland Security has issued multiple directives addressing the agency's spending—including awards made through grant programs—to "ensure that payments made by the Department are consistent with law and do not promote fraud, waste, or abuse."  *See* Hamilton Decl. ¶ 2.  Relevant to the SSP program, the Secretary issued a memorandum on January 28, 2025 placing "on hold pending review" all grant disbursements for which "non-profit organizations are eligible" and "touch in any way on immigration."  *See* Memorandum from the Secretary for Component and Office Heads *re: Direction on Grants to Non-governmental Organizations* ("Memorandum") (Jan. 28, 2025) (Ex. 1 to Hamilton Decl.).[4]

Notwithstanding the above, on February 4, 2025, FEMA made two payments, via United States Department of the Treasury ("Treasury") direct deposit in a combined amount of approximately $80.4 million for these awards.[5]  *See* Hamilton Decl. ¶ 5.  These payments were made "in error because FEMA was under the misunderstanding" that they were allowed under the terms of the Memorandum.  *Id*. ¶ 9.  But because that Memorandum placed a hold on DHS grants and assessments that "go to non-profit organizations *or for which non-profits are eligible*" and "touch in anyway on immigration," *id*. (emphasis added), and non-profits are eligible for SSP grants, FEMA's understanding at the time it made the payment was "incorrect" and it "did not have

---

[4] As Plaintiff notes, the federal government submitted similar materials related to SSP funds in litigation challenging a broader temporary pause on government spending.  Although the court in that case denied the government's motion for permission to continue withholding SSP funds, that denial was only because such permission was not needed from the court because the hold on SSP funding was based on "the applicable authorizing statutes, regulations, and terms" and beyond the scope of the temporary restraining order entered in that case.  Order at 3-4, *New York v. Trump*, 1:25-cv-39-JJM (D.R.I. Feb. 12, 2025), ECF No. 107.

[5] The payment on February 5 covered most, but not all, of the $81.4 million fiscal year 2024 grant award, as approximately $1 million remained unreimbursed.

the authorization to make the payment." *Id*. DHS also "had significant concerns that SSP funding was going to entities engaged in or facilitating illegal activities" that were subject to criminal investigation. *Id*. ¶ 10. Accordingly, FEMA's Acting Chief Financial Officer "contacted the Treasury by telephone to inform them of the mistaken, improper payment and request assistance." *Id*. ¶ 11. After "certifying by phone that the payment was improper, FEMA submitted to Treasury an Improper Recovery Request via the Treasury Check Information System to recover the payment pursuant to 31 C.F.R. § 210.6(f)." *Id*. Treasury then "processed this request and returned the payment to FEMA as a Treasury cancellation." *Id*. ¶ 11.

On February 18, 2025, FEMA issued a "Remedy for Noncompliance Letter" regarding New York's SSP awards for both fiscal years 2023 and 2024. *See* Ex. 4 to Hamilton Decl. ("Noncompliance Letter"). The letter notified New York that FEMA would be "temporarily withholding payments" for its prior grant awards, that it had already recovered its two most recent payments (totaling approximately $80.4 million on February 7, 2025), and that going forward it would also be instituting "specific conditions" on the grant award pursuant to 2 C.F.R. § 200.208. *Id*. at 1. FEMA based these actions on "significant concerns that SSP funding is going to entities engaged in or facilitating illegal activities," providing the example of a hotel and SSP facility in New York City that is reportedly being used as a "recruiting center and base of operations" for a gang to "plan a variety of crimes," including some that can "reasonably be presumed to be conducted in the hotel itself." *Id*. at 1-2. FEMA further stated its concern that entities receiving payments pursuant to New York's SSP program may be violating immigration laws. *Id*. at 2 (citing 8 U.S.C. § 1324(a)(1)(A) and applicable conspiracy, aiding or abetting, and attempt prohibitions).

To ensure compliance going forward, and while it continues to temporarily withhold funds, FEMA stated that it would conduct additional monitoring and review of New York's award and

requested that New York submit additional information regarding the aliens serviced through New York's SSP award. *Id*. at 2. FEMA also notified New York of its right to appeal the Noncompliance Letter and encouraged it to submit a written explanation of its position and any supporting documents or statements. *Id*.

## IV.    This Lawsuit.

Plaintiff, the City of New York initiated this lawsuit on February 21, 2025, *see* Compl., ECF No. 1, and that same day moved for both a temporary restraining order and preliminary injunction. *See* ECF Nos., 3, 5, 10. Asserting claims pursuant to the APA, Due Process Clause, Spending Clause, and Separation of Powers, Plaintiff seeks injunctive relief requiring Defendants to return the $80 million that FEMA canceled and preventing Defendants from recovering any further funds issued for the 2023 and 2024 awards.

