**Exhibit A**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITY OF NEW YORK, *et al.*,<br><br>      Plaintiffs,<br><br>      v.<br><br>DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES, *et al.*,<br><br>      Defendants. | Civil Action No. 1:25-cv-01510 (JHR) |

## **DECLARATION**

I, Cameron Hamilton hereby state as follows:

1. I am the Senior Official Performing the Duties of the Administrator, Department of Homeland Security (DHS or Department), Federal Emergency Management Agency (FEMA). The Senior Official Performing the Duties of the FEMA Administrator is the DHS official responsible for being the principal advisor to the President and the Secretary for all matters relating to emergency management in the United States.

2. Since being sworn in on January 25, 2025, the Secretary of Homeland Security (Secretary) has issued several written and verbal directives regarding payments made by the Department, all of which were designed to ensure that any payments made by the Department are consistent with law and do not promote fraud, waste, or abuse. One such directive is a January 28, 2025, Direction on Grants to Non-governmental Organizations. (Memorandum). *See* Exhibit 1. In this Memorandum, the Secretary, under her own authority, ordered that "all Department grant disbursements and assessments that: (a) go to non-profit organizations or for which non-profits are eligible, and (b) touch in anyway on

1

immigration, are on hold pending review, except to the extent required by controlling legal authority." The Secretary's rationale for this hold includes concerns that these grants may be funding illegal activities or encouraging illegal immigration or illegally harboring illegal aliens. The Secretary required each component of the Department, including FEMA, to, within seven days of the Memorandum, provide a report to the Undersecretary of Management summarizing every grant covered by the Memorandum.

3. Consistent with those directives, FEMA has been reviewing a variety of grant programs to ensure compliance with all grant conditions. Every grant issued by the Department requires compliance with applicable federal laws. An example of such grant conditions is attached as Exhibit 2.

**Shelter and Services Program**

4. The Shelter and Service Program (SSP) was authorized to grant temporary shelter and other services to aliens released from custody. *See* Department of Homeland Security Appropriations Act, 2024, Pub. L. No. 118-47, Div. C (2024); Department of Homeland Security Appropriations Act, 2023, Pub. L. No. 117-328, Div. F (2022).

5. The City of New York is a recipient of grants under the SSP administered by the Department/FEMA. On February 3, 2025, while in the process of complying with the Secretary's Memorandum and continuing to administer its grant programs including SSP, FEMA scheduled and sent to the United States Department of Treasury (Treasury) payments totaling $80,481.861.42 for the City of New York under SSP. On February 4, 2025, the Treasury via direct deposit sent the payments to the City of New York.

6. A substantial portion of SSP money paid to New York City goes to funding alien housing at the Roosevelt Hotel in New York City. New York City contracted with the nonprofit New York City Health and Hospital Corporation, who leased the Roosevelt Hotel, to provide this housing. According to media reports, the vicious Venezuelan gang Tren De

Aragua has taken over the Roosevelt Hotel and is using it as a recruiting center and base of operations to plan a variety of crimes.[1] According to these same media reports, these crimes include gun and drug sales as well as sex trafficking, which can reasonably be presumed to be conducted in the hotel itself. One of the groups responsible for these activities refer to themselves as "diablos de la 42," which means the devils of 42nd St., a street near where the Roosevelt Hotel is located. Notably, the alien who murdered Laken Riley stayed at this hotel, which is funded by payments from the Department.[2]

7.  I am aware of criminal investigations into many of these activities, but I have been informed that these details are law enforcement sensitive and should not be shared in a public declaration.

8.  In addition to the crimes mentioned above, I am concerned that entities receiving payment under this program may be guilty of encouraging or inducing an alien to come to, enter, or reside in the United States in violation of law 8 U.S.C. § 1324(a)(1)(A)(iv), transporting or moving illegal aliens, id. § 1324(a)(1)(A)(ii), harboring, concealing, or shielding from detection illegal aliens, id. § 1324(a)(1)(A)(iii), or applicable conspiracy, aiding or abetting, or attempt liability respecting these statutes. On its face, SSP funds sheltering and transportation for illegal aliens. And a previous Office of Inspector General report concluded that Department of Homeland Security grant recipients used funds from a similar program to provide services to clandestine aliens who never had an encounter with the Department.[3] *See* Exhibit 3.

9.  On February 10, 2025, I was advised that the payment identified in paragraph 5 was made in error because FEMA was under the misunderstanding that the Memorandum allowed FEMA to continue to make payments under SSP to local governments even though a

---

[1] https://nypost.com/2024/10/17/us-news/nyc-migrant-hotels-violent-gang-rep-is-all-over-tiktok-say-fed-up-residents-who-worry-its-only-gonna-get-worse/

[2] https://www.nationalreview.com/news/laken-riley-murder-suspect-received-taxpayer-funded-stay-at-roosevelt-hotel-flight-to-georgia/

[3] https://www.foxnews.com/politics/dhs-oig-finds-millions-american-rescue-plan-funds-misused-ngos-given-gotaway-illegal-immigrants

portion of the funds would be used to fund alien housing at the Roosevelt Hotel. This was incorrect, as the Memorandum stated that "all Department grant disbursements and assessments that: (a) go to non-profit organizations or for which non-profits are eligible, and (b) touch in anyway on immigration, are on hold." Thus, FEMA did not have the authorization to make the payment.

10. In addition, the payment to New York City should not have been released because the Department had significant concerns that SSP funding was going to entities engaged in or facilitating illegal activities and that a criminal investigation was ongoing into these activities.

11. The Department's Acting Chief Financial Officer contacted the Treasury by telephone to inform them of the mistaken, improper payment and request assistance. After the Acting Chief Financial Officer certified by phone that the payment was improper, FEMA submitted to Treasury an Improper Recovery Request via the Treasury Check Information System to recover the payment pursuant to 31 C.F.R. § 210.6(f). The United States Treasury processed this request and returned the payment to FEMA as a Treasury cancellation.

12. On February 18, 2025, I sent a letter to the Deputy Assistant Director of the New York City Office of Management and Budget notifying it that the Department/FEMA was temporarily withholding payments to New York City for the Grant Awards named in the letter pursuant to 2 C.F.R. § 200.339(a) and that it had recovered the $80,481,861.42 identified in paragraph 5 above which constituted a part of the temporary withholding. A copy of the letter is Exhibit 4. Additionally, New York City was notified that FEMA was instituting specific conditions on New York City's award pursuant to 2 C.F.R. § 200.208. In the letter, FEMA explained to New York City that the Department had significant concerns that the SSP funding was going to entities (subrecipients of the funds, in this case the Roosevelt Hotel, an NGO) engaged in or facilitating illegal activities. In addition, I advised New York City that FEMA/DHS was required to administer its grant

awards to ensure that federal funding is expended and associated programs are implemented in full accordance with the U.S. Constitution, applicable federal statutes, regulations. 2 C.F.R. § 200.300. And that the terms and conditions of the award allow the Department to institute appropriate remedies for non-compliance including withholding payments or suspending or terminating the award for failure to comply with the conditions of the award or applicable federal statutes. In addition, FEMA requested that the City of New York provide FEMA with information within 30 days including documents regarding interactions with aliens with whom New York City and its subrecipients (NGOs) and contracts interact. To my knowledge, this information has not been provided. Finally, in the letter, FEMA provided New York City with 60 days to submit an appeal. To date, New York City has not submitted an appeal.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on this 28th day of February 2025.

/s/ _____

Cameron Hamilton
Senior Official Performing the Duties of Administrator
Federal Emergency Management Agency

5

# EXHIBIT 1



Secretary
**U.S. Department of Homeland Security**
Washington, DC 20528

January 28, 2025

MEMORANDUM FOR COMPONENT AND OFFICE HEADS

FROM:        Kristi Noem
             Secretary

SUBJECT:     **Direction on Grants to Non-governmental Organizations**

Over the last four years, the Department of Homeland Security has spent billions of dollars funding illegal immigration. Much of this funding was given to non-profit organizations, which purported to provide a variety of services to illegal aliens. Effective immediately, all Department grant disbursements and assessments of grant applications that: (a) go to non-profit organizations or for which non-profit organizations are eligible, and (b) touch in any way on immigration, are on hold pending review, except to the extent required by controlling legal authority.

The reasons for this freeze include (1) concerns that these grants may be funding illegal activities, such as encouraging or inducing illegal immigration, 8 U.S.C. § 1324(a)(1)(A)(iv), or illegal harboring of illegal aliens, 8 U.S.C. § 1324(a)(1)(A)(ii)–(iii); (2) concerns that there may be racially discriminatory language in certain grants; and (3) concerns that these grants may not be an efficient use of government resources.

Within 7 days, each component shall provide a report to the Undersecretary for Management with a summary of every grant covered by this memorandum and its status. Also within 7 days, any component that invokes the exception above for grants required by controlling legal authority must obtain the express written consent of the General Counsel or his delegee. Finally, within 7 days, the chief counsel of each component shall provide a report to the General Counsel regarding all available legal tools to investigate whether grantees have or are using Department grant funds for illegal purposes, including any statutory, regulatory, or contractual authority to request or demand documents.

The Department is committed to allocating grant funds in a manner that will achieve maximum effectiveness for the intended purposes and in fulfillment of the Department's statutory mission. This hold does not in any way apply to disbursement of essential disaster relief funds, but it does apply to the Shelter and Services Program, and any similar program.

# EXHIBIT 2

## The U. S. Department of Homeland Security (DHS)
## Notice of Funding Opportunity (NOFO)
## Fiscal Year 2024 Case Management Pilot Program (CMPP)

All entities wishing to do business with the federal government must have a unique entity identifier (UEI). The UEI number is issued by the system for Award Management (SAM). Requesting a UEI using SAM can be found at: https://sam.gov/content/entity-registration.

**Updates in Grant Application Forms:**

The Data Universal Numbering System (DUNS) Number was replaced by a new, non-proprietary identifier requested in, and assigned by the SAM. This new identifier is the Unique Entity Identifier.

Additional Information can be found on Grants.gov: https://www.grants.gov/forms/forms-development/planned-uei-updates

## Table of Contents

Updates in Grant Application Forms: ............................................................................... 1
A.  Program Description ......................................................................................................... 5
    1.  Issued By ................................................................................................................... 5
    2.  Assistance Listings Number ...................................................................................... 5
    3.  Assistance Listings Title ............................................................................................ 5
    4.  Funding Opportunity Title ......................................................................................... 5
    5.  Funding Opportunity Number .................................................................................... 5
    6.  Authorizing Authority for Program ............................................................................ 5
    7.  Appropriation Authority for Program ......................................................................... 5
    8.  Announcement Type ................................................................................................... 5
    9.  Program Category ....................................................................................................... 5
    10. Program Overview, Objectives, and Priorities .......................................................... 5
    11. Performance Measures ................................................................................................ 8
B.  Federal Award Information ............................................................................................. 10
    1.  Available Funding for the NOFO:  $15 million ....................................................... 10
    2.  Projected Number of Awards:   One ......................................................................... 10
    3.  Maximum Award Amount:  $15 million ................................................................... 10
    4.  Period of Performance:    36 Months ....................................................................... 10
    5.  Projected Period of Performance Start Date(s): Dec. 1, 2024 ................................. 10
    6.  Projected Period of Performance End Date(s): Nov. 30, 2027 ................................ 10
    **7.  Projected Budget Period(s)**: ................................................................................... 10
    8.  Funding Instrument Type:   Grant ............................................................................ 10
C.  Eligibility Information ..................................................................................................... 10
    1.  Eligible Applicants ................................................................................................... 10
    2.  Applicant Eligibility Criteria ................................................................................... 10
    3.  Subawards and Beneficiaries .................................................................................... 10
    4.  Cost Share or Match ................................................................................................. 11
D.  Application and Submission Information ........................................................................ 11
    1.  Key Dates and Times ................................................................................................ 11
        a.  Application Start Date:  Oct. 22, 2024, at 9 a.m. ET ......................................... 11
        b.  Application Submission Deadline: Nov. 21, 2024, at 5 p.m. ET ........................ 11
        c.  Anticipated Funding Selection Date: Dec. 1, 2024 ............................................ 12
        d.  Anticipated Award Date: Dec. 1, 2024 .............................................................. 12
        e.  Other Key Dates ................................................................................................. 12
    2.  Agreeing to Terms and Conditions of the Award ..................................................... 12
    3.  Address to Request Application Package .................................................................. 12
    4.  Requirements: Obtain a Unique Entity Identifier (UEI) and Register in the System for
        Award Management (SAM.gov) ................................................................................ 12
    5.  Steps Required to Obtain a Unique Entity Identifier, Register in the System for Award
        Management (SAM), and Submit an Application ...................................................... 13
    6.  Electronic Delivery ................................................................................................... 14
    7.  How to Register to Apply FEMA GO ....................................................................... 14
        a.  General Instructions: ......................................................................................... 14
        b.  Obtain an UEI Number: ..................................................................................... 15
        c.  Obtain Employer Identification Number ............................................................ 15

  d. Create a login.gov account: ......................................................................... 15
  e. Register with SAM: ....................................................................................... 15
  f. Register in FEMA GO, Add the Organization to the System, and Establish the AOR: 16
 8. Submitting the Final Application ........................................................................... 16
 9. Timely Receipt Requirements and Proof of Timely Submission ................................ 17
 10. Content and Form of Application Submission ......................................................... 17
  a. Standard Required Application Forms and Information ........................................ 17
  b. Program-Specific Required Forms and Information ............................................ 17
 11. Intergovernmental Review .................................................................................... 18
 12. Funding Restrictions and Allowable Costs ............................................................. 18
  a. Prohibitions on Expending FEMA Award Funds for Covered Telecommunications Equipment or Services ......................................................................................... 18
  b. Pre-Award Costs ........................................................................................... 19
  c. Management and Administration (M&A) Costs .................................................. 19
  d. Indirect Facilities & Administrative (F&A) Costs ................................................ 20
E. Application Review Information ..................................................................................... 20
 1. Application Evaluation Criteria ............................................................................. 20
  a. Programmatic Criteria .................................................................................... 20
  b. Financial Integrity Criteria .............................................................................. 20
  c. Supplemental Financial Integrity Criteria and Review ......................................... 21
 2. Review and Selection Process .............................................................................. 21
F. Federal Award Administration Information ..................................................................... 21
 1. Notice of Award ................................................................................................. 21
 2. Pass-Through Requirements ................................................................................ 22
 3. Administrative and National Policy Requirements.................................................... 22
  a. DHS Standard Terms and Conditions ............................................................... 22
  b. Ensuring the Protection of Civil Rights ............................................................. 22
  c. Environmental Planning and Historic Preservation (EHP) Compliance ................... 23
  d. Mandatory Disclosures ................................................................................... 24
 4. Reporting........................................................................................................... 25
  a. Financial Reporting Requirements .................................................................... 25
  b. Programmatic Performance Reporting Requirements.......................................... 26
  c. Closeout Reporting Requirements .................................................................... 27
  d. Additional Reporting Requirements .................................................................. 29
 5. Monitoring and Oversight ..................................................................................... 30
G. DHS Awarding Agency Contact Information .................................................................. 31
 1. Contact and Resource Information ........................................................................ 31
  a. Program Office Contact................................................................................... 31
  b. FEMA Grants News ........................................................................................ 31
  c. Grant Programs Directorate (GPD) Award Administration Division ....................... 31
  d. Civil Rights.................................................................................................... 32
  e. Environmental Planning and Historic Preservation ............................................. 32
 2. Systems Information ............................................................................................ 32
  a. FEMA GO ..................................................................................................... 32
H. Additional Information .................................................................................................. 32

1.    Termination Provisions ..................................................................................... 32
        a. Noncompliance ........................................................................................ 32
        b. With the Consent of the Recipient ........................................................ 32
        c. Notification by the Recipient ................................................................. 33
2.  Program Evaluation ........................................................................................... 33
3.  Period of Performance Extensions ..................................................................... 33
4.  Disability Integration ......................................................................................... 34
5.  Conflicts of Interest in the Administration of Federal Awards or Subawards .............. 35
6.  Procurement Integrity ........................................................................................ 36
        a. Important Changes to Procurement Standards in 2 C.F.R. Part 200 ...................... 36
        b. Competition and Conflicts of Interest ................................................... 37
        c. Supply Schedules and Purchasing Programs ......................................... 38
        d. Procurement Documentation ................................................................. 40
7.  Record Retention ................................................................................................ 40
        a. Record Retention Period ........................................................................ 40
        b. Types of Records to Retain .................................................................... 41
8.  Actions to Address Noncompliance ................................................................... 42
9.  Audits ................................................................................................................. 43
10. Payment Information .......................................................................................... 44
11. Whole Community Preparedness ........................................................................ 44
12. Report issues of fraud, waste, abuse .................................................................. 45
13. Hazard-Resistant Building Codes ...................................................................... 45

A. **Program Description**

1. **Issued By**
   U.S. Department of Homeland Security (DHS)/Office for Civil Rights and Civil Liberties (CRCL) and Federal Emergency Management Agency (FEMA)

2. **Assistance Listings Number**
   97.102

3. **Assistance Listings Title**
   Case Management Pilot Program

4. **Funding Opportunity Title**
   Fiscal Year 2024 Case Management Pilot Program (CMPP)

5. **Funding Opportunity Number**
   DHS-24-GPD-102-00-99

6. **Authorizing Authority for Program**
   Department of Homeland Security Appropriations Act, 2024, Pub. L. No. 118-47, Title I, Departmental Management, Intelligence, Situational Awareness, and Oversight, Office of the Secretary and Executive Management, Federal Assistance

7. **Appropriation Authority for Program**
   Department of Homeland Security Appropriations Act, 2024, Pub. L. No. 118-47, Title I, Departmental Management, Intelligence, Situational Awareness, and Oversight, Office of the Secretary and Executive Management, Federal Assistance

8. **Announcement Type**
   Initial

9. **Program Category**
   Preparedness: Other

10. **Program Overview, Objectives, and Priorities**

    a. **Overview**
       The Case Management Pilot Program (CMPP) makes funds available to local governments and/or nonprofits to provide voluntary case management and other services to eligible noncitizens. Eligible noncitizens are noncitizens subject to ICE reporting, including, but not limited to, noncitizens paroled by DHS, issued a bond by DHS, who have been or are on an Immigration and Customs Enforcement (ICE) alternative to detention (ATD) program, or who have been served with a Notice to Appear (NTA) by DHS (hereinafter, "eligible noncitizens"). CMPP funds will be awarded to eligible subrecipients through the CMPP National Board. The CMPP National Board is charged with awarding funds to local governments and nonprofit organizations and managing the pilot program.

