P35DCitO

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CITY OF NEW YORK,

4                  Plaintiff,

5          v.                              25 CV 01510

6   DONALD TRUMP, in his official
    capacity as President of the
7   United States, et al.,

8                  Defendants.
                                           Oral Argument
9   ------------------------------x
                                           New York, N.Y.
10                                         March 5, 2025
                                           12:15 p.m.
11
    Before:
12
                        HON. JENNIFER H. REARDEN,
13
                                           District Judge
14

15                          APPEARANCES

16  NEW YORK CITY LAW DEPARTMENT
          Attorneys for Plaintiff
17  BY:   DORIS F. BERNHARDT
          JOSHUA PAUL RUBIN
18        AATIF IQBAL

19  UNITED STATES DEPARTMENT OF JUSTICE - CIVIL DIVISION
          Attorneys for Defendants
20  BY:   EMILY MARGARET HALL
          ALEXANDER RESAR

21

22

23

24

25
```

P35DCitO

1           THE DEPUTY CLERK:  *City of New York v. Trump, et al.*,

2    25 CV 01510.

3           Counsel, please state your appearance for the record,

4    starting with plaintiff.

5           MR. RUBIN:  Josh Rubin for the City of New York.

6           MS. BERNHARDT:  Doris Bernhardt for the City of New

7    York.

8           MR. IQBAL:  Aatif Iqbal for the City of New York.

9           THE COURT:  Hello.

10          MS. HALL:  Good morning, your Honor.  Emily Hall, with

11   the Department of Justice, for the defendants.

12          THE COURT:  Who is with you?

13          MS. HALL:  I'm joined by Alex Resar, also with the

14   Department of Justice.

15          THE COURT:  So, Ms. Hall, you'll be speaking for the

16   defendants then?

17          MS. HALL:  Yes, your Honor.

18          THE COURT:  For the plaintiffs, who will be speaking?

19          MR. RUBIN:  I'll be speaking.  Possibly, if a question

20   comes up, I may ask a colleague.

21          THE COURT:  That's fine.  Thank you.

22          Please be seated.  Good afternoon.

23          MR. RUBIN:  Good afternoon.

24          THE COURT:  I'm going to refer to the plaintiffs as

25   "the City" and the defendants collectively as "the Government."

P35DCitO

1          We are here on the City's application for a temporary

2    restraining order at ECF Nos. 3 and 5, and, specifically, for

3    an order requiring the government "to return to the City's bank

4    account the amount of $80,481,861.42 in" Federal Emergency

5    Management Shelter and Services Program, which I will refer to

6    as SSP, Fiscal Year 2024, which I will refer to as FY24, "grant

7    money that defendants removed on February 11, 2025, and

8    temporarily restraining and enjoining the government from

9    taking any further grant money from any City bank account in

10   connection with SSP FY24 and SSP FY23 FEMA grants."

11          Now, Mr. Rubin, this is your motion, and I do have

12   several questions for both sides, but I'm happy to begin with

13   you affirmatively making your case if you'd like to.

14          MR. RUBIN:  Thank you, your Honor.

15          Do you require that we stand or --

16          THE COURT:  Feel free to remain seated, everybody.

17   It's easier.  Just make sure, please, for the sake of

18   Ms. Walker, our court reporter, that you put the microphone

19   near your own mouth.

20          MR. RUBIN:  Thank you, your Honor.  May it please the

21   Court.

22          We are here because defendants took $80 million -- you

23   quoted the exact amount -- out of the City's bank account with

24   no notice and no lawful procedure.  It's money that FEMA

25   officials determined, after a thorough and detailed review,

P35DCitO

1    that the City was entitled to receive as reimbursement to cover

2    costs associated with providing shelter and services for people

3    that the Department of Homeland Security, the defendant here,

4    determined to release into the United States.  And, after

5    taking the money, the defendants stood up a post hoc and

6    pretextual administrative process through which they've

7    announced a funding freeze or pause to hold onto this money to

8    create a venire of normalcy and the appearance of compliance

9    with the Administrative Procedure Act and constitutional

10   obligations.

11           THE COURT:  Well, it wasn't all post hoc, was it?

12   Secretary Noem's memo was dated January 28, 2025.

13           MR. RUBIN:  Right, and the Noem memo does several

14   things that we think are problematic here.  And I want to pick

15   up the Noem memo, but I would like, if I may, first, to talk

16   about some things that the defendant President said last night,

17   because I think it's illustrative of what's really happening

18   here and it will shed some light on the Noem memo.  So I want

19   to answer your question --

20           THE COURT:  Last night, did you say?

21           MR. RUBIN:  Last night.

22           THE COURT:  All right.  Go ahead.

23           MR. RUBIN:  And I pulled this off of the transcript

24   posted on ABC News.  I have copies if the Court wants me to

25   make an exhibit.  But I'm going to read, what the President

P35DCitO

```
 1    said to Congress and to the American public was, "just listen
 2    to some of the appalling waste," and he went through a long
 3    list.  And in that list he says, "$59 million for illegal alien
 4    hotel rooms in New York City.  Real estate developers have done
 5    very well."
 6          And then he says, in all of these "scams" that he
 7    listed, including listing that, he said, "many more have been
 8    found out and exposed and swiftly terminated."  And then he
 9    said, "and we've taken back the money, and reduced our debt,"
10    and he said, "and we got it just in time."  So --
11          THE COURT:  But that comment didn't relate
12    specifically and exclusively to the $59 million that we're
13    talking about here today, did it?
14          Isn't it broader than that?
15          MR. RUBIN:  Well, I think it's broader than that.  I
16    think it includes all the things that he listed, but I think
17    that what it does do is signal the overall I think intent here,
18    which is to block programs that are already committed and
19    obligated and approved by Congress, grants that have been
20    awarded, payments that have been made, to stop all of that,
21    because they disagree with the programs.
22          And that brings me to the Noem --
23          THE COURT:  Well, just a moment.
24          MR. RUBIN:  I'm sorry.
25          THE COURT:  Now, grant recipients, there are terms and
```

P35DCitO

1   conditions here, correct?

2           MR. RUBIN:  Exactly.

3           THE COURT:  Grant recipients are also bound by the

4   regulatory requirements for grants in 2 CFR 200, correct?

5           MR. RUBIN:  Correct.

6           THE COURT:  Pursuant to those, they must manage and

7   administer the federal award in a manner so as to ensure that

8   federal funding is expended, and associated programs are

9   implemented in full accordance with the U.S. Constitution,

10  applicable federal statutes, and regulations.  From what I see

11  here in the memo circulated by Secretary Noem on January 28,

12  she cites statutes that she's concerned have been violated,

13  correct?

14          MR. RUBIN:  She does cite statutes that she says she's

15  concerned were violated.  What happened, in fact, with this

16  grant is we spent the money exactly as the grant provided we

17  were to spend the money, and as reviewed and determined and

18  approved by FEMA when they paid us the reimbursement.

19          So, for example, the allegation, the suggestion in the

20  memo and in public statements more recently that what we are

21  doing is inducing illegal immigration or anything of that sort

22  is something that FEMA has already determined with respect to

23  this particular payment is not the case, because they matched

24  the A number for every person for which we claimed

25  reimbursement for having provided services to that person and

P35DCitO

1   determined that those were people that the Department of

2   Homeland Security released into the country.

3           We don't receive a penny without FEMA matching up and

4   determining that this is not going to anything that the

5   government might be considering illegal.  It goes to providing

6   services to the people the Department of Homeland Security

7   released into the community.  So to suggest that in doing that

8   we are in violation of these other laws is really a

9   grant-negating position.  It's not a grant compliance question.

10  It's a grant-negating position.  It is a change in the

11  political position or the policy position of the government to

12  negate the grant.

13          It is not related to our compliance, because we went

14  through the very thorough review that we were spending in

15  accordance with the grant.  We really didn't go outside of that

16  at all.  And FEMA reviewed very carefully at several stages

17  before making the payment, and determined that we were within

18  the parameters of the grant.

19          And so the suggestion that in providing the food,

20  providing, you know, a night or however many nights in a room,

21  whether it's a hotel or whatever setting we provided for them,

22  is somehow doing these illegal things, we did exactly what we

23  were authorized to do and what we were authorized to claim

24  reimbursement to do.  And to suggest now that that might be

25  illegal is a change of position.  It is not a compliance issue.

P35DCitO

