UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

THE CITY OF NEW YORK,

                            Plaintiff,

                    v.

DONALD TRUMP, in his official capacity as President of
the United States;

U.S. DEPARTMENT OF THE TREASURY;

SCOTT BESSENT, in his official capacity as Secretary of
the Treasury;

PATRICIA COLLINS, in her official capacity as Treasurer          No. 25-cv-1510 (JHR)
of the U.S.;

U.S. FEDERAL EMERGENCY MANAGEMENT
AGENCY;

CAMERON HAMILTON, in his official capacity as
Senior Official Performing the Duties of the                     **AMENDED COMPLAINT**
Administrator, U.S. Department of Homeland Security,
Federal Emergency Management Agency;

U.S. DEPARTMENT OF HOMELAND SECURITY;

KRISTI NOEM, in her official capacity as Secretary of the
U.S. Department of Homeland Security;

U.S. DEPARTMENT OR AGENCY OF UNKNOWN
IDENTITY;

JOHN OR JANE DOE, in his or her official capacity as
head of U.S. Department or Agency of Unknown Identity;

                            Defendants.

------------------------------------------------------------------------x

Plaintiff The City of New York (the "City"), by its attorney, Muriel Goode-Trufant, Corporation Counsel of the City of New York, alleges upon personal knowledge as to itself and upon information and belief as to all other matters:

## <u>INTRODUCTION</u>

1. On Tuesday, February 11, 2025, at 4:03 pm, the long arm of the federal government reached into a central bank account of the City of New York (the "City") and grabbed $80,481,861.42. It took these funds from the City without any advance notice that it would be doing so and without communicating any decision or rationale to the City.

2. Defendant U.S. Federal Emergency Management Agency ("FEMA") had paid that amount to the City on February 4, 2025 after it had thoroughly reviewed the extensive supporting documentation submitted by the City and approved payment under two federal grants awarded under the Shelter and Services Programs ("SSP").

3. The federal government achieved this illegal seizure of the City's funds using an Automatic Clearing House ("ACH") reversal, a process in which the originator of an ACH electronic funds transfer initiates a request to reverse a payment that has already been processed. Originators are permitted to use the ACH reversal process under very limited and essentially ministerial circumstances not present here, such as to reverse a duplicate payment, a payment made to an incorrect recipient, or a payment made in the incorrect amount.

4. The money was rightfully the City's. FEMA offered and awarded the SSP grants to offset costs the City incurred for shelter and services it provided to noncitizen migrants who were processed and released into the community by defendant the U.S. Department of Homeland Security ("DHS"). The purpose of SSP, as FEMA stated, was to "reliev[e]

1

overcrowding in short-term holding facilities of U.S. Customs and Border Protection"— the exact purpose for which the City used the funds.

5.  As Congress intended, the SSP grants were made to local governments and non-profit organizations in border states, such as Texas and Arizona, and other locales, like New York City, receiving the largest influxes of migrants released by DHS. The City received these funds *only* on a reimbursement basis for eligible and compliant expenditures already incurred to provide shelter and services to noncitizen migrants.

6.  Before FEMA transferred these funds to the City on February 4, FEMA had already determined that the funds were eligible for reimbursement: FEMA reviewed the City's grant applications and awarded the grants, reviewed and approved the City's budget for each grant, and reviewed and approved the City's reimbursement request, which included extensive detail as to each migrant who received services and back-up documentation validating the costs incurred.

7.  Despite the fact that FEMA had reviewed and approved the City's request, and issued payment, Defendants grabbed the money back without any administrative process whatsoever. Indeed, as of the morning of February 18, 2025, FEMA's platform for grant making and administration, entitled "FEMA GO" (an acronym for "FEMA Grant Operations"), continued to indicate that the City's approved request for $80,481,861.42 was disbursed to the City.

8.  Defendants have made it clear in a series of public statements that they opposed the very purpose for which SSP funds were appropriated by Congress and approved by FEMA and that they intended to make sure the funds were recouped and are never paid:

- Defendant Cameron Hamilton, Senior Official Performing the Duties of the FEMA Administrator, posted on February 10, 2025, the day

2

before the money grab: "@USCongress should have never passed bills in 2023 and 2024 asking FEMA to do this work. . . . This stops now." https://x.com/FEMA_Cam/status/1888923672523489649.

- Defendant Hamilton similarly advised the Court in this action that he believes "on its face, SSP funds sheltering and transportation of illegal aliens."

- Defendant DHS Secretary Kristi Noem, in announcing the previous day's money grab, posted on February 12, 2025: "I have clawed back the full payment that FEMA deep state activists unilaterally gave to NYC migrant hotels." https://x.com/KristiNoem/status/1889745752924074088.

- Defendant President Donald Trump told Congress and the nation that SSP, and payments to the City thereunder, was a "scam" and he bragged about recouping the money and terminating the program. https://apnews.com/article/trump-speech-congress-transcript-751b5891a3265ff1e5c1409c391fef7c.

9. These and other statements lay bare Defendants' deep-seated animosity to SSP itself. The intent could not be clearer: Defendants' aim in grabbing back the funds was not related to the City's specific expenditures or grant compliance at all, but to thwart the very purpose of the SSP and to prevent expenditures thereunder to the maximum extent possible.

10. Defendants have acted lawlessly in taking money from the City's account. No lawful procedure permits Defendants to simply take back grant funds previously approved and paid in the manner that they did here. Any review of a grant recipient's compliance with the grant's requirements must be done in a manner that is consistent with regulatory procedures, which do not allow the government to misuse the ACH system to seize money it has already approved and paid.

11. Separate and apart from that initial illegal act, Defendants have since started a process designed to permanently lay claim to the funds under the mask of a pretextual compliance review.

12.    First, several hours after grabbing the funds back from the City, Defendants, including DHS and FEMA, filed papers in a federal court proceeding in Rhode Island requesting that court's confirmation that Defendants may permissibly "withhold" FEMA funding from the City, and represented to that court that they intended to provide "notice to New York City regarding the funding pause and will provide the information and process required by regulation and the terms and conditions of the award." Defs.' Emergency Motion, *New York v. Trump*, No. 1:25-cv-00039 (D.R.I. Feb. 11, 2025), ECF No. 102. FEMA did not tell the Court that, far from merely "withholding" funds, it had already, just hours earlier, unilaterally and without any notice taken funds from the City's bank account in the amount that it had previously approved and paid.

13.    Further, having stated publicly that it was opposed to spending the funds altogether, and having taken the funds without following any lawful process whatsoever, FEMA nonetheless represented to the Court that it sought to "withhold" funding solely "on the basis of the applicable authorizing statutes, regulations, and terms." *Id.* Yet FEMA had not complied with any applicable statutes, regulations, and grant terms and conditions and had illegally taken funds from the City in violation of the same. And, in the same breath, FEMA conceded to the Court that it had paused SSP generally.

14.    Next, a week later, Administrator Hamilton sent the City's Office of Management and Budget ("City OMB"), which administers the FEMA grants for the City, a "Remedy for Noncompliance Letter" dated February 18, 2025 ("noncompliance" letter) that purports to set forth "significant concerns" that the SSP funds are going towards "illegal activities." FEMA sent this letter just days after the City publicly announced its intention to sue over the money grab.

15.     Simply put, the "noncompliance" letter is pretextual, a cover for Defendants' money grab and for Defendants' suspension of the SSP,. They have made clear their intent to withhold the funds permanently because they oppose the purposes for which the funds were appropriated, awarded, approved, and paid. The letter, relying only on unsubstantiated characterizations of "media reports," makes allegations of crime and gang activity at the Roosevelt Hotel—one of the many locations for which FEMA reimbursed the city for shelter and services. Tellingly, the letter omits any mention that FEMA officials twice visited the Roosevelt Hotel in September 2024 and that those visits did not lead to any findings of alleged criminal activity. In addition, Defendants fail to cite any regulatory authority that supports denying funding to the City under the SSP based on purported criminal activity by those released by DHS into the community when the City has been assisting DHS in providing shelter.

16.     Further, the letter makes a show of requesting information to further a purported review of the City's SSP awards for 2024 and 2023 ("SSP24" and "SSP23" and collectively "SSP awards"), but mainly seeks information that OMB previously provided to FEMA, and that FEMA already reviewed and approved in order to determine that the claimed reimbursements were allowable. Indeed, while the letter alleges the City is somehow encouraging illegal immigration, FEMA already confirmed in approving and issuing the payment that all funds were used to provide services to individuals who DHS had released from its custody into the community.

17.     The letter does not identify any applicable rules or grant terms or conditions with which it alleges the City might not have complied. Instead, the letter effectively - and improperly - adds new terms and conditions. The letter is meant to look like it affords the

requisite administrative process when, in fact, the decision has already been made to deny payment to the City because Defendants do not want to pay the City for providing the very services to the very people for the very purposes that Congress appropriated the funds and FEMA awarded the grants and approved and made the payments.

18.    In fact, Defendants appear to have sent similar letters to many other local government SSP recipients. Defendants, having conceded in numerous court filings that SSP is suspended, appear to be using the fig leaf of compliance review as a means to effectively halt SSP in its entirety. Neither Defendants' money grab from the City nor their suspension of SSP has anything to do with City-specific grant compliance, but is instead the result of Defendants' new-found hostility to the very grants they awarded.

19.    This lawsuit challenges two actions by Defendants based on two core contentions. First, Defendants' money-grab—after FEMA review, approval, and actual payment, without notice or process of any kind—was, simply put, lawless. It violated federal regulations and grant terms, separately had no justification in the rules governing ACH electronic funds transfers, was contrary to law and in excess of authority, and contrary to their obligations to implement Congressional appropriations.

20.    Second, this lawsuit challenges Defendants' suspension of SSP – both as to the City and program-wide -- and their use of a pretextual compliance review process to mask and provide legal cover to the suspension. Whether defendants characterize the suspension as a "pause" or "freeze" or a "withholding," the effect is the same. Defendants have stopped SSP in its tracks with respect to the City and with respect to local government grant recipients more generally. Defendants' public and court-filed statements make clear that their reason for the suspension is their animus to the program itself and their intent to terminate it, prevent future

reimbursement payments, and recoup previously reimbursed funds to the extent they can. Such stoppage is lawless because the program was established by Congress and grants were awarded by FEMA pursuant to the program; Defendants do not have the unilateral right to stop the program simply because they don't like it.

21.    Defendants' broad and lawless pause or suspension of SSP, and pretextual use of a compliance review process moreover appears to be part of an overarching strategy to suspend or end programs without legal authority and to find ways to get around legal rulings barring Defendants from implementing funding freezes, such as orders in *New York v. Trump*.

22.    Because Defendants took the extraordinary and lawless measure of seizing money from the City's bank account—by surprise, and without notice—the City seeks the extraordinary remedy of mandatory injunctive relief to compel Defendants to return the money to the CityDefendants, notwithstanding the *post hoc* pretense of administrative process, have made it abundantly clear that they intend to withhold permanently every dime FEMA previously awarded, approved for reimbursement, and paid to the City.

23.    Defendants also seek relief to make sure that Defendants do not improperly withhold funds that the City is entitled to receive.

24.    Therefore, the City brings this suit for a declaration that the money grab and the suspension of SSP and withholding of SSP24 and SSP23 funds are each arbitrary and capricious, contrary to law, ultra vires and in excess of authority, without observance of lawful procedures, and each violates the Due Process Clause, the separation of powers doctrine, and the Spending Clause. Declaratory and injunctive relief is needed to prevent the harm that would result from Defendants' unlawful retention of the $80 million they improperly took and from Defendants' unlawful actions to withhold SSP funds, pause, suspension, and/or terminate SSP,

which would deprive the City of funds it is entitled to receive under the applicable grant terms and conditions.