On February 24, 2025, the Court ordered Defendants to respond to Plaintiff's motion for emergency relief by February 28 at 4:00 p.m. and set a hearing for March 5 at 12:15 p.m.

## LEGAL STANDARDS

"The standard[s] for granting a temporary restraining order and a preliminary injunction . . . are identical." *Sterling v. Deutsche Bank Nat'l Trust Co.*, 368 F. Supp. 3d 723, 726-27 (S.D.N.Y. 2019). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id*. at 20.

As Plaintiff acknowledges, because it seeks a mandatory injunction that would disrupt the status quo, its request for emergency relief must "meet a heightened legal standard by showing a

clear or substantial likelihood of success on the merits." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) (quotation omitted). Plaintiff also must make a "strong showing" of irreparable harm. *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015). Similarly, because the purpose of a preliminary injunction is "not to award the movant the ultimate relief sought in the suit but is only to preserve the status quo," *City of Newburgh v. Sarna*, 690 F. Supp. 2d 136, 175 (S.D.N.Y. 2010) (quotation omitted), "[p]reliminary injunction relief is improper where it would give the plaintiff substantially all the ultimate relief it seeks," *Holy Spirit Ass'n for the Unification of World Christianity v. Town of New Castle*, 480 F. Supp. 1212, 1214 (S.D.N.Y. 1979).

## ARGUMENT

### I.  Emergency Relief Is Not Warranted Because Plaintiff Makes No Showing, Much Less a Strong Showing, of Irreparable Harm.

Plaintiff has failed to "demonstrate that . . . irreparable injury that is neither remote nor speculative, but actual and imminent." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) (internal quotations omitted). Plaintiff speculates it will suffer irreparable injury without emergency injunctive relief because the funds at issue "may be exhausted, lapse, or be rescinded before this action is decided." *See* PI Mem. at 19. That claim lacks merit and conflicts with longstanding appropriations principles.

First, the Purpose Statute, 31 U.S.C. § 1301(a), prevents the funds at issue from being spent on anything other than "the objects for which the appropriations were made." 31 U.S.C. § 1301(a). Therefore, DHS cannot spend the money at issue on anything other than "support[ing] sheltering and related activities provided by non-Federal entities, in support of relieving overcrowding in short-term holding facilities of U.S. Customs and Border Protection." *See* Pub. L. No. 118-47, Title II, 138 Stat. at 598.

Second, the funds DHS obligated to Plaintiff cannot be re-obligated to another entity or potential grantee. The $80.4 million that Plaintiff seeks was appropriated in fiscal year 2024 pursuant to DHS's annual appropriations act. *See id.* Congress generally limits the availability of appropriations to a one-year period for the fiscal year in which the funds are appropriated, unless it specifies otherwise. *See* 31 U.S.C. § 1301(c). The imposition of time limits on appropriations is one of the primary ways Congress exercises control over its Appropriations Clause power. A time-limited appropriation is thus available to incur a new obligation only during the period of time designated by Congress. *See id*. § 1502(a) (stating that "[t]he balance of an appropriation or fund limited for obligation to a definite period is available only for payment of expenses properly incurred during the period of availability").

Here, Congress stated that the funds would be available for obligation only "for the fiscal year ending September 30, 2024." *See id.*, Pub. L. No. 118-147, § 5, 138 Stat. at 461. Acting pursuant to this appropriations authority, FEMA obligated $81.4 million to the City through a series of awards during fiscal year 2024. *See* ECF No. 9-10 at 23, ECF No. 9-12 at 23, 9-13 at 24 ("Obligating Document").[6] Because the time to obligate the funds expired on September 30, 2024, DHS cannot re-award those funds to another entity or potential grantee. *See Cnty. of Westchester v. U.S. Dep't of Hous. & Urb. Dev.*, 802 F.3d 413, 417 n.10 (2d Cir. 2015) (stating that expired funds "may not be reallocated to other jurisdictions" because of the statutory restriction on new obligations); *see also* Government Accountability Office, Principles of Federal Appropriations Law at 5-6 (4th ed., 2016 rev.) ("This rule—that time-limited budget authority ceases to be available for incurring new obligations after the last day of the specified time period—has been

---

[6] An obligation is a commitment by a federal agency, such as entering into a contract, "that creates a legal liability of the government for the payment of goods and services ordered or received . . . ." *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 308 (2020) (internal quotations and citation omitted).

termed an 'elementary principle' of federal fiscal law.") (quoting *City of Houston, Texas v. Department of Housing & Urban Development,* 24 F.3d 1421, 1426 (D.C. Cir. 1994)).