CMPP services are to be made available to eligible noncitizens in geographic locations served by the CMPP. Participants enroll in CMPP through one of three enrollment pathways: (1) telephone calls made to eligible noncitizens by the CMPP service providers using a list of eligible noncitizens provided by ICE to CRCL; (2) CRCL in-person visits at ICE field offices to identify eligible noncitizens attending ICE check-in appointments; and (3) eligible noncitizens "walk in" to service providers seeking services.  The CMPP Appendix to the ICE ATD Privacy Impact Assessment explains ICE and CRCL's roles in the enrollment process.  CMPP funds may be used flexibly to provide case management services and other services CMPP participants identify as a priority, including but not limited to: mental health services; human trafficking screening; legal orientation programs; cultural orientation programs; connections to social services; and for individuals who will be removed, reintegration services.

CMPP makes funds available to local governments and/or nonprofits to provide case management and culturally, trauma-informed, and linguistically responsive services to eligible noncitizens who affirmatively volunteer to participate in the program. CMPP funds will be awarded to eligible subrecipients through the Board.

**b. Goals, Objectives, and Priorities**
The objective of the CMPP is to ensure that eligible noncitizens in geographic locations served by CMPP have access to case management, critical services such as mental health services, trafficking screening, legal orientation programs, cultural orientation programs, and for individuals who will be removed, reintegration and other services that CMPP participants identify as a priority.

The CMPP provides an opportunity for the Department to evaluate the effectiveness of case management services for noncitizens that are voluntary and overseen and managed through a National Board chaired by the Officer for Civil Rights and Civil Liberties and composed of nongovernmental organizations with experience providing and/or evaluating case management programs for immigrants and asylum-seekers.

In addition, the CMPP provides an opportunity for DHS to assess demand for CMPP services for eligible noncitizens and for nonprofit and/or local government capacity to provide and/or connect participants to effective services. The Department plans to evaluate effectiveness by looking at what, if any, impact CMPP services have on participants' attendance at immigration court hearings, compliance with immigration obligations and orders, ability to secure legal representation and/or pro se legal assistance, and ability to access a range of social services that CMPP participants identify as priorities through a participant-led, service planning process.

The CMPP shall make available case management and other services eligible noncitizens identify as a priority, including services that address: mental health; trafficking screening; legal orientation programs; cultural orientation programs; connections to social services; and departure planning and reintegration services for individuals returning to their home countries.

The CMPP National Board will distribute funds to eligible local governments and eligible nonprofits (hereinafter, subrecipients) and manage the program.

The National Board will:

1. Educate and engage local governments and nonprofit organizations about CMPP program.

2. Notify eligible local governments and/or eligible nonprofits of the opportunity to apply to provide CMPP services.

3. Select a Secretariat/Fiscal Agent to perform the necessary administrative duties for the Board.

4. Select eligible local governments and nonprofits to provide CMPP services.

5. Prioritize awarding CMPP funds to subrecipients, taking into consideration the following factors:

   o The subrecipient is a local government or nonprofit organization;
   o The subrecipient has demonstrated capacity either through past performance on current CMPP grants or through other programming to provide voluntary and trauma informed case management services to noncitizens, survivors of human trafficking. or asylum seekers, especially women and girls and other vulnerable noncitizens, and including services for people with limited English proficiency and people with disabilities;
   o The subrecipient has the capability to leverage community resources for program beneficiaries, meet their self-identified needs, and collect and report data related to case management services;
   o The subrecipient has the capacity, either internally or through partnerships with other community-based organizations, to provide case management services, including: mental health services; trafficking screening; legal orientation programs; and cultural orientation programs;
   o The subrecipient has the capacity, either internally or through partnerships with other community-based organizations, to connect participants to the following services:
     - health screening and medical services;
     - referral to legal service providers;
     - family wellness;
     - job training; and
     - school enrollment.
   o The subrecipient has the capacity, either internally or through a partnership with other community-based, national, or international organizations, to provide departure planning and reintegration services to noncitizens returning to their countries of citizenship;

   o The subrecipient preferably has experience with federal grant awards; and

   o The subrecipient can provide proof of fiscal integrity, as required.

The Secretariat/Fiscal Agent will:

1. Maintain all CMPP financial records and disburse funds to CMPP subrecipients in accordance with program requirements;

2. Document funds received and maintain documentation as required by 2 C.F.R. Part 200;

3. Conduct subrecipient compliance reviews of expenditures made under the program;

4. Monitor subrecipients' compliance with 2 C.F.R. Part 200 and program requirements detailed in the NOFO;

5. Develop an operational manual and establish criteria for expenditure of funds and distributing funds;

6. Provide copies of award notification materials to subrecipients;

7. Secure required reporting from subrecipients;

8. Ensure subrecipients comply with CMPP program guidelines;

9. Distribute funds to selected subrecipients;

10. Provide consultation and technical assistance regarding the program, as needed; and,

11. Conduct compliance reviews of expenditures made under this program for subrecipients.

  **c. Alignment to Program Purpose and the DHS Strategic Plan**
   The CMPP aligns with the DHS Strategic Plan for Fiscal Years 2020-2024 through pursuing Goal 2.3, Enforce U.S. Immigration Laws. Specifically, the CMPP will help the Department achieve the associated desired outcome: "Enforce immigration laws throughout the United States in a manner that upholds the rule of law, American values, and national security."

## 11. Performance Measures
Recipients will be required to provide critical data, such as CMPP participants' A numbers, which will be used for performance management and program evaluation. At minimum, the following information must be tracked, and additional information may be collected to support analysis of program implementation and participant outcomes.

Performance Metrics:

- Number of individuals enrolled in CMPP and demographic breakdown, including:
  - Member of family unit (caretaker(s)/minor child) (yes/no);
  - Size of family unit;
  - Gender;
  - Age;
  - Race and nationality; and
  - Preferred language.
- Number of CMPP participants who were offered case management services, including how many participants received or declined services.
- Number of participants who were offered the following CMPP services, including the breakdown of how many participants received or declined services:
  - Mental health services;
  - Human trafficking screening;
  - Legal orientation;
  - Cultural orientation; or
  - Departure information, planning and/or reintegration services (for those departing the United States voluntarily or because of an order of removal).
- Number of CMPP participants who identified each of the following services as a priority, and the number who were:
  - Provided legal screening or provided or referred for legal services; or
  - Connected to other participant identified social services, including housing assistance, childcare, transportation, school enrollment, health care, translation/interpretation, job training, and language classes.

Legal Access Program Performance Metrics:

- Number of CMPP participants without legal counsel at time of CMPP enrollment, and number that secured legal counsel during the program period of performance.
- Number of CMPP participants who received pro se assistance through CMPP.
- Length of time to first immigration hearing date, if applicable.
- Length of time to immigration case resolution, if applicable.
- Breakdown and percentage of forms of immigration relief for which CMPP participants applied.
- Breakdown and percentage of forms of immigration relief granted, such as asylum, CAT, etc.

Outcome Measures:

- Number of CMPP participants who attended scheduled Executive Office of Immigration Review (EOIR) immigration court hearings, as applicable.
  - Include breakdown of those with legal representation and those pro se.
- Number of CMPP participants identified as survivors of human trafficking, and of those identified, number who received assistance.
- Number of CMPP participants (1) with a final order of removal during the time they are enrolled in CMPP; and (2) who complied with the order.

**B.** **Federal Award Information**

**1.** **Available Funding for the NOFO:**          $15 million

**2.** **Projected Number of Awards**:          One

**3.** **Maximum Award Amount:**          $15 million

**4.** **Period of Performance:**          36 Months

Extensions to the period of performance are allowed. For additional information on period of performance extensions, please refer to Section H of this funding notice.

**5.** **Projected Period of Performance Start Date(s):**          Dec. 1, 2024

**6.** **Projected Period of Performance End Date(s):**          Nov. 30, 2027

**7**. **Projected Budget Period(s)**:
There will be only a single budget period with the same start and end dates as the period of performance.

**8**. **Funding Instrument Type:**          Grant

**C.** **Eligibility Information**

**1.** **Eligible Applicants**
Case Management Pilot Program National Board

**2.** **Applicant Eligibility Criteria**
The National Board for the Case Management Pilot Program is the only eligible applicant.

**3.** **Subawards and Beneficiaries**

 **a.** **Subaward Allowability**
 This NOFO allows for subawards (subrecipients). The National Board for the Case Management Pilot Program must select eligible subrecipients to provide CMPP services.

 **b.** **Subrecipient Eligibility**
 Subrecipients must be local governments or nonprofit organizations.

 **c.** **Other subaward information**
 Subrecipients must adhere to the other parts of the NOFO that discuss requirements or restrictions specifically related to subawards/subrecipients: section C.5 regarding cost share or match, Unique Entity Identifier in section D.3, content and form of application submission in section D.10, funding restrictions and allowable costs in section D.12, management and administration costs (if applicable) in section D.12.e, indirect costs (if

applicable) in section D.12.f, and closeout requirements in section F.4.c, and any other section referencing specific subaward/subrecipient requirements.

d. **Beneficiaries or Participants**
This notice and any subsequent federal awards create no rights or causes of action for any participant or beneficiary.

The National Board is required to post a solicitation and award subrecipients. Selection criteria is described above in Section 10.B Goals, Objectives, and Priorities.

Potential eligible participants in CMPP services are noncitizens subject to ICE reporting, including, but not limited to, noncitizens paroled by DHS, issued a bond by DHS, who have been or are on an Immigration and Customs Enforcement (ICE) alternative to detention program, or who have been served with a Notice to Appear (NTA) by DHS in geographic locations served by the CMPP.

**4. Cost Share or Match**
None

**D. <u>Application and Submission Information</u>**
**1. Key Dates and Times**

a. **Application Start Date:**     Oct. 22, 2024, at 9 a.m. ET

b. **Application Submission Deadline:** Nov. 21, 2024, at 5 p.m. ET

All applications **must** be received by the established deadline.

FEMA's Grants Outcomes System (FEMA GO) automatically records proof of timely submission and the system generates an electronic date/time stamp when FEMA GO successfully receives the application. The individual with the Authorized Organization Representative role that submitted the application will also receive the official date/time stamp and a FEMA GO tracking number in an email serving as proof of their timely submission. For additional information on how an applicant will be notified of application receipt, see the subsection titled "Timely Receipt Requirements and Proof of Timely Submission" in Section D of this notice.

**FEMA will not review applications that are received after the deadline or consider these late applications for funding**. FEMA may, however, extend the application deadline on request for any applicant who can demonstrate that good cause exists to justify extending the deadline. Good cause for an extension may include technical problems outside of the applicant's control that prevent submission of the application by the deadline, other exigent or emergency circumstances, or statutory requirements for FEMA to make an award.

**Applicants experiencing technical problems outside of their control must notify FEMA as soon as possible and before the application deadline**. Failure to timely notify FEMA of the issue that prevented the timely filing of the application may preclude consideration of the award. "Timely notification" of FEMA means before the application deadline and within 48 hours after the applicant became aware of the issue.

A list of FEMA contacts can be found in Section G of this notice, "DHS Awarding Agency Contact Information." For technical assistance with the FEMA GO system, please contact the FEMA GO Helpdesk at femago@fema.dhs.gov or (877) 585-3242, Monday through Friday, 9 a.m. – 6 p.m. ET. For programmatic or grants management questions, please contact your Program Analyst or Grants Management Specialist. If applicants do not know who to contact or if there are programmatic questions or concerns, please contact the fema-grants-news@fema.dhs.gov, Monday through Friday, 9 a.m. – 5 p.m. ET.

**c.** **Anticipated Funding Selection Date**: Dec. 1, 2024

**d.** **Anticipated Award Date:** Dec. 1, 2024

**e.** **Other Key Dates**

| Event | Suggested Deadline for Completion |
|---|---|
| Obtaining Unique Entity Identifier (UEI) number | Four weeks before actual submission deadline |
| Obtaining a valid Employer Identification Number (EIN) | Four weeks before actual submission deadline |
| Creating an account with login.gov | Four weeks before actual submission deadline |
| Registering in SAM or updating SAM registration | Four weeks before actual submission deadline |
| Registering Organization in FEMA GO | Before beginning application |
| Submitting complete application in FEMA GO | One week before actual submission deadline |

**2. Agreeing to Terms and Conditions of the Award**
By submitting an application, applicants agree to comply with the requirements of this notice and the terms and conditions of the award, should they receive an award.

**3. Address to Request Application Package**
Applications are processed through the FEMA GO system. To access the system, go to https://go.fema.gov/.

**4. Requirements: Obtain a Unique Entity Identifier (UEI) and Register in the System for Award Management** (SAM.gov)
Each applicant, unless they have a valid exception under 2 C.F.R. §25.110, must:

a. Be registered in Sam.Gov before application submission.
b. Provide a valid UEI in its application.
c. Continue to always maintain an active SAM registration with current information during the federal award process. Note: Per 2 C.F.R. § 25.300, subrecipients are NOT required to go through the full SAM registration process. First-tier subrecipients (meaning entities receiving funds directly from the recipient) are only required to obtain a UEI through SAM, but they are not required to complete the full SAM registration in order to obtain a UEI. Recipients may not make subawards unless the subrecipient has obtained and provided the UEI. Lower-tier subrecipients (meaning entities receiving funds passed through by a higher-tier subrecipient) are not required to have a UEI and are not required to register in SAM. Applicants are also not permitted to require subrecipients to complete a full registration in SAM beyond obtaining the UEI.

Lower-tier subrecipients (meaning entities receiving funds passed through by a higher-tier subrecipient) are not required to have a UEI and are not required to register in SAM. Applicants are also not permitted to require subrecipients to complete a full registration in SAM beyond obtaining the UEI.

5. **Steps Required to Obtain a Unique Entity Identifier, Register in the System for Award Management (SAM), and Submit an Application**
Applying for an award under this program is a multi-step process and requires time to complete. Applicants are encouraged to register early as the registration process can take four weeks or more to complete. Therefore, registration should be done in sufficient time to ensure it does not impact your ability to meet required submission deadlines.

Please review the table above for estimated deadlines to complete each of the steps listed. Failure of an applicant to comply with any of the required steps before the deadline for submitting an application may disqualify that application from funding.

To apply for an award under this program, all applicants must:

a. Apply for, update, or verify their UEI number and Employer Identification Number (EIN) from the Internal Revenue Service;
b. In the application, provide an UEI number;
c. Have an account with login.gov;
d. Register for, update, or verify their SAM account and ensure the account is active before submitting the application;
e. Register in FEMA GO, add the organization to the system, and establish the AOR. The organization's electronic business point of contact (EBiz POC) from the SAM registration may need to be involved in this step. For step-by-step instructions, see https://www.fema.gov/grants/guidance-tools/fema-go/startup
f. Submit the complete application in FEMA GO; and
g. Continue to maintain an active SAM registration with current information at all times during which it has an active federal award or an application or plan under consideration by a federal awarding agency. As part of this, applicants must also provide information on an applicant's immediate and highest-level owner and

subsidiaries, as well as on all predecessors that have been awarded federal contracts or federal financial assistance within the last three years, if applicable.

Applicants are advised that FEMA may not make a federal award until the applicant has complied with all applicable SAM requirements. Therefore, an applicant's SAM registration must be active not only at the time of application, but also during the application review period and when FEMA is ready to make a federal award. Further, as noted above, an applicant's or recipient's SAM registration must remain active for the duration of an active federal award. If an applicant's SAM registration is expired at the time of application, expires during application review, or expires any other time before award, FEMA may determine that the applicant is not qualified to receive a federal award and use that determination as a basis for making a federal award to another applicant.

Per 2 C.F.R. § 25.110(c)(2)(iii), if an applicant is experiencing exigent circumstances that prevents it from obtaining an UEI number and completing SAM registration prior to receiving a federal award, the applicant must notify FEMA as soon as possible by contacting fema-grants-news@fema.dhs.gov and providing the details of the circumstances that prevent completion of these requirements. If FEMA determines that there are exigent circumstances and FEMA has decided to make an award, the applicant will be required to obtain an UEI number, if applicable, and complete SAM registration within 30 days of the federal award date.

6. **Electronic Delivery**
DHS is participating in the Grants.gov initiative to provide the grant community with a single site to find and apply for grant funding opportunities. DHS encourages or requires applicants to submit their applications online through Grants.gov, depending on the funding opportunity.

For this funding opportunity, FEMA requires applicants to submit applications through FEMA GO.

7. **How to Register to Apply FEMA GO**
   a. **General Instructions:**
   Registering and applying for an award under this program is a multi-step process and requires time to complete. Read the instructions below about registering to apply for FEMA funds. Applicants should read the registration instructions carefully and prepare the information requested before beginning the registration process. Reviewing and assembling the required information before beginning the registration process will alleviate last-minute searches for required information.

   **The registration process can take up to four weeks to complete.** To ensure an application meets the deadline, applicants are advised to start the required steps well in advance of their submission.

   Organizations must have an UEI number, an EIN, an active SAM registration and Grants.gov account to apply for a federal award under this funding opportunity.

**b. Obtain an UEI Number:**
All entities applying for funding, including renewal funding, must have a UEI number. Applicants must enter the UEI number in the applicable data entry field on the SF-424 form.

For more detailed instructions for obtaining a UEI number, refer to: SAM.gov

**c. Obtain Employer Identification Number**
All entities applying for funding must provide an Employer Identification Number (EIN). The EIN can be obtained from the IRS by visiting: https://www.irs.gov/businesses/small-businesses-self-employed/apply-for-an-employer-identification-number-ein-online.

**d. Create a login.gov account:**
Applicants must have a login.gov account in order to register with SAM or update their SAM registration. Applicants can create a login.gov account here: https://secure.login.gov/sign_up/enter_email?request_id=34f19fa8-14a2-438c-8323-a62b99571fd3.

Applicants only have to create a login.gov account once. For applicants that are existing SAM users, use the same email address for the login.gov account as with SAM.gov so that the two accounts can be linked.

For more information on the login.gov requirements for SAM registration, refer to https://www.sam.gov/SAM/pages/public/loginFAQ.jsf.

**e. Register with SAM:**

All applicants applying online through FEMAGO must register with SAM. Failure to register with SAM will prevent an applicant from completing the application in Grants.gov. SAM registration must be renewed annually. Organizations will be issued a UEI number with the completed SAM registration.

For more detailed instructions for registering with SAM, refer to https://apply07.grants.gov/help/html/help/Register/RegisterWithSAM.htm

Note: Per 2 C.F.R. § 25.200, applicants must also provide the applicant's immediate and highest-level owner, subsidiaries, and predecessors that have been awarded federal contracts or federal financial assistance within the last three years, if applicable.

**I. ADDITIONAL SAM REMINDERS**
Existing SAM.gov account holders should check their account to make sure it is "ACTIVE." SAM registration should be completed at the very beginning of the application period and should be renewed annually to avoid being "INACTIVE." **Please allow plenty of time before the grant application submission deadline to obtain an UEI number and then to register in SAM. It may be four weeks**

**or more after an applicant submits the SAM registration before the registration is active in SAM, and then it may be an additional 24 hours before FEMA's system recognizes the information.**

It is imperative that the information applicants provide is correct and current. Please ensure that your organization's name, address, and EIN are up to date in SAM and that the UEI number used in SAM is the same one used to apply for all other FEMA awards. Payment under any FEMA award is contingent on the recipient's having a current SAM registration.