```
 1              THE COURT:  All right.  Go ahead.

 2              MR. RUBIN:  So, I can walk through the other

 3   statements, but let me talk a little bit more about the Noem

 4   memo for a second, because the other problematic piece of the

 5   Noem memo I think is that it's in the context of, you know,

 6   there's the litigation in Rhode Island brought by the states;

 7   there's a TRO against a funding pause; the funds here seem to

 8   have been taken back in connection with that memo, because we

 9   had not -- there are -- no apparent procedure had started with

10   us yet.  We were not put on notice.  We didn't receive this

11   noncompliance letter until a week after the money was gone.

12              So, the Noem memo seems to be the only piece of the

13   puzzle that apparently they suggest authorizes taking this

14   payment.  The TRO in that case allows for only normal grant

15   compliance, you know, applicable statutes, terms and

16   conditions.  It doesn't allow for broader freezes.  So, to the

17   extent the money was taken back because there's a broad

18   across-the-board pause on grants, then that's problematic

19   because of, you know, the TRO in that case.  But it's also

20   emblematic of a broader approach to try to negate these

21   programs.

22              In fact, when they went back to the Court in Rhode

23   Island and asked to be able to withhold funds under the FEMA

24   grants, they had already taken the money.  They did not

25   disclose to the Court in that case that they'd already taken
```

P35DCitO

1  this money from us.  And they gave us no notice.  We had to

2  notice it, you know, when we noticed the shortfall in the bank

3  account.

4          But they've also made clear, for example, in

5  statements by -- I'm going to call them the FEMA administrator,

6  because the title -- I'm not sure what his actual title is, but

7  he's acting in that --

8          THE COURT:  Mr. Hamilton?

9          MR. RUBIN:  Mr. Hamilton.  He put out a public

10  statement saying Congress should never have appropriated this

11  money, should never have asked FEMA to do this job, this stops

12  now.  And the --

13          THE COURT:  Well, there are other statements

14  referencing illegal activity, so I think there's a factual

15  issue there.

16          MR. RUBIN:  Again, in terms of illegal activity, if --

17  you know, the statements that were made before they took the

18  money are really more about luxury hotels.  We start hearing

19  about the illegal activity after they took the money and after

20  they started this process.  So the story and the rationales and

21  the different justifications and talking points around taking

22  this money have, you know, varied over time depending on who's

23  speaking and when.

24          The through line is a general animus to the program

25  itself, and they haven't pointed to a grant term or condition

P35DCitO

1    that says what they think we were supposed to have done and

2    didn't do with respect to these grants.  They cite a couple of

3    news articles.  I don't think citing news articles and saying

4    "we read some things in the paper, so we're taking

5    $80 million" -- two times FEMA went to the same facility, went

6    to the Roosevelt Hotel, did a site visit.  None of that's in

7    their letter.  None of that's in any of the statements.  None

8    of that is informing in any way the apparent process that

9    they've started.

10           THE COURT:  It is in their letter.  It is in their

11   letter.  It says, the Department of Homeland Security has

12   significant concerns that SSP funding is going to entities

13   engaged in or facilitating illegal activities.

14           MR. RUBIN:  The site visits are not in the letter.

15   They rely only on the news reports and --

16           THE COURT:  Mr. Hamilton's declaration says that law

17   enforcement investigations are ongoing relating to the hotels

18   or to the Roosevelt Hotel or --

19           MR. RUBIN:  Right, and we have no record of that here.

20   We have no record of that in the letter that they've provided

21   to us.  And in the letter that they provided to us, they don't

22   ask us for any information that's related to the allegations

23   that they're making.  They just said, give us names, A numbers,

24   some other information about the individuals.  They have the

25   names and the A numbers.  They've already reviewed the names

P35DCitO

1    and A numbers in approving the payment.  They haven't asked us

2    about the crime.

3        THE COURT:  This is FEMA last year you're saying,

4    right, 2024, when --

5        MR. RUBIN:  I'm talking about the letter we received

6    on the 18th.  The noncompliance letter doesn't ask us about

7    these alleged -- you know, these allegations about crime.  They

8    just want names and A numbers and other related information

9    about the individuals, but nothing about the things that we

10   did.

11       And, in fact, you have in the record I think a very

12   good example of what a normal compliance review looks like,

13   where they identify a number of issues; we're going to do a

14   site visit; here are a whole lot of things; we're going to come

15   look at records, all that sort of thing.  We identify the

16   issues.  We go through a process.  They say what's resolved,

17   what's still open.  None of that is in the February 18

18   noncompliance letter.

19       There's just a citation to news articles and a request

20   for A numbers, names, and contact information, a few other

21   pieces of information.  There's nothing about, "we're concerned

22   about the crime.  We want to hear what you have to say about

23   it."  There's nothing about that that suggests -- you know,

24   yes, we can appeal, but there's nothing that suggests any real

25   inquiry about this.

P35DCitO

1          On top of that, it's not a grant term or condition

2   issue.  It is a law enforcement issue.  There's nothing in the

3   grant terms and conditions that say, before anyone receives

4   shelter or food from you, that the City has to go through some

5   kind of process to make sure that they haven't and won't

6   potentially commit a crime.

7          So, we're concerned about law enforcement.  They're

8   concerned about law enforcement.  It's a law enforcement issue.

9   It's not a grant term and condition issue, because there's

10  nothing in the grant terms and conditions that say what it is

11  we were supposed to do that they're alleging we didn't do.

12          THE COURT:  Okay.

13          MR. RUBIN:  That's what brings this into the problems

14  -- the violation of the Spending Clause, because you can't

15  impose post hoc grant terms and conditions.  We think that

16  they're actually imposing grant negating terms and conditions

17  by saying, you know, we think that in providing these services,

18  you're inducing illegal immigration.  But we're providing the

19  services to people that DHS released per a grant that says

20  that's exactly what we're supposed to do.

21          THE COURT:  By the way, did you initiate this appeal

22  process outlined in the February 18 letter, or did you start

23  that process, or --

24          MR. RUBIN:  We haven't filed anything.  I mean, that's

25  barely two weeks ago.

P35DCitO

```
1              THE COURT:  Yes.