## PARTIES

25.      Plaintiff the City of New York is a municipal corporation organized and existing under the laws of the State of New York.

26.      Defendant Donald J. Trump is the President of the United States. He is responsible for the actions and decisions that are being challenged by Plaintiffs in this action and is sued in his official capacity.

27.      Defendant United States Federal Emergency Management Agency ("FEMA") is part of the United States Department of Homeland Security, a cabinet agency within the executive branch of the United States government. 6 U.S.C. § 313.

28.      Defendant Cameron Hamilton is the Senior Official Performing the Duties of the Administrator (hereinafter, "Acting Administrator") of FEMA and that agency's highest ranking official. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity. 6 U.S.C. §§ 313, 314.

29.      Defendant United States Department of Homeland Security is a cabinet agency within the executive branch of the United States government. 6 U.S.C. § 111.

30.      Defendant Kristi Noem is the Secretary of the United States Department of Homeland Security and that agency's highest ranking official. She is charged with the supervision and management of all decisions and actions of that agency. She is sued in her official capacity. 6 U.S.C. § 112.

31.      Defendant United States Department of the Treasury is a cabinet agency within the executive branch of the United States government. 31 U.S.C. § 301. The Department

of the Treasury is responsible for ensuring the financial security of the United States. FEMA grant payments are transferred to the City's account by the Federal Reserve Payment System, with the participation of the Treasury Department.

32.     Scott Bessent is the Secretary of the Department of the Treasury and responsible for the operations of the Department of the Treasury, and management of the finances of the United States. He is sued in his official capacity. 31 U.S.C. § 301.

33.     Patricia Collins is the Treasurer of the United States and responsible for the management of the finances of the United States. She is sued in her official capacity. 31 U.S.C. § 301.

34.     Defendant U.S. Department or Agency of Unknown Identity is an as-yet unidentified department, agency, or other unknown entity of the United States with the ability and/or authority to return $80 million in unlawfully grabbed funding to the City's bank account, and is named here for the purposes of ensuring that complete relief may be obtained.

35.     Defendant John or Jane Doe Official is an official of the United States with the ability and/or authority to return $80 million in unlawfully grabbed funding to the City's bank account, and is named here in their official capacity for the purpose of ensuring that complete relief may be granted.

## JURISDICTION & VENUE

36.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 2201(a) because this action arises under federal law. Jurisdiction is also proper under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 702.

37.     Venue is proper in this district pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. §§ 1391(b)(2) & (e)(1). Defendants are United States agencies or officers sued in their

official capacities. Plaintiff is the City of New York, and a substantial part of the events or

omissions giving rise to this Complaint occurred and continue to occur within the City of New

York.

## FACTS

### A. Congress Appropriated Funds for Local Governments to Assist in Providing Shelter and Services to Migrants Released by DHS into the Community

38.    In 2023, Congress authorized FEMA and U.S. Customs and Border

Protection ("CBP") to establish SSP. *See* Department of Homeland Security Appropriations Act,

2023, Pub. L. No. 117-328, Title II, 136 Stat. 4730 (2022). The stated purpose of SSP is to

relieve overcrowding in short-term CBP holding facilities. To that end, the program reimburses

non-federal entities providing shelter and related services to noncitizen migrants following their

release from DHS.

39.    In 2024, Congress, through the Department of Homeland Security

Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 598 (the "DHS Appropriations Act"),

authorized continued funding for SSP. Title II of that Act, entitled Security, Enforcement, and

Investigations, provides that $650 million "shall be transferred to 'Federal Emergency

Management Agency—Federal Assistance' to support sheltering and related activities provided

by non-Federal entities, in support of relieving overcrowding in short term holding facilities of

the U.S. Customs and Border Protection."[1]

---

[1] *See also* FEMA, *Shelter and Services Program,* https://www.fema.gov/grants/shelter-services-program (last visited Feb. 13, 2025) ("SSP provides financial support to non-federal entities to provide sheltering and related activities to noncitizen migrants following their release from the Department of Homeland Security (DHS). The intent is to support CBP in the safe, orderly, and humane release of noncitizen migrants from short-term holding facilities.").

**B. The 2023 SSP Grant**

40.    FEMA awarded the City $106.9 million under the SSP23 grant and, to date, has reimbursed the City $70.6 million for allowable costs under the grant.

41.    FEMA's stated purpose in offering the SSP23 Grant was:

> To provide funding to non-federal entities that serve noncitizen migrants recently released from DHS custody to temporarily provide shelter, food, transportation, acute medical care, personal hygiene supplies, and labor necessary to manage cases to provide these services; and,

> To provide funding to non-federal entities to increase their capacity to temporarily shelter noncitizen migrants recently released from DHS custody, including renovations and modifications to existing facilities.

Notice of Funding Opportunity ("NOFO") for SSP23 at 6. The SSP23 NOFO further states FEMA's "priority" of the "safe, orderly, and humane release of noncitizen migrants from DHS short-term holding facilities." *Id.*

42.    FEMA issued the SSP23 NOFO on June 12, 2023. The City, acting through City OMB, applied for the SSP23 Grant on July 12, 2023. FEMA initially awarded the City a grant of $104.7 million by notice effective August 11, 2023, which FEMA increased to $106.9 million on September 28, 2023. The City's application for the SSP23 Grant included a list of all the locations for which the City indicated it might seek reimbursement, including a location called the Roosevelt Hotel.

43.    In May 2023, the City began using the Roosevelt Hotel – which had closed as a hotel for guests in December 2020 -- as an Arrival Center for noncitizen migrants released by DHS into the U.S., and as a Humanitarian Response and Relief Center as part of the City's response to the influx of noncitizen migrants released by DHS. The facility functioned as a centralized intake center for noncitizen migrants who were newly arriving in New York City

11

following their release by DHS and it provided them with a variety of supportive services

including short-term shelter.

44.      City OMB submitted two requests for partial reimbursement under the

SSP23 Grant.

45.      In connections with both reimbursement requests, OMB submitted to

FEMA the name, Alien Registration Number ("A-Number"), and other information for each

individual to whom the City provided eligible services for which the City was seeking

reimbursement under the grant.[2] This reimbursement information included the date DHS

released each individual from DHS custody ("DHS Release Date"). Per the grant terms, FEMA

would only reimburse the City for shelter and services provided within 45 days of the

individual's release. FEMA reviewed all of this information in determining that the City's

reimbursement request was for allowable costs and in determining to make the payment.

Pursuant to the grant award documents, FEMA provided reimbursements to the City on a per

diem basis, meaning that City OMB received a payment for a fixed amount per person for each

night an individual received shelter and services that were being reimbursed by FEMA. Fixed

per diems were established separately for lodging, food, and other types of eligible services.

46.      On May 21, 2024, City OMB submitted its first request for reimbursement

in the amount of $32 million. FEMA reviewed the request and requested additional

---

[2] The requirement that A-Numbers be submitted to FEMA may be in response to a March 28, 2023 report issued by the DHS Office of Inspector General concerning a different program, the Emergency Food and Shelter Program ("EFSP"), entitled "FEMA should Increase Oversight to Prevent Misuses of Humanitarian Relief Funds." *See* ECF No. 17-1, Ex. 3 ("OIG Report"). The OIG Report found in part that in administering the EFSP, FEMA did not adequately ensure that local grant recipients in California, New Mexico, Arizona and Texas provided adequate documentation concerning the individuals they served and that some families and individuals served by EFSP did not have an encounter record with DHS.

documentation which City OMB provided. On July 25, 2024, FEMA approved reimbursement in the reduced amount of $25.5 million.

47.     FEMA initiated a compliance review audit of the first payment request under the SSP23 Grant that included a "joint financial and programming site visit." As part of the visit, officials from FEMA and CBP toured the Roosevelt Hotel and another facility on September 9, 2024. Apart from the Compliance Review, FEMA officials also visited the Roosevelt Hotel on September 26, 2024.

48.     On October 16, 2024, City OMB submitted a second reimbursement request to FEMA in the amount of $45.1 million.

49.     On November 29, 2024, FEMA provided its compliance review findings regarding the SSP23 Grant to OMB by letter. FEMA made findings in three areas: (1) data privacy protections for A Numbers, (2) contract provisions, and (3) certain financial management issues. FEMA did not identify any purported gang or illegal activities at the Roosevelt Hotel in its Compliance Review Findings.

50.     FEMA approved and paid the City's second reimbursement request in the amount of $45.1 million on January 7, 2025. To date, the City has received $70.6 million in reimbursement from FEMA under the SSP23 Grant. Under the grant terms, $36.3 million remains available for claiming reimbursement of allowable costs.

### C.  The SSP24 Grants

51.     On April 12, 2024, FEMA issued two NOFOs for the $650 million Congress had appropriated for SSP24 Grants. One NOFO announced an allocation grant, meaning that the amount the City and other specified local governments and nongovernmental organizations could apply for were pre-determined on an allocation basis ("SSP-A Grant"). The

other NOFO announced a competitive grant—that is, the City's application would compete with others for an award from a limited set of funds ("SSP-C Grant") (collectively, the SSP24 Grants").[3] FEMA issued an amended SSP-A NOFO on August 28, 2024 and an amended SSP-C NOFO on October 21, 2024.[4]

52.     Both SSP24 Grants have an expected period of performance of 36 months, from October 1, 2023 to September 30, 2026.

53.     Echoing the SSP23 Grant NOFO, the SSP24 Grant NOFOs described the SSP as follows:

> As directed by Congress, SSP makes federal funds available to enable non-federal entities to off-set allowable costs incurred for services associated with noncitizen migrants recently encountered and released by DHS. As stated in the FY 2024 appropriation, the primary purpose of SSP is to "reliev[e] overcrowding in short-term holding facilities of [CBP]." ….
>
> The Department of Homeland Security (DHS) has committed to bolstering the capacity of non-federal entities to receive noncitizens after they have been processed by U.S. Customs and Border Protection (CBP) and released from a DHS facility. DHS is committed to ensuring appropriate coordination with and support for state, local, and community leaders to help mitigate increased impacts to their communities as outlined in the DHS Plan for Southwest

---

[3] The grant identification number is DHS-24-GPD-141-00-98. The SSP-A NOFO may be accessed at https://www.fema.gov/print/pdf/node/676489 or https://www.fema.gov/grants/shelter-services-program/ssp-a/fy-24-nofo. *See also* https://www.grants.gov/search-results-detail/353512; FEMA Grant Programs Directorate Information Bulletin No. 505 (Apr. 12, 2024), https://www.fema.gov/sites/default/files/documents/fema_gpd-ib-505.pdf.

[4] The amended SSP-A NOFO may be accessed at https://www.fema.gov/print/pdf/node/683858 or https://www.fema.gov/grants/shelter-services-program/ssp-a/fy24-ssp-a-amended-reserve-funding-nofo. *See also* FEMA, Grant Programs Directorate Information Bulletin No. 518 (Aug. 28, 2024), https://www.fema.gov/sites/default/files/documents/fema_ib-fy24-ssp-a-round-2.pdf; https://www.fema.gov/grants/shelter-services-program/ssp-a/fy-24-ssp-a-reserve-funding-faqs.

Border Security and Preparedness, issued on April 26, 2022, and updated on December 13, 2022.