Third, even though the funds at issue are not available for new obligations, DHS retains statutory authority until 2029 to disburse the obligated funds to Plaintiff.  With respect to the disbursement of funds that have been obligated to a recipient, time-limited appropriations remain available for an additional five fiscal years beyond their obligation period "for recording, adjusting, and liquidating obligations properly chargeable" to the appropriation.  31 U.S.C. § 1553(a); *see* 31 U.S.C. § 1552(a) ("On September 30th of the 5th fiscal year after the period of availability for obligation of a fixed appropriation account ends, the account shall be closed and any remaining balance (whether obligated or unobligated) in the account shall be canceled and thereafter shall not be available for obligation or expenditure for any purpose").  Because the funds at issue were obligated to Plaintiff during the one-year statutory obligation window, DHS has five additional years—until September 30, 2029—to disburse the challenged funds to Plaintiff.  *See Westchester v. U.S. Dep't of Hous. & Urb. Dev.*, 778 F.3d 412, 417 n.8 (2d Cir. 2015) (concluding that a case was not moot even though the obligation period for challenged funds had expired because the agency had five additional years to pay its obligations).  Five years is more than enough time resolve Plaintiff's claim to the funds without risk that the money will become unavailable during the pendency of this case.

For these reasons, Plaintiff misses the mark by relying on *City of Houston v. Department of Housing & Urban Development,* 24 F.3d 1421 (D.C. Cir. 1994).  *See* PI Mem. at 19-20.  There, the D.C. Circuit held that the City of Houston's claim to certain grant funds was "moot on two independent grounds."  24 F.3d at 1427.  The agency had already obligated certain funds to other grantees and the period of obligation for other funds that Houston claimed had expired before

11

Houston filed suit, such that the Court was powerless to override Congress's statutory limitation on the available obligation period.  *See id.* at 1426-27; *see also Cnty. of Suffolk v. Sebelius*, 605 F.3d 135, 141 (2d Cir. 2010) (discussing *City of Houston*).  Neither of those circumstances is present here.  The funds at issue have already been obligated to the City within the one-year statutory period of availability; this case is not a situation where multiple grantees are fighting over the same limited pot of money.  Thus the dispute here is over disbursement of the funds, which can be litigated in the normal course because of the 5-year liquidation period.  Unlike *City of Houston* and the other D.C. Circuit cases cited in Plaintiff's brief, this case does not involve a dispute over unobligated funds approaching their statutory expiration period.  Accordingly, there is no danger of this case becoming moot in the near future.  As the Second Circuit recognized in *Westchester*, a court does not need to "expeditiously" resolve a case challenging a party's entitlement to expired funds where those funds will remain available to pay the clamant for an additional 5 years after the conclusion of the obligation period.  *See Cnty. of Westchester.*, 802 F.3d at 417 n.10.

Additionally, the Court should reject Plaintiff's argument that immediate relief is needed because Congress might "rescind the appropriation" from which Plaintiff would be paid.  *See* PI Mem. at 20.  Speculation that Congress might enact a law at some point in the future that might adversely impact Plaintiff's financial interests is not the type of "actual and imminent" harm that can provide a basis for the extraordinary remedy of a temporary restraining order or preliminary injunction.  *Freedom Holdings, Inc.*, 408 F.3d at 114.  In any event, Plaintiff provides no authority for its novel position that the Court can override Congress's Appropriations Power or insulate Plaintiff from the effect of future legislation through ex ante temporary injunctive relief.

Plaintiffs also cannot establish irreparable injury based on speculation that DHS will attempt at some point in the future attempt to claw back funds previously paid to Plaintiff under the fiscal year 2023 grant award.  *See* PI Mem. at 21.  As explained above, the recent recoupment of the $80.4 million in fiscal year 2024 funds was the result of an erroneous payment that Plaintiff cannot establish that is likely to recur again.  *See* Hamilton Decl. ¶¶ 9-11.  Protective injunctive relief is not available in circumstances such as this one where the plaintiff cannot show "a sufficient likelihood that he will again be wronged in a similar way."  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (holding prospective relief unavailable based on mere speculation of future injury").

In any event, were DHS to attempt to claw back funds already paid to Plaintiff for noncompliance under the grant award, DHS would be required to follow the process outlined in 2 C.F.R. §§ 200.339 – 200.343, which requires notice and an opportunity for the grant recipient to object in writing and provide information challenging DHS's actions.  *See* 2 C.F.R. § 200.342.  Indeed, FEMA's non-compliance letter expressly referenced these provisions and noted Plaintiff's right to appeal.  *See* Noncompliance Letter.  Accordingly, there is no basis for the Court to enjoin DHS from undertaking this process by issuing an overbroad temporary restraining order that would prohibit DHS from following lawful procedures to recoup funds from Plaintiff if appropriate.

In sum, Plaintiff has not carried its burden to show that the disputed funds at issue in the case must be returned immediately to prevent irreparable injury.  This case can be litigated on a normal schedule without the need for emergency injunctive relief.