II. **HELP WITH SAM**
The SAM quick start guide for new recipient registration and SAM video tutorial for new applicants are tools created by the General Services Administration (GSA) to assist those registering with SAM. If applicants have questions or concerns about a SAM registration, please contact the Federal Support Desk at GDIT TSS Service Portal - GDIT Technology Shared Services Portal (fsd.gov) or call toll free (866) 606-8220.

f. **Register in FEMA GO, Add the Organization to the System, and Establish the AOR:**
Applicants must register in FEMA GO and add their organization to the system. The organization's electronic business point of contact (EBiz POC) from the SAM registration may need to be involved in this step. For step-by-step instructions, see https://www.fema.gov/grants/guidance-tools/fema-go/startup

Note: FEMA GO will support only the most recent major release of the following browsers:
- Google Chrome;
- Internet Explorer;
- Mozilla Firefox;
- Apple Safari; and
- Microsoft Edge.

Users who attempt to use tablet type devices or other browsers may encounter issues with using FEMA GO.

8. **Submitting the Final Application**
Applicants will be prompted to submit the standard application information and any program-specific information required as described in Section D.10 of this notice, "Content and Form of Application Submission." The Standard Forms (SF) may be accessed in the Forms tab under the https://grants.gov/forms/forms-repository/sf-424-family Applicants should review these forms before applying to ensure they have all the information required.

After submitting the final application, FEMA GO will provide either an error message or a successfully received transmission in the form of an email sent to the AOR that submitted the

application. Applicants using slow internet connections, such as dial-up connections, should be aware that transmission can take some time before FEMA GO receives your application.

For additional application submission requirements, including program-specific requirements, please refer to the subsection titled "Content and Form of Application Submission" under Section D of this notice.

9. **Timely Receipt Requirements and Proof of Timely Submission**
All applications must be completed in FEMA GO by the application deadline. FEMA GO automatically records proof of timely submission and the system generates an electronic date/time stamp when FEMA GO successfully receives the application. The individual with the AOR role that submitted the application will also receive the official date/time stamp and a FEMA GO tracking number in an email serving as proof of their timely submission on the date and time that FEMA GO received the application.

**Applicants who experience system-related issues will be addressed until 3  p.m. ET on the date applications are due.** No new system-related issues will be addressed after this deadline. Applications not received by the application submission deadline will not be accepted.

10. **Content and Form of Application Submission**
   a. *Standard Required Application Forms and Information*

   The following forms or information are required to be submitted via FEMA GO. The Standard Forms (SF) are also available at https://grants.gov/forms/forms-repository/sf-424-family
   - **SF-424, Application for Federal Assistance**
   - **Grants.gov Lobbying Form, Certification Regarding Lobbying**
   - **SF-424A, Budget Information (Non-Construction)**
   - **SF-424B, Standard Assurances (Non-Construction)**
   - **SF-LLL, Disclosure of Lobbying Activities**

   b. *Program-Specific Required Forms and Information*
   The following program-specific forms or information are required to be submitted in FEMA GO:

   The applicant must develop a work plan that includes a common set of agreed upon priorities, as explained in the Priorities section above, and a narrative describing: (1) the proposed subrecipient selection process, including the timeframe for selection(s); (2) how the National Board will provide oversight and monitoring of subrecipients, including the plan to collect information needed for Performance Progress Reports; (3) proposed quality assurance activities to be conducted by the National Board; and (4) plans to provide technical assistance to subrecipients, if needed.  The work plan shall be submitted as a PDF file in conjunction with the applicant's response to this notice.

**11. Intergovernmental Review**

An intergovernmental review may be required. Applicants must contact their state's Single Point of Contact (SPOC) to comply with the state's process under Executive Order 12372 (See https://www.archives.gov/federal-register/codification/executive-order/12372.html; Intergovernmental Review (SPOC List) (whitehouse.gov)

**12. Funding Restrictions and Allowable Costs**

All costs charged to federal awards (including both federal funding and any non-federal matching or cost sharing funds) must comply with applicable statutes, rules and regulations, and policies, this NOFO, and the terms and conditions of the federal award. They must also comply with the Uniform Administrative Requirements, Cost Principles, and Audit Requirements at 2 C.F.R. Part 200 unless otherwise indicated in the NOFO or the terms and conditions of the federal award. This includes, among other requirements, that costs must be incurred, and products and services must be delivered within the budget period. 2 C.F.R. § 200.403(h). The following are activities for which a recipient may not use federal funds and any cost sharing or matching funds under federal awards:

- Matching or cost sharing requirements for other federal grants and cooperative agreements (see 2 C.F.R. § 200.306);
- Lobbying or other prohibited activities under 18 U.S.C. § 1913 or 2 C.F.R. § 200.450; and
- Prosecuting claims against the federal government or any other government entity (see 2 C.F.R. § 200.435) See subsections below for information on any other funding restrictions.

**a. *Prohibitions on Expending FEMA Award Funds for Covered Telecommunications Equipment or Services***

Recipients, subrecipients, and their contractors must comply with the prohibitions set forth in Section 889 of the John S. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. No. 115-232 (2018) (FY 2019 NDAA) and 2 C.F.R. §§ 200.216, 200.327, 200.471, and Appendix II to 2 C.F.R. Part 200. The FY 2019 NDAA and these regulations, as they apply to recipients, subrecipients, and their contractors and subcontractors, provide for two distinct prohibitions: (1) prevent the use of federal award funds to procure or obtain covered telecommunications equipment or services; and (2) prevent the use of federal award funds to contract with an entity that uses such covered telecommunications equipment or services. Guidance is available at FEMA Policy #405-143-1 - Prohibitions on Expending FEMA Award Funds for Covered Telecommunications Equipment or Services

Additional guidance is available at Contract Provisions Guide: Navigating Appendix II to Part 200 - Contract Provisions for Non-Federal Entity Contracts Under Federal Awards (fema.gov).

FEMA recipients and subrecipients **may not** use any FEMA funds under open or new awards to:

- Procure or obtain any equipment, system, or service that uses covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology of any system;
- Enter into extend, or renew a contract to procure or obtain any equipment, system, or service that uses covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology of any system; or
- Enter into, extend, or renew contracts with entities that use covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system.

I. **REPLACEMENT EQUIPMENT AND SERVICES**
FEMA grant funding may be permitted to procure replacement equipment and services impacted by this prohibition, provided the costs are otherwise consistent with the requirements of the NOFO.

II. **DEFINITIONS**
Per section 889(f)(2)-(3) of the FY 2019 NDAA and 2 C.F.R. § 200.216, covered telecommunications equipment or services means:

    i. Telecommunications equipment produced by Huawei Technologies Company or ZTE Corporation, (or any subsidiary or affiliate of such entities);

    ii. For the purpose of public safety, security of Government facilities, physical security surveillance of critical infrastructure, and other national security purposes, video surveillance and telecommunications equipment produced by Hytera Communications Corporation, Hangzhou Hikvision Digital Technology Company, or Dahua Technology Company (or any subsidiary or affiliate of such entities);

    iii. Telecommunications or video surveillance services provided by such entities or using such equipment; or

    iv. Telecommunications or video surveillance equipment or services produced or provided by an entity that the Secretary of Defense, in consultation with the Director of National Intelligence or the Director of the Federal Bureau of Investigation, reasonably believes to be an entity owned or controlled by, or otherwise connected to, the People's Republic of China.

Examples of the types of products covered by this prohibition include phones, internet, video surveillance, and cloud servers when produced, provided, or used by the entities listed in the definition of "covered telecommunications equipment or services." *See* 2 C.F.R. § 200.471.

**b.** *Pre-Award Costs*
Pre-award costs are not allowable.

**c.** *Management and Administration (M&A) Costs*

M&A Costs are allowable and available for activities directly related to administering the award. M&A are not operational costs but are necessary costs incurred in direct support of the federal award or as a consequence of it, such as travel, meeting-related expenses, and salaries of full/part-time staff in direct support of the program. As such, M&A costs can be itemized in financial reports.

The National Board may use up to 7% of the total amount of the award for their M&A Costs, inclusive of no less than 7% available to the National Board Secretariat/Fiscal Agent.

**d.** *Indirect Facilities & Administrative (F&A) Costs*
Indirect (F&A) costs (IDC) are allowable costs to include in this application.  These costs are incurred for a common or joint purpose benefitting more than one cost objective and not readily assignable to the cost objectives specifically benefitted, without effort disproportionate to the results achieved. IDC are allowable by the recipient and subrecipients as described in 2 C.F.R. Part 200, including 2 C.F.R. § 200.414. Applicants with a current negotiated IDC rate agreement who desire to charge indirect costs to a federal award must provide a copy of their IDC rate agreement with their applications. Not all applicants are required to have a current negotiated IDC rate agreement. Applicants that are not required to have a negotiated IDC rate agreement but are required to develop an IDC rate proposal must provide a copy of their proposal with their applications. Applicants who do not have a current negotiated IDC rate agreement (including a provisional rate) and wish to charge the de minimis rate must reach out to FEMA for further instructions. Applicants who wish to use a cost allocation plan in lieu of an IDC rate proposal must reach out to the FEMA Point of Contact for further instructions. As it relates to the IDC for subrecipients, a recipient must follow the requirements of 2 C.F.R. §§ 200.332 and 200.414 in approving the IDC rate for subawards.

**E.** **Application Review Information**
**1.** **Application Evaluation Criteria**
   **a.** *Programmatic Criteria*
   Applications will be reviewed to ensure conformance with the Eligibility Criteria in this NOFO and Application Submission requirements.

   **b.** *Financial Integrity Criteria*
   Prior to making a federal award, FEMA is required by 31 U.S.C. § 3354, as enacted by the Payment Integrity Information Act of 2019, Pub. L. No. 116-117 (2020); 41 U.S.C. § 2313; and 2 C.F.R. § 200.206 to review information available through any Office of Management and Budget (OMB)-designated repositories of governmentwide eligibility qualification or financial integrity information, including whether SAM.gov identifies the applicant as being excluded from receiving federal awards or is flagged for any integrity record submission.  FEMA may also pose

additional questions to the applicant to aid in conducting the pre-award risk review. Therefore, application evaluation criteria may include the following risk-based considerations of the applicant:

i. Financial stability;
ii. Quality of management systems and ability to meet management standards;
iii. History of performance in managing federal award;
iv. Reports and findings from audits; and
v. Ability to effectively implement statutory, regulatory, or other requirements.

c. ***Supplemental Financial Integrity Criteria and Review***
Before making a federal award where the anticipated total federal share will be greater than the simplified acquisition threshold, currently $250,000:

i. FEMA is required by 41 U.S.C. § 2313 and 2 C.F.R. § 200.206(a)(2) to review and consider any information about the applicant, including information on the applicant's immediate and highest-level owner, subsidiaries, and predecessors, if applicable, that is in the designated integrity and performance system accessible through the System for Award Management (SAM), which is currently the [Federal Awardee Performance and Integrity Information System](#) (FAPIIS).

ii. An applicant, at its option, may review information in FAPIIS and comment on any information about itself that a federal awarding agency previously entered.

iii. FEMA will consider any comments by the applicant, in addition to the other information in FAPIIS, in making a judgment about the applicant's integrity, business ethics, and record of performance under federal awards when completing the review of risk posed by applicants as described in 2 C.F.R. § 200.206.

**2. Review and Selection Process**
The National Board's application will be evaluated and finalized for funding based on the following:

- The proposed projects are compatible with CMPP requirements; and
- The proposed costs are complete, reasonable, and cost-effective in relation to proposed projects and tasks.

**F. Federal Award Administration Information**
**1. Notice of Award**

Before accepting the award, the AOR and recipient should carefully read the award package. The award package includes instructions on administering the grant award and the terms and conditions associated with responsibilities under federal awards. **Recipients must accept all conditions in this notice as well as any specific terms and conditions in the Notice of Award to receive an award under this program.**

FEMA will provide the federal award package to the applicant electronically via FEMA GO. Award packages include an Award Letter, Summary Award Memo, Agreement Articles, and Obligating Document. An email notification of the award package will be sent through FEMA's grant application system to the AOR that submitted the application.

Recipients must accept their awards no later than 30 days from the award date. The recipient shall notify FEMA of its intent to accept and proceed with work under the award through the FEMA GO system.

Funds will remain on hold until the recipient accepts the award through the FEMA GO system and all other conditions of the award have been satisfied or until the award is otherwise rescinded. Failure to accept a grant award within the specified timeframe may result in a loss of funds.

2. **Pass-Through Requirements**
   The National Board is to publish a solicitation for subrecipients within two months of the date FEMA awards the funds to the National Board and shall select subrecipients for funding allocation within five months of the date FEMA awards funds to the National Board.

3. **Administrative and National Policy Requirements**
   In addition to the requirements of this section and in this notice, FEMA may place specific terms and conditions on individual awards in accordance with 2 C.F.R. Part 200.

   a. ***DHS Standard Terms and Conditions***
      All successful applicants for DHS grant and cooperative agreements are required to comply with DHS Standard Terms and Conditions, which are available online at DHS Standard Terms and Conditions.

      The applicable DHS Standard Terms and Conditions will be those in effect at the time the award was made. What terms and conditions will apply for the award will be clearly stated in the award package at the time of award.

   b. ***Ensuring the Protection of Civil Rights***
      As the Nation works towards achieving the National Preparedness Goal, it is important to continue to protect the civil rights of individuals. Recipients and subrecipients must carry out their programs and activities, including those related to the building, sustainment, and delivery of core capabilities, in a manner that respects and ensures the protection of civil rights for protected populations.

Federal civil rights statutes, such as Section 504 of the Rehabilitation Act of 1973 and Title VI of the Civil Rights Act of 1964, along with DHS and FEMA regulations, prohibit discrimination on the basis of race, color, national origin, sex, religion, age, disability, limited English proficiency, or economic status in connection with programs and activities receiving federal financial assistance from FEMA, as applicable.

The DHS Standard Terms and Conditions include a fuller list of the civil rights provisions that apply to recipients. These terms and conditions can be found in the DHS Standard Terms and Conditions. Additional information on civil rights provisions is available at https://www.fema.gov/about/offices/equal-rights/civil-rights.

Monitoring and oversight requirements in connection with recipient compliance with federal civil rights laws are also authorized pursuant to 44 C.F.R. Part 7 or other applicable regulations.

In accordance with civil rights laws and regulations, recipients and subrecipients must ensure the consistent and systematic fair, just, and impartial treatment of all individuals, including individuals who belong to underserved communities that have been denied such treatment.

c. ***Environmental Planning and Historic Preservation (EHP) Compliance***
As a federal agency, FEMA is required to consider the effects of its actions on the environment and historic properties to ensure that all activities and programs funded by FEMA, including grant-funded projects, comply with federal EHP laws, Executive Orders, regulations, and policies, as applicable.

**Recipients and subrecipients proposing projects that have the potential to impact the environment, including, but not limited to, the construction of communication towers, modification or renovation of existing buildings, structures, and facilities, or new construction including replacement of facilities, must participate in the FEMA EHP review process.** The EHP review process involves the submission of a detailed project description along with any supporting documentation requested by FEMA in order to determine whether the proposed project has the potential to impact environmental resources including, but not limited to, threatened or endangered species and historic properties; and identify mitigation measures and/or alternative courses of action that may lessen any impact to those resources.

In some cases, FEMA is also required to consult with other regulatory agencies and the public in order to complete the review process. Federal law requires EHP review to be completed before federal funds are released to carry out proposed projects. FEMA may not be able to fund projects that are not in compliance with applicable EHP laws, Executive Orders, regulations, and policies. FEMA may recommend mitigation measures and/or alternative courses of action to lessen any impact to

environmental resources and bring the project into compliance with EHP requirements.

Guidance on the EHP process is found at Environmental Planning and Historic Preservation. The site contains links to various documents including those identifying agency EHP responsibilities and program requirements, such as implementation of the National Environmental Policy Act and other EHP laws, regulations, and Executive Orders. DHS and FEMA EHP policy is also found in the EHP Directive & Instruction.

All FEMA actions, including grant-funded actions, must comply with National Flood Insurance Program criteria or any more restrictive federal, state, or local floodplain management standards or building code (44 C.F.R. § 9.11(d)(6)).

All FEMA-funded non-critical actions in 1% annual chance floodplains (also known as 100-year floodplains) that involve new construction or substantial improvement of structures must be elevated, at a minimum, to the lower of:

- Two feet above the 1% annual chance flood elevation (also known as the base flood elevation), in accordance with the Federal Flood Risk Management Standard (FFRMS) "Freeboard Value Approach" (FVA); or

- The 0.2% annual chance flood elevation. Where 0.2% annual chance flood elevations are not available, such actions must be elevated to at least two feet above the 1% annual chance flood elevation.

All FEMA-funded critical actions in 1% annual chance floodplains or 0.2% annual chance floodplains (also known as 500-year floodplains) that involve new construction or substantial improvement of structures must be elevated, at a minimum, to the higher of:

- Three feet above the 1% annual chance flood elevation; or

- The 0.2% annual chance flood elevation. Where 0.2% annual chance flood elevations are not available, such actions must be elevated to at least three feet above the 1% annual chance flood elevation.

See Executive Order 11988, Floodplain Management, as amended by Executive Order 13690, Establishing a Federal Flood Risk Management Standard and a Process for Further Soliciting and Considering Stakeholder Input.

Individual FEMA programs have separate procedures to conduct and document EHP review. Guidance for individual grant programs is available from applicable program offices.

d. *Mandatory Disclosures*

The non-Federal entity or applicant for a Federal award must disclose, in a timely manner, in writing to the Federal awarding agency or pass-through entity all violations of Federal criminal law involving fraud, bribery, or gratuity violations potentially affecting the Federal award. (2 C.F.R. 200.113)

Please note applicants and recipients may report issues of fraud, waste, abuse, and mismanagement, or other criminal or noncriminal misconduct to the Office of Inspector General (OIG) Hotline. The toll-free numbers to call are 1 (800) 323-8603, and TTY 1 (844) 889-4357.

## 4. Reporting

Recipients are required to submit various financial and programmatic reports as a condition of award acceptance. Future awards and funds drawdown may be withheld if these reports are delinquent.

### a. *Financial Reporting Requirements*

#### I. FEDERAL FINANCIAL REPORT (FFR)

Recipients must report obligations and expenditures through the FFR form (SF-425) to FEMA.

Recipients may review the Federal Financial Reporting Form (FFR) (SF-425) at https://apply07.grants.gov/apply/forms/sample/SF425-V1.0.pdf

Recipients must file the FFR electronically using FEMA GO.

#### II. FFR REPORTING PERIODS AND DUE DATES

An FFR must be submitted quarterly throughout the POP, including partial calendar quarters, as well as in periods where no grant award activity occurs. The final FFR is due within 120 calendar days after the end of the POP. Future awards and fund drawdowns may be withheld if these reports are delinquent, demonstrate lack of progress, or are insufficient in detail.