2              MR. RUBIN:  So, we have a 60-day clock on that.

3              THE COURT:  All right.  Please go ahead.

4              MR. RUBIN:  Sure.

5              Another thing that we pointed out on reply but I just

6    want to point out again, that they've acknowledged in their

7    papers, that to clawback money -- and there are numerous

8    instances where they've announced that that's what they did:

9    They've clawed back money; they've initiated a clawback of

10   money; they've demanded a clawback.  They've said these things.

11   It's in our papers.  And they've conceded that before clawing

12   back funds, they have to follow the process in the CFR, and

13   they cited the rules.  They didn't do that before they took the

14   money.

15             So, we're in a position where already there's been a

16   determination to take this money.  They've taken the money.

17   There's a very strong commitment from top to bottom not to fund

18   this program, even though the program has been funded by

19   Congress for this exact purpose, awarded to the City for this

20   exact purpose, approved, the payments were approved.  They went

21   through our budget.  They went through the A numbers.  They

22   went through everything.  They approved all of that in making

23   the payment.

24             So, this is really about a change in position, which

25   they can do going forward.  They can design grants differently.
```

P35DCitO

| | |
|---|---|
| 1 | They cannot issue grants if they're not funded by Congress. |
| 2 | They can do whatever going forward, but they can't |
| 3 | retroactively take back grants that have been provided through |
| 4 | a congressional appropriation and then awarded -- you know, |
| 5 | funded, approved, and paid. |
| 6 | That is problematic under the Administrative Procedure |
| 7 | Act.  It's problematic under several constitutional provisions. |
| 8 | Those are all in our brief.  But that is really the problem |
| 9 | here, that they are trying to negate the program. |
| 10 | I do want to talk about the need for, as we've |
| 11 | acknowledged up front, your Honor, and I -- you know, as we |
| 12 | acknowledged up front, that we know it's an extraordinary |
| 13 | request to have the money returned at the outset of the case. |
| 14 | The reason we're asking for that here is we think this money is |
| 15 | under significant and multiple threats and, as an |
| 16 | appropriation -- we've cited some case law -- funds are at |
| 17 | risk. |
| 18 | We've cited some cases that raise the mootness issue. |
| 19 | We think *Houston* actually is pretty -- the *Houston* case is |
| 20 | actually pretty on point here, because, in that case, the funds |
| 21 | were obligated, as they are here, and then they were |
| 22 | de-obligated on a termination with almost no notice, and then |
| 23 | they were rescinded.  And then, because the funds had not been |
| 24 | preserved through a TRO or preliminary injunction, the Court |
| 25 | then held that the case was moot. |

P35DCitO

1          So, we see multiple threats.  Congress -- there's a

2     bill in Congress.  We've cited that.  There's certainly -- you

3     know, one of the defendants is already saying this money has

4     repaid the Treasury and reduced the debt.  We are not sanguine

5     that the money is safe absent this relief, and, in fact, in a

6     case that we, you know, only had a few minutes to look at that

7     the Supreme Court handed down this morning, that court upheld,

8     allowed a district court's temporary restraining order ordering

9     payment.  Not just stopping things, but ordering payment.

10          So we think, given -- and that's the *USAID* case.

11          THE COURT:  Yes, I know.  But wasn't that a remand in

12     large part for clarification?

13          MR. RUBIN:  Right, but it denied the application to

14     stay the TRO, and the order was to direct payment.  So, you

15     know, this just happened today.  There's a lot of ways that it

16     does or doesn't apply.  But I think the top line point about

17     this is that it's extraordinary, but these are extraordinary

18     circumstances.

19          A lot of what's happening is happening very fast.

20     There's a lot at risk.  There's a lot of uncertainty.  And we

21     think there's just not safety to preserve the value and

22     preserve the claim absent transferring the money to the City.

23          THE COURT:  That bill that you mentioned, it's not

24     even available yet, right?

25          We don't know whether it pertains to funding going

P35DCitO

1   forward or if it includes recision, correct?

2           MR. RUBIN:  We haven't seen the language yet, but, you

3   know, we're just aware of how fast things are moving in

4   Washington right now.  There's certainly a March 14 deadline to

5   not shut down the government.  We don't know what will get

6   folded very quickly into that.  So, there's uncertainty.

7           We're not saying the bill takes the funds, but there

8   clearly -- there's risk, and there's significant risk.  I don't

9   think it's idle speculation at this point.  I think it's

10  substantially more tangible than that, and things can happen

11  very fast.

12          THE COURT:  All right.  Well, I have some questions

13  about that for both sides, but I'm going to hold them and let

14  you -- I want you to make whatever record you want to make.  So

15  if you have other points --

16          MR. RUBIN:  Your Honor, I think I'll address questions

17  as you ask.

18          THE COURT:  Okay.  Let me hear now from the

19  Government, please, Ms. Hall.

20          MS. HALL:  Yes, your Honor.

21          The Government believes that your Honor can dispose of

22  this motion on the irreparable harm factor alone in accordance

23  with *Freedom Holdings v. Spitzer*, and that's because financial

24  injury is generally reparable and the plaintiffs have not

25  established that any exception to that general principle

P35DCitO

applies here.  The money will, by black letter principles of

appropriations law, be available to plaintiff at the conclusion

of this suit, absent intervening congressional action.

Any congressional action, as your Honor and my friend

on the other side just discussed, is speculative at this point.

We don't -- as your Honor mentioned, we don't even know the

text of the bill that plaintiff cites.  We don't know what

might occur in that bill.  We don't know whether it would be

retrospective in any regard.  And so any basis of irreparable

harm based on that pending legislation is fundamentally

speculative, and under 31, U.S.C., 1301(a), funds may not be

spent on anything other than the objects for which the

appropriations were made.

Under the principles of time limits on appropriations,

section 1301(c), DHS can't obligate the funds it has already

obligated to plaintiff to another entity, and the balance of an

appropriation is available for five years after the conclusion

of the fiscal year.  That leaves until September 30 of 2029.

The money will be available at the conclusion of this suit if

it's litigated in the normal course, and so any argument that

plaintiff has made regarding irreparable harm fails.  They have

simply not shown that the City is likely to suffer irreparable

harm absent an injunction, and the Government believes that

that alone is sufficient to deny their motion.

THE COURT:  All right.  Unless you have other points

P35DCitO

1    -- you're going to stand on that, then, on irreparable harm?

2         MS. HALL:  As for irreparable harm, that was just a

3    preliminary point, your Honor.

4         THE COURT:  Go ahead.

5         MS. HALL:  I think there are other reasons as well

6    that the motion fails, if your Honor disagrees on irreparable

7    harm.  That I think is just one way to dispose of this motion,

8    because the plaintiff has clearly not shown irreparable harm.

9    But as to likelihood of success on the merits, plaintiff admits

10   that the standard in this case is more exacting than the usual

11   standard for injunctive relief, which is already very

12   demanding, because it seeks a mandatory injunction against the

13   government.

14        That standard requires the plaintiff to show a clear

15   or substantial likelihood of success on the merits, even more

16   than the typical likelihood of success on the merits.  The

17   plaintiff has not done that here, for several reasons:

18        First, the plaintiff has not demonstrated that its

19   claims belong in this court rather than the Court of Federal

20   Claims under the Tucker Act;

21        Second, the plaintiff has not demonstrated that

22   there's actually final agency action here, or that the

23   plaintiff is challenging final agency action here;

24        And, third, I think the substance of the plaintiff's

25   claims fail.  The actions that the defendants have taken are

P35DCitO