SSP-A NOFO at 5, SSP-C NOFO at 5.

54.     The NOFOs described the goals of SSP as "the safe, orderly, and humane release of noncitizen migrants from DHS short-term holding facilities." The objectives of the program include providing funding for non-federal entities that serve "noncitizen migrants recently released from DHS custody" to "temporarily provide shelter, food, transportation, acute medical care, [and] personal hygiene supplies."

55.     The NOFOs specify the allowable (i.e., reimbursable) activities under the SSP, including providing shelter at hotels and motels and providing food, medical supplies, clothes and personal hygiene products. SSP-A NOFO at 69 *et seq*.; SSP-C NOFO at 64 *et seq*.

56.     As noted above, the FY 2024 SSP appropriation provided $650 million for SSP, including FEMA administration costs. The SSP-A funds were allocated to grantees in two rounds, with allocations based on release and destination data received from CBP. The NOFO released on April 12, 2024 announced $300 million in round 1 allocations and the amended NOFO released on August 28, 2024 announced round 2 (Reserve Fund) allocations. New York City was allocated $38.86 million for round 1 and $20.4 million for round 2.

57.     Millions of dollars were also allocated for non-profit organizations and local governments across the country, including more than $60 million for specified cities, counties, and not-for-profits in Texas, $10.8 million for Fulton County, Georgia, $11.6 million to Maricopa County, Arizona, and $21.8 million to Pima County, Arizona.

58.     The remaining $340.9 million was released through SSP-C grants. *See* SSP-A NOFO at 5; SSP-C NOFO at 7. These grants were awarded on a competitive basis, to local governments and nonprofit organizations that submitted grant proposals evaluated by

FEMA. In addition, "$9.1 million was set aside for FEMA management and administrative costs." SSP-A NOFO at 5.

59.    The SSP-A NOFO lists the "Performance Measures for SSP awardees" as:

- Number of meals provided.

- Number of nights of lodging provided.

- Number of noncitizen migrants transported.

- Number of acute medical care items provided, by type.

- Number of personal hygiene supplies provided, by type.

- Number of hours of labor paid to manage cases to provide these services.

- Number of clothing items provided.

- Number of noncitizen migrants served through translation services.

- Number of noncitizen migrants served through outreach activities.

- Number of renovation or modifications to existing facilities projects completed.

SSP-A NOFO at 7; SSP-C NOFO at 6.

60.    FEMA "calculate[s] and analyze[s] the [enumerated] metrics through a review of performance progress reports and award monitoring to ensure that the funds are expended for their intended purpose and achieve the stated outcomes in the grant application." *Id*.

61.    To complete an SSP-A or SSP-C application, applicants must submit budget information, standard assurances, and worksheets, with program-specific certifications and budget instructions. SSP-A NOFO at 28-29; SSP-C NOFO at 18-19. The applicant must also agree to the terms and conditions of the award. SSP-A NOFO at 11; SSP-C NOFO at 11.

62.    To obtain FEMA's approval to draw down funds, grantees must submit for FEMA's review additional information and documentation, including "[a] summary list

reporting A[lien]-Numbers, names, corresponding DHS release dates of the served population, and corresponding service dates of the served population." SSP-A NOFO at 29; SSP-C NOFO at 19. "For each requested allowable activity service category" the grantee must "provide one example of proof of payment (e.g., canceled check, credit card statement, etc.) and a receipt reflecting the purchase." *Id*. Additional documentation requirements apply for reimbursement of purchases above $5,000. *Id.*

63.     The SSP grants provide for reimbursement for shelter and services provided to those migrants who DHS determined to release into the United States. For that reason, grantees must submit the name, valid A-Number, and corresponding DHS release date for every person for whom the grantee seeks FEMA reimbursement. SSP-A NOFO at 29; SSP-C NOFO at 19. Thus, FEMA provides reimbursement for shelter and services provided to a given individual only after FEMA verifies that the individual has a valid A-Number and was released by DHS into the community.

64.      The NOFOs specify that all funds for which the applicant sought reimbursement "must comply with applicable statutes, rules and regulations, and policies, this NOFO, and the terms and conditions of the federal award. They must also comply with the Uniform Administrative Requirements, Cost Principles, and Audit Requirements at 2 C.F.R. Part 200." SSP-A NOFO at 30, SSP-C NOFO at 21. The NOFOs also incorporate by reference the FY 2024 DHS Standard Terms and Conditions. SSP-A NOFO at 38; SSP-C NOFO at 32.

### i.   *The Grant Awards*

65.     On April 24, 2024, the City, acting through its Office of Management and Budget ("City OMB") submitted an application to FEMA for an SSP-A grant for $38,864,884.00, the maximum amount then allocated to New York City as set forth in the SSP-

A NOFO prior to amendment. On June 11, 2024, City OMB submitted an application to FEMA for an SSP-C grant for $34,090,000, the maximum amount permitted for a single applicant.

66.      The City's applications included detailed budget worksheets for FEMA's review. All costs are budgeted on a per diem basis, with separate line items for, among other things, meals, security, case coordination, and medical. For example, the budgeted per diem cost submitted by the City for a night of hotel lodging is $62.19.

67.      On July 8, 2024, the City received its award letter for round 1 of SSP-A funding, for $38.86 million ("SSP-A Award Letter"). Subsequently, on September 11, 2024, FEMA approved an additional $20.4 million in round 2 funds for the City.

68.      On September 17, 2024, the City received its award letter for SSP-C funding, for $22 million ("SSP-C Award Letter" and collectively with the SSP-A Award Letter, "Award Letters").

69.      To accept the SSP-A and SSP-C grants funds, the City was required to agree to the terms set forth in the NOFOs and Award Letters. *See* SSP-A Award Letter at 1, SSP-C Award Letter at 1.

70.      The Award Letters further incorporated by reference the terms of 2 C.F.R. Part 200 and the NOFOs. SSP-A Award Letter, Arts. 2, 28; SSP-C Award Letter Arts. 2, 28. Additionally, the Award Letters provide that FEMA must inform the grantee in writing if an "error has been made [in a grant package], or if an administrative change must be made" to a grant. SSP-A Award Letter, Art. 44; SSP-C Award Letter Art 44.

71.      The City opted to receive grant payments on a reimbursement basis, meaning that the grantee must obtain FEMA's approval of a grant budget—namely the line items of expected expenditures for which reimbursement will be made—and only following

budget approval, the grantee may submit a documented request for reimbursement for approved expenditures that have already been made.

72.     The Award Letters were issued with a funding hold: as set forth in the NOFOs, in order to obligate or draw down SSP grant funds, the City is required to submit a "detailed cost breakdown and justification." SSP-A Award Letter Art. 48; SSP-C Award Letter Art. 48.

### ii.   FEMA's Approval of the City's Grant Budgets and Payment of Reimbursements

73.     On November 27, 2024, City OMB submitted to FEMA the detailed cost breakdown and justification required in support of a future reimbursement request for both the SSP-A and SSP-C grants.

74.     Following a review process, FEMA approved the City's SSP24 grant budgets on January 8 and 10, 2025, respectively.

75.     On January 14, 2025, City OMB submitted to FEMA a request for reimbursement of $22,169,838.00 of expenditures for its Fiscal Year 2024 SSP-C grant and on January 15, 2025, City OMB submitted to FEMA a request for reimbursement of costs in the amount of $59,302,125.07 for its Fiscal Year 2024 SSP-A grant, together representing the entirety of the SSP grant awards to the City for Fiscal Year 2024.

76.      In support of the payment requests, City OMB submitted all of the documentation required by FEMA including the name and A-Number for each individual, and invoices and other documentation of expenditures.

77.     On January 31, 2025, following its review of the City's submissions, FEMA informed the City that the reimbursement for each of the SSP grants would need to be reduced slightly to account for an error rate of roughly 1.22% in matching the A-Numbers to

eligibility for reimbursement and indicated that it would approve and make payment upon a request for the reduced amount.

78.     The City resubmitted to FEMA revised payment requests for the two grants in the amounts of $58,581,446.08 and $21,900,415.34, respectively, as pre-authorized by FEMA. The amounts in the revised payment requests reflected the reduction of 1.22% that FEMA required from the City's initial payment requests to account for FEMA's 1.22% error rate finding. The remaining balance—roughly $1 million between the two grants—remains available for future reimbursement of allowable expenses based on a subsequent submission.

79.     On February 4, 2025, the City received payments by ACH transfer to the City's central treasury account of $58,581,446.08 and $21,900,415.34, the full amount that FEMA had approved for reimbursement to the City.

80.     FEMA's approval and payment of these amounts constitutes FEMA's determination—after thoroughly reviewing budget details, expenditure documentation, and personal information of migrants—that the funds FEMA approved and disbursed were allowable under the grant terms and conditions.

**D. The Trump Administration Changes Policy and Unlawfully Freezes Federal Funding**

81.     On January 20, 2025, defendant President Donald Trump issued Executive Order 14159, entitled "Protecting the American People Against Invasion" ("Invasion EO"). The Invasion EO states that "[o]ver the last 4 years, the prior administration invited, administered, and oversaw an unprecedented flood of illegal immigration into the United States." As a result, the EO asserts, "[m]illions of illegal aliens" crossed the border and were "allowed to settle in American communities." The EO states that many of the people the federal government admitted and allowed to settle here "present significant threats to national security and public

safety" and that many have "abused the generosity of the American people, and their presence in the United States has cost taxpayers billions of dollars at the Federal, State, and local levels." Invasion EO § 1.

82.     The Invasion EO further asserts that it is the "the policy of the United States to achieve the total and efficient enforcement" of its immigration laws and issues a wide-ranging series of instructions to various persons and agencies within the federal government.

83.     The Invasion EO requires federal agencies to immediately pause funding to non-governmental organizations providing services to "illegal aliens. " Invasion EO § 19. The Attorney General and the Secretary of Homeland Security shall:

> (a) Immediately review and, if appropriate, audit all contracts, grants, or other agreements providing Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens, to ensure that such agreements conform to applicable law and are free of waste, fraud, and abuse, and that they do not promote or facilitate violations of our immigration laws;

> (b) Pause distribution of all further funds pursuant to such agreements pending the results of the review in subsection (a) of this section;

> (c) Terminate all such agreements determined to be in violation of law or to be sources of waste, fraud, or abuse and prohibit any such future agreements;

> (d) Coordinate with the Director of the Office of Management and Budget to ensure that no funding for agreements described in subsection (c) of this section is included in any appropriations request for the Department of Justice or the Department of Homeland Security; and

> (e) Initiate clawback or recoupment procedures, if appropriate, for any agreements described in subsection (c) of this section.

84.     The Invasion EO did not, on its face, order a comparable "pause" with respect to state and local governments.

85.     On January 27, 2025, the United States Office of Management and Budget issued a "Memorandum for Heads of Executive Departments and Agencies" entitled "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance" ("OMB Directive"). The OMB Directive directed federal agencies to "identify and review all Federal financial assistance programs and supporting activities consistent with the President's policies and requirements," as set forth in the Invasion EO and various other EOs.[5]

86.     The OMB Directive required federal agencies to implement the Invasion EO and other EOs by "complet[ing] a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the President's executive orders." In the meantime, the OMB Directive ordered that federal agencies "to the extent permissible under applicable law … pause all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal."