II.     **Plaintiff Is Not Substantially Likely to Succeed on the Merits.**

A.     **Plaintiff's Claims Are Not Cognizable Under The APA.**

To start, Plaintiff attempts to convert what is clearly a dispute for money damages into an APA claim.  But a suit for money damages cannot be brought under the APA—such a claim against the federal government is cognizable solely under the Tucker Act.  The Tucker Act provides the Court of Federal Claims with jurisdiction over claims against the United States founded, *inter alia*, on an express or implied contract with the United States. 28 U.S.C. § 1491(a)(1).   To establish a contract under the Tucker Act, a claimant must prove four elements: (1) lack of ambiguity in offer and acceptance; (2) mutuality of intent to contract; (3) sufficient conduct by a government representative having actual authority to bind the government in contract; and (4) consideration. *Nevin v. United States,* 43 Fed. Cl. 151 (1999).   Here, Plaintiff clearly seeks to enforce an agreement that satisfies these elements.

As discussed above, the four corners of the grant agreement clearly meet the first three prongs of the test.  And the parties both provided consideration for the agreement.  Plaintiff, of course, receives funding and support for a population who the City would otherwise be obligated to utilize City funds to house.  *See Plotnick v. City of New York*, 539 N.Y.S.2d 395 (2d Dep't 1989) ("The City of New York is mandated by law and by consent decree to provide housing to every homeless family and individual who so requests."); *Callahan v. Carey*, N.Y.L.J. Dec. 11, 1979, at 10 (N.Y. Sup. Ct. Dec. 11, 1979).  In exchange, the City commits to providing specific services pursuant to the federal government's terms and for the benefit of the federal government.  The statutory default for this population is detention, 8 U.S.C. § 1225(b), and providing housing offered an alternative that was consistent with the policies of the prior Administration.  Moreover, those

14

policies caused a significant increase in the alien population in New York, and providing federally

funded housing in New York facilitated the Administration continuation of those border policies.

**B.      Plaintiff Does Not Challenge Final Agency Action.**

Plaintiff cannot show a clear likelihood of success on the merits for the threshold reason

that its claims are not reviewable at all.  Judicial review under the APA is proper only where there

is a "final agency action for which there is no other adequate remedy."  5 U.S.C. § 704; *see Larson*

*v. United States*, 888 F.3d 578, 587 (2d Cir. 2018) ("APA review is limited to [ ] final agency

action.").  For an agency action to be "final," two conditions must be met.  *First*, "the action must

mark the consummation of the agency's decisionmaking process—it must not be of a merely

tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotation marks

and citation omitted).  *Second*, "the action must be one by which rights or obligations have been

determined, or from which legal consequences will flow."  *Id.* (quotation marks omitted).  The

final agency action requirement "not only allows the agency to apply its expertise in developing a

factual record, but also promotes efficiency by allowing the administrative proceedings to be

completed without premature interruption.  Moreover, the need for judicial review may be obviated

either by a factual determination or by the exercise of agency discretion." *Am. Cyanamid Co. v.*

*Roudebush*, 411 F. Supp. 1220, 1222 (S.D.N.Y. 1976).

Here, there is no "final agency action" because Defendants have not yet made a final

decision to withhold payments from Plaintiff on a permanent basis or take any other adverse action

against it.  Rather, in light of Defendants' concerns about Plaintiff's potential noncompliance with

its grants, Defendants will "conduct additional monitoring and review" of Plaintiff's awards.

Noncompliance Letter at 2.  "During this time, payments under the grant award(s) will be

*temporarily* held," including the approximately $80 million payment that, as discussed above, was

erroneously disbursed. *Id.* (emphasis added). To assist Defendants' monitoring, Plaintiff has 30 days to provide certain information to FEMA. Noncompliance Letter at 2. "*Upon the conclusion of that monitoring*, FEMA will notify you of the results and any other remedies for noncompliance or specific conditions, as appropriate." *Id.* at 3 (emphasis added). These passages demonstrate that the Noncompliance Letter is an initial step in FEMA's decisionmaking process—as confirmed by the fact that Plaintiff has the ability to appeal the decision within the agency. *See id.* ("Your organization has the right to appeal this action within 60 days of the date of this letter.").

To the extent that Plaintiff asserts independent constitutional claims that do not rely on the APA's cause of action, those claims are similarly unripe. *See Abbot Labs v. Gardner*, 387 U.S. 136, 148-49 (1967) (stating that the ripeness requirement "protect[s] the agencies from judicial interference until an administrative decision has been formalized"); *Seafarers Int'l Union of N. Am., AFL-CIO v. U.S. Coast Guard*, 736 F.2d 19, 26 (2d Cir. 1984) ("The law of ripeness is now very much a matter of common sense, whether one speaks in the related terms of "ripeness," of satisfying the "final agency action" requirement of the APA, or of the exhaustion requirement implicit in the APA. What these doctrines require, however they may be put, is a determination that there is a justiciable case or controversy within the prudential rules by which we are governed." (citations omitted)).