Except for the final FFR due at 120 days after the end of the POP for purposes of closeout, the following reporting periods and due dates apply for the FFR:

| Reporting Period | Report Due Date |
| --- | --- |
| Oct. 1 – Dec. 31 | Jan. 30 |
| Jan. 1 – March 31 | April 30 |
| April 1 – June 30 | July 30 |
| July 1 – Sept. 30 | Oct. 30 |

b. *Programmatic Performance Reporting Requirements*
  I. PERFORMANCE PROGRESS REPORT (PPR)

The National Board shall submit in the FEMAGO quarterly (every four months) performance progress reports and a final PPR at grant closeout. A narrative shall also be provided in each PPR, reporting the overall accomplishments of the reporting period, barriers to implementations, and should include metrics such as the following (if available):

Basic Performance Metrics:

- Number of individuals enrolled in CMPP and demographic breakdown, including:
  - Member of family unit (caretaker(s)/minor child) (yes/no);
  - Size of family unit;
  - Gender;
  - Age;
  - Race/Nationality; and
  - Preferred language.
- Number of CMPP participants who were offered case management services, including how many participants received or declined services.
- Number of participants who were offered the following CMPP services including the breakdown of how many participants received or declined services.
  - Mental health services
  - Human trafficking screening
  - Legal orientation
  - Cultural orientation
  - Departure information, planning, and/or reintegration services (for those departing the United States voluntarily or because of an order of removal.)
- Number of CMPP participants who identified each of the following services as a priority and the number who were:
  - Provided legal screening or provided and/or referred for legal services
  - Connected to other participant identified social services which may include and are not limited to housing assistance, childcare, transportation, school enrollment, healthcare, translation/interpretation, job training, and language classes.

Legal Access Program Performance Metrics:
- Number of CMPP participants without legal counsel at time of CMPP enrollment, and number that secured legal counsel during the program period of performance.
- Number of CMPP participants who received pro se assistance through CMPP.
- Length of time to first immigration hearing date, if applicable.

- Length of time to immigration case resolution, if applicable.
- Breakdown and percentage of forms of immigration relief applied for.
- Breakdown and percentage of forms of relief granted, such as asylum, CAT, etc.

Outcome Measures:
- Number of CMPP participants who attended scheduled Executive Office of Immigration Review (EOIR) immigration court hearings, as applicable
  o Include breakdown of those with legal representation and those pro se.
- Number of CMPP participants identified as survivors of human trafficking, and of those identified, number referred to services.
- Number of CMPP participants (1) with a final order of removal during the time they are enrolled in CMPP; and (2) who complied with the order.

Recipients will be required to provide critical data, such as CMPP participant's A numbers, which will be used for performance management and program evaluation.

Additional information may be collected to inform performance management and program evaluation. The final PPR shall be provided at the time of grant closeout and contain actual data for the preceding service categories and a narrative summary of the grant's overall accomplishments.

**c. *Closeout Reporting Requirements***
   **I. CLOSEOUT REPORTING**
   Within 120 days after the end of the period of performance for the prime award or after an amendment has been issued to close out an award before the original POP ends, recipients must liquidate all financial obligations and must submit the following:
   i. The final request for payment, if applicable.
   ii. The final FFR (SF-425).
   iii. The final progress report detailing all accomplishments, including a narrative summary of the impact of those accomplishments throughout the period of performance. If applicable, the recipient must include with the final progress report an inventory of all construction projects.
   iv. Other documents required by this NOFO, terms and conditions of the award, or other FEMA guidance. If the final FFR and performance report periods coincide with the end of the period of performance, FEMA has discretion under 2 C.F.R. Part 200 to waive the last quarterly/semiannual/annual reports and only require the final FFR and performance report for closeout purposes. The recipient is responsible for returning any balances of unobligated or unliquidated funds that have been drawn down that are not authorized to be retained per 2 C.F.R. § 200.344(d).

In addition, pass-through entities are responsible for closing out their subawards as described in 2 C.F.R. § 200.344; subrecipients are still required to submit closeout materials within 90 calendar days of the period of performance end date. When a subrecipient completes all closeout requirements, pass-through entities must promptly complete all closeout actions for subawards in time for the recipient to submit all necessary documentation and information to FEMA during the closeout of the prime award.

After the prime award closeout reports have been reviewed and approved by FEMA, a closeout notice will be completed to close out the grant. The notice will indicate the period of performance as closed, list any remaining funds that will be de-obligated, and address the requirement of maintaining the grant records for at least three years from the date of the final FFR. The record retention period may be longer, such as due to an audit or litigation, for equipment or real property used beyond the period of performance, or due to other circumstances outlined in 2 C.F.R. § 200.334.

The recipient is responsible for refunding to FEMA any balances of unobligated cash that FEMA paid that are not authorized to be retained per 2 C.F.R. § 200.344(d).

## II. ADMINISTRATIVE CLOSEOUT

Administrative closeout is a mechanism for FEMA to unilaterally move forward with closeout of an award using available award information in lieu of final reports from the recipient per 2 C.F.R. § 200.344(h)-(i). It is a last resort available to FEMA, and if FEMA needs to administratively close an award, this may negatively impact a recipient's ability to obtain future funding. This mechanism can also require FEMA to make cash or cost adjustments and ineligible cost determinations based on the information it has, which may result in identifying a debt owed to FEMA by the recipient.

When a recipient is not responsive to FEMA's reasonable efforts to collect required reports needed to complete the standard closeout process, FEMA is required under 2 C.F.R. § 200.344(h) to start the administrative closeout process within the regulatory timeframe. FEMA will make at least three written attempts to collect required reports before initiating administrative closeout. If the recipient does not submit all required reports in accordance with 2 C.F.R. § 200.344, this NOFO, and the terms and conditions of the award, FEMA must proceed to administratively close the award with the information available within one year of the period of performance end date. Additionally, if the recipient does not submit all required reports within one year of the period of performance end date, per 2 C.F.R. § 200.344(i), FEMA must report in Contracting Performance Assessment Reporting System (CPARS) the recipient's material failure to comply with the terms and conditions of the award.

If FEMA administratively closes an award where no final FFR has been submitted, FEMA uses that administrative closeout date in lieu of the final FFR submission date as the start of the record retention period under 2 C.F.R. § 200.334.

In addition, if an award is administratively closed, FEMA may decide to impose remedies for noncompliance per 2 C.F.R. § 200.339, consider this information in reviewing future award applications, or apply special conditions to existing or future awards.

### d. *Additional Reporting Requirements*

#### I. DISCLOSING INFORMATION PER 2 C.F.R. § 180.335

This reporting requirement pertains to disclosing information related to government-wide suspension and debarment requirements. Before a recipient enters into a grant award with FEMA, the recipient must notify FEMA if it knows if it or any of the recipient's principals under the award fall under one or more of the four criteria listed at 2 C.F.R. § 180.335:

i. Are presently excluded or disqualified;

ii. Have been convicted within the preceding three years of any of the offenses listed in 2 C.F.R. § 180.800(a) or had a civil judgment rendered against it or any of the recipient's principals for one of those offenses within that time period;

iii. Are presently indicted for or otherwise criminally or civilly charged by a governmental entity (federal, state or local) with commission of any of the offenses listed in 2 C.F.R. § 180.800(a); or

iv. Have had one or more public transactions (federal, state, or local) terminated within the preceding three years for cause or default.

At any time after accepting the award, if the recipient learns that it or any of its principals falls under one or more of the criteria listed at 2 C.F.R. § 180.335, the recipient must provide immediate written notice to FEMA in accordance with 2 C.F.R. § 180.350.

#### II. REPORTING OF MATTERS RELATED TO RECIPIENT INTEGRITY AND PERFORMANCE

Appendix XII to 2 C.F.R. Part 200 sets forth a term and condition related to recipient integrity and performance matters that will apply to all federal awards under this funding opportunity. If the total value of currently active grants, cooperative agreements, and procurement contracts from all federal awarding agencies exceeds $10 million for any period of time during the period of performance of a federal award under this funding opportunity, then a recipient must maintain the currency of information reported in the Contracting Performance Assessment Reporting System (CPARS) about civil, criminal, or administrative proceedings described in paragraph 2 of Appendix XII at the reporting frequency described in paragraph 4 of Appendix XII.

III. **SINGLE AUDIT REPORT**

A recipient that expends $750,000 or more during the recipient's fiscal year in federal awards (as defined by 2 C.F.R. § 200.1) must have a single audit conducted in accordance with 2 C.F.R. § 200.514 except when it elects to have a program-specific audit conducted in accordance with 2 C.F.R. § 200.501. The audit must be conducted in accordance with 2 C.F.R. Part 200, Subpart F and, as required by 2 C.F.R. § 200.514, in accordance with the U.S. Government Accountability Office (GAO) Generally Accepted Government Auditing Standards, which can be found on the Yellow Book page of the GAO website.

**5. Monitoring and Oversight**

The regulation at 2 C.F.R. § 200.337 provides DHS and any of its authorized representatives with the right of access to any documents, papers, or other records of the recipient [and any subrecipients] that are pertinent to a federal award in order to make audits, examinations, excerpts, and transcripts. The right also includes timely and reasonable access to the recipient's or subrecipient's personnel for the purpose of interview and discussion related to such documents. Pursuant to this right and per 2 C.F.R. § 200.329, DHS may conduct desk reviews and make site visits to review project accomplishments and management control systems to evaluate project accomplishments and to provide any required technical assistance. During site visits, DHS may review a recipient's or subrecipient's files pertinent to the federal award and interview and/or discuss these files with the recipient's or subrecipient's personnel. Recipients and subrecipients must respond in a timely and accurate manner to DHS requests for information relating to a federal award.

Effective monitoring and oversight help FEMA ensure that recipients use grant funds for their intended purpose(s); verify that projects undertaken are consistent with approved plans; and ensure that recipients make adequate progress toward stated goals and objectives. Additionally, monitoring serves as the primary mechanism to ensure that recipients comply with applicable laws, rules, regulations, program guidance, and requirements. FEMA regularly monitors all grant programs both financially and programmatically in accordance with federal laws, regulations (including 2 C.F.R. Part 200), program guidance, and the terms and conditions of the award. All monitoring efforts ultimately serve to evaluate progress towards grant goals and proactively target and address issues that may threaten grant success during the period of performance.

FEMA staff will periodically monitor recipients to ensure that administrative processes, policies and procedures, budgets, and other related award criteria are meeting Federal Government-wide and FEMA regulations. Aside from reviewing quarterly financial and programmatic reports, FEMA may also conduct enhanced monitoring through either desk-based reviews, onsite monitoring visits, or both. Enhanced monitoring will involve the review and analysis of the financial compliance and administrative processes, policies, activities, and other attributes of each federal assistance award, and it will identify areas where the recipient may need technical assistance, corrective actions, or other support.

Financial and programmatic monitoring are complementary processes within FEMA's overarching monitoring strategy that function together to ensure effective grants management, accountability, and transparency; validate progress against grant and program goals; and safeguard federal funds against fraud, waste, and abuse. Financial monitoring primarily focuses on statutory and regulatory compliance with administrative grant requirements, while programmatic monitoring seeks to validate and assist in grant progress, targeting issues that may be hindering achievement of project goals and ensuring compliance with the purpose of the grant and grant program. Both monitoring processes are similar in that they feature initial reviews of all open awards, and additional, in-depth monitoring of grants requiring additional attention.

Recipients and subrecipients who are pass-through entities are responsible for monitoring their subrecipients in a manner consistent with the terms of the federal award at 2 C.F.R. Part 200, including 2 C.F.R. § 200.332. This includes the pass-through entity's responsibility to monitor the activities of the subrecipient as necessary to ensure that the subaward is used for authorized purposes, in compliance with federal statutes, regulations, and the terms and conditions of the subaward; and that subaward performance goals are achieved.

In terms of overall award management, recipient and subrecipient responsibilities include, but are not limited to: accounting of receipts and expenditures, cash management, maintaining adequate financial records, reporting and refunding expenditures disallowed by audits, monitoring if acting as a pass-through entity, or other assessments and reviews, and ensuring overall compliance with the terms and conditions of the award or subaward, as applicable, including the terms of 2 C.F.R. Part 200.

## G. **DHS Awarding Agency Contact Information**
1. **Contact and Resource Information**
   a. ***Program Office Contact***
      Rachel.Gainor@hq.dhs.gov

   b. ***FEMA Grants News***
      FEMA Grants News is a non-emergency comprehensive management and information resource developed by FEMA for grants stakeholders. This channel provides general information on all FEMA grant programs and maintains a comprehensive database containing key personnel contact information at the federal, state, and local levels. When necessary, recipients will be directed to a federal point of contact who can answer specific programmatic questions or concerns. FEMA Grants News Team can be reached by e-mail at fema-grants-news@fema.dhs.gov OR by phone at (800) 368-6498, Monday through Friday, 9 a.m. – 5 p.m. ET.

   c. ***Grant Programs Directorate (GPD) Award Administration Division***
      GPD's Award Administration Division (AAD) provides support regarding financial matters and budgetary technical assistance. Additional guidance and information can be obtained by contacting the AAD's Help Desk via e-mail at ASK-GMD@fema.dhs.gov.

**d. *Civil Rights***

The FEMA Office of Civil Rights (OCR) is responsible for compliance with and enforcement of federal civil rights obligations in connection with programs and services conducted by FEMA and recipients of FEMA financial assistance. All inquiries and communications about federal civil rights compliance for FEMA grants under this notice should be sent to FEMA-CivilRightsOffice@fema.dhs.gov.

**e. *Environmental Planning and Historic Preservation***

The FEMA Office of Environmental Planning and Historic Preservation (OEHP) provides guidance and information about the EHP review process to FEMA programs and FEMA's recipients and subrecipients. All inquiries and communications about EHP compliance for FEMA grant projects under this notice or the EHP review process should be sent to FEMA-OEHP-NOFOQuestions@fema.dhs.gov.

**2. Systems Information**

**a. *FEMA GO***

For technical assistance with the FEMA GO system, please contact the FEMA GO Helpdesk at femago@fema.dhs.gov or (877) 585-3242, Monday through Friday, 9 a.m. – 6p.m. ET.

**H. Additional Information**
**1. Termination Provisions**

FEMA may terminate a federal award in whole or in part for one of the following reasons. FEMA and the recipient must still comply with closeout requirements at 2 C.F.R. §§ 200.344-200.345 even if an award is terminated in whole or in part. To the extent that subawards are permitted under this notice, pass-through entities should refer to 2 C.F.R. § 200.340 for additional information on termination regarding subawards.

**a. *Noncompliance***

If a recipient fails to comply with the terms and conditions of a federal award, FEMA may terminate the award in whole or in part. If the noncompliance can be corrected, FEMA may first attempt to direct the recipient to correct the noncompliance. This may take the form of a Compliance Notification. If the noncompliance cannot be corrected or the recipient is non-responsive, FEMA may proceed with a Remedy Notification, which could impose a remedy for noncompliance per 2 C.F.R. § 200.339, including termination. Any action to terminate based on noncompliance will follow the requirements of 2 C.F.R. §§ 200.341-200.342 as well as the requirement of 2 C.F.R. § 200.340(c) to report in FAPIIS the recipient's material failure to comply with the award terms and conditions. See also the section on Actions to Address Noncompliance in this notice.

**b. *With the Consent of the Recipient***

FEMA may also terminate an award in whole or in part with the consent of the recipient, in which case the parties must agree upon the termination conditions,

including the effective date, and in the case of partial termination, the portion to be terminated.

**c.  *Notification by the Recipient***
The recipient may terminate the award, in whole or in part, by sending written notification to FEMA setting forth the reasons for such termination, the effective date, and in the case of partial termination, the portion to be terminated. In the case of partial termination, FEMA may determine that a partially terminated award will not accomplish the purpose of the federal award, so FEMA may terminate the award in its entirety. If that occurs, FEMA will follow the requirements of 2 C.F.R. §§ 200.341-200.342 in deciding to fully terminate the award.

**2.  Program Evaluation**
Federal agencies are required to structure funding notices, so they incorporate program evaluation activities from the outset of their program design and implementation to meaningfully document and measure their progress towards meeting agency priority goal(s) and program outcomes.

OMB Memorandum M-21-27, Evidence-Based Policymaking: Learning Agendas and Annual Evaluation Plans, implementing Title I of the Foundations for Evidence-Based Policymaking Act of 2018, Pub. L. No. 115-435 (2019) (Evidence Act), urges federal awarding agencies to use program evaluation as a critical tool to learn, improve equitable delivery, and elevate program service and delivery across the program lifecycle. Evaluation means "an assessment using systematic data collection and analysis of one or more programs, policies, and organizations intended to assess their effectiveness and efficiency." Evidence Act, § 101 (codified at 5 U.S.C. § 311).

As such, recipients and subrecipients are required to participate in a DHS-, Component, or Program Office-led evaluation if selected, which may be carried out by a third-party on behalf of the DHS, its component agencies, or the Program Office. Such an evaluation may involve information collections including but not limited to surveys, interviews, or discussions with individuals who benefit from the federal award program operating personnel, and award recipients, as specified in a DHS-, component agency-, or Program Office-approved evaluation plan. More details about evaluation requirements may be provided in the federal award, if available at that time, or following the award as evaluation requirements are finalized. Evaluation costs incurred during the period of performance are allowable costs (either as direct or indirect) Recipients and subrecipients are also encouraged, but not required, to participate in any additional evaluations after the period of performance ends, although any costs incurred to participate in such evaluations are not allowable and may not be charged to the federal award.

**3.  Period of Performance Extensions**
Extensions to the period of performance (POP) for this program are allowed. Extensions to the POP identified in the award will only be considered through formal, written requests to CRCL.CMPP@hq.dhs.gov and must contain specific and compelling justifications as to why an extension is required. Recipients are advised to coordinate with CRCL.CMPP@hq.dhs.gov as needed when preparing an extension request.

All extension requests must address the following:
  a. The grant program, fiscal year, and award number;
  b. Reason for the delay –including details of the legal, policy, or operational challenges that prevent the final outlay of awarded funds by the deadline;
  c. Current status of the activity(ies);
  d. Approved POP termination date and new project completion date;
  e. Amount of funds drawn down to date;
  f. Remaining available funds, both federal and, if applicable, non-federal;
  g. Budget outlining how remaining federal and, if applicable, non-federal funds will be expended;
  h. Plan for completion, including milestones and timeframes for achieving each milestone and the position or person responsible for implementing the plan for completion; and
  i. Certification that the activity(ies) will be completed within the extended POP without any modification to the original statement of work, as described in the application, or other relevant documents and as approved by FEMA.

Extension requests will be granted only due to compelling legal, policy, or operational challenges. Extension requests will only be considered for the following reasons:
  • Contractual commitments by the recipient or subrecipient with vendors prevent completion of the project, including delivery of equipment or services, within the existing POP;
  • The project must undergo a complex environmental review that cannot be completed within the existing POP;
  • Projects are long-term by design, and therefore acceleration would compromise core programmatic goals; or
  • Where other special or extenuating circumstances exist.