```
1    not contrary to law.  They are not arbitrary and capricious.

2    They're not ultra vires.  They don't violate the Spending

3    Clause, the separation of powers.

4              Your Honor, I can get into the details on any of those

5    points if you wish, but I think our brief lays out our

6    arguments on those issues.

7              THE COURT:  Yes, it does.  All right.  Thank you.

8              So let me jump into some questions now.  I want to

9    start by asking about how the parties are framing the agency

10   action here.

11             The City seems to suggest that the relevant agency

12   actions were, first, FEMA's so-called "money grab," see, for

13   example, ECF No. 10, which is the City's brief, at 6, and,

14   second, the "Remedy for Noncompliance Letter" and the

15   associated process, which is ECF No. 10, at 13.

16             Is that correct, Mr. Rubin?

17             MR. RUBIN:  That's correct, but I would also add that

18   I think what we've -- you know, and it's earlier in my

19   presentation, we think there's a more fundamental determination

20   to stop this program.  And so, with respect to the

21   noncompliance letter and the process that that starts, we've

22   argued and I think we would argue that not only is there

23   futility as a matter of the Administrative Procedure Act, but

24   really there's finality.  There's so many statements that this

25   is done, this is terminated.  The President said it last night.
```

P35DCitO

1           And I know that with 20 things that that might have

2     modified, we don't know exactly what he meant, but I think on

3     the standard here of "likelihood," and consistent with so many

4     of the other statements that other defendants in this case have

5     made, there's a real commitment to terminate this program and

6     to not give us this money.  So I think there's not only the

7     action of taking the money, there's not only the process

8     they've started, but there's a real -- there seems to be an

9     underlying determination to stop the program.

10           THE COURT:  But right now are you seeking a TRO based

11     on the money grab?

12           MR. RUBIN:  Yes, and also to stop the withhold -- stop

13     any withholding in connection with.

14           THE COURT:  All right.  The government, in contrast,

15     frames the action at issue as the yet incomplete final decision

16     to withhold payments from the City on a permanent basis or take

17     any other adverse action against it.  See, for example, ECF No.

18     17, government's opposition, at 22.

19           Is that correct, Ms. Hall?

20           MS. HALL:  That's correct, your Honor.

21           THE COURT:  Regarding the City's claim that the

22     relevant action is a so-called "money grab," regardless of

23     whether that constituted a final agency action, we'll set that

24     aside for a moment, what is your position on whether the

25     so-called "money grab" should be viewed as the action at issue?

P35DCitO

MS. HALL:  Your Honor, I think setting aside the
question of final agency action, that is the center of this
case, and that does seem to me to be the core of what plaintiff
is challenging in its temporary restraining order and
preliminary injunction motion.

MR. RUBIN:  Oh, and, your Honor, if I may?

THE COURT:  Yes.

MR. RUBIN:  I misspoke slightly.  For the TRO, what
we're asking is to return the money and no other taking of
money.  We didn't make the so-called withholding part of the
TRO request.  If the money's returned, then of course there
would be no withholding.  There wouldn't be funds that they
would be withholding at that point.

THE COURT:  Okay.  So just going back to Ms. Hall,
your position is that FEMA's so-called actions to reverse the
improper payment should not be viewed as a discrete agency
action; is that correct?

MS. HALL:  Your Honor, I think in that circumstance,
yes, that's not a discrete agency action.  That was a
ministerial act in accordance with 31 CFR 2106, and so that was
not a final agency action.  The funds are still obligated to
plaintiff and subject to additional review, as outlined in the
noncompliance letter.

THE COURT:  To the extent that reversal of the payment
should be viewed as a discrete action, you contend that it was

P35DCitO

1  not a final agency action then; is that correct?

2        MS. HALL:  That's right, your Honor.

3        THE COURT:  All right.  I'm going to turn now to

4  irreparable harm.

5        The City argues that it faces a heightened risk of

6  irreparable harm "where, as here, the funds were granted under

7  an appropriation that may be exhausted, lapse, or be rescinded

8  before this action is decided," ECF No. 10, at 24.  I would

9  like to discuss each of those circumstances in turn.

10       The FY24 SSP appropriation expired on September 30,

11  2024, but "after the appropriation for those funds expired, the

12  funds remained in an expired account where they will retain

13  their fiscal year identity . . . for that appropriation for an

14  additional five fiscal years."  For that I'm citing to

15  *Westchester v. U.S. Department of Housing and Urban*

16  *Development*, 778 F.3d 412, 417, n.8 (2d Cir. 2015) quoting 1

17  Government Accountability Office, Principles of Federal

18  Appropriations Law (GAO Redbook) 5-67, 5-72 (3d ed. 2004).

19  "During the five-year period, the funds cannot be used to incur

20  new obligations, but they may be used to pay obligations that

21  are properly chargeable to the account prior to its

22  expiration." *Id.; see*, 31 U.S.C. sections 1552(a) and 1553(a).

23       Mr. Rubin, setting aside for the moment the

24  possibility of any recision of the funds by Congress, is there

25  any way that the $81.4 million obligated to the City for SSP

P35DCitO

1    services will not continue to be available until September 30

2    of 2029?

3        MR. RUBIN:  Well, I think there's always the risk of

4    termination, which would de-obligate the funds.  I think what

5    that applies to -- as long as the funds are obligated to us

6    through the award, then that holds; but there's a risk, as

7    happened in the *Houston* case, that the funds will be

8    de-obligated through a termination, and then they're available,

9    they're available for recision.  They may not be available to

10   then spend on something else, because they are -- you know,

11   were outside of the spending period, but they will become

12   available.

13       So I think that that's not a sufficient safety for us,

14   because there's the risk of termination and de-obligation.  And

15   that happened very fast, with almost no notice in the *Houston*

16   case, and we just, quite frankly, don't know what to expect

17   here, and what we can count on, and what we can't count on.

18       THE COURT:  What you have in mind is the bill; is that

19   right?

20       MR. RUBIN:  Well, we have in mind the bill.  The funds

21   would certainly become -- you know, there's certainly the risk

22   that the bill could take the funds back, and there's certainly