87.     On January 28, 2025, Defendant DHS secretary Kristi Noem issued a "Memorandum for Component and Office Heads" entitled "Direction on Grants to Non-

---

[5] The other EOs specifically encompassed in the OMB Directive included EOs entitled Reevaluating and Realigning United States Foreign Aid (Jan. 20, 2025), Putting America First in International Environmental Agreements (Jan. 20, 2025), Unleashing American Energy (Jan. 20, 2025), Ending Radical and Wasteful Government DEI Programs and Preferencing (Jan. 20, 2025), Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government (Jan. 20, 2025), and Enforcing the Hyde Amendment (Jan. 24, 2025). Many of these EOS ordered federal agencies to pause federal funding to grantees, including states and local governments, that touched on particular policy areas, such as the Electric Vehicle Charging, programs included in the "green new deal" and DEI programs.

governmental Organizations" ("Noem Memo"). Echoing the Invasion EO, the Noem Memo stated that "over the last four years, the Department of Homeland Security has spent billions of dollars funding illegal immigrants." The Noem Memo went on to direct "[e]ffective immediately, all [DHS] grant disbursements and assessments of grant applications that (a) go to non profit organizations or for which non-profit organizations are eligible, and (b) touch in any way on immigration, are on hold, pending review, except to the extent required by controlling authority." The Noem Memo specified that the "pause" applied to SSP.

88.    Also on January 28, 2025, a coalition of 22 States, including the State of New York, brought a lawsuit against various federal defendants in the District of Rhode Island seeking to temporarily restrain and preliminarily and permanently enjoin the across-the-board pause on federal funding disbursement ordered in the OMB Memo. *See generally New York v. Trump*, No. 25-cv-39-JJM-PAS (D.R.I. filed Jan. 28, 2025) (hereinafter "*New York v. Trump*"). Defendants in *New York v. Trump* included the following defendants in the instant lawsuit President Trump, Treasury Department, Secretary Bessent, Treasurer Collins, FEMA, Acting Administrator Hamilton, DHS, and Secretary Noem.

89.    The court in *New York v. Trump* granted the TRO application on January 21, 2025 and the preliminary injunction motion on March 6, 2025.

90.    In granting the TRO, the court held that the plaintiff States were likely to succeed on the merits of their claims because there was "no federal law" that authorized the defendants to "unilaterally suspend[] the payment of federal funds to the States and others simply by choosing to do so, no matter the authorizing or appropriating statute, the regulatory regime, or the terms of the grant itself." TRO at 5; 2025 U.S. Dist. LEXIS 17593, at *11. The court held that the defendants' refusal to disburse funds appropriated by Congress was arbitrary

and capricious and a violation of the separation of powers doctrine and that defendants' effort to impose conditions on funding was likewise unlawful. *Id.*

91.     The Court ordered the defendants not to "pause, freeze, impede, block, cancel, or terminate Defendants' compliance with awards and obligations to provide federal financial assistance to the States," and not to "impede the States' access to such awards and obligations, except on the basis of the applicable authorizing statutes, regulations, and terms." The court further ordered:

> If Defendants engage in the "identif[ication] and review" of federal financial assistance programs, as identified in the OMB Directive, such exercise shall not affect [sic] a pause, freeze, impediment, block, cancellation, or termination of Defendants' compliance with such awards and obligations, except on the basis of the applicable authorizing statutes, regulations, and terms.

> Defendants shall comply with all notice and procedural requirements in the award, agreement, or other instrument relating to decisions to stop, delay, or otherwise withhold federal financial assistance programs.

> *Id.* at 12.

92.     The TRO also barred defendants from adopting the substance of the OMB Memo "under any other name or title or through any other Defendants" and required defendants to provide written notice of the TRO to "all Defendants and agencies and their employees, contractors, and grantees by Monday, February 3, 2025, at 9 a.m." *Id.*

**E.  FEMA Grabs Back $80 Million Without Notice**

93.     On or about February 5, 2025, the day after FEMA duly disbursed the over $80 million reimbursement payment to the City under the SSP24 Grants, Mary Comans, then-Chief Financial Officer of FEMA and a veteran of the agency since 2017, "participated in an in-person meeting with leadership of FEMA and DHS, including Acting DHS General

Counsel Joseph Mazzara, and two DOGE[6] team members: Brad Smith and John Burham.

Another DOGE team member, Kyle Schutt, participated by phone." Declaration of Mary

Comans dated February 25, 2025 ("Comans Decl.") ¶¶ 1-2, *Does v. Elon Musk*, No. 8:25-cv-

00462-TDC (D.M.D. filed Feb. 13, 2025) ("*Does v. Musk*"), ECF No. 36 at 49.[7]

94.    The DOGE team members said "they were embedded at U.S. Department

of Health and Human Services but were there to help as the DHS DOGE members onboarded."

In particular, the DOGE team members "wanted to ensure that FEMA was not sending money

to non-governmental organizations ("NGOs") that aided undocumented immigrants through the

'Shelter and Services Program' grant that FEMA administers for U.S. Custom and Border

Protection." Comans Decl. ¶ 3.

95.    At the meeting "one of the DOGE members, asked FEMA's leadership

team whether they had stopped all payments to NGOs," and FEMA confirmed that it had. *Id*.

The DOGE staff member "then asked about payments to state and local governments. The

FEMA representative said those payments were being continued. Wagging his finger for

emphasis, [the DOGE staffer] affirmed, '***that's the right answer***.'" Comans Decl. ¶ 4.

---

[6] "DOGE" stands for "Department of Government Efficiency" as set forth in an executive order
dated January 20, 2025 entitled "Establishing and Implementing the President's "Department of
Governmental Efficiency."

[7] *Does v. Musk* is a class action lawsuit challenging DOGE's role in terminating federal
employees at various federal agencies. Comans is also challenging circumstances surrounding
her own termination in a separate lawsuit styled *Mary Comans v. Department of Homeland
Security*, No. 25-cv-00624-ACR (D. D.C. filed Mar. 4, 2025) ("*Comans v. DHS*"), alleging
among other things that DHS and FEMA "willfully and/or intentionally terminated Ms. Comans'
employment with Defendant FEMA in a manner that was derogatory to her reputation" and in
doing so, relied on "information and conclusions [that] were false, malicious, defamatory,
incomplete, inaccurate, and untimely . . ." Complaint ¶ 21, *Comans v. DHS*, ECF No. 1.

96.     However, four days later, on "February 9, 2025, around 5:00 PM, a DOGE team member embedded at the Treasury Department flagged that FEMA had recently paid New York City tens of millions of dollars" under SSP "to reimburse New York City for eligible expenses incurred for the care and sheltering services the City had provided to migrants following their release from DHS custody." Comans Decl. ¶ 7. Comans then personally "spent the entire evening analyzing the amount of funds paid and in what manner." *Id*.

97.     The following morning, on Monday, February 10, 2025 at 5:03 am, Elon Musk, in a post filled with blatant errors, posted that DOGE had "discovered" a $59 million payment from FEMA to the City "to house illegal immigrants" in "high-end hotels," that a "demand" would be made for the return of the funds, that the funds were meant for disaster relief and that "sending this money violated the law":



https://x.com/elonmusk/status/1888891512303263815.

98.     As detailed above, the funds were approved and disbursed pursuant to SSP, exactly as authorized and intended by Congress and awarded, approved, and paid by FEMA.

99.     Contrary to Musk's post, the funds were not used to pay for "luxury hotels," but rather to pay the FEMA-approved rate of $62.19 per person for lodging in any of the more than 220 hotels, motels, or other facilities that FEMA reviewed and approved. Further, FEMA paid only for shelter and service to migrants who FEMA confirmed before making payment had a DHS-issued A-Number and who DHS released from its custody into the community.

100.     Two hours after Musk's post, at 7:01 a.m., defendant Acting Administrator Hamilton reposted it and added: "I want to thank the @DOGE team for making me aware of this. Effective yesterday these payments have all been suspended from FEMA. Personnel will be held accountable." https://x.com/FEMA_Cam/status/1888921176199635266. Acting Administrator Hamilton here appears to be instituting a "pause" or "suspension" of the FEMA payments— via a post on X—on Monday February 10 (purportedly "[e]ffective yesterday", i.e. Sunday, February 9). City OMB was not notified of this, and on information and belief, neither was any other grantee. Further, the funds FEMA approved for reimbursement to the City had already been paid to the City six days earlier.

101.     Acting Administrator Hamilton followed up ten minutes later at 7:11 a.m. with another post acknowledging that the SSP funds provided to the City were in fact appropriated by Congress for the very purpose for which the City used them, stating: "@USCongress *should have never passed bills in 2023 and 2024 asking FEMA to do this*

*work.*" (Emphasis added.) Notwithstanding his acknowledgment of Congress' express

appropriation, Acting Administrator Hamilton stated: "*This stops now*."

https://x.com/FEMA_Cam/status/1888923672523489649.



102.    The statement could not be clearer: Defendants' purpose for grabbing back

the funds was to stop the SSP program entirely. It was not related to City-specific costs or City-

specific compliance issues, but was designed to thwart the very purpose for which Congress

appropriated the funds and FEMA awarded, approved, and disbursed them.

103.    Following the tweets from Musk and defendant Acting Administrator
Hamilton, Comans "spent all day on Monday, February 10, 2025, recouping the funds from
New York City, which ultimately totaled $80 million dollars." Comans Declaration ¶ 9. At 3:45
p.m. that day, "FEMA's Acting Administrator [Hamilton] sent an email to DHS confirming that
the process to claw back funding was occurring" and at 5:29 p.m. Comans "reported to []
leadership that [she] had successfully coordinated with Treasury and the funds were being
returned." *Id*.

104.    Based on her "experience and the interactions [she] witnessed," Comans
concluded "there was a sudden policy change concerning whether FEMA could send resources
to state and local governments." Comans Decl. ¶ 10. Comans believed the decision was made
by DOGE or Elon Musk. *Id*.

105.    The following day, on February 11, 2025, Comans was abruptly
terminated "effective immediately" from FEMA and federal employment, via a memorandum
stating: "[t]his action is being taken pursuant to Article II of the United States Constitution, at
the direction of the President. Article II, § 1 states that the executive Power 'shall be vested in a
President of the United States of America,'" and this termination is an exercise of that vested
power.'" Complaint ¶ 5, *Comans v. DHS*, ECF No. 1.

106.    DHS announced Comans's termination, along with terminations of three
other FEMA employees, stating that Comans and her colleagues were fired "for circumventing
leadership to unilaterally make egregious payments for luxury NYC hotels for migrants."
https://www.dhs.gov/news/2025/02/11/statement-dhs-spokesperson-termination-4-fema-
employees-who-made-payments-luxury; *see also* Luis Ferré-Sadurní, *Top FEMA Official Is*

*Fired Over Payments for N.Y.C. Migrant Shelters*, N.Y. Times (Feb. 11, 2025),

https://www.nytimes.com/2025/02/11/nyregion/fema-fired-nyc-migrant-hotels.html.

107.    That same day, on February 11, 2025 at 4:03 pm, $80,481,861.42,

disappeared from the City's central treasury account. The money disappeared via a reversal of

the ACH transfer. Defendants had removed from the City's bank account the entire amount that

FEMA had seven days earlier approved for reimbursement and disbursed to the City for the

SSP-A and SSP-C grants combined. Although the reversal was accomplished within the five-

day window for reversals of ACH transfers under the rules and procedures governing automated

clearinghouse ("ACH") transfers, those rules do not allow for reversals for the reasons

Defendants effectuated it, as discussed further below.

108.    FEMA did not provide any advance notice to the City of the money grab.

FEMA did not follow any of the measures set forth in the grant terms and conditions or the

regulations relevant to the grant. In fact, FEMA does not appear to have followed any

administrative process at all in grabbing the SSP funds.