### C.     Plaintiff's APA and Due Process Claims Are Not Likely to Succeed.

In its emergency motion briefing, Plaintiff presses a grab bag of APA claims, contending that the Noncompliance Letter is "arbitrary and capricious," an "abuse of discretion," "contrary to law," and without "adherence to 'procedure required by law.'" *See* PI Mem. at 11-16. Plaintiff further argues that FEMA's alleged procedural violation "also violates the Due Process Clause." *Id*. at 16. These arguments all mischaracterize the nature of the agency's action reversing its

erroneous $80.4 million payment.  And they all fail for the same reason: FEMA is entitled to recover improper payments, temporarily withhold funds, and impose specific conditions based on a recipient's noncompliance with the terms of the grant and/or federal law.

<u>Contrary to law (PI Mem. at 14-15)</u>

Plaintiff's central contention is that "Defendants have no legal authority to grab back SSP funds from the City."  PI Mem. at 14.  But Plaintiff does not appear to dispute DHS's general authority to withhold (and recover improper) payments from grant recipients based on noncompliance with federal law.  Nor could it: the authority of federal agencies to do so is well established in the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 2 C.F.R. Part 200, which as discussed above broadly recognize agency authority to withhold, terminate, suspend, disallow, or recover federal funding.  *See* 2 C.F.R. § 200.339; 2 C.F.R. § 200.345(a)(1) (providing that the closeout of a Federal award does not affect the "right of the Federal agency . . . to disallow costs and recover funds").  The Notices of Funding Opportunities, the terms of which Plaintiff has agreed to abide by, confirms this: they state that if an award recipient is in noncompliance with, among other things, "applicable federal statutes," the agency can "take other remedies," including "actions to disallow costs, recover funds, wholly or partly suspend or terminate the award, initiate suspension and debarment proceedings, withhold further federal awards, or take other remedies that may be legally available."  *E.g.*, Ex. 2 at 64-65, ECF No. 9-2.  Expressly among the types of funds that FEMA may recover are "improper payments."  *Id*.

Plaintiff's concern, instead, is with the process FEMA used to draw back the $80 million. But as noted above, FEMA did not "grab back" funds that had been "duly approved and disbursed by the grantmaking agency," PI Mem. at 14, and thus was not required to utilize the cited

"prescribed processes for recovering grant funds,' *id*. at 15.  Rather, it was acting to cancel a payment made in error, in the same manner someone might cancel a check that had been inadvertently mailed to the wrong party.  This action is consistent with FEMA's general obligation to ensure that "Federal funding is expended . . . in full accordance with the U.S. Constitution, applicable Federal statutes and regulations," 2 C.F.R. § 200.300(a), as well as applicable Bureau of Fiscal Service regulations.   In particular, those regulations provide that all entities that participate in the Automated Clearing House (ACH) network to "originate[] or receive[] a Government entry agrees to be bound" by the regulations, 31 C.F.R. § 210.3(c), and also agrees "[t]hat the Federal Government may reverse any duplicate or erroneous entry or file as provided in § 210.6(f) of this part."  *Id*. § 210.4(b)(5); *see also id*. § 210.6(f) (permitting an agency to "reverse any duplicate or erroneous entry").  Plaintiff points to no source of law prohibiting such a limited and common sense action.  *Cf. Ledbetter v. Shalala*, 986 F.2d 428, 434 (11th Cir. 1993) ("This court finds it difficult to conceive that Congress would authorize funds for specific purposes but would provide no action to recover the funds if the fund**s** were misused or otherwise improperly spent.").  Because FEMA had authority to impose each remedy mentioned in the Noncompliance Letter, Plaintiff is not likely to show that the letter is contrary to law.

> Procedure required by law and due process (PI Mem. at 15-16)

Plaintiff's procedural APA claim—asserting that FEMA acted "without observance of procedure required by law," 5 U.S.C. § 706(D)—and due process claims are based solely on FEMA's alleged "money grab" (*i.e.*, its cancelation of payments mistakenly made).  As noted above, Plaintiff mischaracterizes the nature of FEMA's action which, properly understood, is fully consistent with applicable procedures.  The funds at issue had not "already been approved and disbursed into a grantee bank account"; rather, they were paid improperly and, once that error was

remedied, were withheld, which Plaintiff concedes is proper. *See* PI Mem. at 16. FEMA's actions to reverse the improper payment are not subject to the regulatory provisions requiring "notice, with an opportunity to contest," *id*. at 15.