Recipients should submit all proposed extension requests to FEMA for review and approval at least 60 days before the end of the POP to allow sufficient processing time.

**4. Disability Integration**
Pursuant to Section 504 of the Rehabilitation Act of 1973, recipients of FEMA financial assistance must ensure that their programs and activities do not discriminate against qualified individuals with disabilities.

Grant and cooperative agreement recipients should engage with the whole community to advance individual and community preparedness and to work as a nation to build and sustain resilience. In doing so, recipients are encouraged to consider the needs of individuals with disabilities into the activities and projects funded by the grant or cooperative agreement.

FEMA expects that the integration of the needs of people with disabilities will occur at all levels, including planning; alerting, notification, and public outreach; training; purchasing of equipment and supplies; protective action implementation; and exercises/drills.

The following are examples that demonstrate the integration of the needs of people with disabilities in carrying out FEMA awards:

- Include representatives of organizations that work with/for people with disabilities on planning committees, work groups and other bodies engaged in development and implementation of the grant programs and activities.
- Hold all activities related to the grant in locations that are accessible to persons with physical disabilities and intellectual disabilities to the extent practicable.
- Provide auxiliary aids and services, including American Sign Language interpreters, that provide public information across the community and in shelters.
- Ensure shelter-specific grant funds are in alignment with FEMA's Guidance on Planning for Integration of Functional Needs Support Services in General Population Shelters.
- If making alterations to an existing building to a primary function area utilizing federal funds, complying with the most recent codes and standards, and making path of travel to the primary function area accessible to the greatest extent possible.
- Implement specific procedures used by public transportation agencies that include evacuation and passenger communication plans and measures for individuals with disabilities.
- Identify, create, and deliver training to address any training gaps specifically aimed toward whole-community preparedness. Include and interact with individuals with disabilities, aligning with the designated program capability.
- Establish best practices in inclusive planning and preparedness that consider physical access, needs of individuals with intellectual disabilities, and information access.

FEMA grant recipients can fund projects towards the resiliency of the whole community, including people with disabilities, such as training, outreach, and safety campaigns, provided that the project aligns with this funding and the terms and conditions of the award.

**5. Conflicts of Interest in the Administration of Federal Awards or Subawards**
For conflicts of interest under grant-funded procurements and contracts, refer to the section on Procurement Integrity in this NOFO and 2 C.F.R. §§ 200.317 – 200.327.

To eliminate and reduce the impact of conflicts of interest in the subaward process, recipients and pass-through entities must follow their own policies and procedures regarding the elimination or reduction of conflicts of interest when making subawards. Recipients and pass-through entities are also required to follow any applicable federal and state, local, tribal, or territorial (SLTT) statutes or regulations governing conflicts of interest in the making of subawards.

The recipient or pass-through entity must disclose to the respective Program Analyst or Program Manager, in writing, any real or potential conflict of interest that may arise during the administration of the federal award, as defined by the federal or SLTT statutes or regulations or their own existing policies, within five days of learning of the conflict of interest. Similarly, subrecipients, whether acting as subrecipients or as pass-through entities, must disclose any real or potential conflict of interest to the recipient or next-level pass-through entity as required by the recipient or pass-through entity's conflict of interest policies, or any applicable federal or SLTT statutes or regulations.

Conflicts of interest may arise during the process of FEMA making a federal award in situations where an employee, officer, or agent, any members of his or her immediate family, his or her partner has a close personal relationship, a business relationship, or a professional relationship, with an applicant, subapplicant, recipient, subrecipient, or FEMA employees.

6. **Procurement Integrity**

Through audits conducted by the DHS Office of Inspector General (OIG) and FEMA grant monitoring, findings have shown that some FEMA recipients have not fully adhered to the proper procurement requirements at 2 C.F.R. §§ 200.317 – 200.327 when spending grant funds. Anything less than full compliance with federal procurement requirements jeopardizes the integrity of the grant as well as the grant program. To assist with determining whether an action is a procurement or instead a subaward, please consult 2 C.F.R. § 200.331. For detailed guidance on the federal procurement standards, recipients and subrecipients should refer to various materials issued by FEMA's Procurement Disaster Assistance Team (PDAT), such as the PDAT Field Manual and Contract Provisions Guide. Additional resources, including an upcoming trainings schedule can be found on the PDAT Website: https://www.fema.gov/grants/procurement.

The below highlights the federal procurement requirements for FEMA recipients when procuring goods and services with federal grant funds. FEMA will include a review of recipients' procurement practices as part of the normal monitoring activities. **All procurement activity must be conducted in accordance with federal procurement standards at 2 C.F.R. §§ 200.317 – 200.327.** Select requirements under these standards are listed below. The recipient and any of its subrecipients must comply with all requirements, even if they are not listed below.

Under 2 C.F.R. § 200.317, when procuring property and services under a federal award, states (including territories) must follow the same policies and procedures they use for procurements from their non-federal funds; additionally, states must now follow 2 C.F.R. § 200.321 regarding socioeconomic steps, 200.322 regarding domestic preferences for procurements, 200.323 regarding procurement of recovered materials, and 2 C.F.R. § 200.327 regarding required contract provisions.

All other non-federal entities, such as tribes (collectively, non-state entities), must have and use their own documented procurement procedures that reflect applicable SLTT laws and regulations, provided that the procurements conform to applicable federal law and the standards identified in 2 C.F.R. Part 200. These standards include, but are not limited to, providing for full and open competition consistent with the standards of 2 C.F.R. § 200.319 and the required procurement methods at § 200.320.

   a. ***Important Changes to Procurement Standards in 2 C.F.R. Part 200***

States are now required to follow the socioeconomic steps in soliciting small and minority businesses, women's business enterprises, and labor surplus area firms per 2 C.F.R. § 200.321. All non-federal entities should also, to the greatest extent practicable under a federal award, provide a preference for the purchase, acquisition,

or use of goods, products, or materials produced in the United States per 2 C.F.R. § 200.322. More information on OMB's revisions to the federal procurement standards can be found in Purchasing Under a FEMA Award: OMB Revisions Fact Sheet.

The recognized procurement methods in 2 C.F.R. § 200.320 have been reorganized into informal procurement methods, which include micro-purchases and small purchases; formal procurement methods, which include sealed bidding and competitive proposals; and noncompetitive procurements. The federal micro-purchase threshold is currently $10,000, and non-state entities may use a lower threshold when using micro-purchase procedures under a FEMA award. If a non-state entity wants to use a micro-purchase threshold higher than the federal threshold, it must follow the requirements of 2 C.F.R. § 200.320(a)(1)(iii)-(v). The federal simplified acquisition threshold is currently $250,000, and a non-state entity may use a lower threshold but may not exceed the federal threshold when using small purchase procedures under a FEMA award. *See* 2 C.F.R. § 200.1 (citing the definition of simplified acquisition threshold from 48 C.F.R. Part 2, Subpart 2.1).

See 2 C.F.R. §§ 200.216, 200.471, and Appendix II as well as section D.13.a of the NOFO regarding prohibitions on covered telecommunications equipment or services.

**b.** ***Competition and Conflicts of Interest***
Among the requirements of 2 C.F.R. § 200.319(b) applicable to all non-federal entities other than states, in order to ensure objective contractor performance and eliminate unfair competitive advantage, contractors that develop or draft specifications, requirements, statements of work, or invitations for bids or requests for proposals must be excluded from competing for such procurements. FEMA considers these actions to be an organizational conflict of interest and interprets this restriction as applying to contractors that help a non-federal entity develop its grant application, project plans, or project budget. This prohibition also applies to the use of former employees to manage the grant or carry out a contract when those former employees worked on such activities while they were employees of the non-federal entity.

Under this prohibition, unless the non-federal entity solicits for and awards a contract covering both development <u>and</u> execution of specifications (or similar elements as described above), and this contract was procured in compliance with 2 C.F.R. §§ 200.317 – 200.327, federal funds cannot be used to pay a contractor to carry out the work if that contractor also worked on the development of those specifications. This rule applies to all contracts funded with federal grant funds, including pre-award costs, such as grant writer fees, as well as post-award costs, such as grant management fees.

Additionally, some of the situations considered to be restrictive of competition include, but are not limited to:
- Placing unreasonable requirements on firms for them to qualify to do business;
- Requiring unnecessary experience and excessive bonding;
- Noncompetitive pricing practices between firms or between affiliated companies;

- Noncompetitive contracts to consultants that are on retainer contracts;
- Organizational conflicts of interest;
- Specifying only a "brand name" product instead of allowing "an equal" product to be offered and describing the performance or other relevant requirements of the procurement; and
- Any arbitrary action in the procurement process.

Per 2 C.F.R. § 200.319(c), non-federal entities other than states must conduct procurements in a manner that prohibits the use of statutorily or administratively imposed SLTT geographical preferences in the evaluation of bids or proposals, except in those cases where applicable federal statutes expressly mandate or encourage geographic preference. Nothing in this section preempts state licensing laws. When contracting for architectural and engineering services, geographic location may be a selection criterion provided its application leaves an appropriate number of qualified firms, given the nature and size of the project, to compete for the contract.

Under 2 C.F.R. § 200.318(c)(1), non-federal entities other than states are required to maintain written standards of conduct covering conflicts of interest and governing the actions of their employees engaged in the selection, award, and administration of contracts. **No employee, officer, or agent may participate in the selection, award, or administration of a contract supported by a federal award if he or she has a real or apparent conflict of interest.** Such conflicts of interest would arise when the employee, officer or agent, any member of his or her immediate family, his or her partner, or an organization that employs or is about to employ any of the parties indicated herein, has a financial or other interest in or a tangible personal benefit from a firm considered for a contract. The officers, employees, and agents of the non-federal entity may neither solicit nor accept gratuities, favors, or anything of monetary value from contractors or parties to subcontracts. However, non-federal entities may set standards for situations in which the financial interest is not substantial, or the gift is an unsolicited item of nominal value. The standards of conduct must provide for disciplinary actions to be applied for violations of such standards by officers, employees, or agents of the non-federal entity.

Under 2 C.F.R. 200.318(c)(2), if the recipient or subrecipient (other than states) has a parent, affiliate, or subsidiary organization that is not a state, local, tribal, or territorial government, the non-federal entity must also maintain written standards of conduct covering organizational conflicts of interest. In this context, organizational conflict of interest means that because of a relationship with a parent company, affiliate, or subsidiary organization, the non-federal entity is unable or appears to be unable to be impartial in conducting a procurement action involving a related organization. The non-federal entity must disclose in writing any potential conflicts of interest to FEMA or the pass-through entity in accordance with applicable FEMA policy.

**c.   *Supply Schedules and Purchasing Programs***
Generally, a non-federal entity may seek to procure goods or services from a federal supply schedule, state supply schedule, or group purchasing agreement.

I. **GENERAL SERVICES ADMINISTRATION SCHEDULES**

States, tribes, and local governments, and any instrumentality thereof (such as local education agencies or institutions of higher education) may procure goods and services from a General Services Administration (GSA) schedule. GSA offers multiple efficient and effective procurement programs for state, tribal, and local governments, and instrumentalities thereof, to purchase products and services directly from pre-vetted contractors. The GSA Schedules (also referred to as the Multiple Award Schedules and the Federal Supply Schedules) are long-term government-wide contracts with commercial firms that provide access to millions of commercial products and services at volume discount pricing.

Information about GSA programs for states, tribes, and local governments, and instrumentalities thereof, can be found at https://www.gsa.gov/resources-for/programs-for-State-and-local-governments and https://www.gsa.gov/buying-selling/purchasing-programs/gsa-schedules/schedule-buyers/state-and-local-governments.

For tribes, local governments, and their instrumentalities that purchase off of a GSA schedule, this will satisfy the federal requirements for full and open competition provided that the recipient follows the GSA ordering procedures; however, tribes, local governments, and their instrumentalities will still need to follow the other rules under 2 C.F.R. §§ 200.317 – 200.327, such as solicitation of minority businesses, women's business enterprises, small businesses, or labor surplus area firms (§ 200.321), domestic preferences (§ 200.322), contract cost and price (§ 200.324), and required contract provisions (§ 200.327 and Appendix II).

II. **OTHER SUPPLY SCHEDULES AND PROGRAMS**

For non-federal entities other than states, such as tribes, local governments, and nonprofits, that want to procure goods or services from a state supply schedule, cooperative purchasing program, or other similar program, in order for such procurements to be permissible under federal requirements, the following must be true:

- The procurement of the original contract or purchasing schedule and its use by the non-federal entity complies with state and local law, regulations, and written procurement procedures;
- The state or other entity that originally procured the original contract or purchasing schedule entered into the contract or schedule with the express purpose of making it available to the non-federal entity and other similar types of entities;
- The contract or purchasing schedule specifically allows for such use, and the work to be performed for the non-federal entity falls within the scope of work under the contract as to type, amount, and geography;

- The procurement of the original contract or purchasing schedule complied with all the procurement standards applicable to a non-federal entity other than states under at 2 C.F.R. §§ 200.317 – 200.327; and
- With respect to the use of a purchasing schedule, the non-federal entity must follow ordering procedures that adhere to applicable state, tribal, and local laws and regulations and the minimum requirements of full and open competition under 2 C.F.R. Part 200.

If a non-federal entity other than a state seeks to use a state supply schedule, cooperative purchasing program, or other similar type of arrangement, FEMA recommends the recipient discuss the procurement plans with CRCL.CMPP@hq.dhs.gov.

**d.** *Procurement Documentation*
Per 2 C.F.R. § 200.318(i), non-federal entities other than states and territories are required to maintain and retain records sufficient to detail the history of procurement covering at least the rationale for the procurement method, selection of contract type, contractor selection or rejection, and the basis for the contract price. States and territories are encouraged to maintain and retain this information as well and are reminded that in order for any cost to be allowable, it must be adequately documented per 2 C.F.R. § 200.403(g).

Examples of the types of documents that would cover this information include but are not limited to:
- Solicitation documentation, such as requests for quotes, invitations for bids, or requests for proposals;
- Responses to solicitations, such as quotes, bids, or proposals;
- Pre-solicitation independent cost estimates and post-solicitation cost/price analyses on file for review by federal personnel, if applicable;
- Contract documents and amendments, including required contract provisions; and
- Other documents required by federal regulations applicable at the time a grant is awarded to a recipient.
- Additional information on required procurement records can be found on pages 24-26 of the PDAT Field Manual.

**7. Record Retention**
**a.** *Record Retention Period*
Financial records, supporting documents, statistical records, and all other non-Federal entity records pertinent to a Federal award generally must be maintained for <u>at least</u> three years from the date the final FFR is submitted. *See* 2 C.F.R. § 200.334. Further, if the recipient does not submit a final FFR and the award is administratively closed, FEMA uses the date of administrative closeout as the start of the general record retention period.

The record retention period **may be longer than three years or have a different start date** in certain cases. These include:

- Records for real property and equipment acquired with Federal funds must be retained for **three years after final disposition of the property**. *See* 2 C.F.R. § 200.334(c).
- If any litigation, claim, or audit is started before the expiration of the three-year period, the records **must be retained until** all litigation, claims, or audit findings involving the records **have been resolved and final action taken**. *See* 2 C.F.R. § 200.334(a).
- The **record retention period will be extended if the non-federal entity is notified in writing** of the extension by FEMA, the cognizant or oversight agency for audit, or the cognizant agency for indirect costs, or pass-through entity. *See* 2 C.F.R. § 200.334(b).
- Where FEMA requires recipients to report program income after the period of performance ends, the **program income record retention period begins at the end of the recipient's fiscal year in which program income is earned**. *See* 2 C.F.R. § 200.334(e).
- For indirect cost rate computations and proposals, cost allocation plans, or any similar accounting computations of the rate at which a particular group of costs is chargeable (such as computer usage chargeback rates or composite fringe benefit rates), the start of the record retention period depends on whether the indirect cost rate documents were submitted for negotiation. If the **indirect cost rate documents were submitted for negotiation, the record retention period begins from the date those documents were submitted** for negotiation. If indirect cost rate documents were **not submitted for negotiation, the record retention period begins at the end of the recipient's fiscal year or other accounting period covered by that indirect cost rate**. *See* 2 C.F.R. § 200.334(f).

**b.** *Types of Records to Retain*

FEMA requires that non-federal entities maintain the following documentation for federally funded purchases:

- Specifications;
- Solicitations;
- Competitive quotes or proposals;
- Basis for selection decisions;
- Purchase orders;
- Contracts;
- Invoices; and
- Canceled checks.

Non-federal entities should keep detailed records of all transactions involving the grant. FEMA may at any time request copies of any relevant documentation and records, including purchasing documentation along with copies of cancelled checks for verification. *See, e.g.*, 2 C.F.R. §§ 200.318(i), 200.334, 200.337.

For any cost to be allowable, it must be adequately documented per 2 C.F.R. § 200.403(g). Non-federal entities who fail to fully document all purchases may find their expenditures questioned and subsequently disallowed.

## 8. Actions to Address Noncompliance

Non-federal entities receiving financial assistance funding from FEMA are required to comply with requirements in the terms and conditions of their awards or subawards, including the terms set forth in applicable federal statutes, regulations, funding notices, and policies. Throughout the award lifecycle or even after an award has been closed, FEMA or the pass-through entity may discover potential or actual noncompliance on the part of a recipient or subrecipient. This potential or actual noncompliance may be discovered through routine monitoring, audits, civil rights complaint investigations and compliance reviews, closeout, or reporting from various sources.

In the case of any potential or actual noncompliance, FEMA may place special conditions on an award per 2 C.F.R. §§ 200.208 and 200.339, FEMA may place a hold on funds until the matter is corrected, or additional information is provided per 2 C.F.R. § 200.339, or it may do both. Similar remedies for noncompliance with certain federal civil rights laws are authorized pursuant to 44 C.F.R. Parts 7 and 19 or other applicable regulations.

In the event the noncompliance is not able to be corrected by imposing additional conditions or the recipient or subrecipient refuses to correct the matter, FEMA may take other remedies allowed under 2 C.F.R. § 200.339. These remedies include actions to disallow costs, recover funds, wholly or partly suspend or terminate the award, initiate suspension and debarment proceedings, withhold further federal awards, or take other remedies that may be legally available. For further information on termination due to noncompliance, see the section on Termination Provisions in the funding notice.

FEMA may discover and take action on noncompliance even after an award has been closed. The closeout of an award does not affect FEMA's right to disallow costs and recover funds as long as the action to disallow costs takes place during the record retention period. *See* 2 C.F.R. §§ 200.334, 200.345(a). Closeout also does not affect the obligation of the non-federal entity to return any funds due as a result of later refunds, corrections, or other transactions. 2 C.F.R. § 200.345(a)(2).

The types of funds FEMA may attempt to recover include, but are not limited to, improper payments, cost share reimbursements, program income, interest earned on advance payments, or equipment disposition amounts.