23   a risk of de-obligation through termination.

24       THE COURT:  All right.  Ms. Hall, can the FY24 SSP

25   appropriation be exhausted before the conclusion of this case?

P35DCitO

1          MS. HALL:  No, your Honor.

2          THE COURT:  Can you explain that, please?

3          MS. HALL:  I don't believe that the appropriation can

4     be exhausted, because, as your Honor mentioned, the obligation

5     period closed on September 30, 2024, and so the funds cannot be

6     sent to other entities in a way that would exhaust them and

7     make them unavailable for the City.

8          THE COURT:  All right.  Second, in view of the expired

9     account that I just discussed, is there any possibility that

10    the funds in the FY24 SSP appropriation will lapse before

11    September 30 of 2029?

12         MS. HALL:  No, your Honor.  I have no reason to

13    believe that the funds would lapse before September 30 of 2029.

14         THE COURT:  Can you say a little more about that?

15         MS. HALL:  Your Honor, as I understand appropriations

16    law, the balance is available only to the entity for which it

17    was obligated.  So the only way for the funds to become

18    unavailable before 2029 would be for them to be disbursed to

19    plaintiff.

20         THE COURT:  All right.  Mr. Rubin, do you have a

21    different view?

22         MR. RUBIN:  No, your Honor.  I think our view is as

23    I've stated before, the risk of de-obligation and termination

24    and recision.

25         THE COURT:  All right.  Turning to the third

P35DCitO

1    circumstance, can the Court impose a mandatory injunction, as

2    the City suggests, Mr. Rubin, to limit Congress's ability to

3    rescind funds such as these that have been appropriated and

4    obligated?

5            Consider, for example, that the D.C. Circuit reversed

6    a district court's temporary restraining order against a

7    recision of appropriated funds, because "that order was not nor

8    could it have been binding on Congress."  That's from *Rochester*

9    *Pure Waters District v. Environmental Protection Agency*, 960

10   F.2d 180, 185 (D.C. Cir. 1992).

11           I'll start with you on that one, Mr. Rubin.

12           MR. RUBIN:  So our view is that, yes, *Rochester* is

13   exactly what concerns us here in that regard, that, you know,

14   Congress is not a party here, and I think that any kind of

15   order to bind Congress not to rescind I think would be very

16   problematic.

17           THE COURT:  All right.  Ms. Hall, anything that you

18   want to say on that point?

19           MS. HALL:  Your Honor, I agree that an order binding

20   Congress would be inappropriate in this case.  I also think

21   that there's no need for such relief given that any

22   congressional action is speculative.

23           THE COURT:  Is --

24           MS. HALL:  Speculative.

25           THE COURT:  Thank you.

P35DCitO

1          All right.  I want to talk a little bit about the

2     mechanics of ACH reversal as part of considering whether the

3     harm is irreparable absent a TRO.

4          Mr. Rubin, you raised the ACH reversal in your reply

5     brief in footnote four I believe, or footnote one maybe.

6          MR. RUBIN:  I'm pulling it up --

7          THE COURT:  I'll wait until you have it.

8          MR. RUBIN:  -- so I can see what you said.

9          THE COURT:  I'm going to read it.  So, specifically,

10    in that footnote, you contend that the government "did not

11    comply with the applicable rules or regulations for a reversal

12    of an Automated Clearing House, or ACH, payment under 31 CFR

13    section 210.6(f), which incorporates by reference the National

14    Automated Clearing House Association, or NACHA, 2021 Operating

15    Rules and Guidelines, or the NACHA Rules, an erroneous entry

16    subject to reversal is:  One, an exact duplicate of an earlier

17    ACH payment; two, a payment not to the intended recipient;

18    three, an incorrect dollar amount or date; or, four, a payment

19    to a former employee duplicative of a check already delivered

20    to that employee.  31 CFR 210.3(b).  An ACH reversal is

21    improper if initiated for any other reason.  NACHA Rule 2.9.5.

22    FEMA's reasons for reversal are not within any of the allowable

23    criteria."  ECF No. 19.  That's the City's Reply Brief.

24         Ms. Hall, what is your response to that contention?

25         MS. HALL:  Yes, your Honor.

P35DCitO

1              As to that contention regarding the NACHA rules,

2       first, I will mention I don't have the text of the rules in

3       front of me, because I was not able to locate their particular

4       language, but even assuming that the footnote that plaintiffs

5       included -- or plaintiff included in its brief is an accurate

6       representation of those rules, I think that when you look at

7       section 210.6(f), 31 CFR section 210.6(f), section F discusses

8       in various points places where the applicable ACH rules do

9       govern.

10             So, for example, in the last sentence of that section,

11      it states "reversals under this section shall comply with the

12      time limitations set forth in the applicable ACH rules."  It is

13      our view that if that does -- I'm sorry, your Honor.  Because

14      that provision discusses specific circumstances in which the

15      ACH rules apply, there's not a general presumption that every

16      type of ACH rule applies, and the common sense understanding of

17      "erroneous" that the defendants advance here governs.

18             THE COURT:  All right.  Mr. Rubin, has the City filed

19      a Written Statement of Unauthorized Debit with its receiving

20      depository financial institution to contest the ACH reversal

21      pursuant to NACHA Rule 3.12.2.4 or --

22             MR. RUBIN:  I'm not aware, your Honor.

23             THE COURT:  All right.  Have you made attempts to

24      recover the money using any other means?

25             MR. RUBIN:  You know, my understanding, and this is

P35DCitO

1  really me talking, is this is a federal wire system.  There is

2  not a whole lot that we're really able to do with it.

3           THE COURT:  Well, I got this from your brief, so --

4           MR. RUBIN:  I appreciate that, your Honor.

5           THE COURT:  All right.  Considering that the

6  government effected the withdrawal of the $80.4 million from

7  the City's bank account using an ACH reversal, is the City

8  still seeking to temporarily -- I believe I know the answer to

9  this -- to temporarily restrain and enjoin the government from

10  taking any further grant money from any City bank account in

11  connection with SSP FY24 and SSP FY23 FEMA grants?

12           That's from ECF No. 5.

13           MR. RUBIN:  Yes, your Honor.

14           THE COURT:  You are.  Okay.

15           Do you anticipate that the government might use the

16  ACH reversal mechanism again to withdraw recently disbursed

17  funds?

18           MR. RUBIN:  Your Honor, it's actually just hard to