109.    Nor did FEMA provide any advance notice of any reason or basis to the

City for the money grab. Indeed, it did not communicate with the City at all before taking the

funds.

### F.  Defendants Evade Their Obligations under the TRO through Elisions and Distortions of Fact

110.    As discussed *supra*, at the time of the money grab, Defendants were

subject to a TRO ordering them not to "pause, freeze, impede, block, cancel, or terminate

Defendants' compliance with awards and obligations to provide federal financial assistance

…except on the basis of the applicable authorizing statutes, regulations, and terms" and to

"comply with all notice and procedural requirements in the award, agreement, or other

instrument relating to decisions to stop, delay, or otherwise withhold federal financial assistance programs." *New York v. Trump*, ECF No. 50. This TRO barred Defendants from "pausing" SSP pursuant to the Invasion EO, the Noem Memo or any other, unilateral, across-the-board pause on federal funding to grant recipients, including states and local governments.

111.    To evade these obligations and create cover for the money grab, at approximately 7 p.m. on February 11, 2025—three hours after FEMA had already grabbed the SSP24 funds—some of the defendants here filed a motion in *New York v. Trump* entitled, "Emergency Motion. . . for Permission to Continue Withholding FEMA and Other Funding."

112.    The emergency motion purported to seek confirmation that a "withholding" of FEMA funding to the City did not violate the TRO.

113.    Without mentioning that FEMA had already taken the funds the emergency motion stated that "FEMA ***seeks to withhold*** Shelter and Services Program (SSP) funding based on concerns regarding the program" and "respectfully ***requests*** confirmation that Defendants may permissibly withhold certain FEMA funding, i.e., as 'a specific instance where they are acting in compliance with this Order but otherwise withholding funds due to specific authority.'" *Id*. (emphasis added).

114.    In a declaration accompanying the emergency motion, Defendant Acting Administrator Hamilton represented that FEMA had "paused" SSP funding to the City because of concerns the funds were being mis-used by the City and that FEMA would follow all applicable processes under the SSP grant and applicable laws and regulations. Specifically, Administrator Hamilton made the following representations:

- "As of today, the Department has paused funding to the Shelter and Services Program based on significant concerns that the funding is going to entities engaged in or facilitating illegal activities."

- "For example, a substantial portion of Shelter and Services Program money goes to funding alien housing at the Roosevelt Hotel in New York City. According to media reports, the vicious Venezuelan gang Tren De Aragua has taken over the hotel and is using it as a recruiting center and base of operations to plan a variety of crimes."

- "FEMA is in the process of requesting information from New York City to further investigate this matter to ensure that federal funds are not being used for illegal activities."

- "FEMA will begin the process of providing notice to New York City regarding the funding pause and will provide the information and process required by regulation and the terms and conditions of the award. *See* 2 C.F.R. § 200.242."

Declaration of Cameron Hamilton, *New York v. Trump*, Feb. 11, 2025, ECF No. 102-1 ("Hamilton 2/11 Declaration") ¶¶ 6, 7, 12, 13. The Hamilton 2/11 Declaration also attached the Noem Memo.

115.    The Hamilton 2/11 Declaration relied on "media reports," rather than on any fact-based analysis. It did not identify any activity by the City that was inconsistent with SSP24 grant conditions or unlawful, except for vague allegations of encouraging aliens to reside in the U.S., transporting illegal aliens, harboring, or aiding and abetting. Since all of the migrants for whom FEMA reimbursed the City were, as FEMA itself determined, assigned released into the community with an assigned A Number by DHS, and the reimbursement was for the express purpose of relieving DHS of the burden of maintaining these individuals in DHS custody, these assertions are faulty and appear to be disingenuous because there is nothing "illegal" about providing shelter and services for specific individuals released from DHS custody as specified in the grant.

116.    The Hamilton 2/11 Declaration represented only that, "as of today [February 11, 2025]", FEMA had "paused" SSP and did not inform the court that FEMA had already grabbed back the SSP24 funds without complying with any of the notice or procedural

requirements in the SSP Award Letters, NOFOs, or applicable federal regulations. The Declaration did not mention the supposed and unsupported concerns that Musk and defendant Hamilton articulated on February 10, 2025, before the money grab, about SSP funds going to provide "luxury" accommodations to "illegal aliens."

117. The Hamilton 2/11 Declaration cites 2 C.F.R. § 200.242, but that provision does not exist. If Hamilton meant to refer to 2 C.F.R. § 200.342, that provision requires that an agency that "initiat[es] a remedy for noncompliance (for example, disallowed costs, a corrective action plan, or termination)… must provide the recipient with an opportunity to object and provide information challenging the action." No such opportunity was provided before FEMA took the money. And nothing in the provision authorizes the unilateral reversal of an approved and completed payment to grab funds out of a grantee's bank account.

118. The court denied the emergency motion on February 12, 2025, stating:

> As to FEMA funds to New York City, the Defendants represent that they intend to provide 'notice to New York City regarding the funding pause and will provide the information and process required by regulation and the terms and conditions of the award.' ECF No. 102-1 at ¶ 13. Because the Defendants are seeking to terminate *funding 'on the basis of the applicable authorizing statutes, regulations, and terms,'* ECF No. 50 at 12 (emphasis added), the Court sees no need for further clarification.

Order, *New York v. Trump*, Feb. 12, 2025, ECF No. 107.

119. The District Court of Rhode Island thus relied on Defendants' representation that they were seeking merely to "pause" funding to the City "on the basis of the applicable authorizing statutes, regulations and terms" when, in fact, Defendants had already taken the SSP24 funds without providing notice to the City and without following any of the applicable statutes, regulations and terms.

120.    The day after the filing in *New York v. Trump*, on February 12, 2025, at 1:37 pm, defendant DHS Secretary Kristi Noem repeated the unsupported statements in the Hamilton 2/11 Declaration, that persons residing in hotels the City used to temporarily shelter non-citizen migrants committed crimes and that approved SSP funds were grabbed back for that reason. https://x.com/KristiNoem/status/1889745752924074088.



121.    Defendant Noem's February 12 message makes clear her hostility and opposition to the program itself.

### G.  FEMA Issued a "Noncompliance Letter" in a Pretense of Procedural Compliance

122.    More than a week after the money grab, Defendants began to manufacture a veneer of the procedural compliance—at least as to the withholding of SSP funds, though not for the unilateral removal of the funds from the City's bank account—that defendant Hamilton had represented in court filings they were following. On February 19, 2025, Neil Thompson, the Deputy Assistant Director at City OMB, received a letter, dated February 18, 2025, from

Hamilton with the subject line "Remedy for Noncompliance Letter, Shelter and Services Program (SSP)."

123.    The letter purports to "notify [City OMB] that DHS/FEMA is temporarily withholding payments to [City OMB]" for three grant awards: the SSP23 and both SSP24 Grants. The letter admits that FEMA had already grabbed back the SSP-A and SSP-C grant awards paid to the City, stating that FEMA "recovered two payments completed via direct deposit on February 4, 2025, totaling $80,481,861.42."

124.    The letter states that DHS/FEMA is withholding funds pursuant to 2 C.F.R. § 200.339(a), which provides that "[w]hen [a] Federal agency . . . determines that noncompliance cannot be remedied by imposing specific conditions, the Federal agency . . . may . . . (a) temporarily withhold payments until the recipient or subrecipient takes corrective action." But the letter also states, inconsistently with the above, that FEMA "is instituting specific conditions on [the City's] award pursuant to 2 C.F.R. § 200.208."

125.    2 C.F.R. § 200.208 allows federal agencies to adjust specific conditions in the Federal award based on analysis of the following factors:

> (1) Review of OMB-designated repositories of government-wide data (for example, *SAM.gov*) or review of its risk assessment (See § 200.206);
>
> (2) The recipient's or subrecipient's history of compliance with the terms and conditions of Federal awards;
>
> (3) The recipient's or subrecipient's ability to meet expected performance goals as described in § 200.211; or
>
> (4) A determination of whether a recipient or subrecipient has inadequate financial capability to perform the Federal award.

126.    None of the foregoing factors are discussed in the "noncompliance" letter nor do they appear to be within the scope of the concerns set forth in the letter.

127.    The letter also fails to note that FEMA may not initiate a remedy for "noncompliance," such as withholding funds, without providing notice to the City and an opportunity to object and provide information challenging the action. 2 C.F.R. § 200.342.

128.    The letter also omits reference to regulations providing that "payments for allowable costs *must not be withheld at any time during the period of performance* unless required by Federal statute, regulations," or "The recipient … has failed to comply with the terms and conditions of the Federal award; or… is delinquent in a debt." CFR § 200.305(b)(6) (emphasis added). If "such conditions" are met, "the Federal agency… may, *after providing reasonable notice*, withhold payments to the recipient… until the conditions are corrected." *Id*. And in the event payments are withheld for noncompliance, they must be released "upon subsequent compliance." 2 CFR § 200.305(b)(7).

129.    Here, FEMA has not identified any federal statute or regulation that requires withholding of SSP grant funds, has not identified a failure to comply with any grant terms or conditions, and did not provide notice, before grabbing back the funds.

130.    Instead, even taking the letter at face value, the stated reasons for withholding funds are based on specious and unsubstantiated allegations unrelated to any grant terms or conditions.

131.    The "noncompliance" letter announces purported "Findings," which are expressed as no more than "concerns" and which are, in any event, facially pretextual.

132.    First, the letter states that DHS "has significant concerns that SSP funding is going to entities engaged in or facilitating illegal activities." But it does not allege any purported illegal activities committed by any entity that might have been paid with funds for

which the City obtained reimbursement. Instead, the letter alleges—citing and exaggerating the

same news reports that defendant Hamilton cited in his declaration a week earlier:

> According to media reports, the vicious Venezuelan gang Tren De Aragua has
> taken over the hotel and is using it as a recruiting center and base of
> operations to plan a variety of crimes. According to these same reports, these
> crimes include gun and drug sales as well as sex trafficking, which can
> reasonably be presumed to be conducted in the hotel itself.

133.    The letter asserts that "DHS/FEMA has a responsibility to ensure that it

does not make payments that fund criminal activity." But, the letter does not explain what

"illegal activity" might be funded by the grant. As FEMA knows, the grant provides "financial

support to non-federal entities to provide sheltering and related activities to noncitizen migrants

following their release from the Department of Homeland Security." FEMA, *Shelter and*

*Services Program,* https://www.fema.gov/grants/shelter-services-program (last visited Feb. 13,

2025). The grant does not provide funds directly to any noncitizen migrants, nor to fund any

activities not specified within the grant terms.

134.    A further "finding" is FEMA's purported "concern" that

> entities receiving payment under this program may be guilty of encouraging
> or inducing an alien to come to, enter, or reside in the United States in
> violation of law, 8 U.S.C. § 1324(a)(1)(A)(iv); transporting or moving illegal
> aliens, id. § 1324(a)(1)(A)(ii); harboring, concealing, or shielding from
> detection illegal aliens, id. § 1324(a)(1)(A)(iii); or applicable conspiracy,
> aiding or abetting, or attempt liability respecting these statutes.

135.    As FEMA knows, this is a patently false "concern" because the grants

fund only those costs for shelter and services that are provided to individuals that DHS

determined to release from its custody into the community. That is, the individual was already in

the United States, in DHS custody, and then released by DHS to the community—facts that

FEMA confirmed for each individual before, and as a condition of, making payment.