In any event, even if those procedural requirements were applicable to the action that Plaintiff challenges, FEMA has followed them here. All that the regulations require is that the agency "provide the recipient with an opportunity to object and provide information challenging the action." 2 C.F.R. § 200.342. FEMA has satisfied that requirement by issuing the Noncompliance Letter, which expressly invites Plaintiff to file an administrative appeal containing such information. Plaintiff points to no source of law requiring that an agency seeking to disallow costs and recover funds improperly spent must provide advance notice before doing so. And allowing for this process to occur after the agency's recovery action is especially appropriate in this context, where the only interest Plaintiff is claiming is money, which as explained further above is "completely compensable by a post-deprivation decision." *Benson v. Sebelius*, 771 F. Supp. 2d 68, 77 (D.C. Cir. 2011) (quotations omitted).

Plaintiff asserts a due process claim but does not independently argue for a substantial likelihood of success on that claim, instead contending that FEMA has violated the Due Process Clause "[f]or the same reasons" Plaintiff contends its conduct violates the APA's procedural requirements. PI Mem. at 16. For the same reasons explained above, then, Plaintiff's claim fails. And to the extent Plaintiff contends (in its complaint) that a "pre-deprivation opportunity to be heard" was required here, Compl. ¶ 176, it is mistaken. Even setting aside that FEMA's cancelation of a mistaken payment does not affect any "deprivation" cognizable under the Due Process Clause, *see Ass'n of Proprietary Colleges. v. Duncan*, 107 F. Supp. 3d 332, 347 (S.D.N.Y. 2015) (recognizing that to have a protectable "property interest in a benefit," a person must "have

a legitimate claim of entitlement to it" (quotations omitted)), the Due Process Clause "is flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976). The Clause's requirements can be satisfied through "adequate post-deprivation remedies." *Rason v. Nicholson*, 562 F. Supp. 2d 153, 155 (D.D.C. 2008) (quotation omitted); *see Catanzaro v. Weiden*, 188 F.3d 56, 63 (2d Cir. 1999) (recognizing that post-deprivation process can be sufficient where "there is competent evidence allowing the official to reasonably believe that an emergency does in fact exist, or that affording predeprivation process would be otherwise impractical"). Here, given the fact the payment was made improperly in the first place, it was reasonable for the agency to reclaim the funds first and afterwards provide an opportunity for Plaintiff to contest its alleged noncompliance with the grant award. *Cf. López Bello v. Smith*, 651 F. Supp. 3d 20, 40 (D.D.C. 2022) (noting that pre-deprivation process may not be necessary where there is a "need to minimiz[e] the potential for asset flight").

       Arbitrary and capricious and abuse of discretion (PI Mem. at 12-14)

       Plaintiff's arbitrary-and-capricious arguments are similarly meritless and based on an improper understanding of FEMA's actions and federal grant law. Agency action must be upheld in the face of an arbitrary and capricious challenge so long as the agency "articulate[s] a satisfactory explanation for [the] action including a rational connection between the facts found and the choice made." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 682 (2020) (citation omitted). Under this deferential standard, "a court is not to substitute its judgment for that of the agency," and should uphold even a decision of "less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (citations omitted).

Here, FEMA provided a straightforward and persuasive rationale for its decision to withhold SSP funding to Plaintiff: concerns that funding was being used to violate the law and fund criminal activity. Given the express provisions in the grant regulations and Plaintiff's particular instruments authorizing such a remedy for noncompliance with the law, the agency's reasoning was anything but arbitrary. Plaintiff recognizes that agency action "must be upheld, if at all, on the basis articulated by the agency itself," PI Mem. at 12. That document, which as noted above is a first-level agency determination to temporarily withhold funding based on noncompliance with the law, not an instance of federal rulemaking with a voluminous administrative record, falls within the "zone of reasonableness," *Missouri v. Biden*, 595 U.S. 87, 96 (2022), for a decision of its kind.

Plaintiff seeks to discredit the evidence FEMA cited of criminal activity at Plaintiff's SSP facility because the media reports it relied on predated FEMA's "decision to approve and disburse the City's SSP funds." PI Mem. at 13. But as discussed above, FEMA made no such decision and released those funds in error. In any event, the APA does not require an agency to act immediately upon discovering a misuse of funds to take action against the noncompliant party. FEMA responded within a reasonable period of time and consistent with the priorities of a new presidential administration, which is not an inappropriate basis upon which to justify agency action. *See Dep't of Commerce v. New York*, 588 U.S. 752, 781 (2019) ("Agency policymaking is not a 'rarified technocratic process, unaffected by political considerations or the presence of Presidential power," and there would be nothing problematic even if an agency action were "informed by unstated considerations" of, among other things, "politics, the legislative process, public relations, [and] interest group relations.").