FEMA may seek to recover disallowed costs through a Notice of Potential Debt Letter, a Remedy Notification, or other letter. The document will describe the potential amount owed, the reason why FEMA is recovering the funds, the recipient's appeal rights, how the amount can be paid, and the consequences for not appealing or paying the amount by the deadline.

If the recipient neither appeals nor pays the amount by the deadline, the amount owed will become final. Potential consequences if the debt is not paid in full or otherwise resolved by

the deadline include the assessment of interest, administrative fees, and penalty charges; administratively offsetting the debt against other payable federal funds; and transferring the debt to the U.S. Department of the Treasury for collection.

FEMA notes the following common areas of noncompliance for FEMA's grant programs:
- Insufficient documentation and lack of record retention;
- Failure to follow the procurement under grants requirements;
- Failure to submit closeout documents in a timely manner;
- Failure to follow EHP requirements; and
- Failure to comply with the POP deadline.

9. **Audits**

FEMA grant recipients are subject to audit oversight from multiple entities including the DHS OIG, the GAO, the pass-through entity, or independent auditing firms for single audits, and may cover activities and costs incurred under the award. Auditing agencies such as the DHS OIG, the GAO, and the pass-through entity (if applicable), and FEMA in its oversight capacity, must have access to records pertaining to the FEMA award. Recipients and subrecipients must retain award documents for at least three years from the date the final FFR is submitted, and even longer in many cases subject to the requirements of 2 C.F.R. § 200.334. In the case of administrative closeout, documents must be retained for at least three years from the date of closeout, or longer subject to the requirements of 2 C.F.R. § 200.334. If documents are retained longer than the required retention period, the DHS OIG, the GAO, and the pass-through entity, as well as FEMA in its oversight capacity, have the right to access these records as well. *See* 2 C.F.R. §§ 200.334, 200.337.

Additionally, non-federal entities must comply with the single audit requirements at 2 C.F.R. Part 200, Subpart F. Specifically, non-federal entities, other than for-profit subrecipients, that expend $750,000 or more in federal awards during their fiscal year must have a single or program-specific audit conducted for that year in accordance with Subpart F. 2 C.F.R. § 200.501. A single audit covers all federal funds expended during a fiscal year, not just FEMA funds. The cost of audit services may be allowable per 2 C.F.R. § 200.425, but non-federal entities must select auditors in accordance with 2 C.F.R. § 200.509, including following the proper procurement procedures. For additional information on single audit reporting requirements, see section F of this notice under the header "Single Audit Report" within the subsection "Additional Reporting Requirements" or other applicable document.

The objectives of single audits are to:
- Determine whether financial statements conform to generally accepted accounting principles (GAAP);
- Determine whether the schedule of expenditures of federal awards is presented fairly;
- Understand, assess and test the adequacy of internal controls for compliance with major programs; and
- Determine whether the entity complied with applicable laws, regulations, and contracts or grants.

For single audits, the auditee is required to prepare financial statements reflecting its financial position, a schedule of federal award expenditures, and a summary of the status of prior audit findings and questioned costs. The auditee also is required to follow up and take appropriate corrective actions on new and previously issued but not yet addressed audit findings. The auditee must prepare a corrective action plan to address the new audit findings. 2 C.F.R. §§ 200.508, 200.510, 200.511.

Non-federal entities must have an audit conducted, either single or program-specific, of their financial statements and federal expenditures annually or biennially pursuant to 2 C.F.R. § 200.504. Non-federal entities must also follow the information submission requirements of 2 C.F.R. § 200.512, including submitting the audit information to the Federal Audit Clearinghouse within the earlier of 30 calendar days after receipt of the auditor's report(s) or nine months after the end of the audit period. The audit information to be submitted include the data collection form described at 2 C.F.R. § 200.512(c) and Appendix X to 2 C.F.R. Part 200 as well as the reporting package described at 2 C.F.R. § 200.512(b).

The non-federal entity must retain one copy of the data collection form and one copy of the reporting package for three years from the date of submission to the Federal Audit Clearinghouse. 2 C.F.R. § 200.512; *see also* 2 C.F.R. § 200.517 (setting requirements for retention of documents by the auditor and access to audit records in the auditor's possession).

FEMA, the DHS OIG, the GAO, and the pass-through entity (if applicable), as part of monitoring or as part of an audit, may review a non-federal entity's compliance with the single audit requirements. In cases of continued inability or unwillingness to have an audit conducted in compliance with 2 C.F.R. Part 200, Subpart F, FEMA and the pass-through entity, if applicable, are required to take appropriate remedial action under 2 C.F.R. § 200.339 for noncompliance, pursuant to 2 C.F.R. § 200.505.

## 10. Payment Information
FEMA uses the Direct Deposit/Electronic Funds Transfer (DD/EFT) method of payment to recipients.

Payment requests are submitted through FEMA GO.

## 11. Whole Community Preparedness
Preparedness is a shared responsibility that calls for the involvement of everyone—not just the government—in preparedness efforts. By working together, everyone can help keep the nation safe from harm and help keep it resilient when struck by hazards, such as natural disasters, acts of terrorism, and pandemics.

Whole Community includes:
- Individuals and families, including those with access and functional needs;
- Businesses;
- Faith-based and community organizations;
- Nonprofit groups;
- Schools and academia;

- Media outlets; and
- All levels of government, including state, local, tribal, territorial, and federal partners.

The phrase "Whole Community" often appears in preparedness materials, as it is one of the guiding principles. It means:
1. Involving people in the development of national preparedness documents; and
2. Ensuring their roles and responsibilities are reflected in the content of the materials.

## 12. Report issues of fraud, waste, abuse

Please note, when applying to this notice of funding opportunity and when administering the grant, applicants may report issues of fraud, waste, abuse, and mismanagement, or other criminal or noncriminal misconduct to the Office of Inspector General (OIG) Hotline. The toll-free numbers to call are (800-323-8603, and TTY 844-889-4357.

## 13. Hazard-Resistant Building Codes

Hazard-resistant building codes are a foundational element of a more resilient nation, safeguarding communities and lives against natural disasters, with an estimated $11:1 return on investment. The adoption, enforcement and application of modern building codes mitigates community vulnerabilities, reduces disaster recovery costs, and strengthens nationwide capability. FEMA is working to promote and support building codes in all areas of its work in support of the multi-agency National Initiative to Advance Building Codes. In the interest of building a stronger, more resilient nation, FEMA encourages all grant recipients and subrecipients to meet current published editions of relevant consensus-based building codes, specifications, and standards, and to exceed them where feasible."

# EXHIBIT 3

OFFICE OF INSPECTOR GENERAL

# FEMA Should Increase Oversight to Prevent Misuse of Humanitarian Relief Funds



**March 28, 2023**

**OIG-23-20**



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

March 28, 2023

MEMORANDUM FOR:   The Honorable Deanne Criswell
Administrator
Federal Emergency Management Agency

FROM:   Joseph V. Cuffari, Ph.D.
Inspector General

JOSEPH V CUFFARI  Digitally signed by JOSEPH V CUFFARI
Date: 2023.03.24 15:43:40 -07'00'

SUBJECT:   *FEMA Should Increase Oversight to Prevent Misuse of Humanitarian Relief Funds*

For your action is our final report, *FEMA Should Increase Oversight to Prevent Misuse of Humanitarian Relief Funds*. We incorporated the formal comments provided by your office.

The report contains two recommendations aimed at improving FEMA's oversight of the humanitarian relief funds. Your office concurred with both recommendations. Based on information provided in your response to the draft report, we consider recommendation 1 open and unresolved. As prescribed by the Department of Homeland Security Directive 077-01, *Follow-Up and Resolutions for the Office of Inspector General Report Recommendations*, within 90 days of the date of this memorandum, please provide our office with a written response that includes your (1) agreement or disagreement, (2) corrective action plan, and (3) target completion date for the recommendation. Also, please include responsible parties and any other supporting documentation necessary to inform us about the current status of the recommendation. Until your response is received and evaluated, recommendation 1 will be considered open and unresolved.

Based on information provided in your response to the draft report, we consider recommendation 2 open and resolved. Once your office has fully implemented the recommendation, please submit a formal closeout letter to us within 30 days so that we may close the recommendation. The memorandum should be accompanied by evidence of completion of agreed-upon corrective actions and of the disposition of any monetary amounts.

Please send your response or closure request to OIGAuditsFollowup@oig.dhs.gov.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Consistent with our responsibility under the *Inspector General Act of 1978, as amended*, we will provide copies of our report to congressional committees with oversight and appropriation responsibility over the DHS. We will post the report on our website for public dissemination.

If you have any questions, please call me at (202) 981-6000, or your staff may call Bruce Miller, Deputy Inspector General for Audits, at the same number.

Attachment



# DHS OIG HIGHLIGHTS
## *FEMA Should Increase Oversight to Prevent Misuse of Humanitarian Relief Funds*

**March 28, 2023**

## Why We Did This Audit

Congress appropriated $110 million to the Federal Emergency Management Agency (FEMA) Emergency Food and Shelter Program (EFSP) to provide humanitarian relief to families and individuals encountered by the Department of Homeland Security. We conducted this audit to determine whether FEMA awarded funding provided in the *American Rescue Plan Act of 2021* (ARPA) in accordance with Federal law and regulations.

## What We Recommend

We made two recommendations to improve oversight and enforcement for similar future appropriations.

**For Further Information:**
Contact our Office of Public Affairs at (202) 981-6000, or email us at DHS-OIG.OfficePublicAffairs@oig.dhs.gov

## What We Found

FEMA awarded $110 million in humanitarian relief funds provided by ARPA to the EFSP National Board to provide services to families and individuals encountered by DHS in communities most impacted by the humanitarian crisis at the Southwest border. As of September 8, 2021, the National Board awarded $80.6 million of the funds to 25 local recipient organizations (LRO) in California, New Mexico, Arizona, and Texas. We reviewed $12.9 million from 18 LROs and found they did not always use the funds consistent with the *American Rescue Plan Act of 2021 Humanitarian Relief Funding and Application Guidance* (funding and application guidance). Specifically, the LROs did not always provide the required receipts or documentation for claimed reimbursements. In addition, some of the LROs were unable to provide supporting documentation for families and individuals to whom they provided services. Also, we determined some families and individuals did not have a DHS encounter record.

These issues occurred because FEMA did not provide sufficient oversight of the funds and instead relied on local boards and fiscal agents to enforce the funding and application guidance. As a result, FEMA, as the National Board Chair, cannot ensure the humanitarian relief funds were used as intended by the funding and application guidance. We questioned $7.4 million, or 58 percent, of the $12.9 million we reviewed because, after several attempts, we were unable to obtain the required supporting documentation. Without additional oversight and enforcement from FEMA and the National Board, LROs may continue to use the funds for services without providing the required supporting documentation for reimbursement, increasing the risk of misuse of funds and fraud.

## FEMA's Response

FEMA concurred with both recommendations. Appendix A contains FEMA's management response in its entirety.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

# Background

On March 11, 2021, the President signed the *American Rescue Plan Act of 2021* (ARPA). ARPA appropriated $110 million to the Federal Emergency Management Agency (FEMA) for the Emergency Food and Shelter Program (EFSP) to provide humanitarian relief to families and individuals encountered by the Department of Homeland Security. *The Consolidated Appropriations Act, 2022* (Pub. L. 117-103), provided an additional $150 million in humanitarian relief funding to the EFSP.[1]

The EFSP was established to supplement and expand the ongoing work of local service agencies (non-profit, faith-based, and governmental) providing shelter, food, and supportive services to individuals and families in economic crisis, and to prevent individuals from becoming homeless. The program's existing grant delivery structure and public-private partnership made it a viable means for providing funds quickly to organizations providing humanitarian relief to families and individuals encountered by DHS in southern border states with the greatest need. The EFSP involves multiple organizations with different roles:

- The National Board is the governing body that administers the program. The National Board establishes the program's policies, procedures, and guidelines, makes award decisions, and oversees the use of the funds. It is composed of six nongovernmental organizations and FEMA.

- United Way Worldwide is the National Board's designated fiscal agent and Secretariat. In that role, United Way Worldwide performs the necessary daily administrative duties and functions of the National Board. It receives funds, disburses funds to vendors, documents funds received, and maintains documentation for subrecipient organizations, such as fiscal agents or local recipient organizations (LRO). Additionally, it is responsible for reconciling distributed funds, including collecting receipts and supporting documentation from LROs.

- FEMA is the National Board Chair. As the National Board Chair, FEMA is responsible for providing policy guidance, monitoring the overall administration and management of grant expenditures, Federal coordination, and staff assistance to the board. FEMA also obtains reports from the Secretariat and fiscal agent (United Way Worldwide) with a detailed accounting of all program funds.

---

[1] We did not review the additional funding or the associated guidance as part of this audit.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

- A local board is the governing body for the local EFSP in the county or city it serves. Local boards may review LRO applications for ESFP funds, determine eligibility, and submit the applications to the National Board.

- An LRO is any local non-profit, faith-based, or governmental entity that has been awarded EFSP funds. LROs are to expend funds on eligible costs and maintain supporting documentation.

The National Board, along with FEMA, developed the *American Rescue Plan Act of 2021 Humanitarian Relief Funding and Application Guidance* (funding and application guidance). This guidance covers award determination, eligible services, eligible recipients of the services, period to provide qualified services, and required documentation. The funding and application guidance groups eligible services into five broad categories: (1) primary services (food and shelter); (2) secondary services (clothing, health and medical services, legal aid, and translation expenses); (3) administrative services (staff salaries and supplies expenses); (4) equipment and asset services (purchases, leases, and necessary renovations to equipment and assets); and (5) transportation services (taxi, bus, airline, train, and associated parking expenses). The guidance prioritizes reimbursing LROs for primary services. Should funds remain, the National Board will consider non-primary services.

The funding and application guidance prioritizes awarding humanitarian relief funds to LROs in communities most impacted by the humanitarian crisis along the Southwest border in 2021. According to U.S. Customs and Border Protection (CBP) data, DHS made about 2 million encounters at the Southwest border in 2021. The National Board considered several factors when making award determinations:

- migrant release data from U.S. Immigration and Customs Enforcement and CBP;
- proximity to U.S. Immigration and Customs Enforcement and CBP facilities releasing migrants;
- number of migrants served;
- information organizations provided on the direct costs incurred in serving migrants;
- subject matter expertise and discretion of the National Board;
- any other information and guidance that might be applicable to determining awards; and
- sufficiency of available funding.

ARPA funding flows from the EFSP to the LROs. LROs can claim reimbursement for eligible humanitarian relief services they provided beginning on January 1, 2021. LROs receive funding by either direct reimbursement or advance funding. Expenditures already incurred by an LRO are directly



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

reimbursed.  LROs request special funding to receive advance funding before expending funds for services.  Figure 1 shows how ARPA funding in the EFSP flows.

**Figure 1. Flow of ARPA Humanitarian Relief Funding in the EFSP**



*Source:*  DHS Office of Inspector General analysis of FEMA's process

On March 18, 2021, FEMA awarded $110 million in humanitarian relief funding to the National Board.  According to the National Board, as of September 8, 2021, it had awarded $80.6 million of humanitarian relief funds to 25 LROs throughout California, New Mexico, Arizona, and Texas.  We judgmentally selected 18 LROs, which received awards totaling $66 million, to review how the funds were used.  The National Board continued to award and reimburse humanitarian relief funding to LROs throughout our audit.

As of September 2021, the 18 LROs reported they used $35.3 million of the $66 million in humanitarian relief funds they received to provide services to about 324,000 individuals.  As shown in Figure 2, the LROs used 30 percent of the $35.3 million in funds for primary services (food and shelter) and 70 percent for secondary, administrative, travel, and equipment services.  See Appendix B for the services provided by the 18 LROs and the reimbursed ARPA humanitarian relief funds.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

**Figure 2.  Spending Reported by 18 LROs by Service Category as of September 2021**



*Source:*  DHS OIG analysis of ARPA humanitarian relief funds approved and reimbursed as of September 2021

We conducted this audit to determine whether FEMA awarded funding provided in ARPA in accordance with Federal laws and regulations.

## Results of Audit

LROs did not always use the humanitarian relief funds consistent with ARPA and funding and application guidance.  The National Board awarded $66 million in ARPA-appropriated humanitarian relief funds to 18 eligible LROs to provide services to families and individuals encountered by DHS.  The 18 LROs reported using $35.3 million of those funds, of which we reviewed $12.9 million.  We determined that these 18 LROs did not always comply with the funding and application guidance when using funds.  Specifically, the LROs did not always provide or maintain the required receipts or documentation to support reimbursement for humanitarian relief fund services.  In addition, some of the LROs were unable to provide supporting documentation for families and individuals to whom they provided services.  From the information some LROs provided, we determined some families and individuals did not have a DHS encounter record.

These issues occurred because FEMA did not provide sufficient oversight and relied on local boards and fiscal agents to enforce the funding and application guidance.  As a result, FEMA, as National Board Chair, cannot ensure the humanitarian relief funds were used as intended by the funding and application guidance.  We questioned $7.4 million in humanitarian relief fund spending by LROs because, after several attempts, we were unable to obtain the required supporting documentation.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

**LROs Did Not Always Provide Receipts and Supporting Documentation for Reimbursement**

The funding and application guidance requires LROs to maintain and submit receipts for qualified expenses related to humanitarian relief funds.  For secondary and other non-primary services, LROs are required to provide documentation based on actual costs, daily logs of migrants served, spreadsheet of expenses incurred, and itemized receipts for the purchases, along with proof of payment, to the EFSP local board and National Board.

However, LROs did not always provide adequate supporting documentation for reimbursement for humanitarian relief services.  We tested a nonstatistical sample of 28 LRO Supplemental Funding Reimbursement Reports and five invoices LROs provided, in lieu of the reports, totaling $12.9 million (36 percent) of $35.3 million in claimed expenses.  We found $7.4 million in claimed expenses, representing 58 percent of the amount reviewed, were missing required supporting documentation.

Specifically, one LRO, a local government entity, did not adequately support $7.3 million in labor charges paid to a contractor that provided COVID-19 testing, a secondary service, between May and September 2021.  The National Board awarded a local government entity $30.6 million, or 28 percent of the $110 million humanitarian relief funds, to conduct COVID-19 testing at the Southwest border.  The local government entity entered into a time and materials contract with a private company (contractor) to test migrants for COVID-19, which required the contractor to provide qualified staff to work two 8-hour shifts anytime within a 24-hour period.[2]

Between May and September 2021, the local government entity paid $11.7 million in contractor invoices, which included more than $8.9 million in labor expenses.  Instead of providing supporting documentation for its labor charges, the contractor simply calculated the labor expenses on its invoices by multiplying 24 hours per day for every employee deployed to the testing site by each employee's labor rate.  At our request, the government entity requested the supporting documentation for the reimbursed labor expenses, but the contractor could not provide documentation to prove it actually paid the employees the amount it was reimbursed.  The contractor did provide records for some employees deployed to the testing site, which amounted to about $1.5 million.[3]  However, we questioned the remaining $7.3 million in labor expenses because the contractor did not provide supporting documentation.