19  know what to anticipate.  This was kind of a real shock to us

20  that they would do this.  There is no reason for them to have

21  the funds while they do the kind of review that they say

22  they're doing.  To have this without notice, we're just

23  shocked.

24           So, we don't know what to anticipate, but we're not

25  comfortable ruling anything out.  I know that that's not an

P35DCitO

1    exact answer, it's not a particularly legal answer, but it's

2    kind of where we are as a client right now.

3           THE COURT:  All right.  I want to ask you about

4    illegal exaction claims.  Now, the government suggests that a

5    proper venue for the City's suit is in the Court of Federal

6    Claims.  *See*, for example, ECF No. 17, at 8.

7           Some litigants pursue illegal exaction claims in that

8    court, not simply contract claims.  "The Court of Claims has

9    explained that an illegal exaction claim may be maintained when

10   the plaintiff has paid money over to the government directly or

11   in effect and seeks return of all or part of that sum that was

12   improperly paid, exacted, or taken from the claimant in

13   contravention of the Constitution, a statute, or a regulation."

14   That's from *Aerolineas Argentinas v. United States*, 77 F.3d

15   1564, 1572-73 (Fed. Cir. 1996).

16          Could you bring an illegal exaction claim for money

17   damages to address the alleged injury caused by the ACH

18   reversal?

19          MR. RUBIN:  Well, your Honor, it's part of a larger

20   problem where we need equitable relief and we need relief under

21   the APA and the constitutional claims, and those are not

22   redressable there.

23          So, the suggestion is, you know, what, we split our

24   claim and take our chances?  That's not really the position

25   that we are in.

P35DCitO

1          And the cases that we have cited, and even the cases

2     that they've cited, the various cases around, you know, whether

3     it's *Houston*, *Rochester*, all of those cases, you know, we have

4     cognizable APA claims and we have equitable relief that we

5     seek.  And the Court of Claims is really not the place for

6     these kinds of claims.

7          THE COURT:  All right.  Thank you.  This has been very

8     helpful.

9          After I make sure that nobody has any other points to

10    make, I'm going to go briefly into the robing room to think

11    about what I've heard from both sides today, and then I

12    anticipate, when I come back, that I will give you my ruling.

13         Is there any other point that anyone wants to be heard

14    on now?

15         MR. RUBIN:  No, your Honor.  Thank you.

16         MS. HALL:  No, your Honor.  Thank you.

17         THE COURT:  All right.

18         THE DEPUTY CLERK:  All rise.

19         (Recess taken)

20         THE COURT:  Please be seated.

21         I'm now going to read my ruling, if you could bear

22    with me for a few minutes, please.

23         "Plaintiff, the City of New York, is a municipal

24    corporation organized and existing under the laws of the State

25    of New York."  ECF No. 12, at 23.

1          The City brings suit against Defendants President

2     Donald J. Trump, the U.S. Department of the Treasury, Secretary

3     of the Treasury Scott Bessent, Treasurer of the United States

4     Patricia Collins, the U.S. Federal Emergency Management Agency,

5     which I will again refer to as "FEMA" in this ruling, Senior

6     Official Performing the Duties of the FEMA Administrator

7     Cameron Hamilton, the U.S. Department of Homeland Security,

8     Secretary of the U.S. Department of Homeland Security Kristi

9     Noem, a U.S. department or agency of unknown identity, and John

10    or Jane Doe, referred to collectively as "the Government."

11          The City brought an order to show cause for a

12    temporary restraining order and a preliminary injunction.  ECF

13    Nos. 3 and 5.

14          Specifically, the City seeks a TRO "ordering the

15    Government to return to the City's bank account the amount of

16    $80,481,861.42 in FEMA SSP FY24 grant money that defendants

17    removed on February 11, 2025; and . . . temporarily restraining

18    and enjoining the Government from taking any further grant

19    money from any City bank account in connection with SSP FY24

20    and SSP FY23 FEMA grants."  ECF Nos. 3 and 5.

21          The relevant procedural history is as follows.  The

22    City filed its Complaint on February 21, 2025.  See ECF Nos. 1

23    and 12.  That same day, the City moved for a TRO and a PI, ECF

24    Nos. 3 and 5, and filed a memorandum of law, ECF No. 10, and

25    declarations with exhibits in support, ECF Nos. 6, the Rubin

P35DCitO

Declaration, and 9, the Jiha Declaration.

On February 24, 2025, the case was assigned to this Court.

On February 28, 2025, pursuant to a schedule ordered by the Court at ECF No. 14, the Government filed a memorandum of law in opposition to the City's motion.  ECF No. 17.

The City filed a reply memorandum of law in further support of its motion on March 3, 2025.  ECF No. 19.

Today the Court heard about an hour of oral argument before recessing in the robing room to finalize its order.

Given the parties' familiarity with the underlying facts, I will not recount them separately.  They are incorporated into the analysis that follows.  I now address the City's motion.

The Government argues that "the City attempts to convert what is clearly a dispute for money damages into an APA claim," contesting that, since "a suit for money damages cannot be brought under the APA . . . such a claim against the federal government is cognizable solely under the Tucker Act."  See ECF No. 17, at 21 (citing 28 U.S.C. § 1491(a)(1)).

The City persuasively rejoins, however, that "this case is not barred because it is 'an equitable action for specific relief,' which seeks 'recovery of specific property or monies.'"  See ECF No. 19, at 12 (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988) ("The fact that a

P35DCitO

judicial remedy may require one party to pay money to another
is not a sufficient reason to characterize the relief as 'money
damages'" because "an equitable action for specific relief may
include an order providing for . . . 'the recovery of specific
property or monies. . . .'")). Because the City structures its
claim as a request for equitable relief, as opposed to a claim
for money damages, the Court has jurisdiction to address this
motion.

In terms of the applicable legal standards, in the
Second Circuit, the standard for obtaining a temporary
restraining order is the same as the standard for obtaining a
preliminary injunction. See, e.g., *Basank v. Decker*, 449 F.
Supp. 3d 205, 210 (S.D.N.Y. 2020) ("It is well established that
in this Circuit the standard for an entry of a TRO is the same
as for a preliminary injunction."); *see also Empire Trust, LLC
v. Cellura*, No. 24 Civ. 859 (KMK), 2024 WL 1216729, at *2
(S.D.N.Y. Mar. 21, 2024*)*.

In general, a party seeking a temporary restraining
order or a preliminary injunction must establish:

A. "A likelihood of success on the merits;"

B. That the movant is "likely to suffer irreparable
injury in the absence of preliminary relief;"

C. That "the balance of hardships tips in its favor;"

And, D., "that an injunction is in the public
interest."

P35DCitO

For that proposition, I am quoting *Pharaohs GC, Inc. v. United States Small Business Administration*, 990 F.3d 217, 225 (2d Cir. 2021) (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)).

"Like a preliminary injunction, a temporary restraining order is 'an extraordinary remedy never awarded as of right.'" *Bragg v. Jordan*, 669 F. Supp. 3d 257, 267 (S.D.N.Y. 2023) (quoting *Winter*, 555 U.S., at 24); *see also Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 462, 472 (S.D.N.Y. 2010) ("Temporary restraining orders and preliminary injunctions are among the most drastic tools in the arsenal of judicial remedies, and must be used with great care.").

Here, the City concedes that it seeks "the extraordinary remedy of mandatory injunctive relief to compel defendants to return the money to the City," ECF No. 12, at paragraph 20, "commanding a positive act, rather than seeking to maintain the status quo." ECF No. 10, at 15-16. The City must therefore "meet a heightened legal standard by showing 'a clear or substantial likelihood of success on the merits.'" *North American Soccer League, LLC v. United States Soccer Federation, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) (quoting *New York Civil Liberties Union v. New York City Transit Authority*, 684 F.3d 286, 294 (2d Cir. 2012)).

Based on a review of the parties' submissions and the arguments made in Court today, the agency action at issue in

P35DCitO

this TRO application is FEMA's so-called "money grab," ECF No. 10, at 6.

I now address whether, in the absence of a TRO, the City will suffer immediate irreparable harm.

A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction" or a TRO. *Faiveley Transport Malmo AB v. Wabtec Corporation*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)).

"The moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Grand River Enterprise Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007); *see also Winter*, 555 U.S., at 22 (holding that a party "seeking preliminary relief" must "demonstrate that irreparable injury is likely" -- not just a possibility -- "in the absence of an injunction").

The Second Circuit has explained that, "to satisfy their burden to show irreparable harm, 'Plaintiffs must demonstrate that absent a preliminary injunction, they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 672 (2d Cir. 2023) (quoting *Grand River Enterprise*, 481 F.3d, at 66).

P35DCitO

The City contends that its injury is irreparable in several respects.  First, the City asserts that the harm is "irreparable because the funds cannot be recovered in an action for compensatory money damages."  ECF No. 10, at 24.

Quoting *New York v. United States Department of Homeland Security*, 969 F.3d 42, 86 (2d Cir. 2020), the City argues that, "because money damages are prohibited in APA actions, they are irreparable."  Br. at 24.  It is true that "the APA does not waive sovereign immunity for money damages claims."  *Ward v. Brown*, 22 F.3d 516, 520 (2d Cir. 1994).  But the City uses the quotation from *New York v. United States Department of Homeland Security* out of context.  In that case, the plaintiffs sought preliminary injunctive relief against implementation of a DHS rule that would have required costly compliance efforts.  *See id*. at 86.  The Court concluded that the "economic harms of expending [additional] funds to mitigate the impact of the Rule" would be irreparable, because those harms were only compensable through money damages, not through specific equitable relief, and "money damages are prohibited in APA actions."  *Id.*

Here, in contrast, the City ultimately seeks a "permanent injunction ordering [the Government] to reverse the SSP24 $80 million money grab by returning the $80 million to the City's bank account."  ECF No. 12, at 22.  In other words, if the City succeeds, it will recover the funds at issue

P35DCitO

pursuant to an equitable remedy.  Because the City has an equitable means of recovering its economic harms, through an equitable action for specific relief, this injury is not inherently irreparable.

Next, the City contends that its injury is "actual and imminent and cannot be remedied if the Court waits until the end of trial to resolve the harm," *JTH Tax*, 62 F.4th, at 672, because the FY24 SSP "appropriation may be exhausted, lapse, or be rescinded before this action is decided."  ECF No. 10, at 24.

An injury cannot be remedied if, at the end of trial, the Court "can offer no relief which can redress [the City's] asserted grievance."  *City of Houston, Texas v. Department of Housing & Urban Development*, 24 F.3d 1421, 1426 (D.C. Cir. 1994).  In other words, an injury may be irreparable if a case is likely to become moot before it reaches a final resolution.

The City has raised potential barriers to ultimate recovery that the Court must address.  "No money can be paid out of the Treasury unless it has been appropriated by an act of Congress."  *County of Suffolk, New York v. Sebelius*, 605 F.3d 135, 141 (2d Cir. 2010) (quoting *Office of Personnel Management v. Richmond*, 496 U.S. 414, 424 (1990)).  Because "a claim seeking [compensatory damages] falls outside the scope of the waiver of sovereign immunity arising from § 702 of the APA," the City may seek monetary equitable relief only from

P35DCitO

"the congressional appropriation that authorized" the FY24 SSP funding.  *Id.*  Thus, the Court cannot grant the City's requested relief if "funds appropriated for an agency's use become unavailable."  *City of Houston*, 24 F.3d, at 1426.

The D.C. Circuit has identified three circumstances in which appropriated funds may become unavailable:  "If the appropriation lapses; if the funds have already been awarded to other recipients; or if Congress rescinds the appropriation."  *Id.*  I consider, in turn, whether each circumstance is "likely" to cause irreparable harm in the absence of an injunction.  *Winter*, 555 U.S., at 22.

First, the appropriation for the FY24 SSP funds is not likely to lapse before final resolution of this case.

Although the appropriation for those funds expired on September 30, 2024, see Public Law No. 118-147, § 5, 138 Statutes at Large, at 461, "the funds will remain in an 'expired account,' where they will 'retain their fiscal year identity . . . for that appropriation for an additional five fiscal years.'"  *Westchester*, 778 F.3d at 417, n.8 (quoting 1 Gov't Accountability Office, Principles of Federal Appropriations Law (GAO Redbook) 5-67, 5-72 (3d ed. 2004)).  "During the five-year period, the funds cannot be used to incur new obligations, but they may be used to pay obligations that are properly chargeable to the account prior to its expiration."  *Id.*  *See* 31 U.S.C. §§ 1552(a), 1553(a).

Accordingly, the FY24 SSP funds will "remain available to satisfy obligations," including any equitable relief granted in this case, until five years from September 30, 2024, or September 30, 2029.