136.     In re-framing as illegal "harboring" or "transporting" the provision of shelter and services to noncitizen migrants released by DHS into the U.S., the letter effectively imposes new and grant-negating conditions by rendering grant compliance to be unlawful.

137.     The "noncompliance" letter claims that "[b]ased on the concerns described . . . , DHS/FEMA will conduct additional monitoring and review of" the FY23 and FY24 SSP awards "as permitted by the terms and conditions of the award(s) to ensure compliance with all terms and conditions of [the] award(s)." The letter reiterates that "[d]uring this time, payments under the grant award(s) will be temporarily held. This action includes the amount of funding . . . that DHS/FEMA recently clawed back." The "noncompliance" letter adds that "[u]pon the conclusion of that monitoring, FEMA will notify you of the results and any other remedies for noncompliance or specific conditions, as appropriate."

138.     The "noncompliance" letter makes a show of requesting information that would somehow assist FEMA in making a final determination. But the information requested is largely information that FEMA not only possesses but has already reviewed in determining to make payment to the City. The letter seeks:

> All documents regarding the aliens with whom your organization and your subrecipients and contracts [sic] interacted with in carrying out the scope of your SSP award, including their names and contact information; and a detailed and descriptive list of specific services provided, and proof of provision of these services; or

> A written statement that your organization has already submitted all of the information identified in No. 1, above, to DHS/FEMA.

139.     As described above, the City supplied the name and A-Number for individuals for whom the City sought reimbursement, as well as proof of services rendered—all of which FEMA reviewed and approved for payment. Further, none of the information

requested is in any way related to the letter's stated central "concern": allegations of criminal activity. It is a charade of a request for information.

140.    By letter dated March 14, 2025, the City responded to FEMA's information request, reserving all rights with respect to the issues it is raising in this litigation and in any appeal of the noncompliance letter itself.

## H. Defendant Hamilton Doubles Down on Opposition to SSP and Demonstrates that the Money Grab was Unjustified

141.    On February 28, 2025, Acting Administrator Hamilton, in a declaration submitted in this action, ECF No. 17-1 ("Hamilton 2/28 Declaration"), asserts that "on its face, SSP funds sheltering and transportation of illegal aliens." In so stating, Hamilton makes clear FEMA's opposition to SSP itself.

142.    Hamilton further states that no funds should have been disbursed to the City following the Noem Memo because the memo put "on hold" all disbursements that "touch in anyway on immigration" and "go to non-profit organizations or for which non-profits are eligible." ECF No. 17-1 ¶ 8-9. Hamilton's reliance on the Noem Memo is telling: the Noem Memo uses the purpose of the SSP – providing services to non-citizens – as a basis to "pause" the SSP. The Noem Memo thus seeks to stop SSP because Defendants reject its purpose; the money grab and the pause have nothing to do with the City's compliance, which FEMA itself had previously determined when it paid the City on February 4, 2025.

143.    Furthermore, at the time of the money grab and the "noncompliance" letter, the Noem Memo, was enjoined as an across the board unilateral pause in funding, by the TRO in *New York v. Trump. See supra*. Significantly, in his February 11 declaration filed in the Rhode Island case, Hamilton averred that the pause was imposed "as of [that] day," not as of the issuance of the Noem Memo.

144.    The Hamilton 2/28 Declaration also states for the first time – 24 days after the $80 million SSP payment to the City and 17 days after the money grab – that the payment was made "in error." ECF No. 17.1 ¶ 9. The allegation of a payment "error" appears to be an attempt to justify the money grab as a legitimate "reversal" of the ACH transfer to the City's account. However, Defendants did not make an "error" in paying the City; rather Defendants decided they did not like the SSP program and tried to reclaim whatever monies they could without following agency procedures. That is not a proper basis for an ACH reversal and is not a proper basis for taking back money after approving the reimbursement.

145.    Defendant Hamilton explains in his February 28 Declaration that the money grab was executed by certifying over the phone to the Department of the Treasury that the SSP payment to the City was "improper" and by submitting to "Treasury an Improper Recovery Request via the Treasury Check Information System to recover the payment pursuant to 31 C.F.R. § 210.6(f)." ECF No. 17-1 ¶ 11. However, Section 210.6(f) does not permit a reversal of an ACH transfer for a change of mind about policy; it permits a reversal for a "duplicate or erroneous entry."

146.    FEMA's decision to pay the City over $80 million after a thorough review of the claims was not an "erroneous entry." The Code of Federal Regulations incorporates by reference the "ACH Rules," defined as the "2021 Operating Rules & Guidelines … published by Nacha," (the National Automated Clearing House Association). 31 C.F.R. 210.2(a) ("Any term that is not defined in [31 C.F.R. Part 210] shall have the meaning set forth in the ACH Rules"). Under the 2021 Nacha rules, an "erroneous entry" is defined as "(a) a duplicate [of a previous entry]…(b) a payment to or from a Receiver [who is not the] … Receiver … intended … by the Originator; (c) a payment in a dollar amount different than was intended by the

Originator … ; or (d) [a] payment of a debit Entry on a date earlier" than intended by the Originator or a "Credit Entry on a date later" than intended by the Originator. NACHA Rule § 8.38.[8] None of the reasons Defendants have articulated for the money grab are an allowable basis for an ACH reversal.

147.    Hamilton's statements moreover are inconsistent with earlier statements by various defendants, including DHS Secretary Noem's February 12, 2025 X post, that make clear the real reason for the reversal was animus towards the program. As Secretary Noem stated, she "clawed back the full payment that deep state activists unilaterally gave to NYC migrant hotels." *See supra.*

148.    Defendant Hamilton's factual assertions are also contradicted by the far-more-specific recollection of Comans that, even after the reimbursement payments were made on February 4, 2025, FEMA leadership and DOGE discussed and agreed that the Noem Memo applied only to nongovernmental organizations and did not stop payments to state and local government grantees. Comans recalled that there was a policy change made later, some time *after* February 5, 2025, to apply the Noem memo to stop payments to state and local governments and that this policy change lead to the money grab. Thus, FEMA's February 4, 2025 wire transfer to the City was not in "error" at the time that it was made.

149.    The Hamilton 2/28 Declaration repeats the vague assertions about possible illegal activity he articulated in the Hamilton 2/11 Declaration and in the "noncompliance"

---

[8] *See also* NACHA Rule 2.9.1 (allowing ACH reversals to "correct an Erroneous Entry previously initiated" and requiring that the "Originator must make a reasonable attempt to notify the Receiver of the Reversing Entry and the reason for the Reversing Entry no later than the Settlement Date of the Reversing Entry"); NACHA Rule 2.9.5 (clarifying that an ACH reversal is improper if initiated "for any reason other than" to correct an "erroneous entry").

letter. He also further elaborates on Defendants purported "concern" that "entities receiving payments might be involved in illegal activity, seemingly specifying the "Roosevelt Hotel" as an "NGO" that may be receiving funds. ECF No. 17-1 ¶¶ 10, 12. But, Defendant Hamilton does not identify any illegal activity by the hotel, only speculation that illegal activities might be "presumed" to have occurred there. *Id.* ¶ 6. And none of these vague allegations justify the money grab, after FEMA had reviewed the reimbursement request and approved and paid the reimbursement.

150.    While Hamilton claims that the February 4, 2025 payment to the City was an "error" because of the pause effectuated by the Noem Memo, that memo cannot form a legitimate basis of authority for the money grab or for the suspension of SSP. The Noem Memo violates the APA, the separation of powers doctrine and the Spending Clause. To the extent the Noem Memo effectuated an across-the-board "pause," it violates the TRO in *New York v. Trump*. To the extent it is being interpreted as applying to payments to local governments, as well as non-governmental organizations, that interpretation was not in effect when the payment to the City was made and therefore cannot form the basis of any claim that the February 4 payment to the City was the result of an "error." To the extent the Noem Memo is premised on the concern of possible illegality in providing shelter and services to noncitizen migrants released into the United States by DHS, it improperly imposes new, grant-negating conditions. And finally, nothing set forth in the Noem Memo establishes grounds consistent with the Nacha rules concerning reversal of an "erroneous entry."

## I.    President Trump Announces Termination of SSP as "Waste" and "Scam " and Gloats Over the Money Grab Executed "Just in Time"

151.    On March 4, 2025, President Trump, delivered an address to Congress in which he touted, among other things, his Administration's efforts to "combat inflation" by

"ending the flagrant waste of taxpayer dollars." President Trump enumerated a long list of so-called "appalling waste" "including "$59 million for illegal alien hotel rooms in New York City, real estate developers done very well."[9] He then went on to call "all of these" programs he had identified—including SSP—as "scams" that had "been found out and exposed and swiftly terminated."

152.    Defendant Trump thus made clear that Defendants' intent is to end SSP entirely, and not merely to review the City's compliance with applicable terms and conditions, saying "[w]e found hundreds of billions of dollars of fraud. And we've taken back the money and reduced our debt to fight inflation and other things."

153.    Defendant Trump then added: "Taking back a lot of that money, we got it just in time"— a seeming reference to the money grab, which was completed near close of business on the last day for which an ACH reversal could be effectuated under the ACH rules[10]— before insisting "[t]his is just the beginning."

**J.  Defendants Continue to Effectuate the Suspension of SSP**

154.    On March 11, 2025, Defendants notified SSP recipients across the country that their awards are being withheld.[11]

---

[9] *Transcript of President Donald Trump's speech to a joint session of Congress*, Associated Press, Mar. 5, 2025 10:05 am, https://apnews.com/article/trump-speech-congress-transcript-751b5891a3265ff1e5c1409c391fef7c.

[10] *See* 31 C.F.R. 210.6(f) ("Reversal under this section shall comply with the time limitations set forth in the applicable ACH Rules"); NACHA Rule 2.9.1 (requiring reversals to be made "within five Banking Days following the Settlement Date of the Erroneous Entry").

[11] Letter from FEMA to Pima County, Arizona (Mar. 11, 2025), https://content.civicplus.com/api/assets/f82f85f8-1974-47ab-83e7-ef0964fa56d8 ; Uriel J. García, Alejandro Serrano & Berenice Garcia, *FEMA wants the names and addresses of migrants helped by Texas nonprofits and local governments that got federal grant money*, Texas

155. These letters use substantially similar boilerplate language to that found in the "noncompliance" letter that FEMA sent the City, stating, without identifying any facts or basis, that DHS "has significant concerns that SSP funding is going to entities engaged in or facilitating illegal activities" and that DHS is concerned that

> entities receiving payment under this program may be guilty of encouraging or inducing an alien to come to, enter, or reside in the United States in violation of law, 8 U.S.C. § 1324(a)(1)(A)(iv); transporting or moving illegal aliens, id. § 1324(a)(1)(A)(ii); harboring, concealing, or shielding from detection illegal aliens, id. § 1324(a)(1)(A)(iii); or applicable conspiracy, aiding or abetting, or attempt liability respecting these statutes.

*See e.g.* https://content.civicplus.com/api/assets/f82f85f8-1974-47ab-83e7-ef0964fa56d8.