Finally, Plaintiff's contention that "no grant conditions or requirements are implicated" by FEMA's concern about federal funds being used to facilitate criminal activity, PI Mem. at 13, beggars belief: as discussed throughout this brief, Plaintiff's grant requires that it use federal funds in compliance with the law.

### D.    Plaintiff's Constitutional Claims Are Not Likely To Succeed.

Plaintiff asserts two additional constitutional claims, but they are in reality just variations of the argument that Defendants exceeded their statutory authority.  Not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution," *Dalton v. Spencer*, 511 U.S. 462, 472 (1994), and the above analysis defeats Plaintiff's alleged constitutional claims as well.  In any event, those claims fail on their own terms.

Separation of Powers

Plaintiff's "separation of powers" claim is based entirely on the premise that Defendants are "hostil[e]" to the SSP program itself and that the Noncompliance Letter "disregard[s] Congressional enactments."  PI Mem. at 17.  But Plaintiff does not rely on the Noncompliance Letter itself for that assertion, which includes findings specific to Plaintiff's potential misuse of federal funds.

Moreover, Plaintiff's claim assumes that the Noncompliance Letter is "contrary to the express or implied will of Congress."  *Id*. at 16.  As discussed above, that is not the case, and the Court should reject Plaintiff's attempt to constitutionalize their disagreement about the scope of FEMA's statutory authority.  Simply put, an agency does not violate the separation of powers by temporarily withholding grant funds pursuant to the express terms of federal regulations and the

express terms of a grant.  *Cf. Northrop Grumman v. United States*, 46 Fed. Cl. 622, 626 (2000) ("The Government's right to terminate a contract for convenience is broad.").

Spending Clause

Congress has the power to "lay and collect Taxes, Duties, Imports, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."  U.S. Const. art. I, § 8, cl. 1.  The Spending Clause thus allows Congress to, "fix the terms on which it shall disburse federal money to the States." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); *South Dakota v. Dole*, 483 U.S. 203, 206 (1987).  Conditions on funding must be "unambiguous[]" and they cannot "surprise[] participating States [or localities] with post acceptance or 'retroactive' conditions." *Pennhurst*, 451 U.S. at 18, 25.  However, advance notice of grant conditions may be provided by the federal grant-making agency, rather than Congress, "as long [as] they were grounded in statutory provisions, regulations, and other guidelines provided by the Department at the time of the grant." *New York v. DOJ*, 951 F.3d 84, 110 (2d Cir. 2020).

Plaintiff contends that Defendants have "violated" the Spending Clause by "imposing new, retroactive grant conditions."  PI Mem. at 12.  In particular, it argues that "Defendants cannot unilaterally change the terms and requirements of SSP grants in order to grab-back previously approved funding disbursed to the City." *Id.* at 17.  Plaintiff does not identify exactly what grant conditions are "new" and "retroactive" and therefore purportedly unconstitutional. *See id.* at 17–18.  That is not surprising because the Noncompliance Letter simply identifies conditions and remedies, outlined in federal regulations, of which Plaintiff was on notice when it accepted the SSP grants. *See Tennessee v. Becerra*, 117 F.4th 348, 361 (6th Cir. 2024) (no Spending Clause violation where recipient of funds was on clear notice that it was required to follow applicable regulatory requirements and voluntarily agreed to abide by them).

23

To the extent that Plaintiff challenges the Defendants' cancellation of the February 4, 2025, disbursement of funds in connection with the FY 2024 SSP, this event was not a grant "condition" at all. It was, instead, a correction of DHS's erroneous release of the funds in the first place. Hamilton Decl. ¶¶ 9-11.

Plaintiff's challenge to the prospective remedies outlined in the Noncompliance Letter fares no better. The Noncompliance Letter indicates that, going forward, FEMA will be: (i) temporarily withholding payments for the FY 2023 and 2024 awards, and (ii) requesting information regarding the noncitizen migrants with whom Plaintiff interacted in carrying out the scope of its awards. Noncompliance Letter at 3. The temporary withholding of payments is a remedy for noncompliance expressly authorized by regulation and referenced in Plaintiff's grant award documents—it cannot be a "condition" about which Plaintiff lacked advance notice. 2 C.F.R. § 200.339(a). And requests for information are "specific conditions" permitted by 2 C.F.R. § 200.208, which states that "[t]he Federal agency or pass-through entity may adjust specific conditions in the Federal award based on an analysis of," *inter alia*, "[t]he recipient's . . . history of compliance with the terms and conditions of Federal awards." 2 C.F.R. § 200.208(b)(2). Specific conditions "may include" "additional project monitoring." *Id.* § 200.208(c)(4). Thus, even assuming that the requests for information are "conditions" for purposes of the Spending Claims, they are consistent with the Clause's requirements.