---

[2] DHS' Combating Weapons of Mass Destruction Office had a similar contract with the same private company to provide COVID-19 testing prior to the local government entity's contract.
[3] We requested payroll information in September 2022 and reviewed contractor records provided through October 2022.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Additionally, we found:

- One LRO received duplicate reimbursements for claimed expenses. The LRO submitted all required documentation but was reimbursed twice for the same request of about $40,000. When this issue was brought to the attention of the LRO, it confirmed the amount paid was a duplicate and resolved the overpayment by offsetting a future payment.

- Two LROs miscalculated or failed to support expenses totaling about $7,000 in humanitarian relief services. In these instances, the LROs did not include documentation for all claimed expenses, as required.

**LROs Did Not Always Provide Supporting Documentation for Families and Individuals They Assisted**

ARPA requires humanitarian relief funds be used only for families and individuals encountered by DHS. Further, the funding and application guidance allows LROs to claim reimbursement for primary services (i.e., food and shelter) using per meal rates or per diem shelter rates, but they must submit a daily log of the number of meals served or shelter nights provided. Alternatively, LROs may claim actual expenses for these primary services. LROs that provide both primary and secondary services may claim reimbursement at per capita rates (i.e., per person rates),[4] but must provide a log of "unique migrants" (i.e., the number of migrants) who receive these services. However, the funding and application guidance does not require LROs to maintain logs that include the names of the families and individuals to whom they provided humanitarian relief services. Of the 15[5] LROs that provided food and shelter to families and individuals we found:

- One LRO did not respond to our requests for supporting documentation for the number of families and individuals served. Therefore, we could not confirm that those who received services amounting to about $15,000 in reimbursements met the ARPA eligibility requirement.

- Two LROs did not maintain supporting documentation for the number of families and individuals served. Therefore, we could not confirm that those who received services amounting to about $13,000 in reimbursements met the ARPA eligibility requirement.

- Two LROs maintained supporting documentation for the number but did not include the names of the families and individuals served. Therefore,

---

[4] Per the funding and application guidance, expenses for equipment and assets services are not included in the per capita rate.
[5] We did not review 3 of the 18 LROs in our sample because they did not provide primary services and were not required to submit a daily log for migrants served.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

we could not confirm that those who received services amounting to about $14,000 in reimbursements met the ARPA eligibility requirement.

- Ten LROs provided supporting documentation, that is, numbers and names or alien registration numbers (A-Number)[6] of families and individuals served.

In some cases, we determined LROs had provided services to individuals not encountered by DHS. We obtained names or A-Numbers from logs provided by the 10 LROs, which we tested in DHS' Enforcement Integrated Database[7] (EID) to determine whether the individuals met the ARPA eligibility requirement. Of the 824 names or A-Numbers we tested, 197 (24 percent) were ineligible to receive humanitarian relief services.[8] Specifically, 154 did not have an encounter recorded in EID, and 43 were encountered before the funding availability or they received services before DHS encountered them. For example, one of the 43 individuals whom DHS encountered in October 2017 obtained humanitarian relief services 1,235 days later, in March 2021. Another individual received humanitarian relief services 296 days before being encountered by DHS.

These issues occurred because, although FEMA and the National Board developed the detailed funding and application guidance for the humanitarian relief funds, they did not provide sufficient oversight to enforce the guidance to ensure funds were used as intended. Specifically, FEMA and the National Board relied on local boards and fiscal agents to review ongoing expenditures to ensure the LROs adequately supported claimed services. In addition, FEMA and the National Board cannot ensure LROs provide humanitarian relief services only to individuals DHS has encountered.

As a result, FEMA, as the National Board Chair, cannot ensure humanitarian relief funds were used as the guidance intended. If FEMA and the National Board continue awarding humanitarian relief funds without ensuring LROs are fully adhering to the requirements, LROs could continue to use the funding for unsupported expenditures. FEMA and the National Board should also

---

[6] An A-Number is a unique number DHS assigns to a noncitizen.

[7] EID is a "DHS shared common database repository used by several DHS law enforcement and homeland security applications. EID stores and maintains information related to the investigation, arrest, booking, detention, and removal of persons encountered during immigration and criminal law enforcement investigations and operations conducted by U.S. Immigration and Customs Enforcement (ICE), U.S. Citizenship and Immigration Services (USCIS), and U.S. Customs and Border Protection (USCBP)." *See*, https://www.dhs.gov/publication/dhsicepia-015h-enforcement-integrated-database-eid-criminal-history-information-sharing.

[8] Because we tested individual names or A-Numbers from a single day and the individuals may have received services on multiple days, we could not calculate the total humanitarian relief funds attributed to the 197 exceptions.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

determine how to prevent LROs from receiving reimbursements for expenditures used to assist ineligible individuals. FEMA's insufficient oversight opens humanitarian relief funds and future supplemental funding, including the $150 million humanitarian relief appropriated in 2022, to misuse or fraud.

## Recommendations

**Recommendation 1:** We recommend the FEMA Administrator ensure that the EFSP National Board resolve the $7.4 million in questioned costs and incorporate controls in the *American Rescue Plan Act of 2021 Humanitarian Relief Funding and Application Guidance* to minimize future reimbursements of unsupported costs. Additionally, the FEMA Administrator should ensure the labor hour reimbursements made to the COVID-19 testing contractor are appropriately supported.

**Recommendation 2:** We recommend the FEMA Administrator ensure the EFSP National Board implements oversight measures to enforce the *American Rescue Plan Act of 2021 Humanitarian Relief Funding and Application Guidance* for future supplemental appropriations. Specifically, develop a risk-based methodology to review a sample of ongoing funding execution for future supplemental appropriations to ensure funds approved are:

- reviewed and reconciled for completeness and accuracy; and
- supported with appropriate documentation, including rosters or other documentation for the number of people served.

## Management Comments and OIG Analysis

The Associate Administrator Office of Policy and Program Analysis provided written comments on a draft of this report, which are included in their entirety in Appendix A. FEMA concurred with the two recommendations in this report. FEMA submitted technical comments separately, which we addressed as appropriate. We consider recommendation 1 open and unresolved and recommendation 2 open and resolved. A summary of FEMA's management responses and our analysis follow.

**FEMA Response to Recommendation 1:** Concur. FEMA coordinated with the EFSP National Board to develop guidance to minimize future reimbursements of unsupported costs. Specifically, the EFSP in coordination with FEMA proactively issued guidance to disallow "on-call" labor hour terms in contracts using humanitarian relief funds and to require fiscal agents to report reimbursements quarterly. FEMA proposed additional fiscal guidance to require the EFSP National Board to report quarterly how funds are used and require LROs to provide additional information regarding migrants encountered



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

by DHS.  FEMA's estimated completion date for planned actions is June 30, 2023.

According to FEMA, the EFSP Board determined that the approximately $7.3 million in labor costs we questioned as unsupported was expended in accordance with the terms of the contract.  Additionally, FEMA indicated that the remaining questioned costs of approximately $100,000 had also been resolved.

**OIG Analysis:**  FEMA's response was partially responsive to our recommendation.  The actions planned and implemented by FEMA and the EFSP to update the application and funding guidance should improve compliance for future humanitarian relief funds.

However, FEMA's corrective actions do not address how FEMA intends to ensure the $7.4 million reimbursements we questioned are appropriately supported.  Specifically, the COVID-19 testing contract was a time and material or reimbursement-type contract, so the contractor should be able to promptly support labor hours claimed with evidence the respective employees were also paid for those hours.  As noted in our report, after several attempts, the contractor was unable to provide evidence that the contractor employees were paid for all the labor hours it was reimbursed.

Additionally, FEMA officials did not provide a response to our recommendation to address the missing receipts or unsupported migrant logs.  We consider this recommendation open and unresolved until FEMA provides evidence the planned corrective actions are implemented and provides supporting documentation or a plan to resolve the $7.4 million in questioned costs, including an estimated completion date and official(s) responsible for implementing the recommendation.

**FEMA Response to Recommendation 2:**  Concur.  FEMA coordinated with the EFSP National Board to develop guidance to enhance the oversight of humanitarian relief funds by requiring the EFSP and LROs to report expenditures quarterly.  In addition, FEMA plans to issue guidance and policy to verify humanitarian relief funds are used as intended.  FEMA's estimated completion date to implement all the corrective actions is June 30, 2023.

**OIG Analysis:** FEMA's corrective actions are responsive to the recommendation.  We consider this recommendation resolved and open until FEMA provides documentation to support the corrective actions have been completed and until FEMA identifies the official(s) responsible for implementing the recommendation.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

<hr>

## Objective, Scope, and Methodology

The Department of Homeland Security Office of Inspector General was established by the *Homeland Security Act of 2002* (Public Law 107–296) by amendment to the *Inspector General Act of 1978*.

Through ARPA, Congress appropriated $110 million to FEMA for the EFSP to provide humanitarian relief to families and individuals encountered by DHS. The EFSP awarded the humanitarian relief funds to LROs in communities most impacted by the humanitarian crisis along the Southwest border in 2021. The objective of this audit was to determine whether FEMA awarded funding provided in ARPA in accordance with Federal law and regulations. To answer our objective, we:

- interviewed the National Board to gain an understanding of its roles and responsibilities in distributing ARPA funding;
- interviewed United Way Worldwide officials to understand how they accounted for and reported on ARPA funding;
- interviewed LRO officials to determine how they accounted for ARPA funding; and
- reviewed the *American Rescue Plan Act of 2021 Humanitarian Relief Funding and Application Guidance.*

We analyzed the universe of humanitarian relief funds awarded to LROs as of September 8, 2021. According to the universe the EFSP National Board provided, it awarded funding to 25 LROs totaling $80.6 million, 73 percent of the $110 million humanitarian relief fund appropriation. From that universe, we judgmentally selected a sample of 18 LROs based on reimbursement status and largest funding award amounts, with award amounts just over $66 million. We requested and obtained Supplemental Funding Reimbursement Reports for the 18 LROs, which totaled $35.3 million in humanitarian relief funding received by the LROs.

To test whether LROs used the humanitarian relief funds in accordance with the funding and application guidance, we judgmentally selected a nonstatistical sample of 28 Supplemental Funding Reimbursement Reports and 5 invoices from the 18 LROs totaling $12.9 million. Additionally, we randomly selected daily logs from the 15 LROs that provided primary services, which totaled 9,719 migrants served. Of the 9,719 migrants' names requested, we received 9,310 names or A-Numbers and randomly selected 824 to test in EID.

To assess the validity and accuracy of this data, we reviewed the Supplemental Funding Reimbursement Reports, daily logs, and documentation for the 18 LROs in our sample. We performed detailed testing on the expenses



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

claimed to determine compliance with the funding and application guidance. Except for the deficiencies noted in our report, we verified that claimed reimbursements tested were supported by source documents. We used EID to test/determine whether the individuals and families claimed from the counts in the daily logs were encountered by DHS. As a result of our testing, we deemed the information sufficient and reliable to answer our audit objective.

We assessed EFSP's internal control structure, policies, procedures, and practices applicable to ARPA funding. We identified deficiencies in the communication and information, control activities, and monitoring internal control components. Our assessment would not necessarily disclose all significant deficiencies in this control structure. However, it disclosed deficiencies in FEMA's and the National Board's design and implementation of controls to ensure the humanitarian relief funds were used as intended. We discuss these deficiencies in the body of this report.

We conducted this performance audit between August 2021 and November 2022 pursuant to the *Inspector General Act of 1978, as amended,* and according to generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based upon our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based upon our audit objectives.



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

## Appendix A
## FEMA Comments to the Draft Report

**U.S. Department of Homeland Security**
**Washington, DC 20472**



February 24, 2023

MEMORANDUM FOR:    Joseph V. Cuffari, Ph.D.
                             Inspector General

FROM:                 Cynthia Spishak       CYNTHIA    Digitally signed by CYNTHIA SPISHAK
                 Associate Administrator   SPISHAK    Date: 2023.02.24 16:21:29 -05'00'
                 Office of Policy and Program Analysis

SUBJECT:           Management Response to Draft Report: "FEMA Should
                 Increase Oversight to Prevent Misuse of Humanitarian Relief
                 Funds"
                 (Project No. 21-043(a)-AUD-FEMA)

Thank you for the opportunity to comment on this draft report. The Federal Emergency Management Agency (FEMA) appreciates the work of the Office of Inspector General (OIG) in planning and conducting its review and issuing this report.

FEMA remains committed to our mission of helping people before, during and after disasters. The Emergency Food and Shelter Program (EFSP) is a FEMA-funded program that is administered by the EFSP National Board and that was authorized by the McKinney-Vento Homeless Assistance Act of 1987.[1] For the past 40 years, the EFSP has been providing funding for emergency and supplemental needs for those that are experiencing, or at risk of experiencing, hunger and homelessness across the nation. The thousands of local recipient organizations that received EFSP funding, and the thousands of clients who benefit, typically represent those who are most affected by local, regional, or national events of significance (including disasters).

The EFSP National Board is composed of representatives of the American Red Cross; Catholic Charities, USA; The Jewish Federations of North America; National Council of the Churches of Christ in the USA; The Salvation Army; and United Way Worldwide. A representative of FEMA serves as the chair of the EFSP National Board. FEMA's primary responsibilities pertaining to the EFSP are to constitute and chair the EFSP National Board, to provide grant oversight, and to serve as the Federal liaison to the EFSP National Board. The EFSP National Board is an excellent example of how public-

---

[1] The McKinney-Vento Homeless Assistance Act of 1987, the authorizing statute that lays out the structure for EFSP. See 42 U.S.C. §§ 11331 - 11352.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

private partnerships can succeed by capitalizing on the strengths of both the government and the nonprofit and faith-based community to recognize need within a community and to deliver funds efficiently.

On March 11, 2021, President Biden signed into law the American Rescue Plan Act of 2021 (ARPA). ARPA provided $400 million in appropriated EFSP funding for local social service organizations aiding our nation's hungry and homeless communities. ARPA also provided $110 million in appropriated EFSP funding for local recipient organizations providing critical humanitarian assistance to individuals and families encountered by the Department of Homeland Security at the southern border.

On March 17, 2021, FEMA awarded the entirety of this $110 million in ARPA humanitarian funding to the EFSP National Board to subsequently provide funding to local social service organizations. As of January 4, 2023, the EFSP National Board had awarded $98,700,684 (94.5% of the available $104,500,000)[2] in ARPA humanitarian funding to provide services to individuals and families encountered by DHS at the southern border. As of February 13, 2023, the remaining balance of available ARPA humanitarian funding is reserved to award applications currently in process.

Since FY2019, FEMA has awarded $290 million to the EFSP National Board to provide funding to local recipient organizations assisting individuals and families encountered by the Department of Homeland Security at the southern border. This financial assistance has been instrumental in providing shelter, food, and a number of other resources critical to this vulnerable community.

The EFSP National Board that governs the EFSP embraces its mission in providing life-sustaining resources to those in need, including communities experiencing hunger and homelessness and individuals and families encountered by DHS at the southern border. FEMA also recognizes the importance of ensuring funds – including the humanitarian funding provided within ARPA – are used properly and as appropriated. In April 2021, the EFSP National Board developed the *American Rescue Plan Act of 2021 Humanitarian Relief: Funding and Application Guidance* (referred to as *ARPA Humanitarian Funding and Application Guidance*).[3] The *ARPA Humanitarian Funding and Application Guidance* describes allowable costs, the eligible populations, and how to access funds. The *ARPA Humanitarian Funding and Application Guidance* also prioritizes awarding humanitarian relief funds to local recipient organizations (LROs) in communities most impacted by the humanitarian crisis along the southern border in 2021.

---

[2] The available ARPA humanitarian funding figure of $104,500,000 represents the $110,000,000 in appropriated ARPA humanitarian funding reduced by a 5% administrative allowance.
[3] EFSP National Board, *American Rescue Plan Act of 2021 Humanitarian Relief: Funding and Application Guidance* (April 2021).
https://www.efsp.unitedway.org/efsp/website/websiteContents/PDFs/American%20Rescue%20Plan%20Act%20Guidance.pdf.

2



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

To ensure better controls pertaining to the types of contracts used by LROs and to prevent issues to claimed labor expenses, the EFSP National Board proactively issued *Humanitarian Relief Funding Guidance Addendum Fiscal Year 2022* (dated September 2022) that allowed only for the use of time-worked contracts (as opposed to contract conditions that provide for the payment of "on-call" or "standby" hours).[4]

In December 2022, the EFSP National Board issued *Humanitarian Relief Funding Guidance Fiscal Year 2023 (Continuing Resolution $75 Million): Application and Funding Guidance* which instituted quarterly reporting to provide more oversight and updates on how funds were spent, thus reducing risk and increasing transparency.[5]

The draft report contained two recommendations with which FEMA concurs. Attached find our detailed response to each recommendation. FEMA previously submitted technical comments addressing several accuracy, contextual, and other issues under a separate cover for OIG's consideration.

Again, thank you for the opportunity to review and comment on this draft report. Please feel free to contact me if you have any questions. We look forward to working with you again in the future.

Attachment

---

[4] EFSP National Board, *Humanitarian Relief Funding Guidance Addendum Fiscal Year 2022*, at p. 1 (September 2022). https://www.efsp.unitedway.org/efsp/website/websiteContents/PDFs/AddendumtotheHumanitarianGuidance.pdf.
[5] EFSP National Board, *Humanitarian Relief Funding Guidance Fiscal Year 2023 (Continuing Resolution $75 Million): Application and Funding Guidance* (December 2022). https://www.efsp.unitedway.org/efsp/website/websiteContents/PDFs/Fiscal%20Year%202023%20Humanitarian%20Relief%20Funding%20Guidance.pdf.

3



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

**Attachment: Management Response to Recommendations
Contained in 21-043(a)-AUD-FEMA**

OIG recommended that:

**Recommendation 1:** The FEMA Administrator ensure that the Emergency Food and
Shelter Program National Board resolve the $7.4 million in questioned costs and
incorporate controls in the *American Rescue Plan Act of 2021 Humanitarian Relief
Funding and Application Guidance* to minimize future reimbursements of unsupported
costs. Additionally, the FEMA Administrator should ensure the labor hour
reimbursements made to the COVID-19 testing contractor are appropriately supported.

**Response:** Concur. The OIG's Notice of Findings and Recommendations (NFR) (dated
June 2022) referenced $3.1 million in questioned costs for claimed labor expenses.
Accordingly, FEMA coordinated with the EFSP National Board to look into this matter.
In January 2023, the EFSP National Board determined that the LRO paid the vendor
consistent with the terms of the contract and that there was no indication of misuse of
funds or fraud.