Second, the Government cannot award the funds in question to other recipients, nor can it exhaust the funds available under the FY24 SSP appropriation.

As noted a moment ago, the appropriation expired on September 30, 2024.  See Pub. L. No. 118-147, § 5, 138 Stat. at Large, at 461.  FEMA may not "incur new obligations after" the appropriation period ended.  GAO Redbook at 5-6 (4th ed., 2016 rev.).  Accordingly, the FY24 SSP "funds may not be reallocated to other jurisdictions." *Cnty. of Westchester v. U.S. Dep't of Hous. & Urb. Dev.*, 802 F.3d 413, 417 (2d Cir. 2015).

Nor is there any possibility that FEMA can exhaust the 2024 SSP appropriation.  For FY24, Congress appropriated $650 million to FEMA for SSP programs, and it permitted FEMA to retain $9.1 million to cover administrative costs.  Pub. L. 118-47, Div. C, Title II.  Subtracting this $9.1 million for administrative costs, FEMA then awarded no more than $640.9 million in FY24 SSP grants.  *See* Shelter and Services Program (SSP) FY2024 Funding, Congressional Research Reports, https://crsreports.congress.gov/product/pdf/IN/IN12349/3 (Apr. 17, 2024).  Therefore, FEMA's obligations under the FY24 SSP grant program cannot exceed the value of the appropriation,

P35DCitO

$650 million.

Third, the City has not cited any precedent to suggest that this Court has the authority to grant injunctive relief that will bind Congress and prevent it from exercising its power to rescind the appropriation.

"The res at issue is the funds appropriated by Congress for this grant program." *County of Suffolk, New York*, 605 F.3d, at 141. "Where the object of a plaintiff's claims is the public fisc, the Appropriations Clause of the Constitution puts things in perspective:  'No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law.'" *Id.* (quoting U.S. Const. art. I, § 9, cl. 7).

The Appropriations Clause "assures that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good." *Office of Personnel Management v. Richmond*, 496 U.S. 414, 428 (1990).

Indeed, the City cites only one case to support its argument that this Court should issue a mandatory injunction to preempt congressional rescission of the funds*, Rochester Pure Waters District v. Environmental Protection Agency*, 960 F.2d 180 (D.C. Cir. 1992).  See ECF No. 10, at 25-26; ECF No. 18, at 13.  But that case held that a district court's order seeking to restrain a congressional rescission "was not, nor could it have been, binding on Congress." *Id.*, at 185.

If Congress "chooses to rescind the appropriated funds

P35DCitO

1   that would otherwise have been available to meet [the City's]

2   claim . . . then the intent of Congress could not be clearer:

3   It did not want any part of the remaining funds to be expended

4   for the [SSP] grant program, so it canceled the appropriation."

5   *Id.* Although such action by Congress might render the harm

6   "irreparable," the Court will not, in connection with this TRO

7   application, purport to grant mandatory injunctive relief to

8   displace or circumvent a congressional rescission.

9          In any event, "the purpose of a temporary restraining

10  order is to preserve an existing situation in status quo until

11  the court has an opportunity to pass upon the merits of the

12  demand for a preliminary injunction." *Goldstein v. Hochul*, No.

13  22 Civ. 8300 (VSB), 2022 WL 20305832, at *1 (S.D.N.Y. Oct. 3,

14  2022) (quoting *Pan Am. World Airways, Inc. v. Flight Engineers'*

15  *Int'l Ass'n, PAA Chapter, AFL-CIO*, 306 F.2d 840, 842 (2d Cir.

16  1962)).  Here, there has been no showing of irreparable injury

17  that will occur between now and the time that the preliminary

18  injunction can be decided.

19         The City contends that "the threat of irreparable harm

20  has intensified" because "Senate Bill S. 771, entitled 'A Bill

21  to Terminate the Shelter and Services Program of the Federal

22  Emergency Management Agency, and for Other Purposes,' was

23  referred to the Senate Committee on Homeland Security and

24  Government Affairs" on February 27, 2025.  ECF No. 18, at

25  12-13.  But the City points to no provision of that bill that

P35DCitO

might rescind the relevant funds.  Indeed, at this time, the text of the bill is not available for review.  Therefore, at this point, the City's concerns about a congressional rescission remain "speculative." *JTH Tax*, 62 F.4th, at 672.

I also note that the City may have other avenues available to pursue the relevant funds, even if Congress rescinds the appropriation.  As previously explained, the City itself pointed out in its reply brief that it may be able to challenge the ACH reversal with its Receiving Depository Financial Institution, and earlier today we discussed whether the City could bring an illegal exaction claim for money damages.  While I need not rely on these alternative remedies to conclude that the City faces no irreparable harm, they do suggest that the City may have other ways of remedying its injury outside of this lawsuit.

As to the City's request to "temporarily restrain and enjoin the Government from taking any further grant money from any City bank account in connection with SSP FY24 and SSP FY23 FEMA grants," ECF Nos. 3 and 5, the City has not contended that the Government is "likely" to disburse additional SSP funds into the City's bank account and then use another ACH reversal to take back the funds. *Winter*, 555 U.S., at 22.  Indeed, the City noted specifically that it is hard to know whether to anticipate another ACH reversal by FEMA.

Accordingly, whether the Government might take grant

P35DCitO

money from the City's bank account in the future is a "remote"

and "speculative" possibility, not an "actual and imminent"

injury.  *JTH Tax*, 62 F.4th, at 672.

            In sum, the City has identified no irreparable harm

warranting the extraordinary relief it seeks.

            "Having concluded that the City has failed to

demonstrate irreparable harm, it is unnecessary for this Court

to reach the remaining preliminary injunction factors."

*Appalseed Productions., Inc. v. MediaNet Digital, Inc.*, No. 11

Civ. 5922 (PGG), 2012 WL 2700383, at *11, n.13 (S.D.N.Y. July

6, 2012); *see Grand River Enterprise*, 481 F.3d, at 63 (holding

that "the district court did not abuse its discretion in

finding that Plaintiff failed to demonstrate sufficiently a

likelihood of irreparable harm, and, therefore, on that basis

alone, affirmed its denial of Plaintiff's motion for a

preliminary injunction.").

            For the foregoing reasons, the City's motion for a TRO

is denied.

            I would like the parties to propose next steps to the

Court by Monday, March 10, in a letter filed on the docket.

            Is there anything else the parties would like to be

heard on today?

            MR. RUBIN:  No, your Honor.

            MS. HALL:  No, your Honor.

            THE COURT:  I assume that the transcript will be

P35DCitO

1    ordered?

2              MS. HALL:  Yes, your Honor.

3              MS. BERNHARDT:  Yes, your Honor.

4              THE COURT:  Thank you all.  We are adjourned.

5              (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25