156. The letters purport to apply "specific conditions" to the recipient's SSP award and go on to request the same information the "noncompliance" letter sought from the City, namely "1. [a]ll documents regarding the aliens with whom your organization and your subrecipients and contracts interacted with in carrying out the scope of your SSP award, including their names and contact information; and a detailed and descriptive list of specific services provided, and proof of provision of these services; or … 2 A written statement that your organization has already submitted all of the information identified in No. 1, above." *Id.*

157. Defendant Hamilton reiterated that SSP is suspended in a March 14, 2025 Declaration in *New York v. Trump*, stating that FEMA has "paused funding to the [SSP]" and

---

Tribune, Mar. 13, 2025, https://www.texastribune.org/2025/03/13/texas-fema-federal-grants-immigrants/; Elliott Wenzler, *Trump administration threatens to rescind $32 million promised to Denver by FEMA for migrant shelter costs*, Denver Post, Mar. 14, 2025, https://www.denverpost.com/2025/03/14/denver-fema-letter-migrants-shelters-money-trump-administration/; *FEMA Withholds SSP Program Payments to Migrant Shelters Pending Review*, Immigration Policy Tracking Project, Mar. 11, 2025, https://immpolicytracking.org/policies/fema-announces-review-of-migrant-shelter-aid/#/tab-policy-documents.

asserting that the pause is pursuant to the Noem Memo and for the reasons set forth in his February 11, 2025 declaration. *New York v. Trump*, ECF No. 166-1 ¶ 3. As discussed above, the Hamilton 2/11 Declaration, submitted hours after the money grab, disingenuously purported to seek leave from the *New York v. Trump* court to "withhold" SSP funds from the City pursuant to grant terms and conditions.

158.    Defendant Hamilton also stated that SSP grants to the states of Colorado and Wisconsin are being withheld and "specific conditions" are being imposed on these grants because DHS has "significant concerns that the SSP funding is going to entities engaged in or facilitating illegal activities." *New York v. Trump*, ECF No 166-1 ¶¶ 30-31.

### K. FEMA is Bound by Extensive Rules and Procedures, Including in the Grant Terms and Conditions

159.    By grabbing back funding from the City, and suspending further funding under SSP24 and SSP23, FEMA has acted contrary to the applicable rules and grant terms. There is nothing in the NOFOs, Award Letters, applicable regulations, or Nacha rules that allows Defendants to "recover" funds by taking them out of the City's bank account before going through an administrative process that includes notice and an opportunity to object.

160.    Furthermore, Defendants' supposed administrative determination to suspend SSP24 and SSP23 funding is plainly pretextual, as it does not identify any legitimate basis for withholding SSP funding – let alone for having taken back funds that were previously approved and paid. Instead, it makes specious allegations unrelated to the grant terms, asks for submission of information that City OMB already provided and that FEMA already reviewed in detail, and fails to cite any grant term with which the City has not complied.

### L.  The Money Grab Violates Federal Rules and Grant Terms and Conditions

161.    As described above, FEMA did not provide any notice to City OMB before the money grab.

162.    The money grab was made in total disregard of the fact that FEMA awarded the grant and then reviewed, approved, and paid the reimbursement.

163.    No lawful grounds exist—and none have been asserted—for the money grab, and no lawful procedure was followed. Instead, Defendants have made clear that their true intent is to halt the program entirely because they do not like it, and have commenced a *post hoc* "procedure" to give legal gloss to their unlawful determination and action. The money grab must be reversed and defendants prevented from engaging in unlawful money grabs in the future.

## <u>CLAIMS FOR RELIEF</u>

### Count I
### Substantive APA Violation: Illegal Money Grab
### Arbitrary and Capricious; Abuses of Discretion
### (Against Agency Defendants)

164.    The City repeats and realleges all paragraphs above as if fully set forth herein.

165.    Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

166.    The FEMA money grab is agency action subject to review under the APA.

167.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

168.    An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency

must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up).

169.    The "reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce* v. *New York*, 588 U.S. 752, 785 (2019). Agencies may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decision-making process." *Id.*

170.    Moreover, "courts may not accept … counsel's post hoc rationalizations for agency action" or otherwise "supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 50. Rather, "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Id.*

171.    Here, Defendants provided the City no reason or basis at all for grabbing $80 million from the City's bank account for costs FEMA has already confirmed through review of extensive documentation were eligible for reimbursement under the SSP grants.

172.    The money grab also separately violated the rules governing action by the federal government to reverse ACH transactions, as incorporated in and modified by 31 C.F.R. Part 210.

173.    To the extent FEMA officials and other federal officials offered rationales for the money grab on social media, in public statements, and in lawsuits to which the City is not a party, these rationales are unsupported by fact or law, and offer no legitimate basis for FEMA's action.

174.    To the extent the "noncompliance" letter purports to offer rationales for the money grab, it does not add anything, is pretextual, unsupported, and offer no legitimate basis for FEMA's action.

175.    An action is also arbitrary and capricious if the agency "failed to consider . . . important aspects of the problem" before it. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 25 (2020) (quoting *Motor Vehicle Mfrs*., 463 U.S. at 43). Here, Defendants demonstrated no consideration of the City's substantial reliance interests in receiving funds to reimburse the City for monies already spent housing and providing services to non-citizen migrants in compliance with the grant terms and requirements. Where, as here, "an agency changes course ... it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *Id*. (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016)); *see also Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 106 (2015) ("[T]he APA requires an agency to provide more substantial justification when its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account.")

176.    Under 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the FEMA money grab violates the APA because it is arbitrary and capricious.

177.    In addition, Plaintiff is entitled to additional appropriate relief under 5 U.S.C. § 705 ordering Defendants to reverse the FEMA money grab by returning the $80 million to the City's bank account.

## Count II
### Substantive APA Violation: Illegal Pause/Suspension of SSP and Withholding

**Arbitrary and Capricious; Abuses of Discretion
(Against Agency Defendants)**

178.    The City repeats and realleges all paragraphs above as if fully set forth herein.

179.    Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

180.    The suspension or pause of SSP and the withholding of SSP24 and SSP23 funding are agency action subject to review under the APA.

181.    Defendants have not offered any lawful basis for suspending or pausing SSP or withholding the SSP24 and SSP23 grants. Defendants have not identified any costs that are not reimbursable under the SSP grants.

182.    Defendants have not provided any reason – other than the improper rationale of animus to SSP itself – for pausing, suspending, and/or terminating SSP. Defendants purported reasons for suspending or pausing SSP or withholding the SSP24 and SSP23 grants are inconsistent with and directly contrary to the statutory text of the DHS Appropriations Act and the stated goals of the SSP, which include providing funds to local governments that provide food, shelter and other services for migrants recently released by DHS into the community, in order to facilitate the safe, orderly, and humane release of noncitizen migrants from DHS short-term holding facilities.

183.    The "noncompliance" letter is pretextual, unsupported, and offers no legitimate basis for FEMA's action.

184.    Under 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that FEMA's suspension or pause of SSP and its withholding of SSP24 and SSP23 funding violates the APA because it is arbitrary and capricious.

185.    In addition, Plaintiff is entitled to additional appropriate relief under 5 U.S.C. § 705 enjoining Defendants from pausing or suspending SSP or implementing the withholding of SSP24 and SSP23 funds.

**Count III**
**Substantive APA Violations: Illegal Money Grab**
**Contrary to Law, Ultra Vires, and in Excess of Statutory Authority**
**(Against Agency Defendants)**

186.    The City repeats and realleges all paragraphs above as if fully set forth herein.

187.    Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

188.    The FEMA money grab is agency action subject to review under the APA.

189.    Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(B) – (C).

190.    Neither the President nor an agency can take any action that exceeds the scope of their constitutional and/or statutory authority.

191.    Congress enacted the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *U.S. v. Morton Salt*, 338 U.S. 632, 644 (1950)). Moreover, "Section 706 makes clear that agency interpretations of statutes—like agency interpretations of the Constitution—are *not* entitled to deference." *Id.* at 392 (emphasis in original). Rather, it "remains the responsibility of the court to decide whether the law means what the agency says." *Id.* (quoting *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 109 (2015) (Scalia, J., concurring in judgment)).

192.    The DHS Appropriations Act authorizing the SSP grants appropriated funds for the purpose of providing monies to local governments that provide food, shelter and

other services for migrants recently released by DHS into the community, in order to facilitate the safe, orderly, and humane release of noncitizen migrants from DHS short-term holding facilities. Defendants cannot unilaterally grab back or refuse to disburse funds appropriated by Congress contrary to congressional intent and directive.

193.    Moreover, the Impoundment Control Act of 1974 requires the Executive to make appropriated funds "available for obligation," subject to only two exceptions: rescissions and deferrals. 2 U.S.C. §§ 683-84. Deferrals may not be made for policy reasons, and rescissions are subject to congressional approval. *Id*. § 684(b).

194.    The FEMA money grab is neither a lawful rescission nor a lawful deferral under the Impoundment Control Act. It is not a lawful rescission because lawful rescissions are subject to congressional approval, *id*. § 684(b) and the President has not sought congressional approval. It is not a lawful deferral because Defendants made clear that the FEMA money grab was motivated by a policy disagreement with the SSP. As the D.C. Circuit has explained, the Executive lacks the statutory authority to engage in policy-based deferrals that would "negate the will of Congress." *City of New Haven v. United States*, 809 F.2d 900, 901 (D.C. Cir. 1987).

195.    The money grab is contrary to law, ultra vires, and in excess of statutory authority for the additional reason that the ACH reversal was effectuated for reasons other than those for which reversal is permitted under the C.F.R.

196.    Under 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the FEMA money grab violates the APA because it is contrary to law, ultra vires, and in excess of statutory authority.

197.     Plaintiff is entitled to additional appropriate relief under 5 U.S.C. § 705 ordering Defendants to reverse the FEMA money grab by returning the $80 million to the City's bank account.

**Count IV**
**Substantive APA Violations: Illegal Pause/Suspension of SSP and Withholding of Funds**
**Contrary to Law, Ultra Vires, and in Excess of Statutory Authority**
**(Against Agency Defendants)**

198.     The City repeats and realleges all paragraphs above as if fully set forth herein.

199.     Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

200.     The suspension or pause of SSP and the withholding of SSP24 and SSP23 funding are agency action subject to review under the APA.

201.     Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(B) – (C).

202.     The DHS Appropriations Act authorizing the SSP grants appropriated funds for the purpose of providing monies to local governments that provide food, shelter and other services for migrants recently released by DHS into the community, in order to facilitate the safe, orderly, and humane release of noncitizen migrants from DHS short-term holding facilities. Defendants cannot unilaterally grab back or refuse to disburse funds appropriated by Congress contrary to congressional intent and directive.

203.     Moreover, the Impoundment Control Act of 1974 requires the Executive to make appropriated funds "available for obligation," subject to only two exceptions: rescissions

and deferrals. 2 U.S.C. §§ 683-84. Deferrals may not be made for policy reasons, and rescissions are subject to congressional approval. *Id*. § 684(b).

204.    FEMA's suspension or pause of SSP and withholding of SSP24 and SSP23 funding is neither a lawful rescission nor a lawful deferral under the Impoundment Control Act. It is not a lawful rescission because lawful rescissions are subject to congressional approval, and the President has not sought congressional approval. It is not a lawful deferral because Defendants made clear that it was motivated by their hostility to the stated purpose of the congressional appropriation and their determination not to make SSP payments.

205.    Under 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that FEMA's suspension or pause of SSP and withholding of SSP24 and SSP23 funding violates the APA because it is contrary to law, ultra vires, and in excess of statutory authority.

206.    In addition, Plaintiff is entitled to additional appropriate relief under 5 U.S.C. § 705 enjoining Defendants from pausing or suspending SSP or implementing the withholding of SSP24 and SSP23 funds.