Because Defendants have provided Plaintiff advance notice of conditions authorized by regulation, Plaintiff cannot show a clear likelihood of success on their Spending Clause claim. *New York*, 951 F.3d at 110.

24

**III.     The Equities Weigh Against Emergency Relief.**

Finally, Plaintiff cannot establish that the balance of equities and the public interest favor granting the extraordinary remedy of a preliminary injunction.  These final two factors merge in cases where relief is sought from the government.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

In arguing that the public interest weighs in their favor, Plaintiff primarily relies on the notion that it is likely to prevail on the merits and that there is no public interest in the perpetuation of unlawful agency action.  *See* PI Mem. at 21-22.  But that is just a repackaged version of Plaintiff's merits arguments, which are not likely to succeed, and not an independent basis for relief.  This is especially true given Plaintiff's nonexistent showing of irreparable harm.

Meanwhile, contrary to Plaintiff's assertions that Defendants will suffer no cognizable harm if a preliminary injunction is granted, "[a]ny time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *see also Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Local Lodge 207 v. Ctr. for Biological Diversity*, 18 F.4th 38, 47 (1st Cir. 2021) (citing same language from *King* in a decision granting a stay pending appeal of a preliminary injunction against a federal agency rulemaking).  This is especially true here, where FEMA has identified a concern that federal funds will be spent to facilitate criminal activity in violation of requirements applicable to the use of those funds.  And where the government is legally entitled to make decisions about the disbursement or allocation of federal funds but is nonetheless ordered to release the funding, such funds may not be retrievable afterwards.

IV.    **Relief Against The President Is Improper.**

Although Plaintiff has named the President as a Defendant, "courts do not have jurisdiction to enjoin [the President] . . . and have never submitted the President to declaratory relief." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (citations omitted); *see Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) ("[I]n general 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.'") (citation omitted); 505 U.S. at 827 (Scalia, J., concurring in part) ("[W]e cannot issue a declaratory judgment against the President."); *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866). Accordingly, the Court lacks jurisdiction to enter Plaintiff's requested relief against the President and, at minimum, should dismiss him as a defendant in this case. *See Trump v. United States*, 603 U.S. 593, 609 (2024) (stating that "Congress cannot act on, and courts cannot examine, the President's actions on subjects within his 'conclusive and preclusive' constitutional authority").

V.    **If the Court Grants Relief, It Should Issue a Preliminary Injunction, Stay the Order, and Require Plaintiff to Submit a Bond as Security.**

In the event the Court grants injunctive relief to Plaintiff, that relief should be in the form of preliminary injunction rather than a temporary restraining order. Plaintiff has sought both a preliminary injunction and temporary restraining order, but does not explain why it needs a temporary restraining order ahead of a preliminary injunction. Under these circumstances, the most appropriate course of action to further party and judicial resources, and the efficient resolution of this case, is to decide this matter as a preliminary injunction. That approach would provide Defendants with an appealable order, *see* 28 U.S.C. § 129, and avoid redundant litigation over both a temporary restraining order and then a preliminary injunction. *See* Fed. R. Civ. P. 1 (stating that rules should be administered to "secure the just, speedy, and inexpensive determination of every action and proceeding").

26

Further, if the Court grants the Plaintiff's requested injunction, the Court should stay the injunction pending any appeal authorized by the Solicitor General.  *See* Fed. R. App. P. 8(a).  For the reasons explained above, Defendants have, at a minimum, satisfied the requirements for a stay of any injunction pending appeal.  *See Nken*, 556 U.S. at 434.

Finally, the Court should order security with any preliminary injunction.  Under Rule 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained by" Defendants if they are later found to "have been wrongfully enjoined[.]" Fed. R. Civ. P. 65(c).  As the Second Circuit has explained, the bond requirement "serves a number of functions" such as ensuring that the enjoined party "may readily collect damages from the funds posted" in the event future proceedings establish that the injunction was entered in error.  *Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 557 (2d Cir. 2011).  Should the Court issue an injunction requiring Defendants to pay Plaintiff $80.4 million at this preliminary stage, Defendants request Plaintiff post a bond equal to that amount during the pendency of this case, including resolution of appeals.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's motions for a temporary restraining order and a preliminary injunction.

Dated: February 28, 2025                     Respectfully submitted,

                                             YAAKOV M. ROTH
                                             Acting Assistant Attorney General
                                             Civil Division

                                             ANDREW I. WARDEN
                                             Assistant Branch Director

                                             */s/ R. Charlie Merritt*
                                             R. CHARLIE MERRITT (VA Bar No. 89400)
                                             MARIANNE F. KIES

Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
Washington, DC 20005
Phone: 202-616-8098
Fax: 202-616-8460
Email: robert.c.merritt@usdoj.gov

*Attorneys for Defendants*

*I certify that this memorandum contains 8,481 words, in compliance with the Local Civil Rules.*

28