To ensure better controls on the permissibility of different types of contracts and to
prevent future issues, the EFSP National Board proactively issued *Humanitarian Relief
Funding Guidance Addendum Fiscal Year 2022* (dated September 2022) that allowed
only for the use of time-worked contracts (as opposed to contract conditions that provide
for the payment of "on-call" or "standby" hours):

> "FOR ALL CONTRACTS AND PROCUREMENT Effective immediately, all
> contracts that include compensation for paid staff will be restricted to "hours
> worked" only. Any contract conditions that include the payment of "on call" or
> "standby" hours will no longer be eligible. Agencies that currently use contracts
> with "on call" compensation for staff, should notify the EFSP National Board
> immediately to indicate when the contracts can be modified or the EFSP grant
> recipient will be responsible for a portion of these associated costs."
>
> *See* EFSP National Board, *Humanitarian Relief Funding Guidance Addendum
> Fiscal Year 2022*, at p. 1 (September 2022).
> https://www.efsp.unitedway.org/efsp/website/websiteContents/PDFs/Addendumto
> theHumanitarianGuidance.pdf.

Previously, in 2022 and again on February 7, 2023, FEMA Recovery Directorate
confirmed with the EFSP National Board that the applicant in question regarding the
COVID-19 testing contract terminated its previous agreement and is only using a time-

4



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

worked contract in compliance with the *Humanitarian Relief Funding Guidance Addendum Fiscal Year 2022* (September 2022).

Furthermore, in December 2022 the EFSP National Board issued *Humanitarian Relief Funding Guidance Fiscal Year 2023 (Continuing Resolution $75 Million): Application and Funding Guidance*[6] which instituted quarterly reporting to provide more oversight and updates on how funds were spent, thus reducing risk and increasing transparency.

By an estimated completion date of February 28, 2023, FEMA will publish the *Notice of Funding Opportunity for FY 2023 Humanitarian Relief Funding* which will require the EFSP National Board to report quarterly the estimated number of services provided by LROs, thus allowing greater transparency and reducing risk.

Whereas the OIG initially identified $3.1 million in questioned costs within the OIG's *Notice of Findings and Recommendations* (date June 2022), within the OIG's *Draft Report* (dated January 2023) the OIG identified $7.4 million in questioned costs. Specifically, in February 2023, the OIG provided the following itemization of its $7.4 million questioned costs figure:

- $7,339,106.89 questioned as unsupported because the contractor did not provide timely documentation supporting the labor charges in the "time and material" contract for COVID-19 testing;
- $40,106.16 questioned as unsupported because of duplicate payment;
- $7,205.41 questioned as unsupported because of miscalculated expenses or missing receipts; and
- $42,156.02 questioned as unsupported because LROs did not provide supporting documentation for migrants served.

The OIG's $7.339 million in questioned costs includes the previously addressed $3.1 million in questioned costs that OIG initially identified within its June 2022 NFR and an additional $4.239 million in questioned costs (pertaining to the same issue that the EFSP National Board addressed in 01/2023 by determining that the funds were expended in accordance with the terms described within the contract and that the EFSP National Board addressed in September 2022 by issuing *Humanitarian Relief Funding Guidance Addendum Fiscal Year 2022* that prohibited the use of contract conditions that provide for the payment of "on-call" or "standby" hours).

---

[6] EFSP National Board, *Humanitarian Relief Funding Guidance Fiscal Year 2023 (Continuing Resolution $75 Million): Application and Funding Guidance* (December 2022).
https://www.efsp.unitedway.org/efsp/website/websiteContents/PDFs/Fiscal%20Year%202023%20Humanitarian%20Relief%20Funding%20Guidance.pdf.

5



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

Regarding the $40,106.16 in questioned costs related to duplication of payments, the OIG noted that the LRO associated with this questioned cost "resolved the overpayment by offsetting a future payment" (*Draft Report*, p. 6).

Regarding the $7,205.41 in questioned costs pertaining to the missing receipts or miscalculated expenses, the EFSP National Board has a process in place to reconcile any compliance issues in accordance with its guidance (e.g. *ARPA of 2021 Humanitarian Relief: Funding and Application Guidance* section entitled "Closeout" at page 53) and 2 CFR 200.344.[7] The EFSP National Board extended the spending period for LROs to fully spend ARPA funds until March 31, 2023. As such, the final reports are not yet due according to the EFSP National Board's procedures. Since the EFSP National Board already has appropriate procedure in place, FEMA considers the subject matter of these questioned costs to be resolved.

Regarding the $42,156.02 in questioned costs related to LROs not providing the supporting documentation for the number of migrants served, the EFSP National Board's *American Rescue Plan Act of 2021 Humanitarian Relief: Funding and Application Guidance* (April 2021)[8] and application sample logs required the count of the number of unique migrants served and did not require LROs to provide the underlying Personally Identifiable Information such as name and Alien number.

To ensure LROs have a process for verifying that they are serving the eligible population and to inform the numbers added to the daily logs, by an estimated completion date of June 30, 2023, the EFSP National Board, with technical assistance from FEMA, will complete a funding request template that will include questions surrounding how the recipient organization will ensure services are being provided to individuals and families encountered by DHS, as designated within the appropriations, by outlining their process to identify those individuals and families who require assistance.

We request this recommendation be considered implemented and closed.

---

[7] "§ 200.344 Closeout." Code of Federal Regulations. https://www.ecfr.gov/current/title-2/subtitle-A/chapter-II/part-200/subpart-D/subject-group-ECFR682eb6fbfabcde2/section-200.344.
[8] EFSP National Board, *American Rescue Plan Act of 2021 Humanitarian Relief: Funding and Application Guidance* (April 2021). https://www.efsp.unitedway.org/efsp/website/websiteContents/PDFs/American%20Rescue%20Plan%20Act%20Guidance.pdf.

6



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

**Recommendation 2:** We recommend the FEMA Administrator ensure the Emergency Food and Shelter Program National Board implements oversight measures to enforce the American Rescue Plan Act of 2021 Humanitarian Relief Funding and Application Guidance for future supplemental appropriations. Specifically, develop a risk-based methodology to review a sample of ongoing funding execution for future supplemental appropriations to ensure funds approved are:

- reviewed and reconciled for completeness and accuracy; and
- supported with appropriate documentation, including rosters or other documentation for the number of people served.

**Response:** Concur. In December 2022 the EFSP National Board issued *Humanitarian Relief Funding Guidance Fiscal Year 2023 (Continuing Resolution $75 Million): Application and Funding Guidance*[9] which included a quarterly reporting requirement for local recipient organizations receiving EFSP humanitarian relief funding. This new requirement assists in providing more oversight and more current updates on how funds are being spent, thus reducing risk and increasing transparency. These reports allow the EFSP National Board to perform additional sampling of documentation for humanitarian funding.

By an estimated completion date of March 31, 2023, FEMA will also include in the forthcoming *Notice of Award for the FY2023 Humanitarian Relief Funding* to the EFSP National Board a requirement for the EFSP National Board to further define or clarify what is considered a recent encounter within EFSP National Board's forthcoming guidance pertaining to funding appropriated by Congress under the Consolidated Appropriations Act of 2023 (signed into law by President Biden on December 29, 2022).

Also, by an estimated completion date of April 30, 2023, FEMA will propose to the EFSP National Board a method for FEMA, the National Board, or their delegate, to perform random site visits to confirm that organizations are providing services to individuals and families encountered by DHS in accordance with their submitted and approved applications for funding from the EFSP National Board. (FEMA is one of seven votes on the EFSP National Board and FEMA cannot unilaterally guarantee changes to the EFSP National Board's guidance or procedures.)

Additionally, by an estimated completion date of June 30, 2023 the EFSP National Board, with technical assistance from FEMA, will complete a funding request template that will include questions surrounding how the recipient organization will ensure

---

[9] EFSP National Board, *Humanitarian Relief Funding Guidance Fiscal Year 2023 (Continuing Resolution $75 Million): Application and Funding Guidance* (December 2022). https://www.efsp.unitedway.org/efsp/website/websiteContents/PDFs/Fiscal%20Year%202023%20Humanitarian%20Relief%20Funding%20Guidance.pdf.

7



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

services are being provided to individuals and families encountered by DHS, as designated within the appropriations, by outlining their process to identify those individuals and families who require assistance.

In the Consolidated Appropriations Act of 2023 (signed into law by President Biden on December 29, 2022) for FY2023, Congress appropriated funds to the U.S. Customs and Border Protection (CBP) to transfer to FEMA to establish on CBP's behalf a new Shelter and Services Program (SSP) for the purpose of supporting migrant sheltering and related activities and to support CBP in effectively managing migrant processing and preventing the overcrowding of short-term CBP holding facilities. Because Congress recognized that FEMA and CBP will require adequate time to launch SSP, the FY2023 appropriation also authorizes DHS to use a portion of the FY2023 funding for EFSP humanitarian relief (as a bridge prior to the launch of SSP). Per Congress's Joint Explanatory Statement associated with Consolidated Appropriations Act of 2023, Congress' intent is for SSP to replace the need for supplemental EFSP humanitarian relief funding directed to individuals and families encountered by DHS.

We request this recommendation be considered implemented and closed.

8



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix B
## Humanitarian Relief Services Provided and Funds Reimbursed to 18 LROs, by Service Category, as of September 30, 2021

| Service Category | Total for All Charities Reviewed |
|---|---|
| A.  Primary Services, Per Capita Rate | $4,175,392.50 |
| B.  Primary Services, Per Meal Rate | $44,424.00 |
| C.  Primary Services, Per Diem Shelter Rate | $330,425.00 |
| D.  Primary Services, Congregate Meals | $2,088,125.83 |
| E.  Primary Services, Bags/Boxes of Food | $0- |
| F.  Primary Services, Food Bank - Cost of Food Purchased | $1,065.87 |
| G.  Primary Services, Food Bank - Indirect Provider (food by poundage) | $0- |
| H.  Primary Services, Basic First Aid/Over the Counter | $9,871.32 |
| I.  Primary Services, Food Storage Containers/Cookware/Utensils/T-Shirt bags | $14,660.17 |
| J.  Primary Services, Hygiene Items | $41,545.69 |
| K.  Primary Services, Cots and Beds | $24,177.00 |
| L.  Primary Services, Linen | $788.01 |
| M.  Primary Services, Agency/Facility Utilities | $0- |
| N.  Transportation Services, Local Transportation | $206,222.94 |
| O.  Transportation Services, Local Transportation Contracts (e.g., charter bus) | $113,010.00 |
| P.  Transportation Services, Mileage at Federal rate of 56 cents per mile | $14,224.13 |
| Q.  Transportation Services, Parking (local street, airport) | $9,457.24 |
| R.  Primary Services, Maintenance/Housekeeping | $5,701.36 |
| S.  Primary Services, Personal Protective Equipment (PPE) | $2,681.80 |
| T.  Secondary Services, Clothing, Shoes/Shoelaces/Belts | $106,710.52 |
| U.  Primary Services, Contracted Services | $959,817.52 |
| V.  Equipment and Assets Services | $780,998.86 |
| W.  Primary Services, Hotel/Motel Stay | $2,841,492.15 |
| X.  Transportation Services, Long Distance Transportation | $2,742,270.07 |
| Y.  Secondary Services, Health/Medical, including Health Screenings | $4,692,645.00 |
| Z.  Secondary Services, COVID-19 Testing | $11,662,203.28 |
| AA. Secondary Services, COVID-19 Associated Medical Care During Quarantine | $0- |
| AB. Secondary Services, Mental Health | $0- |
| AC. Secondary Services, Legal Aid | $0- |
| AD. Secondary Services, Translation Services | $145,245.88 |
| AE. Administrative Services | $4,335,481.80 |
| Total: | **$35,348,637.94** |

*Source:* DHS OIG analysis of 18 LRO Supplemental Funding Reimbursement Reports



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

**Appendix C**
**Potential Monetary Benefits**

| Type of Potential Monetary Benefit | Rec. No. | Amounts (Millions) |
|---|---|---|
| Questioned Costs –Unsupported | 1 | $7.4 |
| Funds Put to Better Use | | 0 |
| Totals | | $7.4 |

*Source*: DHS OIG analysis of findings in this report



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

## Appendix D
## Report Distribution

### Department of Homeland Security

Secretary
Deputy Secretary
Chief of Staff
Deputy Chiefs of Staff
General Counsel
Executive Secretary
Director, GAO/OIG Liaison Office
Under Secretary, Office of Strategy, Policy, and Plans
Assistant Secretary for Office of Public Affairs
Assistant Secretary for Office of Legislative Affairs

### Office of Management and Budget

Chief, Homeland Security Branch
DHS OIG Budget Examiner

### Congress

Congressional Oversight and Appropriations Committees

## Additional Information and Copies

To view this and any of our other reports, please visit our website at: www.oig.dhs.gov.

For further information or questions, please contact Office of Inspector General Public Affairs at: DHS-OIG.OfficePublicAffairs@oig.dhs.gov.
Follow us on Twitter at: @dhsoig.



## OIG Hotline

To report fraud, waste, or abuse, visit our website at www.oig.dhs.gov and click on the red "Hotline" tab. If you cannot access our website, call our hotline at (800) 323-8603, fax our hotline at (202) 254-4297, or write to us at:

Department of Homeland Security
Office of Inspector General, Mail Stop 0305
Attention: Hotline
245 Murray Drive, SW
Washington, DC 20528-0305

# EXHIBIT 4

U.S. Department of Homeland Security
Washington, DC 20472

 FEMA

February 18, 2025

Neil Thompson
Deputy Assistant Director
New York City Office of Management and Budget
255 Greenwich Street, 8th Floor
New York, NY 10007

Re:     Remedy for Noncompliance Letter, Shelter and Services Program (SSP)

        Grant Number: EMW-2023-SP-05027
        Period of Performance: 03/01/2023 – 09/30/2025 Award amount: $106,879,743.00

        Grant Number: EMW-2024-SP-05018
        Period of Performance: 10/01/2023 – 09/30/2026 Award amount: $59,302,125.07

        Grant Number: EMW-2024-SP-05125
        Period of Performance: 10/01/2023 – 09/30/2026 Award amount: $22,169,838.00

Dear Mr. Thompson:

The purpose of this letter is to notify you that DHS/FEMA is temporarily withholding payments to
your organization for the grant award(s) named above, pursuant to 2 C.F.R. § 200.339(a); has
recovered two payments completed via direct deposit on February 4, 2025, totaling $80,481,861.42,
and which constitutes a part of this temporary withholding; and is instituting specific conditions on
your award pursuant to 2 C.F.R. § 200.208.

**Findings**
The Department of Homeland Security has significant concerns that SSP funding is going to entities
engaged in or facilitating illegal activities.

For example, a substantial portion of your award goes to funding alien housing at the Roosevelt
Hotel in New York City. According to media reports, the vicious Venezuelan gang Tren De Aragua
has taken over the hotel and is using it as a recruiting center and base of operations to plan a variety
of crimes.[1] According to these same reports, these crimes include gun and drug sales as well as sex
trafficking, which can reasonably be presumed to be conducted in the hotel itself. One of the groups

---

[1] https://nypost.com/2024/10/17/us-news/nyc-migrant-hotels-violent-gang-rep-is-all-over-tiktok-say-fed-up-residents-who-worry-its-only-gonna-get-worse/; NYPD says migrant children behind several violent crimes near Times Square - ABC7 New York.

1

responsible for these activities refer to themselves as "diablos de la 42," which means the devils of 42nd St., a street near where the Roosevelt Hotel is located. DHS/FEMA has a responsibility to ensure that it does not make payments that fund criminal activity.

In addition to the crimes mentioned above, the Department is concerned that entities receiving payment under this program may be guilty of encouraging or inducing an alien to come to, enter, or reside in the United States in violation of law, 8 U.S.C. § 1324(a)(1)(A)(iv); transporting or moving illegal aliens, *id.* § 1324(a)(1)(A)(ii); harboring, concealing, or shielding from detection illegal aliens, *id.* § 1324(a)(1)(A)(iii); or applicable conspiracy, aiding or abetting, or attempt liability respecting these statutes.

DHS/FEMA is required to administer its grant awards so as to ensure that federal funding is expended and associated programs are implemented in full accordance with the U.S. Constitution, applicable federal statutes, and regulations. 2 C.F.R. § 200.300(a). The terms and conditions of the award allow the Department to institute appropriate remedies for noncompliance which include temporarily withholding payments or suspending or terminating the award for a failure to comply with the conditions of the award or applicable federal statutes. See 2 C.F.R. §§ 200.208; 200.340; and 200.339(a).

**Remedy Action(s) and Specific Condition(s)**
Non-federal entities receiving financial assistance from DHS/FEMA are required to comply with requirements in the terms and conditions of their awards or subawards, including the terms set forth in applicable federal statutes, regulations, NOFOs, and policies. Throughout the award lifecycle or even after an award has been closed, DHS/FEMA may discover potential or actual noncompliance on the part of a recipient or subrecipient. This potential or actual noncompliance may be discovered through routine monitoring, audits, closeout, or reporting from various sources. In the case of any potential or actual noncompliance, DHS/FEMA may place special conditions on an award per 2 C.F.R. § 200.208 and § 200.339, DHS/FEMA may place a hold on funds until the matter is corrected, or additional information is provided per 2 C.F.R. § 200.339, or it may do both.

Based on the concerns described above, DHS/FEMA will conduct additional monitoring and review of your award(s) as permitted by the terms and conditions of the award(s) to ensure compliance with all terms and conditions of your award(s). During this time, payments under the grant award(s) will be temporarily held. This action includes the amount of funding identified above that DHS/FEMA recently clawed back. Further, you are not permitted to incur any additional costs under the grant until notified further by DHS/FEMA.

To assist DHS/FEMA in conducting this review, please respond within 30 days with the following information that your organization has not already submitted to DHS/FEMA:

1. All documents regarding the aliens with whom your organization and your subrecipients and contracts interacted with in carrying out the scope of your SSP award, including their names and contact information; and a detailed and descriptive list of specific services provided, and proof of provision of these services; or
2. A written statement that your organization has already submitted all of the information identified in No. 1, above, to DHS/FEMA.

2

Upon the conclusion of that monitoring, FEMA will notify you of the results and any other remedies for noncompliance or specific conditions, as appropriate.

**Opportunity to Appeal**
Your organization has the right to appeal this action within 60 days of the date of this letter. The appeal must include the following information:

> 1. Grant number(s).
> 2. Recipient name.
> 3. A written explanation, on your organization's letterhead, explaining why you believe FEMA's decision to temporarily withhold payments to your organization for the grant award(s) named above, pursuant to 2 C.F.R. § 200.339(a), or to prohibit your organization from incurring additional costs under the grant, is not correct.
> 4. Copies of any documents or statements that support your position that FEMA's decision to temporarily withhold payments to your organization for the grant award(s) named above, pursuant to 2 C.F.R. § 200.339(a) is not correct.

Written appeals should be sent directly to FEMA-SSP@fema.dhs.gov.

The FEMA Grant Programs Directorate is available to respond to any questions you may have. Please send all information and communications regarding this notification to FEMA-SSP@fema.dhs.gov.

Sincerely,

Cameron Hamilton
Senior Official Performing the Duties of the
Administrator