### Count V
### Procedural APA Violations: Illegal Money Grab & Illegal Pause/Suspension of SSP and Withholding of Funds Without Observance of Procedure Required by Law
### (Against Agency Defendants)

207.    The City repeats and realleges all paragraphs above as if fully set forth herein.

208.    Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

209.    The FEMA money grab is agency action subject to review under the APA.

210.    FEMA's pause or suspension of SSP and withholding of SSP24 and SSP23 funding are agency action subject to review under the APA.

211.    Under the APA, a court "shall . . . hold unlawful and set aside agency action, findings and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

212.    Neither the DHS Appropriations Act, the SSP grant Award Letters, the NOFOs nor the Code of Federal Regulations, incorporated into the SSP grant documents, permit Defendants to grab back funds duly disbursed by FEMA to the City pursuant to and in accordance with the SSP grants' terms and conditions. Nor do they allow Defendants to pause or suspend SSP or withhold payment of funds that were approved pursuant to and in accordance with the SSP grants' terms and conditions.

213.    In effectuating the money grab, the suspension or pause of SSP and the withholding of funding, Defendants failed to follow the procedures available under the SSP Grant Award Letters, the NOFOs and the Code of Federal Regulations, incorporated into the grant documents.

214.    Prior to grabbing back $80 million, Defendants did not provide the City with notice of any agency determination of non-compliance, any specific conditions to be applied to the City SSP grants, nor any grant suspension, pause or termination. 2 C.F.R. §§ 200.208, 200.243; 200.305; 200.339 – 200.342. Nor did FEMA offer the City any opportunity to contest any agency determinations before taking the money. *Id.* § 200.342.

215.    FEMA represented to the Rhode Island District Court as of February 11, 2025 that FEMA was already "in the process of requesting information from New York City to further investigate this matter" and would "provide[] notice" to the City and "provide the information and process required by regulation and the terms and conditions of the award." Hamilton Declaration at ¶¶ 12, 13. But at the time of their filing, FEMA had already grabbed the

$80 million from New York City without providing notice, without requesting any information, without announcing any findings, and without following any required process.

216.    Defendants' February 18, 2025 "noncompliance" letter did not identify any noncompliance by the City. Indeed, FEMA issued the letter, purporting to impose on the City "specific conditions" and withholding of funding, before conducting a compliance review and then appeared to collapse multiple steps in the administrative process. It carried out this misuse of administrative procedures without giving the City the opportunity to object and present its own information before implementing the specific conditions, the pause or suspension of SSP and the withholding of funds. 2 CFR 200.305(b)(6), 200.305(b)(7), 200.342.

217.    Moreover FEMA's "concerns" are facially pretextual and unsupported. The "noncompliance" letter requests information that is not related to the asserted concerns and seeks information that, for the most part, has already been provided by the City, reviewed by FEMA, and determined to be sufficient for payment. This pretextual "noncompliance" letter does not provide the City with the procedural protections to which it is entitled.

218.    Further, the letter creates the impression of a City-specific compliance review when, in fact, Defendants have determined to suspend or pause SSP due to antipathy towards the program itself and with the intent to terminate SSP for that reason, whether as to the City or program-wide.

219.    Under 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the FEMA money grab, the pausing or suspending of SSP and the withholding of SSP24 and SSP23 funding violates the APA because it is without observance of procedure required by law.

220.    In addition, Plaintiff is entitled to additional appropriate relief under 5

U.S.C. § 705 ordering Defendants to reverse the FEMA money grab by returning the $80

million to the City's bank account, and enjoining Defendants from pausing or suspending SSP

and implementing the withholding of SSP24 and SSP23 funds.

### .Count VI
### Violation of Due Process
### (Against All Defendants)

221.    The City repeats and realleges all paragraphs above as if fully set forth

herein.

222.    Under the Due Process Clause of the Fifth Amendment of the United

States Constitution, the government may not deprive a person or entity of a protected property

interest without due process of law.

223.    Federal courts possess the power in equity to grant injunctive relief "with

respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr.,*

*Inc.*, 575 U.S. 320, 326–27 (2015).

224.    The City has a protected property interest in the $80 million that

Defendants grabbed back from the City's bank account and in the SSP23 funds it has been

awarded and which have been disbursed to the City.

225.    Defendants' conduct in implementing the FEMA money grab deprived the

City of its property interest without providing notice or a pre-deprivation opportunity to be

heard.

226.    While a post-deprivation opportunity to be heard would not be sufficient

under the circumstances, Defendants have not in fact provided a genuine post-deprivation

opportunity to be heard because the process being offered is pretextual and illusory. For

example, while the "noncompliance" letter requests more information, that information is largely identical to the information that FEMA already reviewed and approved in connection with approving disbursements to the City for the SSP24 and SSP23 grants. Additionally, the information requested does not speak to the purported "concerns" articulated in the letter. As is clear from Defendants' statements and actions, they have determined to suspend and terminate SSP and not make SSP payments and are using the noncompliance letter (and similar letters to other grant recipients) to accomplish that aim.

227.    Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the FEMA money grab, the pausing or suspending of SSP, and the withholding of SSP24 and SSP23 funding are contrary to law.

228.    In addition, Plaintiff is entitled to additional appropriate relief including (1) ordering Defendants to reverse the FEMA money grab by returning the $80 million to the City's bank account; (2) enjoining Defendants from taking any further money from any City bank account in connection with the SSP24 and SSP23 FEMA grants; and (3) enjoining Defendants from suspending or pausing SSP or implementing the withholding of SSP24 and SSP23 funds.

### Count VII
### Separation of Powers
### (Against All Defendants)

229.    The City repeats and realleges all paragraphs above as if fully set forth herein.

230.    Article I, Section 1 of the United States Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives." U.S. Const. Art. I, Sec. 1.

231.    "As Chief Justice Marshall put it, this means that 'important subjects . . . must be entirely regulated by the legislature itself,' even if Congress may leave the Executive 'to act under such general provisions to fill up the details.'" *West Virginia v. EPA*, 597 U.S. 697, 737 (2022) (Gorsuch, J., concurring) (quoting *Wayman v. Southard*, 10 Wheat. 1, 42-43, 6 L.Ed. 253 (1825)).

232.    The separation of powers doctrine thus represents perhaps the central tenet of our constitution. *See, e.g., Trump v. United States*, 603 U.S. 593, 637-38 (2024); *West Virginia v. EPA*, 597 U.S. at 723-24. Consistent with these principles, the executive acts at the lowest ebb of his constitutional authority and power when he acts contrary to the express or implied will of Congress. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

233.    FEMA's money grab, suspension and apparent termination of SSP, and withholding of SSP24 and SSP23 funds violates the separation of powers because the executive branch has overridden the careful judgments of Congress by acting without legitimate basis or justification in taking back funding and withholding funding, and suspending programs without legitimate basis or justification, that were specifically authorized and appropriated under the DHS Appropriations Act and was used by the City for the purposes set forth in that Act. Indeed, FEMA officials have acknowledged that they are refusing and will continue to refuse to effectuate the DHS Appropriations Act, thus acting contrary to law.

234.    Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the FEMA money grab, the pausing or suspending of SSP and the withholding of SSP24 and SSP23 funding are contrary to law.

235.    In addition, Plaintiff is entitled to additional appropriate relief including (1) ordering Defendants to reverse the FEMA money grab by returning the $80 million to the City's bank account; (2) enjoining Defendants from taking any further money from any City bank account in connection with the SSP24 and SSP23 FEMA grants; and (3) enjoining Defendants from suspending or pausing SSP or implementing the withholding of SSP24 and SSP23 funds.

### Count VIII
### Spending Clause
### (Against All Defendants)

236.    The City repeats and realleges all paragraphs above as if fully set forth herein.

237.    The Spending Clause provides that Congress—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . . ." U.S. Const. Art. I, Sec. 8, clause 1.

238.    "Congress' power to legislate under the spending power is broad," but conditions on funding must be "unambiguous[]" and they cannot "surprise[] participating States [or localities] with post acceptance or 'retroactive' conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981). States and localities must have fair notice of conditions, and once funds have been accepted pursuant to a federal spending program, the Federal government cannot alter the conditions attached to those funds so significantly as to "accomplish[ ] a shift in kind, not merely degree." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 583-84 (2012).

239.     Furthermore, conditions must be "reasonably related to the purpose of the expenditure." *New York v. United States*, 505 U.S. 144, 172 (1992) (*citing Mass. v. United States*, 435 U.S. 444 (1978)).

240.     FEMA's money grab, suspension of SSP, and withholding violate the Spending Clause because the executive branch has overridden the careful judgments of Congress by imposing purported new conditions and requirements on SSP funding that are inconsistent with the DHS Appropriations Act, the SSP Award Letters, the NOFOs and the Code of Federal Regulations as incorporated by reference into the SSP grant documents.

241.     Defendants have made clear their animus towards and intent to thwart and terminate SSP. The concerns Defendants put forth as rationales for compliance review impose new terms and conditions that are effectively grant-negating inasmuch as they describe as unlawful the exact acts that the grant funds the city to do: provide shelter and services to noncitizen migrants released into the United States by DHS. .

242.     Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the money grab, the pausing or suspension of SSP, and the withholding of SSP24 and SSP23 funding are contrary to law.

243.     In addition, Plaintiff is entitled to additional appropriate relief including (1) ordering Defendants to reverse the FEMA money grab by returning the $80 million to the City's bank account; (2) enjoining Defendants from taking any further money from any City bank account in connection with the SSP24 and SSP23 FEMA grants; and (3) enjoining Defendants from suspending or pausing SSP or implementing the withholding of SSP24 and SSP23 funds.

## PRAYER FOR RELIEF

**WHEREFORE**, the City demands judgment against Defendants:

(a) Declaring unlawful and setting aside the SSP24 $80 million money grab as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A); as contrary to constitutional right, power, privilege, or immunity under 5 U.S.C. § 706(2)(B); as in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C); and without observance of procedure required by law under 5 U.S.C § 706(2)(D) and a violation of the Due Process Clause, the separation of powers, and the Spending Clause of the United States Constitution;

(b) Declaring unlawful and setting aside the SSP24 $80 million money grab as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A); as violating the law governing ACH transfers and reversals.

(c) Issuing a permanent injunction ordering Defendants to ordering Defendants to return the SSP24 $80 million money grab funds to the City's bank account; reverse the SSP24 $80 million money grab by returning the $80 million to the City's bank account;

(d) Declaring unlawful and setting aside, and enjoining Defendants' suspension or pause of SSP and the February 18, 2025 FEMA Remedy for Noncompliance Letter withholding funding as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A); as contrary to constitutional right, power, privilege, or immunity under 5 U.S.C. § 706(2)(B); as

in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C); and without observance of procedure required by law under 5 U.S.C § 706(2)(D) and a violation of the Due Process Clause, the separation of powers, and the Spending Clause of the United States Constitution;

(e) Awarding Plaintiff its costs and attorneys' fees in this action, and other disbursements as appropriate; and

(f) Granting such other relief as this Court may deem just and proper.

Dated:     New York, New York
           March 20, 2025

                          **MURIEL GOODE-TRUFANT**
                          Corporation Counsel of
                           the City of New York
                          *Attorney for Plaintiff The City of New York*
                          100 Church Street
                          New York, NY 10007
                          (212) 356-1000


                    By:     *s/Doris Bernhardt*
                          Joshua Rubin
                          Doris Bernhardt
                          Melanie Ash
                          June R. Buch
                          Aatif Iqbal
                          Gail Rubin
                          Elizabeth Slater

                          Assistant Corporation Counsels