UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------X

THE CITY OF NEW YORK,

                    Plaintiff,

           v.

DONALD TRUMP, in his official capacity as President of
the United States;

U.S. DEPARTMENT OF THE TREASURY;

SCOTT BESSENT, in his official capacity as Secretary of
the Treasury;

PATRICIA COLLINS, in her official capacity as Treasurer
of the U.S.;

U.S. FEDERAL EMERGENCY MANAGEMENT
AGENCY;

~~CAMERON HAMILTON~~DAVID RICHARDSON, in his
official capacity as Senior Official Performing the Duties
of the Administrator, U.S. Department of Homeland
Security, Federal Emergency Management Agency;

U.S. DEPARTMENT OF HOMELAND SECURITY;

KRISTI NOEM, in her official capacity as Secretary of the
U.S. Department of Homeland Security;

U.S. DEPARTMENT OR AGENCY OF UNKNOWN
IDENTITY;.

JOHN OR JANE DOE, in his or her official capacity as
head of U.S. Department or Agency of Unknown Identity;

                    Defendants.

-------------------------------------------------------------------------X

No. 25-cv-1510 (JHR)

**SECOND AMENDED
COMPLAINT**

Plaintiff The City of New York (the "City"), by its attorney, Muriel Goode-Trufant, Corporation Counsel of the City of New York, alleges upon personal knowledge as to itself and upon information and belief as to all other matters:

## INTRODUCTION

1.  On Tuesday, February 11, 2025, at 4:03 pm, the long arm of the federal government reached into a central bank account of the City of New York (the "City") and grabbed $80,481,861.42. It took these funds from the City without any advance notice that it would be doing so and without communicating any decision or rationale to the City. This "Money Grab" was the opening salvo in a multi-speared effort by the Trump administration to deprive the City, by unlawful means and for illegitimate reasons, of as much as $186 million in previously-awarded grant funding.

2.  A week earlier, on February 4, 2025, Defendant U.S. Federal Emergency Management Agency ("FEMA") had paid that amount$80,481,861.42 to the City on February 4, 2025 after it hadFEMA thoroughly reviewed the extensive supporting documentation submitted by the City and approved payment under two federal grants that FEMA awarded under the Shelter and Services Programs ("SSP").

3.  The federal government achieved this illegal seizure ofseized the City's funds using an Automatic Clearing House ("ACH") reversal, a process in which the originator of an ACH electronic funds transfer initiates a request to reverse a payment that has already been processed. Originators are permitted to use the ACH reversal process under very limited and essentially ministerial circumstances not present here, such as to reverse a duplicate payment, a payment made to an incorrect recipient, or a payment made in the incorrect amount.

1

4.  ~~The~~ Pursuant to Congressional appropriation and all applicable regulations, the money was rightfully the City's. FEMA offered and awarded the SSP grants to offset costs the City incurred for shelter and services it provided to noncitizen migrants who were processed and released into the community by defendant the U.S. Department of Homeland Security ("DHS"). The purpose of SSP, as FEMA stated, was to "reliev[e] overcrowding in short-term holding facilities of U.S. Customs and Border Protection"— the exact purpose for which the City used the funds.

5.  As Congress intended, the SSP grants were made to local governments and non-profit organizations in border states, such as Texas and Arizona, and other locales, like New York City, receiving the largest influxes of migrants released by DHS. The City received these now-seized funds *only* on a reimbursement basis for eligible and compliant expenditures already incurred to provide shelter and services to noncitizen migrants.

6.  Before FEMA transferred these funds to the City on February 4, 2025, FEMA had already determined that the funds were eligible for reimbursement: FEMA reviewed the City's grant applications and awarded the grants, reviewed and approved the City's budget for each grant, and reviewed and approved the City's reimbursement request, which included extensive detail as to each migrant who received services and back-up documentation validating the costs incurred.

7.  Despite the fact that FEMA had reviewed and approved the City's request, and issued payment, Defendants grabbed the money back without any administrative process whatsoever. Indeed, as of the morning of February 18, 2025, FEMA's platform for grant making and administration, entitled "FEMA GO" (an acronym for "FEMA Grant Operations"),

continued to indicate that the City's approved request for $80,481,861.42 was disbursed to the City.

8. Defendants ~~have~~ made it clear in a series of contemporaneous public statements that they ~~opposed~~oppose the very purpose for which SSP funds were appropriated by Congress and approved for reimbursement by FEMA and that they intended to undermine Congressional intent in enacting and funding SSP and make sure the SSP funds were recouped and are never paid:

- ~~Defendant~~ Cameron Hamilton, then-Senior Official Performing the Duties of the FEMA Administrator, posted on February 10, 2025, the day before the ~~money grab~~Money Grab: "@USCongress should have never passed bills in 2023 and 2024 asking FEMA to do this work. . . . This stops now." https://x.com/FEMA_Cam/status/1888923672523489649.

- ~~Defendant~~ Hamilton similarly advised the Court in this action that he believes "on its face, SSP funds sheltering and transportation of illegal aliens."

- Defendant DHS Secretary Kristi Noem, in announcing the previous day's ~~money grab~~Money Grab, posted on February 12, 2025: "I have clawed back the full payment that FEMA deep state activists unilaterally gave to NYC migrant hotels." https://x.com/KristiNoem/status/1889745752924074088.

- Defendant President Donald Trump told Congress and the nation that SSP, and payments to the City thereunder, was a "scam" and he bragged about recouping the money and terminating the program. https://apnews.com/article/trump-speech-congress-transcript-751b5891a3265ff1e5c1409c391fef7c.

9. These and other statements lay bare Defendants' deep-seated animosity to SSP itself. as well as to the City. The intent could not be clearer: Defendants' aim in grabbing back the funds was not related to the City's specific expenditures or grant compliance at all, but to thwart the very purpose of the SSP and to prevent and take back expenditures thereunder to the

3

maximum extent possible and to deprive the City of SSP funds whenever and however they could manage it.

10. Defendants have acted lawlessly in taking money from the City's account. No lawful procedure permits Defendants to simply take back grant funds previously approved and paid in the manner that they did here. Any review of a grant recipient's compliance with the grant's requirements must be done in a manner that is consistent with regulatory procedures, which do not allow the government to misuse the ACH system to seize money it has already approved and paid.

11. Separate and apart from that initial illegal act, Defendants have since started a processseries of processes designed to permanently lay claim to the funds, and indeed all SSP funds that Congress appropriated and FEMA awarded to the City, under the mask of a pretextual compliance review and unlawful termination of the program.

12. First, several hours after grabbing the funds back from the City, Defendants, including DHS and FEMA, filed papers in a federal court proceeding in Rhode Island requesting that court's confirmation that Defendants may permissibly "withhold" FEMA funding from the City, and represented to that court that they intended to provide "notice to New York City regarding the funding pause and will provide the information and process required by regulation and the terms and conditions of the award." Defs.' Emergency Motion, *New York v. Trump*, No. 1:25-cv-00039 (D.R.I. Feb. 11, 2025), ECF No. 102. FEMA did not tell the Court that, far from merely "withholding" funds, it had already, just hours earlier, unilaterally and without any notice taken funds from the City's bank account in the amount that it had previously approved and paid.

13. Further, having stated publicly that it was opposed to spending the funds altogether, and having taken the funds without following any lawful process whatsoever, FEMA

nonetheless represented to the Court that it sought to "withhold" funding solely "on the basis of the applicable authorizing statutes, regulations, and terms." *Id.* Yet FEMA had not complied with any applicable statutes, regulations, and grant terms and conditions and had illegally taken funds from the City in violation of the same. And, in the same breath, FEMA conceded to the Court that it had paused SSP generally.

14. Between February 10 and 12 2025, Defendants also zeroed-out all the funds remining in the City's SSP grants for all years, including the over $80 million in the Money Grab, on one platform, USASpending.gov, without informing the City. As the funds continued to be shown as available on "FEMA GO," FEMA's dedicated platform for administering the SSP grants, the City only learned the funds were zeroed out much later, when FEMA GO was no longer available and City officials visited USASpending.gov, the "official open data source of federal spending information, including information about federal awards such as contracts, grants, and loans," and saw that all of its SSP money had disappeared from that platform and that "obligations" to the City under the SSP grants for 2024 had been reduced to "0." This zeroing out was surprising for the additional reason that Defendants had, in the interim, made multiple representations – in letters and court proceedings – that SSP funds were merely being temporarily withheld.

15. Next, a week later, ~~Administrator~~ Hamilton sent the City's Office of Management and Budget ("City OMB"), which administers the FEMA grants for the City, a "Remedy for Noncompliance Letter" dated February 18, 2025 ("~~noncompliance" letter)~~Remedy for Noncompliance Letter") that purports to set forth "significant concerns" that the SSP funds are going towards "illegal activities.~~"~~," even though FEMA had already reviewed and approved

reimbursement for the exact activities funded by SSP. FEMA sent this letter just days after the

City publicly announced its intention to sue over the ~~money grab~~Money Grab.

      ~~15.~~16.     Simply put, the ~~"noncompliance" letter~~Remedy for Noncompliance Letter

is pretextual, a cover for Defendants' ~~money grab~~Money Grab and for Defendants' suspension of

the SSP~~,~~. They have made clear their intent to withhold the funds permanently because they

oppose the purposes for which the funds were appropriated, awarded, approved, and paid. The

letter, relying only on unsubstantiated characterizations of "media reports," makes allegations of

crime and gang activity at the Roosevelt Hotel—one of the many locations for which FEMA

reimbursed the city for shelter and services. Tellingly, the letter omits any mention that FEMA

officials twice visited the Roosevelt Hotel in September 2024 and that those visits did not lead to

any findings of alleged criminal activity. In addition, Defendants fail to cite any regulatory

authority that supports denying funding to the City under the SSP based on purported criminal

activity by those released by DHS into the community ~~when the City has been assisting DHS in~~

~~providing shelter.~~.

      ~~16.~~17.     Further, the letter makes a show of requesting information to further a

purported review of the City's SSP awards for 2024 and 2023 ("SSP24" and "SSP23" and

collectively "SSP awards"), but mainly seeks information that City OMB previously provided to

FEMA, and that FEMA already reviewed and approved in order to determine that the claimed

reimbursements were allowable. Indeed, while the letter alleges the City is somehow

encouraging illegal immigration, FEMA already confirmed in approving and issuing the payment

that all funds were used to provide services to individuals who DHS had released from its

custody into the community.

~~17.~~18.    The letter does not identify any applicable rules or grant terms or conditions with which it alleges the City might not have complied. Instead, the letter effectively -~~-~~ and improperly -~~-~~ adds new terms and conditions. The letter is meant to look like it affords the requisite administrative process when, in fact, the decision has already been made to deny payment to the City because Defendants do not want to pay the City for providing the very services to the very people for the very purposes that Congress appropriated the funds and FEMA awarded the grants and approved and made the payments.

~~18.~~19.    ~~In fact,~~ Defendants appear to have sent similar letters to many other local government SSP recipients. Defendants, having conceded in numerous court filings that SSP ~~is~~was suspended, appear to ~~be using~~have adopted the fig leaf of compliance review ~~as a means~~ to cover the fact that they had effectively ~~halt~~halted SSP in its entirety. Neither Defendants' ~~money grab~~Money Grab from the City nor their suspension of SSP has anything to do with City-specific grant compliance, but is instead the result of Defendants' new-found hostility to the very grants they awarded.

20. Then, with the purported compliance review apparently uncompleted, FEMA announced on April 1, 2025, that it was terminating SSP entirely.  FEMA stated that it was terminating the City's SSP award for the entirely different reason that the grants "no longer effectuate [] the program goals or agency priorities" (quoting 2 C.F.R. § 200.340(a)(2) (2020)). But the regulation FEMA cited does not permit a federal agency to cancel a grant program funded by Congressional appropriation simply because it has changed its mind and now opposes the program.

21. Not only that.  While FEMA's termination letter provides for a closeout process at the end of which FEMA will determine whether any additional SSP grant funds are owed the

City, all SSP funds that were awarded the City and that would have remained available to make any such payment were apparently zeroed out on USASpending.gov more than six weeks earlier.

22. Collectively, these events make plain that Defendants determined to overturn the Congressional appropriation, deny the City SSP funds, and re-take any funds they could find a way to lay their hands on. The subsequent compliance review and termination are no more than post hoc efforts to provide a paper cover for the unlawful and unauthorized determination and action Defendants already made.

~~19.~~23.    This lawsuit challenges ~~two~~multiple final actions taken by Defendants ~~based on two core contentions~~. First, Defendants' ~~money-grab~~Money Grab—after FEMA review, approval, and actual payment, without notice or process of any kind—was, simply put, lawless. It violated federal regulations and grant terms, separately had no justification in the rules governing ACH electronic funds transfers, was contrary to law and in excess of authority, and contrary to their obligations to implement Congressional appropriations.

~~20.~~    Second, this lawsuit challenges a series of subsequent actions Defendants took in furtherance of their determination to override entirely Congress's establishment and appropriation of SSP. These include Defendants' suspension ~~of SSP—both as to the City and program-wide—and their~~ subsequent termination of the City's SSP awards and Defendants' use of a pretextual compliance review process to mask and provide legal cover to the suspension. ~~Whether defendants~~They also include Defendants' acts in an apparent effort to zero out all remaining funds awarded to the City. Defendants characterize the suspension as a "pause" or "freeze" or a "withholding," ~~the effect is the same. Defendants have stopped~~ when in fact they set out to stop SSP in its tracks and terminate it, with respect to the City and with respect to local government grant recipients more generally~~. Defendants' public and court-filed statements~~

8

~~make clear that their reason for the suspension is their animus to the program itself and their intent to terminate it, prevent future reimbursement payments~~, and ~~recoup previously reimbursed funds to the extent they can. Such stoppage is lawless because the program was established by Congress and grants were awarded by FEMA pursuant to the program; Defendants do not have the unilateral right to stop the program simply because they don't like it.~~

~~21.~~24.     ~~Defendants' broad and lawless pause or suspension of SSP, and pretextual use of a compliance review~~give a bogus veneer of administrative process ~~moreover appears to be part of an overarching strategy to suspend or end programs without legal authority and to find ways to get around legal rulings barring Defendants from implementing funding freezes, such as orders in~~ *~~New York v. Trump~~*to their unlawful and unauthorized actions.

~~22.~~25.     ~~Because Defendants took the extraordinary and lawless measure of seizing money from the City's bank account—by surprise, and without notice—the City seeks the extraordinary remedy of mandatory injunctive relief to compel Defendants to return the money to the City~~~~Defendants~~Defendants, notwithstanding the *post hoc* pretense of administrative process, have made it abundantly clear that they intend to ~~withhold~~deprive the City permanently of every dime FEMA previously awarded, approved for reimbursement, and paid to the City.

~~23.~~26.     ~~Defendants~~The City also ~~seek~~seeks relief to make sure that Defendants do not improperly withhold funds that the City is entitled to receive.

~~24.~~27.     Therefore, the City brings this suit for a declaration that the ~~money grab and~~Money Grab, the suspension of SSP ~~and~~, the pretextual compliance review, the withholding of SSP24 and SSP23 funds ~~are~~, the zeroing out of SSP funds, and the Termination Letter and ultimate termination of SSP in its entirety, collectively and each individually violate the

Administrative Procedure Act and the U.S. Constitution.  Individually and collectively, these acts are arbitrary and capricious, contrary to law, ultra vires and in excess of authority, without observance of lawful procedures, and ~~each violates~~violate the Due Process Clause, the separation of powers doctrine, and the Spending Clause. Declaratory and injunctive relief is needed to prevent the harm that would result from Defendants' unlawful retention of the $80 million they improperly took and from Defendants' unlawful actions to ~~withhold SSP funds, pause, suspension, and/or terminate SSP, which would~~ deprive the City of funds it is entitled to receive ~~under~~and keep per Congressional appropriation and pursuant to applicable regulations and the applicable grant terms and conditions.

## PARTIES

~~25.~~28.      Plaintiff the City of New York is a municipal corporation organized and existing under the laws of the State of New York.

~~26.~~29.      Defendant Donald J. Trump is the President of the United States. He is responsible for the actions and decisions that are being challenged by Plaintiffs in this action and is sued in his official capacity.

~~27.~~30.      Defendant United States Federal Emergency Management Agency ("FEMA") is part of the United States Department of Homeland Security, a cabinet agency within the executive branch of the United States government. 6 U.S.C. § 313.

~~28.~~31.      Defendant ~~Cameron Hamilton~~David Richardson is the Senior Official Performing the Duties of the Administrator (hereinafter, "Acting Administrator") of FEMA and that agency's highest ranking official. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity. 6 U.S.C. §§ 313, 314. Cameron Hamilton previously served as the Senior Official Performing the Duties of the

10

Administrator and was named in his official capacity as a defendant in the original and first amended complaints, but he no longer serves in that position. Fed. R. Civ. P. Rule 25(d).

~~29.~~32.    Defendant United States Department of Homeland Security is a cabinet agency within the executive branch of the United States government. 6 U.S.C. § 111.

~~30.~~33.    Defendant Kristi Noem is the Secretary of the United States Department of Homeland Security and that agency's highest ranking official. She is charged with the supervision and management of all decisions and actions of that agency. She is sued in her official capacity. 6 U.S.C. § 112.

~~31.~~34.    Defendant United States Department of the Treasury is a cabinet agency within the executive branch of the United States government. 31 U.S.C. § 301. The Department of the Treasury is responsible for ensuring the financial security of the United States. FEMA grant payments are transferred to the City's account by the Federal Reserve Payment System, with the participation of the Treasury Department.

~~32.~~35.    Defendant Scott Bessent is the Secretary of the Department of the Treasury and responsible for the operations of the Department of the Treasury, and management of the finances of the United States. He is sued in his official capacity. 31 U.S.C. § 301.

~~33.~~36.    Defendant Patricia Collins is the Treasurer of the United States and responsible for the management of the finances of the United States. She is sued in her official capacity. 31 U.S.C. § 301.

~~34.~~37.    Defendant U.S. Department or Agency of Unknown Identity is an as-yet unidentified department, agency, or other unknown entity of the United States with the ability and/or authority to return $80 million in unlawfully grabbed funding to the City's bank account, and is named here for the purposes of ensuring that complete relief may be obtained.

35.38.      Defendant John or Jane Doe Official is an official of the United States with the ability and/or authority to return $80 million in unlawfully grabbed funding to the City's bank account, and is named here in their official capacity for the purpose of ensuring that complete relief may be granted.

## JURISDICTION & VENUE

36.39.      This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 2201(a) because this action arises under federal law. Jurisdiction is also proper under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 702.

37.40.      Venue is proper in this district pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. §§ 1391(b)(2) & (e)(1). Defendants are United States agencies or officers sued in their official capacities. Plaintiff is the City of New York, and a substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur within the City of New York.

## FACTS

**A. Congress Appropriated Funds for Local Governments to Assist in Providing Shelter and Services to Migrants Released by DHS into the Community**

38.41.      In 2023, Congress authorized FEMA and U.S. Customs and Border Protection ("CBP") to establish SSP. *See* Department of Homeland Security Appropriations Act, 2023, Pub. L. No. 117-328, Title II, 136 Stat. 4730 (2022). TheCongress's stated purpose ofin establishing SSP is to relieve overcrowding in short-term CBP holding facilities. To that end, the program reimburses non-federal entities providing shelter and related services to noncitizen migrants following their release from DHS.

39.42.      In 2024, Congress, through the Department of Homeland Security Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 598 (the "DHS Appropriations Act"),

authorized continued funding for SSP. Title II of that Act, entitled Security, Enforcement, and Investigations, provides that $650 million "shall be transferred to 'Federal Emergency Management Agency—Federal Assistance' to support sheltering and related activities provided by non-Federal entities, in support of relieving overcrowding in short term holding facilities of the U.S. Customs and Border Protection."[1]

## B. The 2023 SSP Grant

40.43.    FEMA awarded the City $106.9 million under the SSP23 grant and, to date, has reimbursed the City $70.6 million for allowable costs under the grant.

41.44.    FEMA's stated purpose in offering the SSP23 Grant was:

> To provide funding to non-federal entities that serve noncitizen migrants recently released from DHS custody to temporarily provide shelter, food, transportation, acute medical care, personal hygiene supplies, and labor necessary to manage cases to provide these services; and,

> To provide funding to non-federal entities to increase their capacity to temporarily shelter noncitizen migrants recently released from DHS custody, including renovations and modifications to existing facilities.

Notice of Funding Opportunity ("NOFO") for SSP23 at 6. The SSP23 NOFO further states FEMA's "priority" of the "safe, orderly, and humane release of noncitizen migrants from DHS short-term holding facilities." *Id.*

---

[1] ~~*See also* FEMA, *Shelter and Services Program*~~ FEMA had previously made information concerning SSP available online but that has since been taken down.  The information had been available at, https://www.fema.gov/grants/shelter-services-program (last visited Feb. 13, 2025) ("SSP provides financial support to non-federal entities to provide sheltering and related activities to noncitizen migrants following their release from the Department of Homeland Security (DHS). The intent is to support CBP in the safe, orderly, and humane release of noncitizen migrants from short-term holding facilities.").

42.45.     FEMA issued the SSP23 NOFO on June 12, 2023. The City, acting through City OMB, applied for the SSP23 Grant on July 12, 2023. FEMA initially awarded the City a grant of $104.7 million by notice effective August 11, 2023, which FEMA increased to $106.9 million on September 28, 2023. The City's application for the SSP23 Grant included a list of all the locations for which the City indicated it might seek reimbursement, including a location called the Roosevelt Hotel.

43.46.     In May 2023, the City began using the Roosevelt Hotel – which had closed as a hotel for guests in December 2020 -- as an Arrival Center for noncitizen migrants released by DHS into the U.S., and as a Humanitarian Response and Relief Center as part of the City's response to the influx of noncitizen migrants released by DHS. The facility functioned as a centralized intake center for noncitizen migrants who were newly arriving in New York City following their release by DHS and it provided them with a variety of supportive services including short-term shelter.

44.47.     City OMB submitted two requests for partial reimbursement under the SSP23 Grant.

45.48.     In connections with both reimbursement requests, City OMB submitted to FEMA the name, Alien Registration Number ("A-Number"), and other information for each individual to whom the City provided eligible services for which the City was seeking reimbursement under the grant.[2] This reimbursement information included the date DHS released

---

[2] The requirement that A-Numbers be submitted to FEMA may be in response to a March 28, 2023 report issued by the DHS Office of Inspector General concerning a different program, the Emergency Food and Shelter Program ("EFSP"), entitled "FEMA should Increase Oversight to Prevent Misuses of Humanitarian Relief Funds." *See* ECF No. 17-1, Ex. 3 ("OIG Report"). The OIG Report found in part that in administering the EFSP, FEMA did not adequately ensure that local grant recipients in California, New Mexico, Arizona and Texas provided adequate

each individual from DHS custody ("DHS Release Date"). Per the grant terms, FEMA would only reimburse the City for shelter and services provided within 45 days of the individual's release. FEMA reviewed all of this information in determining that the City's reimbursement request was for allowable costs and in determining to make the payment. Pursuant to the grant award documents, FEMA provided reimbursements to the City on a per diem basis, meaning that City OMB received a payment for a fixed amount per person for each night an individual received shelter and services that were being reimbursed by FEMA. Fixed per diems were established separately for lodging, food, and other types of eligible services.

46.49.    On May 21, 2024, City OMB submitted its first request for reimbursement in the amount of $32 million. FEMA reviewed the request and requested additional documentation which City OMB provided. On July 25, 2024, FEMA approved reimbursement in the reduced amount of $25.5 million.

47.50.    FEMA initiated a compliance review audit of the first payment request under the SSP23 Grant that included a "joint financial and programming site visit." As part of the visit, officials from FEMA and CBP toured the Roosevelt Hotel and another facility on September 9, 2024. Apart from the Compliance Review, FEMA officials also visited the Roosevelt Hotel on September 26, 2024.

48.51.    On October 16, 2024, City OMB submitted a second reimbursement request to FEMA in the amount of $45.1 million.

49.52.    On November 29, 2024, FEMA provided its compliance review findings regarding the SSP23 Grant to OMB by letter. FEMA made findings in three areas: (1) data

---

documentation concerning the individuals they served and that some families and individuals served by EFSP did not have an encounter record with DHS.

privacy protections for A Numbers, (2) contract provisions, and (3) certain financial management issues. FEMA did not identify any purported gang or illegal activities at the Roosevelt Hotel in its Compliance Review Findings.

50.53.    FEMA approved and paid the City's second reimbursement request in the amount of $45.1 million on January 7, 2025. To date, the City has received $70.6 million in reimbursement from FEMA under the SSP23 Grant. Under the grant terms, $36.3 million remainsshould remain available for claiming reimbursement of allowable costs.

## C. The SSP24 Grants

51.54.    On April 12, 2024, FEMA issued two NOFOs for the $650 million Congress had appropriated for SSP24 Grants. One NOFO announced an allocation grant, meaning that the amount the City and other specified local governments and nongovernmental organizations could apply for were pre-determined on an allocation basis ("SSP-A Grant"). The other NOFO announced a competitive grant—that is, the City's application would compete with others for an award from a limited set of funds ("SSP-C Grant") (collectively, the SSP24 Grants").[3] FEMA issued an amended SSP-A NOFO on August 28, 2024 and an amended SSP-C NOFO on October 21, 2024.[4]

---

[3] The grant identification number is DHS-24-GPD-141-00-98. The SSP-A NOFO may be accessed at https://www.fema.gov/print/pdf/node/676489 or https://www.fema.gov/grants/shelter-services-program/ssp-a/fy-24-nofo. *See also* https://www.grants.gov/search-results-detail/353512; FEMA Grant Programs Directorate Information Bulletin No. 505 (Apr. 12, 2024), https://www.fema.gov/sites/default/files/documents/fema_gpd-ib-505.pdf.

[4] The amended SSP-A NOFO may be accessed at https://www.fema.gov/print/pdf/node/683858 or https://www.fema.gov/grants/shelter-services-program/ssp-a/fy24-ssp-a-amended-reserve-funding-nofo. *See also* FEMA, Grant Programs Directorate Information Bulletin No. 518 (Aug. 28, 2024), https://www.fema.gov/sites/default/files/documents/fema_ib-fy24-ssp-a-round-2.pdf; https://www.fema.gov/grants/shelter-services-program/ssp-a/fy-24-ssp-a-reserve-funding-faqs.

52.55.    Both SSP24 Grants have an expected period of performance of 36 months, from October 1, 2023 to September 30, 2026.

53.56.    Echoing the SSP23 Grant NOFO, the SSP24 Grant NOFOs described the SSP as follows:

> As directed by Congress, SSP makes federal funds available to enable non-federal entities to off-set allowable costs incurred for services associated with noncitizen migrants recently encountered and released by DHS. As stated in the FY 2024 appropriation, the primary purpose of SSP is to "reliev[e] overcrowding in short-term holding facilities of [CBP]." ….

> The Department of Homeland Security (DHS) has committed to bolstering the capacity of non-federal entities to receive noncitizens after they have been processed by U.S. Customs and Border Protection (CBP) and released from a DHS facility. DHS is committed to ensuring appropriate coordination with and support for state, local, and community leaders to help mitigate increased impacts to their communities as outlined in the DHS Plan for Southwest Border Security and Preparedness, issued on April 26, 2022, and updated on December 13, 2022.

SSP-A NOFO at 5, SSP-C NOFO at 5.

54.57.    The NOFOs described the goals of SSP as "the safe, orderly, and humane release of noncitizen migrants from DHS short-term holding facilities." The objectives of the program include providing funding for non-federal entities that serve "noncitizen migrants recently released from DHS custody" to "temporarily provide shelter, food, transportation, acute medical care, [and] personal hygiene supplies."

55.58.    The NOFOs specify the allowable (i.e., reimbursable) activities under the SSP, including providing shelter at hotels and motels and providing food, medical supplies, clothes and personal hygiene products. SSP-A NOFO at 69 *et seq.*; SSP-C NOFO at 64 *et seq.*

56.59.    As noted above, the FY 2024 SSP appropriation provided $650 million for SSP, including FEMA administration costs. The SSP-A funds were allocated to grantees in two

rounds, with allocations based on release and destination data received from CBP. The NOFO released on April 12, 2024 announced $300 million in round 1 allocations and the amended NOFO released on August 28, 2024 announced round 2 (Reserve Fund) allocations. New York City was allocated $38.86 million for round 1 and $20.4 million for round 2.

57.60.    Millions of dollars were also allocated for non-profit organizations and local governments across the country, including more than $60 million for specified cities, counties, and not-for-profits in Texas, $10.8 million for Fulton County, Georgia, $11.6 million to Maricopa County, Arizona, and $21.8 million to Pima County, Arizona.

58.61.    The remaining $340.9 million was released through SSP-C grants. *See* SSP-A NOFO at 5; SSP-C NOFO at 7. These grants were awarded on a competitive basis, to local governments and nonprofit organizations that submitted grant proposals evaluated by FEMA. In addition, "$9.1 million was set aside for FEMA management and administrative costs." SSP-A NOFO at 5.

59.62.    The SSP-A NOFO lists the "Performance Measures for SSP awardees" as:

- Number of meals provided.
- Number of nights of lodging provided.
- Number of noncitizen migrants transported.
- Number of acute medical care items provided, by type.
- Number of personal hygiene supplies provided, by type.
- Number of hours of labor paid to manage cases to provide these services.
- Number of clothing items provided.
- Number of noncitizen migrants served through translation services.
- Number of noncitizen migrants served through outreach activities.
- Number of renovation or modifications to existing facilities projects completed.

18

SSP-A NOFO at 7; SSP-C NOFO at 6.

60.63.    FEMA "calculate[s] and analyze[s] the [enumerated] metrics through a review of performance progress reports and award monitoring to ensure that the funds are expended for their intended purpose and achieve the stated outcomes in the grant application." *Id.*

61.64.    To complete an SSP-A or SSP-C application, applicants must submit budget information, standard assurances, and worksheets, with program-specific certifications and budget instructions. SSP-A NOFO at 28-29; SSP-C NOFO at 18-19. The applicant must also agree to the terms and conditions of the award. SSP-A NOFO at 11; SSP-C NOFO at 11.

62.65.    To obtain FEMA's approval to draw down funds, grantees must submit for FEMA's review additional information and documentation, including "[a] summary list reporting A[lien]-Numbers, names, corresponding DHS release dates of the served population, and corresponding service dates of the served population." SSP-A NOFO at 29; SSP-C NOFO at 19. "For each requested allowable activity service category" the grantee must "provide one example of proof of payment (e.g., canceled check, credit card statement, etc.) and a receipt reflecting the purchase." *Id.* SSP-A NOFO at 29; SSP-C NOFO at 19. Additional documentation requirements apply for reimbursement of purchases above $5,000. *Id.* SSP-A NOFO at 29; SSP-C NOFO at 19.

63.66.    The SSP grants provide for reimbursement for shelter and services provided to those migrants who DHS determined to release into the United States. For that reason, grantees must submit the name, valid A-Number, and corresponding DHS release date for every person for whom the grantee seeks FEMA reimbursement. SSP-A NOFO at 29; SSP-C NOFO at 19. Thus, FEMA provides reimbursement for shelter and services provided to a given

individual only after FEMA verifies that the individual has a valid A-Number and was released by DHS into the community.

64.67.    The NOFOs specify that all funds for which the applicant sought reimbursement "must comply with applicable statutes, rules and regulations, and policies, this NOFO, and the terms and conditions of the federal award. They must also comply with the Uniform Administrative Requirements, Cost Principles, and Audit Requirements at 2 C.F.R. Part 200." SSP-A NOFO at 30, SSP-C NOFO at 21. The NOFOs also incorporate by reference the FY 2024 DHS Standard Terms and Conditions. SSP-A NOFO at 38; SSP-C NOFO at 32.

### i. *The Grant Awards*

65.68.    On April 24, 2024, the City, acting through its Office of Management and Budget ("City OMB") submitted an application to FEMA for an SSP-A grant for $38,864,884.00, the maximum amount then allocated to New York City as set forth in the SSP-A NOFO prior to amendment. On June 11, 2024, City OMB submitted an application to FEMA for an SSP-C grant for $34,090,000, the maximum amount permitted for a single applicant.

66.69.    The City's applications included detailed budget worksheets for FEMA's review. All costs are budgeted on a per diem basis, with separate line items for, among other things, meals, security, case coordination, and medical. For example, the budgeted per diem cost submitted by the City for a night of hotel lodging is $62.19.

67.70.    On July 8, 2024, the City received its award letter for round 1 of SSP-A funding, for $38.86 million ("SSP-A Award Letter"). Subsequently, on September 11, 2024, FEMA approved an additional $20.4 million in round 2 funds for the City.

68.71.    On September 17, 2024, the City received its award letter for SSP-C funding, for $22 million ("SSP-C Award Letter" and collectively with the SSP-A Award Letter, "Award Letters").

69.72.    To accept the SSP-A and SSP-C grants funds, the City was required to agree to the terms set forth in the NOFOs and Award Letters. *See* SSP-A Award Letter at 1, SSP-C Award Letter at 1.

70.73.    The Award Letters further incorporated by reference the terms of 2 C.F.R. Part 200 and the NOFOs. SSP-A Award Letter, Arts. 2, 28; SSP-C Award Letter Arts. 2, 28. Additionally, the Award Letters provide that FEMA must inform the grantee in writing if an "error has been made [in a grant package], or if an administrative change must be made" to a grant. SSP-A Award Letter, Art. 44; SSP-C Award Letter Art 44.

71.74.    The City opted to receive grant payments on a reimbursement basis, meaning that the grantee must obtain FEMA's approval of a grant budget—namely the line items of expected expenditures for which reimbursement will be made—and only following budget approval, the grantee may submit a documented request for reimbursement for approved expenditures that have already been made.

72.75.    The Award Letters were issued with a funding hold: as set forth in the NOFOs, in order to obligate or draw down SSP grant funds, the City is required to submit a "detailed cost breakdown and justification." SSP-A Award Letter Art. 48; SSP-C Award Letter Art. 48.

### ii.    FEMA's Approval of the City's Grant Budgets and Payment of Reimbursements

73.76.    On November 27, 2024, City OMB submitted to FEMA the detailed cost breakdown and justification required in support of a future reimbursement request for both the SSP-A and SSP-C grants.

74.77.    Following a review process, FEMA approved the City's SSP24 grant budgets on January 8 and 10, 2025, respectively.

75.78.    On January 14, 2025, City OMB submitted to FEMA a request for reimbursement of $22,169,838.00 of expenditures for its Fiscal Year 2024 SSP-C grant and on January 15, 2025, City OMB submitted to FEMA a request for reimbursement of costs in the amount of $59,302,125.07 for its Fiscal Year 2024 SSP-A grant, together representing the entirety of the SSP grant awards to the City for Fiscal Year 2024.

76.79.    In support of the payment requests, City OMB submitted all of the documentation required by FEMA including the name and A-Number for each individual, and invoices and other documentation of expenditures.

77.80.    On January 31, 2025, following its review of the City's submissions, FEMA informed the City that the reimbursement for each of the SSPSSP24 grants would need to be reduced slightly to account for an error rate of roughly 1.22% in matching the A-Numbers to eligibility for reimbursement and indicated that it would approve and make payment upon a request for the reduced amount.

78.81.    The City resubmitted to FEMA revised payment requests for the two grants in the amounts of $58,581,446.08 and $21,900,415.34, respectively, as pre-authorized by FEMA. The amounts in the revised payment requests reflected the reduction of 1.22% that FEMA required from the City's initial payment requests to account for FEMA's 1.22% error rate finding. The remaining balance—roughly $1 million between the two grants—remainsremained available for future reimbursement of allowable expenses based on a subsequent submission.

79.82.    On February 4, 2025, the City received payments by ACH transfer to the City's central treasury account of $58,581,446.08 and $21,900,415.34, the full amount that FEMA had approved for reimbursement to the City.

80.83.      FEMA's approval and payment of these amounts constitutes FEMA's

determination—after FEMA thoroughly ~~reviewing~~reviewed the City's budget details,

expenditure documentation, and personal information of migrants—that the funds FEMA

approved and disbursed to the City were allowable under the grant terms and conditions.

### D. The Trump Administration Changes Policy and Unlawfully Freezes Federal Funding

81.84.      On January 20, 2025, defendant President Donald Trump issued Executive

Order 14159, entitled "Protecting the American People Against Invasion" ("Invasion EO"). The

Invasion EO states that "[o]ver the last 4 years, the prior administration invited, administered,

and oversaw an unprecedented flood of illegal immigration into the United States." As a result,

the EO asserts, "[m]illions of illegal aliens" crossed the border and were "allowed to settle in

American communities." The EO states that many of the people the federal government admitted

and allowed to settle here "present significant threats to national security and public safety" and

that many have "abused the generosity of the American people, and their presence in the United

States has cost taxpayers billions of dollars at the Federal, State, and local levels." Invasion EO §

1.

82.85.      The Invasion EO further asserts that it is the "the policy of the United

States to achieve the total and efficient enforcement" of its immigration laws and issues a wide-

ranging series of instructions to various persons and agencies within the federal government.

83.86.      The Invasion EO requires federal agencies to immediately pause funding to

non-governmental organizations providing services to "illegal aliens. " Invasion EO § 19. The

Attorney General and the Secretary of Homeland Security shall:

> (a) Immediately review and, if appropriate, audit all contracts, grants, or
> other agreements providing Federal funding to non-governmental
> organizations supporting or providing services, either directly or
> indirectly, to removable or illegal aliens, to ensure that such agreements

conform to applicable law and are free of waste, fraud, and abuse, and that they do not promote or facilitate violations of our immigration laws;

(b) Pause distribution of all further funds pursuant to such agreements pending the results of the review in subsection (a) of this section;

(c) Terminate all such agreements determined to be in violation of law or to be sources of waste, fraud, or abuse and prohibit any such future agreements;

(d) Coordinate with the Director of the Office of Management and Budget to ensure that no funding for agreements described in subsection (c) of this section is included in any appropriations request for the Department of Justice or the Department of Homeland Security; and

(e) Initiate clawback or recoupment procedures, if appropriate, for any agreements described in subsection (c) of this section.

84.87.    The Invasion EO did not, on its face, order a comparable "pause" with respect to state and local governments.

85.88.    On January 27, 2025, the United States Office of Management and Budget issued a "Memorandum for Heads of Executive Departments and Agencies" entitled "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance" ("OMB Directive"). The OMB Directive directed federal agencies to "identify and review all Federal financial assistance programs and supporting activities consistent with the President's policies and requirements," as set forth in the Invasion EO and various other EOs.[5]

---

[5] The other EOs specifically encompassed in the OMB Directive included EOs entitled Reevaluating and Realigning United States Foreign Aid (Jan. 20, 2025), Putting America First in International Environmental Agreements (Jan. 20, 2025), Unleashing American Energy (Jan. 20, 2025), Ending Radical and Wasteful Government DEI Programs and Preferencing (Jan. 20, 2025), Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government (Jan. 20, 2025), and Enforcing the Hyde Amendment (Jan. 24, 2025).

86.89.    The OMB Directive required federal agencies to implement the Invasion EO and other EOs by "complet[ing] a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the President's executive orders." In the meantime, the OMB Directive ordered that federal agencies "to the extent permissible under applicable law … pause all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal."

87.90.    On January 28, 2025, Defendant DHS secretary Kristi Noem issued a "Memorandum for Component and Office Heads" entitled "Direction on Grants to Non-governmental Organizations" ("Noem Memo"). Echoing the Invasion EO, the Noem Memo stated that "over the last four years, the Department of Homeland Security has spent billions of dollars funding illegal immigrants." The Noem Memo went on to direct "[e]ffective immediately, all [DHS] grant disbursements and assessments of grant applications that (a) go to non profit organizations or for which non-profit organizations are eligible, and (b) touch in any way on immigration, are on hold, pending review, except to the extent required by controlling authority." The Noem Memo specified that the "pause" applied to SSP.

88.91.    Also on January 28, 2025, a coalition of 22 States, including the State of New York, brought a lawsuit against various federal defendants in the District of Rhode Island seeking to temporarily restrain and preliminarily and permanently enjoin the across-the-board

---

Many of these EOS ordered federal agencies to pause federal funding to grantees, including states and local governments, that touched on particular policy areas, such as the Electric Vehicle Charging, programs included in the "green new deal" and DEI programs.

pause on federal funding disbursement ordered in the OMB Memo. *See generally New York v. Trump*, No. 25-cv-39-JJM-PAS (D.R.I. filed Jan. 28, 2025) (hereinafter "*New York v. Trump*"). Defendants in *New York v. Trump* included the following defendants in the instant lawsuit President Trump, Treasury Department, Secretary Bessent, Treasurer Collins, FEMA, then-Acting Administrator Hamilton, DHS, and Secretary Noem.

89.92.    The court in *New York v. Trump* granted the TRO application on January 21, 2025 and the preliminary injunction motion on March 6, 2025.

90.93.    In granting the TRO, the court held that the plaintiff States were likely to succeed on the merits of their claims because there was "no federal law" that authorized the defendants to "unilaterally suspend[] the payment of federal funds to the States and others simply by choosing to do so, no matter the authorizing or appropriating statute, the regulatory regime, or the terms of the grant itself." TRO at 5; 2025 U.S. Dist. LEXIS 17593, at *11. The court held that the defendants' refusal to disburse funds appropriated by Congress was arbitrary and capricious and a violation of the separation of powers doctrine and that defendants' effort to impose conditions on funding was likewise unlawful. *Id.*

91.94.    The Court ordered the defendants not to "pause, freeze, impede, block, cancel, or terminate Defendants' compliance with awards and obligations to provide federal financial assistance to the States," and not to "impede the States' access to such awards and obligations, except on the basis of the applicable authorizing statutes, regulations, and terms." The court further ordered:

> If Defendants engage in the "identif[ication] and review" of federal financial assistance programs, as identified in the OMB Directive, such exercise shall not affect [sic] a pause, freeze, impediment, block, cancellation, or termination of Defendants' compliance with such awards and obligations, except on the basis of the applicable authorizing statutes, regulations, and terms.

Defendants shall comply with all notice and procedural requirements in the award, agreement, or other instrument relating to decisions to stop, delay, or otherwise withhold federal financial assistance programs.

*Id.* at 12.

~~92.~~95.    The TRO also barred defendants from adopting the substance of the OMB Memo "under any other name or title or through any other Defendants" and required defendants to provide written notice of the TRO to "all Defendants and agencies and their employees, contractors, and grantees by Monday, February 3, 2025, at 9 a.m." *Id.*

### E. FEMA Grabs Back $80 Million Without Notice

~~93.~~96.    On or about February 5, 2025, the day after FEMA duly disbursed the over $80 million reimbursement payment to the City under the SSP24 Grants, Mary Comans, then-Chief Financial Officer of FEMA and a veteran of the agency since 2017, "participated in an in-person meeting with leadership of FEMA and DHS, including Acting DHS General Counsel Joseph Mazzara, and two DOGE[6] team members: Brad Smith and John Burham. Another DOGE team member, Kyle Schutt, participated by phone." Declaration of Mary Comans dated February 25, 2025 ("Comans Decl.") ¶¶ 1-2, *Does v. Elon Musk*, No. 8:25-cv-00462-TDC (D.M.D. filed Feb. 13, 2025) ("*Does v. Musk*"), ECF No. 36 at 49.[7]

---

[6] "DOGE" stands for "Department of Government Efficiency" as set forth in an executive order dated January 20, 2025 entitled "Establishing and Implementing the President's "Department of Governmental Efficiency."

[7] *Does v. Musk* is a class action lawsuit challenging DOGE's role in terminating federal employees at various federal agencies. Comans is also challenging circumstances surrounding her own termination in a separate lawsuit styled *Mary Comans v. Department of Homeland Security*, No. 25-cv-00624-ACR (D. D.C. filed Mar. 4, 2025) ("*Comans v. DHS*"), alleging among other things that DHS and FEMA "willfully and/or intentionally terminated Ms. Comans' employment with Defendant FEMA in a manner that was derogatory to her reputation" and in

94.97.    The DOGE team members said "they were embedded at U.S. Department of Health and Human Services but were there to help as the DHS DOGE members onboarded." In particular, the DOGE team members "wanted to ensure that FEMA was not sending money to non-governmental organizations ("NGOs") that aided undocumented immigrants through the 'Shelter and Services Program' grant that FEMA administers for U.S. Custom and Border Protection." Comans Decl. ¶ 3.

95.98.    At the meeting "one of the DOGE members, asked FEMA's leadership team whether they had stopped all payments to NGOs," and FEMA confirmed that it had. *Id.* The DOGE staff member "then asked about payments to state and local governments. The FEMA representative said those payments were being continued. Wagging his finger for emphasis, [the DOGE staffer] affirmed, '***that's the right answer***.'" Comans Decl. ¶ 4.

96.99.    However, four days later, on "February 9, 2025, around 5:00 PM, a DOGE team member embedded at the Treasury Department flagged that FEMA had recently paid New York City tens of millions of dollars" under SSP "to reimburse New York City for eligible expenses incurred for the care and sheltering services the City had provided to migrants following their release from DHS custody." Comans Decl. ¶ 7. Comans then personally "spent the entire evening analyzing the amount of funds paid and in what manner." *Id.*

97.100.    The following morning, on Monday, February 10, 2025 at 5:03 am, Elon Musk, in a post filled with blatant errors, posted that DOGE had "discovered" a $59 million payment from FEMA to the City "to house illegal immigrants" in "high-end hotels," that a

---

doing so, relied on "information and conclusions [that] were false, malicious, defamatory, incomplete, inaccurate, and untimely . . ." Complaint ¶ 21, *Comans v. DHS*, ECF No. 1.

"demand" would be made for the return of the funds, that the funds were meant for disaster relief and that "sending this money violated the law":

 **Elon Musk** ✓ 🔲
@elonmusk



**The @DOGE team just discovered that FEMA sent $59M LAST WEEK to luxury hotels in New York City to house illegal migrants.**

**Sending this money violated the law and is in gross insubordination to the President's executive order.**

**That money is meant for American disaster relief and instead is being spent on high end hotels for illegals!**

**A clawback demand will be made today to recoup those funds.**

5:03 AM · Feb 10, 2025 · **66.2M** Views

💬 40K          ↻ 129K          ♡ 647K          🔖 28K          ⬆️

https://x.com/elonmusk/status/1888891512303263815.

~~98.~~101.    As detailed above, the funds were approved and disbursed pursuant to SSP, exactly as authorized and intended by Congress and awarded, approved, and paid by FEMA.

~~99.~~102.    Contrary to Musk's post, the funds were not used to pay for "luxury hotels," but rather to pay to the City the FEMA-approved rate of $62.19 per person for lodging in any of the more than 220 hotels, motels, or other facilities that FEMA reviewed and approved. Further, FEMA paid only for shelter and ~~service~~services that the City provided to migrants who FEMA confirmed before the making payment had a DHS-issued A-Number and who DHS

29

released from its custody into the community. That is, far from being "illegal," the migrants to whom services were provided that were reimbursed under SSP were present in the United States lawfully because DHS itself released them into the United States.

100.103.   Two hours after Musk's post, at 7:01 a.m., ~~defendant~~ then-Acting Administrator Hamilton reposted it and added: "I want to thank the @DOGE team for making me aware of this. Effective yesterday these payments have all been suspended from FEMA. Personnel will be held accountable." https://x.com/FEMA_Cam/status/1888921176199635266. Then-Acting Administrator Hamilton here appears to ~~be~~have been instituting a "pause" or "suspension" of the FEMA payments— via a post on X—on Monday February 10 (purportedly "[e]ffective yesterday", i.e. Sunday, February 9). City OMB was not notified of this, and on information and belief, neither was any other grantee. Further, the funds FEMA approved for reimbursement to the City had already been paid to the City six days earlier.

101.104.   ~~Acting Administrator~~ Hamilton followed up ten minutes later at 7:11 a.m. with another post acknowledging that the SSP funds provided to the City were in fact appropriated by Congress for the very purpose for which the City used them, stating: "@USCongress ***should have never passed bills in 2023 and 2024 asking FEMA to do this work.***" (Emphasis added.) Notwithstanding his acknowledgment of Congress' express appropriation, ~~Acting Administrator~~ Hamilton stated: "***This stops now.***" https://x.com/FEMA_Cam/status/1888923672523489649.



@USCongress should have never passed bills in 2023 and 2024 asking FEMA to do this work. This stops now.

7:11 AM · Feb 10, 2025 · **78K** Views

○ 217          ⇄ 645          ♡ 4K          ◻ 60          ⬆

102.105.   The statement could not be clearer: Defendants' purpose for grabbing back the funds was to <u>undo the work of Congress and</u> stop the SSP program entirely. It was not related to City-specific costs or City-specific compliance issues, but was designed to thwart the very purpose for which Congress appropriated the funds and FEMA awarded, approved, and disbursed them.

103.106.   Following the tweets from Musk and ~~defendant Acting Administrator~~ Hamilton, Comans "spent all day on Monday, February 10, 2025, recouping the funds from New

York City, which ultimately totaled $80 million dollars." Comans Declaration ¶ 9. At 3:45 p.m.

that day, "FEMA's Acting Administrator [Hamilton] sent an email to DHS confirming that the

process to claw back funding was occurring" and at 5:29 p.m. Comans "reported to [] leadership

that [she] had successfully coordinated with Treasury and the funds were being returned." *Id.*

104.107.   Based on her "experience and the interactions [she] witnessed," Comans

concluded "there was a sudden policy change concerning whether FEMA could send resources

to state and local governments." Comans Decl. ¶ 10. Comans believed the decision was made by

DOGE or Elon Musk. *Id.*

105.108.   The following day, on February 11, 2025, Comans was abruptly

terminated "effective immediately" from FEMA and federal employment, via a memorandum

stating: "[t]his action is being taken pursuant to Article II of the United States Constitution, at the

direction of the President. Article II, § 1 states that the executive Power 'shall be vested in a

President of the United States of America,'" and this termination is an exercise of that vested

power.."." Complaint ¶ 5, *Comans v. DHS,* ECF No. 1.

106.109.   DHS announced Comans's termination, along with terminations of three

other FEMA employees, stating that Comans and her colleagues were fired "for circumventing

leadership to unilaterally make egregious payments for luxury NYC hotels for migrants."

https://www.dhs.gov/news/2025/02/11/statement-dhs-spokesperson-termination-4-fema-

employees-who-made-payments-luxury; *see also* Luis Ferré-Sadurní, *Top FEMA Official Is

Fired Over Payments for N.Y.C. Migrant Shelters,* N.Y. Times (Feb. 11, 2025),

https://www.nytimes.com/2025/02/11/nyregion/fema-fired-nyc-migrant-hotels.html.

107.110.   That same day, on February 11, 2025 at 4:03 pm, $80,481,861.42,

disappeared from the City's central treasury account. The money disappeared via a reversal of the

ACH transfer. Defendants had removed from the City's bank account the entire amount that

FEMA had seven days earlier approved for reimbursement and disbursed to the City for the SSP-

A and SSP-C grants combined. Although the reversal was accomplished within the five-day

window for reversals of ACH transfers under the rules and procedures governing automated

clearinghouse ("ACH") transfers, those rules do not ~~allow for~~authorize reversals for the reasons

Defendants effectuated it, as discussed further below.

~~108.~~111.    FEMA did not provide any advance notice to the City of the ~~money~~

~~grab~~Money Grab. FEMA did not follow any of the measures set forth in the grant terms and

conditions or the regulations relevant to the grant. In fact, FEMA does not appear to have

followed any administrative process at all in grabbing the SSP funds.

~~109.~~112.    Nor did FEMA provide any advance notice of any reason or basis to the

City for the ~~money grab~~Money Grab. Indeed, it did not communicate with the City at all before

taking the funds.

### F.  Defendants Evade Their Obligations under the TRO through Elisions and Distortions of Fact

~~110.~~113.    As discussed *supra*, at the time of the ~~money grab~~Money Grab,

Defendants were subject to a TRO ordering them not to "pause, freeze, impede, block, cancel, or

terminate Defendants' compliance with awards and obligations to provide federal financial

assistance …except on the basis of the applicable authorizing statutes, regulations, and terms"

and to "comply with all notice and procedural requirements in the award, agreement, or other

instrument relating to decisions to stop, delay, or otherwise withhold federal financial assistance

programs." *New York v. Trump*, ECF No. 50. This TRO barred Defendants from "pausing" SSP

pursuant to the Invasion EO, the Noem Memo or any other, unilateral, across-the-board pause on

federal funding to grant recipients, including states and local governments.

33

~~111.~~114.   To evade these obligations and create cover for the ~~money grab~~Money Grab, at approximately 7 p.m. on February 11, 2025—three hours after FEMA had already grabbed the SSP24 funds—some of the defendants here filed a motion in *New York v. Trump* entitled, "Emergency Motion. . . for Permission to Continue Withholding FEMA and Other Funding."

~~112.~~115.   The emergency motion purported to seek confirmation that a "withholding" of FEMA funding to the City did not violate the TRO.

~~113.~~116.   Without mentioning that FEMA had already taken the funds the emergency motion stated that "FEMA *seeks to withhold* Shelter and Services Program (SSP) funding based on concerns regarding the program" and "respectfully *requests* confirmation that Defendants may permissibly withhold certain FEMA funding, i.e., as 'a specific instance where they are acting in compliance with this Order but otherwise withholding funds due to specific authority.'" *Id.* (emphasis added).

~~114.~~117.   In a declaration accompanying the emergency motion, ~~Defendant~~ then-Acting Administrator Hamilton represented that FEMA had "paused" SSP funding to the City because of concerns the funds were being mis-used by the City and that FEMA would follow all applicable processes under the SSP grant and applicable laws and regulations. Specifically, then-Administrator Hamilton made the following representations:

- "As of today, the Department has paused funding to the Shelter and Services Program based on significant concerns that the funding is going to entities engaged in or facilitating illegal activities."
- "For example, a substantial portion of Shelter and Services Program money goes to funding alien housing at the Roosevelt Hotel in New York City. According to media reports, the vicious Venezuelan gang Tren De Aragua has taken over the hotel and is using it as a recruiting center and base of operations to plan a variety of crimes."

- "FEMA is in the process of requesting information from New York City to further investigate this matter to ensure that federal funds are not being used for illegal activities."

- "FEMA will begin the process of providing notice to New York City regarding the funding pause and will provide the information and process required by regulation and the terms and conditions of the award. *See* 2 C.F.R. § 200.242."

Declaration of Cameron Hamilton, *New York v. Trump*, Feb. 11, 2025, ECF No. 102-1 ("Hamilton 2/11 Declaration") ¶¶ 6, 7, 12, 13. The Hamilton 2/11 Declaration also attached the Noem Memo. As of the time the motion was filed, FEMA had neither requested information from the City nor notified it that it was withholding funds or any reason it was doing so.

115.118.   The Hamilton 2/11 Declaration relied on "media reports," rather than on any fact-based analysis. It did not identify any activity by the City that was inconsistent with SSP24 grant conditions or unlawful, except for vague allegations of encouraging aliens to reside in the U.S., transporting illegal aliens, harboring, or aiding and abetting. Since all of the migrants for whom FEMA reimbursed the City were, as FEMA itself determined, assigned released into the community with an assigned A Number by DHS, and the reimbursement was for the express purpose of relieving DHS of the burden of maintaining these individuals in DHS custody, these assertions are faulty and appear to be disingenuous because there is nothing "illegal" about providing shelter and services for specific individuals released from DHS custody as specified in the grant.

116.119.   The Hamilton 2/11 Declaration represented only that, "as of today [February 11, 2025]", FEMA had "paused" SSP and did not inform the court that FEMA had already grabbed back the SSP24 funds without complying with any of the notice or procedural requirements in the SSP Award Letters, NOFOs, or applicable federal regulations. The Declaration did not mention the supposed and unsupported concerns that Musk and defendant

Hamilton articulated on February 10, 2025, before the ~~money grab~~Money Grab, about SSP funds going to provide "luxury" accommodations to "illegal aliens."

~~117.~~120.   The Hamilton 2/11 Declaration cites 2 C.F.R. § 200.242, but that provision does not exist. If Hamilton meant to refer to 2 C.F.R. § 200.342, that provision requires that an agency that "initiat[es] a remedy for noncompliance (for example, disallowed costs, a corrective action plan, or termination)… must provide the recipient with an opportunity to object and provide information challenging the action." No such opportunity was provided before FEMA took the money. And nothing in the provision authorizes the unilateral reversal of an approved and completed payment to grab funds out of a grantee's bank account.

~~118.~~121.   The court denied the emergency motion on February 12, 2025, stating:

> As to FEMA funds to New York City, the Defendants represent that they
> intend to provide 'notice to New York City regarding the funding pause and
> will provide the information and process required by regulation and the terms
> and conditions of the award.' ECF No. 102-1 at ¶ 13. Because the Defendants
> are seeking to terminate *funding 'on the basis of the applicable authorizing
> statutes, regulations, and terms,'* ECF No. 50 at 12 (emphasis added), the
> Court sees no need for further clarification.

Order, *New York v. Trump*, Feb. 12, 2025, ECF No. 107.

~~119.~~122.   The District Court of Rhode Island thus relied on Defendants' representation that they were seeking merely to "pause" funding to the City "on the basis of the applicable authorizing statutes, regulations and terms" when, in fact, Defendants had already taken the SSP24 funds without providing notice to the City and without following any of the applicable statutes, regulations, and terms.

~~120.~~123.   The day after the filing in *New York v. Trump*, on February 12, 2025, at 1:37 pm, defendant DHS Secretary Kristi Noem repeated the unsupported statements in the Hamilton 2/11 Declaration, that persons residing in hotels the City used to temporarily shelter

non-citizen migrants committed crimes and that approved SSP funds were grabbed back for that

reason. https://x.com/KristiNoem/status/1889745752924074088.

 **Kristi Noem** ✓
@KristiNoem

 ···

I have clawed back the full payment that FEMA deep state activists
unilaterally gave to NYC migrant hotels.

FEMA was funding the Roosevelt Hotel that serves as a Tren de Aragua
base of operations and was used to house Laken Riley's killer.

Mark my words: there will not be a single penny spent that goes against
the interest and safety of the American people.

1:37 PM · Feb 12, 2025 · **1.4M** Views

💬 5.9K          🔁 21K          ♡ 130K          🔖 1.3K          ⬆️

121.124.   Defendant Noem's February 12 message makes clear her hostility and

opposition to the program itself.

### G. Defendants Mysteriously Zero Out SSP Funds on a Government Website

125.        Despite Defendants' representations – to the District Court in Rhode

Island on February 11 and, as set forth more fully below, a week later in the Remedy for

Noncompliance Letter  – that the SSP funds were merely being "paused" or "temporarily"

withheld pending a further review, Defendants had elsewhere already recorded the funds as no

longer available at all.

126.        On February 10, 2025 – the same day that Elon Musk posted about the

payment to the City, data on USASpending.gov—the official repository of federal government

37

spending data—indicated that someone with access to FEMA's financial systems began zeroing out the available funds under the SSP Grants ("Zero Out").[8]

| Prime Award ID ⇕ | Recipient Name ⬆ | Obligations ⇕ | Outlays ⇕ | |
|---|---|---|---|---|
| EMW-2023-SP-05027 | NEW YORK CITY OFFICE OF MANAGEMENT & BUDGET | $70,571,977.56 | $70,571,977.56 | |
| EMW-2024-SP-05018 | NEW YORK CITY OFFICE OF MANAGEMENT & BUDGET | $0.00 | ·· | |
| EMW-2024-SP-05125 | NEW YORK CITY OFFICE OF MANAGEMENT & BUDGET | $0.00 | ·· | |

127.    USASpending.gov reflects that the City's SSP23 grant was revised downward by $36,307,765 on February 10, 2025. That is, the entire amount of Congressionally-appropriated funds that FEMA awarded and obligated to the City on the SSP23 grant but from which the City had not yet (as of that date) sought reimbursement for allowable costs was zeroed out on this government platform.

🕑 Award History

| Transaction History | Sub-Awards ∘ | Federal Account Funding ∘ |
|---|---|---|

| Modification Number | Assistance Listing | Action Date | Amount | Action Type | Transaction Description |
|---|---|---|---|---|---|
| ·· | 97.141 | 02/10/2025 | -$36,307,765 | C: REVISION | SHELTER AND SERVICES PROGRAM |
| ·· | 97.141 | 09/28/2023 | $2,201,736 | A: NEW | SHELTER AND SERVICES PROGRAM |
| ·· | 97.141 | 08/11/2023 | $104,678,007 | A: NEW | SHELTER AND SERVICES PROGRAM |

1-3 of 3 results                                                   Rows per page: 10 ⌄

---

[8] According to an explainer on USASpending.gov, transaction-level changes to federal grants—such as grant revisions—occur in the agency's financial system and are then reported by the agency to the USASpending.gov website.

128.    USASpending.gov reflects that the City's SSP24 grants were similarly revised downward, apparently resulting in $0 in funds left to draw upon:

| Transaction History ④ ⓘ | Sub-Awards ◊ ⓘ | Federal Account Funding ◊ ⓘ | | | |
|---|---|---|---|---|---|
| Modification Number | Assistance Listing | Action Date | Amount | Action Type | Transaction Description |
| -- | 97.141 | 02/10/2025 | -$720,679 | C: REVISION | SHELTER AND SERVICES PROGRAM |
| -- | 97.141 | 02/12/2025 | -$58,581,446 | C: REVISION | SHELTER AND SERVICES PROGRAM |
| 0 | 97.141 | 07/08/2024 | $38,864,884 | A: NEW | SHELTER AND SERVICES PROGRAM |
| 1 | 97.141 | 09/12/2024 | $20,437,241 | C: REVISION | SHELTER AND SERVICES PROGRAM |

1-4 of 4 results                                                                 Rows per page:  10  ∨

↺  Award History

| Transaction History ③ ⓘ | Sub-Awards ◊ ⓘ | Federal Account Funding ◊ ⓘ | | | |
|---|---|---|---|---|---|
| Modification Number | Assistance Listing | Action Date | Amount | Action Type | Transaction Description |
| -- | 97.141 | 02/12/2025 | -$21,900,415 | C: REVISION | SHELTER AND SERVICES PROGRAM |
| -- | 97.141 | 02/10/2025 | -$269,423 | C: REVISION | SHELTER AND SERVICES PROGRAM |
| 0 | 97.141 | 09/17/2024 | $22,169,838 | A: NEW | SHELTER AND SERVICES PROGRAM |

1-3 of 3 results                                                                 Rows per page:  10  ∨

129.    That is, the entire amount – slightly more than $1 million – that remained awarded but not yet claimed or paid under the SSP24 grants as of February 10, 2025, was also zeroed out on that date.

130.    Then, after FEMA executed the Money Grab by ACH reversal at close of business February 11, 2025, those funds, too, were zeroed out on February 12, 2025, the very next day.

131.    Thus, while Defendants were professing that funds were merely being withheld subject to review, at least one government platform was showing that no funds at all remained available for reimbursement of allowable costs.

132.    It is not clear who zeroed out the SSP funds on USASpending or under what claim of authority. Nor is it clear why funds that Defendants represented in court were merely being temporarily withheld were nonetheless zeroed out entirely on this platform.

133.    Money that was duly obligated pursuant to a federal appropriation must be maintained in the related appropriations account and must remain available for adjustments, or payments of obligations "properly chargeable to that account." 31 U.S.C. § 1553. Accounts containing obligated but unspent funds can only be closed out, and the remaining account balances canceled, five years after the obligation period for the account has ended. *See* 31 U.S.C. § 1552(a).

134.    Only Congress may authorize an agency to de-obligate funds and move them out of their designated accounts before the date set by Section 1552(a). *See Dabney v. Reagan*, 1985 WL 443 (S.D.N.Y. Mar. 21, 1985) (finding bank could only depart from the procedures set forth in 31 U.S.C. §§ 1552 and 1553 because Congress specifically authorized the alternative procedure in statute). Defendants did not obtain Congressional approval for the Zero Out. Defendants had no authority to de-obligate SSP funds awarded to the City, if that is what they indeed purport to have done.

### ~~G.~~H.    FEMA Issued a "Noncompliance Letter" in a Pretense of Procedural Compliance

135.    More than a week after the ~~money grab, Defendants began~~Money Grab and the Zero Out, and more than a week after several Defendants announced their animus towards SSP and intent to thwart the program, Defendants began to manufacture a paper trail to

create the misimpression that their lawless sabotage of the City's SSP grant funding was part of and consistent with lawful administrative procedures.

122.136.  In the first of these steps, Defendants sought to manufacture a veneer of the procedural compliance—at least as to the withholding of SSP funds, though not for the unilateral removal of the funds from the City's bank account—that defendant Hamilton had represented in court filings they were following in the February 11, 2025 court filings. On February 19, 2025, Neil Thompson, the Deputy Assistant Director at City OMB, received a letter, dated February 18, 2025, from Hamilton with the subject line "Remedy for Noncompliance Letter, Shelter and Services Program (SSP)."

123.137.   The letter purports to "notify [City OMB] that DHS/FEMA is temporarily withholding payments to [City OMB]" for three grant awards: the SSP23 and both SSP24 Grants. The letter admits that FEMA had already grabbed back the SSP-A and SSP-C grant awards paid to the City, stating that FEMA "recovered two payments completed via direct deposit on February 4, 2025, totaling $80,481,861.42." The letter makes no mention of the fact that the very same funds being "temporarily" withheld were also zeroed out of USASpending on February 10 and 12.

124.138.   The letter states that DHS/FEMA is temporarily withholding these funds pursuant to 2 C.F.R. § 200.339(a), which providesthatprovides that "[w]hen [a] Federal agency . . . determines that noncompliance cannot be remedied by imposing specific conditions, the Federal agency . . . may . . . (a) temporarily withhold payments until the recipient or subrecipient takes corrective action." But the letter also states, inconsistently with the above, that FEMA "is instituting specific conditions on [the City's] award pursuant to 2 C.F.R. § 200.208."

~~125.~~139.  2 C.F.R. § 200.208 allows federal agencies to adjust specific conditions in the Federal award based on analysis of the following factors:

> (1) Review of OMB-designated repositories of government-wide data (for example, *SAM.gov*) or review of its risk assessment (See § 200.206);

> (2) The recipient's or subrecipient's history of compliance with the terms and conditions of Federal awards;

> (3) The recipient's or subrecipient's ability to meet expected performance goals as described in § 200.211; or

> (4) A determination of whether a recipient or subrecipient has inadequate financial capability to perform the Federal award.

~~126.~~140.  None of the foregoing factors are discussed in the ~~"noncompliance" letter~~Remedy of Noncompliance Letter nor do they appear to be within the scope of the concerns set forth in the letter.

~~127.~~141.  The letter also fails to note that FEMA may not initiate a remedy for "noncompliance," such as withholding funds, without providing notice to the City and an opportunity to object and provide information challenging the action. 2 C.F.R. § 200.342.

~~128.~~142.  The letter also omits reference to regulations providing that "payments for allowable costs ***must not be withheld at any time during the period of performance*** unless required by Federal statute, regulations," or "The recipient … has failed to comply with the terms and conditions of the Federal award; or… is delinquent in a debt." CFR § 200.305(b)(6) (emphasis added). If "such conditions" are met, "the Federal agency… may, ***after providing reasonable notice***, withhold payments to the recipient… until the conditions are corrected." *Id.* And in the event payments are withheld for noncompliance, they must be released "upon subsequent compliance." 2 CFR § 200.305(b)(7).

129.143.   Here, FEMA has not identified any federal statute or regulation that requires withholding of SSP grant funds, has not identified a failure to comply with any grant terms or conditions, and did not provide notice, before grabbing back the funds.

130.144.   Instead, even taking the letter at face value, the stated reasons for withholding funds are based on specious and unsubstantiated allegations unrelated to any grant terms or conditions.

131.145.   The "noncompliance" letterThe Remedy of Noncompliance Letter announces purported "Findings," which are expressed as no more than "concerns" and which are, in any event, facially pretextual.

132.146.   First, the letter states that DHS "has significant concerns that SSP funding is going to entities engaged in or facilitating illegal activities." But it does not allege any purported illegal activities committed by any entity that might have been paid with funds for which the City obtained reimbursement. Instead, the letter alleges—citing and exaggerating the same news reports that defendant Hamilton cited in his declaration a week earlier:

> According to media reports, the vicious Venezuelan gang Tren De Aragua has taken over the hotel and is using it as a recruiting center and base of operations to plan a variety of crimes. According to these same reports, these crimes include gun and drug sales as well as sex trafficking, which can reasonably be presumed to be conducted in the hotel itself.

133.147.   The letter asserts that "DHS/FEMA has a responsibility to ensure that it does not make payments that fund criminal activity." But, the letter does not explain what "illegal activity" might be funded by the grant. As FEMA knows, the grant provides "financial support to non-federal entities to provide sheltering and related activities to noncitizen migrants following their release from the Department of Homeland Security." FEMA, *Shelter and Services Program,* https://www.fema.gov/grants/shelter-services-program (last visited Feb. 13,

2025). The grant does not provide funds directly to any noncitizen migrants, nor to fund any activities not specified within the grant terms.

134.148.    A further "finding" is FEMA's purported "concern" that

entities receiving payment under this program may be guilty of encouraging or inducing an alien to come to, enter, or reside in the United States in violation of law, 8 U.S.C. § 1324(a)(1)(A)(iv); transporting or moving illegal aliens, id. § 1324(a)(1)(A)(ii); harboring, concealing, or shielding from detection illegal aliens, id. § 1324(a)(1)(A)(iii); or applicable conspiracy, aiding or abetting, or attempt liability respecting these statutes.

135.149.    As FEMA knows, this is a patently false "concern" because the grants fund only those costs for shelter and services that are provided to individuals that DHS determined to release from its custody into the community. That is, the individual was already in the United States, in DHS custody, and then released by DHS to the community—facts that FEMA confirmed for each individual before, and as a condition of, making payment.

136.150.    In re-framing as illegal "harboring" or "transporting" the provision of shelter and services to noncitizen migrants released by DHS into the U.S., the letter effectively and retroactively imposes new and grant-negating conditions by rendering grant compliance to be unlawful.

137.151.    The "noncompliance" letterThe Remedy of Noncompliance Letter claims that "[b]ased on the concerns described . . . , DHS/FEMA will conduct additional monitoring and review of" the FY23 and FY24 SSP awards "as permitted by the terms and conditions of the award(s) to ensure compliance with all terms and conditions of [the] award(s)." The letter reiterates that "[d]uring this time, payments under the grant award(s) will be temporarily held. This action includes the amount of funding . . . that DHS/FEMA recently clawed back." The "noncompliance" letter The letter does not acknowledge that the funds it represents are "temporarily held" were already subject to the Zero Out. The Remedy of Noncompliance Letter

adds that "[u]pon the conclusion of that monitoring, FEMA will notify you of the results and any

other remedies for noncompliance or specific conditions, as appropriate."

138.152.   ~~The "noncompliance" letter~~The Remedy of Noncompliance Letter makes a

show of requesting information that would somehow assist FEMA in making a final

determination. But the information requested is largely information that FEMA not only

possesses but has already reviewed in determining to make payment to the City. The letter seeks:

> All documents regarding the aliens with whom your organization and your
> subrecipients and contracts [sic] interacted with in carrying out the scope of
> your SSP award, including their names and contact information; and a detailed
> and descriptive list of specific services provided, and proof of provision of
> these services; or
>
> A written statement that your organization has already submitted all of the
> information identified in No. 1, above, to DHS/FEMA.

139.153.   As described above, the City supplied the name and A-Number for

individuals for whom the City sought reimbursement, as well as proof of services rendered—all

of which FEMA reviewed and approved for payment. Further, none of the information requested

is in any way related to the letter's stated central "concern": allegations of criminal activity. It is

a charade of a request for information.

140.154.   By letter dated March 14, 2025, the City responded to FEMA's

information request, reserving all rights with respect to the issues it is raising in this litigation

and in any appeal of the noncompliance letter itself.

### I.   Defendant ~~Hamilton~~Noem Amplifies Defendants' Hostility to SSP and to the City

155.      Despite the TRO in place in N.Y. v. Trump, on February 19, 2025,

Secretary Noem issued another memo, titled "Restricting Grant Funding for Sanctuary

Jurisdictions" ("Second Noem Memo"). The Second Noem Memo ordered that:

> All components are to review all federal financial assistance awards to determine
> if Department funds, directly or indirectly, are going to sanctuary jurisdictions. To
> the extent consistent with relevant legal authorities and the applicable terms and
> conditions of each award, each component must cease providing federal funding
> to sanctuary jurisdictions.

Second Noem Memo at 2.

156.    The Second Noem memo also contained the following statement:

> If any government entity chooses to thumb its nose at the Department of
> Homeland Security's national security and public safety mission, it should not
> receive a single dollar of the Department's money unless Congress has
> specifically required it.

157.    Thus, the Second Noem Memo provides additional reasons, unrelated to
the SSP itself, as to why Defendants aim to deprive the City of SSP funds.

## ~~H.~~J.    **FEMA Doubles Down on Opposition to SSP and Demonstrates that the Money Grab was Unjustified and Violated ACH Rules**

~~141.~~158.    On February 28, 2025, ~~then-~~Acting Administrator Hamilton, in a
declaration submitted in this action, ECF No. 17-1 ("Hamilton 2/28 Declaration"),
~~asserts~~asserted that "on its face, SSP funds sheltering and transportation of illegal aliens." In so
stating, Hamilton ~~makes~~made clear FEMA's opposition to SSP itself.

~~142.~~159.    Hamilton further ~~states~~stated that no funds should have been disbursed to
the City following the Noem Memo because the memo put "on hold" all disbursements that
"touch in anyway on immigration" and "go to non-profit organizations or for which non-profits
are eligible." ECF No. 17-1 ¶ 8-9. Hamilton's reliance on the Noem Memo ~~is~~was telling: the
Noem Memo ~~uses~~used the purpose of the SSP – providing services to non-citizens – as a basis to
"pause" the SSP. _The Noem Memo thus ~~seeks~~sought to stop SSP because Defendants reject its
purpose; the ~~money grab~~Money Grab, the pause, and the ~~pause have~~Zero Out had nothing to do
with the City's compliance, ~~which FEMA itself had previously determined when it~~

~~paid~~particularly since, in approving and paying reimbursement to the City on February 4, 2025~~.~~,

FEMA had already determined that the reimbursed costs complied with grant terms and

conditions.

~~143.~~160.    Furthermore, at the time of the ~~money grab~~Money Grab and the

~~"noncompliance" letter~~Remedy of Noncompliance Letter, the Noem Memo~~,~~ was enjoined as an

across the board unilateral pause in funding, by the TRO in *New York v. Trump. See supra.*

Significantly, in his February 11 declaration filed in the Rhode Island case, Hamilton averred that

the pause was imposed "as of [that] day," not as of the issuance of the Noem Memo.

~~144.~~161.    The Hamilton 2/28 Declaration also ~~states~~stated for the first time – 24 days

after the $80 million SSP payment to the City and 17 days after the ~~money grab~~Money Grab –

that the payment was made "in error." ECF No. 17.1 ¶ 9. The allegation of a payment "error"

appears to be an attempt to justify the ~~money grab~~Money Grab as a legitimate "reversal" of the

ACH transfer to the City's account under applicable rules. However, Defendants did not make an

"error" in paying the City; rather Defendants decided they did not like the SSP program and tried

to reclaim whatever monies they could without following agency procedures. That is not a proper

basis for an ACH reversal and is not a proper basis for taking back money after approving the

reimbursement.

~~145.~~162.    ~~Defendant~~ Hamilton ~~explains~~explained in his February 28 Declaration that

the ~~money grab~~Money Grab was executed by certifying over the phone to the Department of the

Treasury that the SSP payment to the City was "improper" and by submitting to "Treasury an

Improper Recovery Request via the Treasury Check Information System to recover the payment

pursuant to 31 C.F.R. § 210.6(f)." ECF No. 17-1 ¶ 11. However, Section 210.6(f) does not permit

a reversal of an ACH transfer for a change of mind about policy; it permits a reversal for a "duplicate or erroneous entry."

~~146.~~163.    FEMA's decision to pay the City over $80 million after a thorough review of the claims was not an "erroneous entry." The Code of Federal Regulations incorporates by reference the "ACH Rules," defined as the "2021 Operating Rules & Guidelines … published by Nacha," (the National Automated Clearing House Association). 31 C.F.R. 210.2(a) ("Any term that is not defined in [31 C.F.R. Part 210] shall have the meaning set forth in the ACH Rules"). Under the 2021 Nacha rules, an "erroneous entry" is defined as "(a) a duplicate [of a previous entry]…(b) a payment to or from a Receiver [who is not the] … Receiver … intended … by the Originator; (c) a payment in a dollar amount different than was intended by the Originator … ; or (d) [a] payment of a debit Entry on a date earlier" than intended by the Originator or a "Credit Entry on a date later" than intended by the Originator. NACHA Rule § 8.38.[9] None of the reasons Defendants have articulated for the ~~money grab~~Money Grab are an allowable basis for an ACH reversal.

~~147.~~164.    Hamilton's statements moreover are inconsistent with earlier statements by various defendants, including DHS Secretary Noem's February 12, 2025 X post, that make clear the real reason for the reversal was animus towards the program. As Secretary Noem stated, she "clawed back the full payment that deep state activists unilaterally gave to NYC migrant hotels." *See supra.*

---

[9] *See also* NACHA Rule 2.9.1 (allowing ACH reversals to "correct an Erroneous Entry previously initiated" and requiring that the "Originator must make a reasonable attempt to notify the Receiver of the Reversing Entry and the reason for the Reversing Entry no later than the Settlement Date of the Reversing Entry"); NACHA Rule 2.9.5 (clarifying that an ACH reversal is improper if initiated "for any reason other than" to correct an "erroneous entry").

148.165.   ~~Defendant~~ Hamilton's factual assertions are also contradicted by the far-more-specific recollection of Comans that, even after the reimbursement payments were made on February 4, 2025, FEMA leadership and DOGE discussed and agreed that the Noem Memo applied only to nongovernmental organizations and did not stop payments to state and local government grantees. Comans recalled that there was a policy change made later, some time *after* February 5, 2025, to apply the Noem memo to stop payments to state and local governments and that this policy change lead to the ~~money grab~~Money Grab. Thus, FEMA's February 4, 2025 wire transfer to the City was not in "error" at the time that it was made.

149.166.   The Hamilton 2/28 Declaration ~~repeats~~repeated the vague assertions about possible illegal activity he articulated in the Hamilton 2/11 Declaration and in the ~~"noncompliance" letter.~~Remedy of Noncompliance Letter. He also further ~~elaborates~~elaborated on Defendants purported "concern" that "entities receiving payments might be involved in illegal activity, seemingly specifying the "Roosevelt Hotel" as an "NGO" that may be receiving funds. ECF No. 17-1 ¶¶ 10, 12. But, ~~Defendant~~ Hamilton ~~does~~did not identify any illegal activity by the hotel itself, only mere speculation that illegal activities might be "presumed" to have occurred there. *Id.* ¶ 6. And none of these vague allegations justify the ~~money grab~~Money Grab, after FEMA had reviewed the reimbursement request and approved and paid the reimbursement.

150.167.   While Hamilton ~~claims~~claimed that the February 4, 2025 payment to the City was an "error" because of the pause effectuated by the Noem Memo, that memo cannot form a legitimate basis of authority for the ~~money grab~~Money Grab or for the suspension of SSP. The Noem Memo violates the APA, the separation of powers doctrine and the Spending Clause. To the extent the Noem Memo effectuated an across-the-board "pause," it violates the TRO in *New York v. Trump*. To the extent it is being interpreted as applying to payments to local

governments, as well as non-governmental organizations, that interpretation was not in effect when the payment to the City was made and therefore cannot form the basis of any claim that the February 4 payment to the City was the result of an "error." To the extent the Noem Memo is premised on the concern of possible illegality in providing shelter and services to noncitizen migrants released into the United States by DHS, it improperly imposes new, grant-negating conditions. And finally, nothing set forth in the Noem Memo establishes grounds consistent with the Nacha rules concerning reversal of an "erroneous entry."

### I.K.    President Trump Announces Termination of SSP as "Waste" and "Scam " and Gloats Over the Money Grab Executed "Just in Time"

151.168.    On March 4, 2025, President Trump, delivered an address to Congress in which he touted, among other things, his Administration's efforts to "combat inflation" by "ending the flagrant waste of taxpayer dollars." President Trump enumerated a long list of so-called "appalling waste" "including "$59 million for illegal alien hotel rooms in New York City, real estate developers done very well."[10] He then went on to call "all of these" programs he had identified—including SSP—as "scams" that had "been found out and exposed and swiftly terminated."

152.169.    Defendant Trump thus made clear that Defendants' intent iswas to end SSP entirely, and not merely to review the City's compliance with applicable terms and conditions, saying "[w]e found hundreds of billions of dollars of fraud. And we've taken back the money and reduced our debt to fight inflation and other things."

---

[10] *Transcript of President Donald Trump's speech to a joint session of Congress*, Associated Press, Mar. 5, 2025 10:05 am, https://apnews.com/article/trump-speech-congress-transcript-751b5891a3265ff1e5c1409c391fef7c.

~~153.~~170.   Defendant Trump then added: "Taking back a lot of that money, we got it just in time"— a seeming reference to the ~~money grab~~Money Grab, which was completed near close of business on the last day for which an ACH reversal could be effectuated under the ACH rules[11]— before insisting "[t]his is just the beginning."

### L.  Defendants Continued to Represent that the Funds Remain Obligated to the City

171.       On February 21, 2025, the City moved for a temporary restraining order ("TRO") in this case.  Specifically, the City sought a TRO requiring that the funds taken by ACH reversal be returned to the City during the pendency of this action.

172.       In their opposition papers, Defendants sought to reassure the Court that no irreparable harm was imminent and no TRO was necessary by representing that "the funds at issue were obligated to" the City, and that DHS has "until September 30, 2029" to "disburse the challenged funds" to the City. *See* Mem. of Law in Opp. to Pl.'s Mot. for Prelim. Injunction and Temporary Restraining Order at 11, *City of N.Y. v. Trump*, No. 25-cv-01510, Dkt. 17 (S.D.N.Y. Feb. 28, 2025). The Government represented that "[f]ive years is more than enough time to resolve [the City's] claim to the funds without risk that the money will become unavailable during the pendency of this case." *Id.*  Indeed, then-Acting Administrator Hamilton declared that FEMA "retains statutory authority until 2029 to disburse the obligated funds to the plaintiff." DKT # 17 at 11.

173.       Defendants did not disclose or acknowledge at that time that all of the funds that they represented were still obligated to the City and would remain so until 2029 had been zeroed out on USASpending.

---

[11] *See* 31 C.F.R. 210.6(f) ("Reversal under this section shall comply with the time limitations set forth in the applicable ACH Rules"); NACHA Rule 2.9.1 (requiring reversals to be made "within five Banking Days following the Settlement Date of the Erroneous Entry").

174.    This Court denied the City's TRO motion on grounds that the City had not

shown it would suffer irreparable harm warranting the requested relief because the disputed

funds remained legally "obligated" to the City through September 2029.  Dkt # 45 (Transcript at

43).

**J.M.    Defendants Continue to Effectuate the Suspension of SSP**

154.175.    On March 11, 2025, Defendants notifiedissued letters to notify other SSP

recipients across the country that, as with the City, their awards arewere being withheld.[12] For at

least some recipients, funds had been zeroed out on USASpending, just as they had been with

respect to funds obligated to the City.  The letters make no mention of funds being zeroed out of

USASpending.

155.176.    These letters use substantially similar boilerplate language to that found in

the "noncompliance" letterRemedy of Noncompliance Letter that FEMA sent the City, stating,

without identifying any facts or basis, that DHS "has significant concerns that SSP funding is

going to entities engaged in or facilitating illegal activities" and that DHS is concerned that

> entities receiving payment under this program may be guilty of encouraging
> or inducing an alien to come to, enter, or reside in the United States in
> violation of law, 8 U.S.C. § 1324(a)(1)(A)(iv); transporting or moving illegal

---

[12]Letter from FEMA to Pima County, Arizona (Mar. 11, 2025),
https://content.civicplus.com/api/assets/f82f85f8-1974-47ab-83e7-ef0964fa56d8 ; Uriel J.
García, Alejandro Serrano & Berenice Garcia, *FEMA wants the names and addresses of
migrants helped by Texas nonprofits and local governments that got federal grant money*, Texas
Tribune, Mar. 13, 2025, https://www.texastribune.org/2025/03/13/texas-fema-federal-grants-
immigrants/; Elliott Wenzler, *Trump administration threatens to rescind $32 million promised to
Denver by FEMA for migrant shelter costs*, Denver Post, Mar. 14, 2025,
https://www.denverpost.com/2025/03/14/denver-fema-letter-migrants-shelters-money-trump-
administration/; *FEMA Withholds SSP Program Payments to Migrant Shelters Pending Review*,
Immigration Policy Tracking Project, Mar. 11, 2025,
https://immpolicytracking.org/policies/fema-announces-review-of-migrant-shelter-aid/#/tab-
policy-documents.

aliens, id. § 1324(a)(1)(A)(ii); harboring, concealing, or shielding from detection illegal aliens, id. § 1324(a)(1)(A)(iii); or applicable conspiracy, aiding or abetting, or attempt liability respecting these statutes.

*See e.g.* https://content.civicplus.com/api/assets/f82f85f8-1974-47ab-83e7-ef0964fa56d8.

~~156.~~177.   The letters purport to apply "specific conditions" to the recipient's SSP award and go on to request the same information the ~~"noncompliance" letter~~Remedy of Noncompliance Letter sought from the City, namely "1. [a]ll documents regarding the aliens with whom your organization and your subrecipients and ~~contracts~~contractors interacted with in carrying out the scope of your SSP award, including their names and contact information; and a detailed and descriptive list of specific services provided, and proof of provision of these services; or … 2 A written statement that your organization has already submitted all of the information identified in No. 1, above." *Id.*

~~157.~~178.   ~~Defendant~~ Hamilton reiterated that SSP is ~~suspended~~paused in a March 14, 2025 Declaration in *New York v. Trump*, stating that FEMA has "paused funding to the [SSP]" and asserting that the pause is pursuant to the Noem Memo and for the reasons set forth in his February 11, 2025 declaration. *New York v. Trump*, ECF No. 166-1 ¶ 3.  He did not mention the Zero Out.  As discussed above, the Hamilton 2/11 Declaration, submitted hours after the ~~money grab~~Money Grab, disingenuously purported to seek leave from the *New York v. Trump* court to "withhold" SSP funds from the City pursuant to grant terms and conditions.

~~158.~~179.   ~~Defendant~~ Hamilton also stated that SSP grants to the states of Colorado and Wisconsin are being withheld and "specific conditions" are being imposed on these grants because DHS has "significant concerns that the SSP funding is going to entities engaged in or facilitating illegal activities." *New York v. Trump*, ECF No 166-1 ¶¶ 30-31.

**N. FEMA Recommends Formally Terminating SSP**

180.    On March 20, 2025, Hamilton provided defendant Noem with a memorandum titled "Decision" ("FEMA Decision Memo"). The FEMA Decision Memo is ~~Bound by Extensive Rules~~a further papering of Defendants' efforts to arbitrarily and ~~Procedures, Including~~unlawfully negate Congress's appropriation and deny the City SSP funds to which it is entitled.

181.    The FEMA Decision Memo sets forth FEMA's recommendations to DHS following its review of FEMA grants pursuant to the Second Noem Memo. The FEMA Decision Memo seeks DHS's approval of its recommendations as to which grants should be cleared, or subject to further review, or terminated, and the grounds for each recommendation. Defendant Noem signed off on the FEMA Decision memo on March 25, 2025, approving FEMA's recommended actions.

~~K.~~182.    The recommendations in the ~~Grant Terms and Conditions~~FEMA Decision Memo address two questions: 1. To which grants should (unspecified) DHS/FEMA "sanctuary jurisdiction" conditions or restrictions apply; 2. What is the "risk profile" of each grant as it pertains to immigration, i.e. whether, in the view of DHS/FEMA, the grants "do not encourage or induce illegal immigration or harboring of illegal aliens or any other unlawful activity." FEMA Decision Memo at 1-3.

~~159.    By grabbing back funding from the City, and suspending further funding under SSP24 and SSP23, FEMA has acted contrary to the applicable rules and grant terms. There is nothing in the NOFOs, Award Letters, applicable regulations, or Nacha rules that allows Defendants to "recover" funds by taking them out of the City's bank account before going through an administrative process that includes notice and an opportunity to object.~~

160. ~~Furthermore, Defendants' supposed administrative determination to suspend SSP24 and SSP23 funding is plainly pretextual, as it does not identify any legitimate basis for withholding SSP funding—let alone for having taken back funds that were previously approved and paid. Instead, it makes specious allegations unrelated to the grant terms, asks for submission of information that City OMB already provided and that FEMA already reviewed in detail, and fails to cite any grant term with which the City has not complied.~~

**L. ~~The Money Grab Violates Federal Rules and Grant Terms and Conditions~~**

161. ~~As described above, FEMA did not provide any notice to City OMB before the money grab.~~

162. ~~The money grab was made in total disregard of the fact that FEMA awarded the grant and then reviewed, approved, and paid the reimbursement.~~

<u>183.</u>    ~~No lawful grounds exist—and none have been asserted—for the money grab, and no lawful procedure was followed. Instead, Defendants have made clear that their true intent is to halt the program entirely because they do not like it, and have commenced a *post hoc* "procedure" to give legal gloss to their unlawful determination and action. The money grab must be reversed and defendants prevented from engaging in unlawful money grabs in the future.~~<u>The memo sets forth a "Proposed Sanctuary Jurisdictions Risk Methodology."  Under the proposed methodology, "Sanctuary Jurisdiction" conditions and restrictions apply to grant programs that either "go to a designated sanctuary jurisdiction" or "are non-disaster grants and have a nexus to immigration activities, law enforcement, or national security, or are not limited by statute." FEMA Decision Memo at 3.</u>

184.    Of the more than 50 grant programs covered by the memo, FEMA recommended terminating just three of them. One of the three is SSP. FEMA Decision Memo, Table A at 5.

185.    FEMA recommended, and Defendant Noem approved, terminating SSP on grounds that "Sanctuary Jurisdiction" restrictions and conditions should apply and because FEMA determined that SSP's immigration "risk profile" was high.

186.    Both FEMA determinations that are the stated bases for the proposed termination are groundless. There were no grounds to designate SSP as a high immigration risk profile. SSP funds only those services that are provided to migrants that DHS releases into the community, a population for whom Congress and FEMA determined to reimburse a portion of the cost of shelter and services provided. By definition, the migrants served under SSP are not "illegal" and are not harbored, as they are provided with Congressionally-authorized shelter and services.

187.    FEMA's determination to scrap SSP because of "sanctuary jurisdiction" risk is likewise not warranted. The administration's displeasure with a jurisdiction's so-called "sanctuary" policies is no basis for terminating a grant that Congress appropriated and that was previously and duly awarded to that jurisdiction. There are no lawful or rational grounds to terminate a grant that is specifically appropriated by Congress to address migrants simply on grounds that the grant has a "nexus to immigration."

**O. FEMA Formally Terminates SSP**

188.    On April 1, 2025, then-Acting Administrator Hamilton sent the City a letter announcing that FEMA was terminating each of the City's SSP awards, "effective immediately." ("Termination Letter.") Upon information and belief, on that same date, then-

Acting Administrator Hamilton sent substantively identical letters to most or all other SSP

grantees. *See* Compl. ¶ 173, *City of Chicago, et al. v. United States Department of Homeland*

*Security, et al.*, 1:25-cv-054363 (N.D. Ill May 16, 2025). The Termination Letter arrived seven

weeks after the Zero Out took place and six weeks after the Remedy of Noncompliance Letter

yet does not make reference to either action.

189.    Whereas the Remedy for Noncompliance Letter announced that FEMA

withheld funding based on purported concerns about compliance with 8 U.S.C. § 1324, the April

1 Letters provide an entirely different rationale for FEMA's termination decision: that the grants

"no longer effectuate [] the program goals or agency priorities" (quoting 2 C.F.R. § 200.340(a)(2)

(2020)). The Termination Letter asserted that FEMA took this action "pursuant to the terms and

conditions of the grant awards," which were defined to include the applicable NOFOs and 2

C.F.R. § 200.340(a)(2).

190.    The Termination Letter further states that DHS "consistent with President

Trump's direction, is focused on advancing the essential mission of enforcing immigration laws

and securing the border. Consequently, grant programs that support, or have the potential to

support, illegal immigration through funding illegal activities or support for illegal aliens that is

not consistent with DHS's enforcement focus do not effectuate the agency's current priorities."

191.    FEMA's assertion that its action is pursuant to the terms and the conditions

of the grant awards is a red herring. Neither the NOFOs nor 2 C.F.R. § 200.340(a)(2) authorize

FEMA to terminate the City's SSP awards, let alone *every* Shelter and Services Program award at

once, simply because the agency no longer approves of the Congressionally-appropriated

program.

192.     The NOFOs do not permit FEMA to terminate SSP grants based on changed "program goals or agency priorities." Rather, the NOFOs for the grants identify only three permissible reasons for termination: (1) noncompliance; (2) on consent of the recipient; or (3) upon written notice from the recipient.

193.     Nor does 2 C.F.R. § 200.340(a)(2) permit FEMA to terminate SSP grants based on changed "program goals or agency priorities" in the manner that Defendants are interpreting and deploying that phrase.  That provision authorizes termination "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."  Defendants did not terminate SSP because the awards no longer effectuate the goals of SSP but because Defendants oppose SSP entirely and do not wish to fund it.  2 C.F.R. § 200.340(a)(2) does not authorize Defendants to simply change their minds about SSP itself and override the Congressional appropriation that created it.

194.     Federal regulations require agencies to "make recipients aware, in a clear and unambiguous manner" of the "applicable termination provisions in the Federal awarding agency's regulations or in each Federal award." 2 C.F.R. § 200.211(c)(1)(v); *see also id.* § 200.340(b) (agencies "must clearly and unambiguously specify all termination provisions applicable to each Federal award, in applicable regulations or in the award, consistent with this section"). Nothing in either the Notices of Funding Opportunity or the applicable regulations contemplates a wholesale shutdown of every grant award at once.

195.     Moreover, 2 C.F.R. § 200.340(a)(2) does not permit termination for the reason provided in the Termination Letter for at least three independent reasons.

196.    First, agencies may terminate grants under section 200.340(a)(2) only when the ground for termination is "authorized by law" and is actually included as a term and condition of the federal award.  2 C.F.R. § 200.340(a)(4); *see Metro. Transp. Auth. V. Duffy*, 2025 U.S. Distr. LEXIS 101448, *60 (S.D.N.Y. May 28, 2025) (citing *Climate United Fund v. Citibank, N.A.*, 2025 WL 1131412, at 16 (D.D.C. Apr. 16, 2025).  In enacting SSP to reimburse non-federal entities for the cost of caring for migrants released by DHS, Congress did not authorize FEMA to terminate grants, individually or *en masse*, based on FEMA's disagreement with the Program's purpose.

197.    Second, in amending section 200.340 to add subsection (a)(2), the U.S. Office of Management and Budget made clear that the amendment may not be used in the manner that Defendants invoke it here: to simply negate grant programs over changes in policy. OMB specifically addressed concerns that "the proposed language will provide Federal agencies too much leverage to arbitrarily terminate awards without sufficient cause" by emphasizing that "agencies are not able to terminate grants arbitrarily." Guidance for Grants and Agreements, 85 Fed. Reg. 49506 (Aug. 13, 2020). The Office explained:

> The intent of this change is to ensure that Federal awarding agencies prioritize ongoing support to Federal awards that meet program goals. For instance, following the issuance of a Federal award, if additional evidence reveals that a specific award objective is ineffective at achieving program goals, it may be in the government's interest to terminate the Federal award.

*Id.*

198.    This explanation makes clear that an agency cannot terminate a grant based on mid-grant changes in the agency's ***own*** goals. Rather, section 200.340(a)(2) permits terminations only if the grantee is ineffective in advancing the ***program's*** original goals.  The April 1 Letter does not argue that the City has been ineffective in providing shelter and services consistent with SSP, only that SSP itself no longer aligns with Defendants' priorities.

199.    Third, even if section 200.340(a)(2) allowed FEMA to terminate individual grants based on changes in FEMA's own goals, FEMA failed to offer a reasonable explanation why terminating SSP entirely will further FEMA's stated goals. The April 1 Letters did not explain how coordinating with DHS to provide shelter and services to migrants processed by DHS and released from DHS custody is inconsistent with "enforcing immigration laws" or "securing the border," particularly since it was DHS itself that released the migrants served by SSP into the country. Nor did the agency demonstrate that it had given appropriate consideration to the reliance interests of grantees such as the City.

200.    The Termination Letter's assertion that migrants receiving services under the Shelter and Services Program "often have no legal status and are in the United States unlawfully … this, in turn, provides support for illegal aliens and is not consistent with DHS's current priorities" contradicts the Termination Letter's acknowledgement that SSP limits funding to entities that provide services to migrants "released from DHS short-term holding facilities"—i.e., migrants whose status is known to DHS and who DHS determined should be released into the U.S. As noted above, FEMA approved reimbursement payments only after reviewing the A Numbers of people served by the City for whom reimbursement was sought.

201.    In fact, the Termination Letter acknowledges that the City "carr[ied] out the purposes of the SSP identified in the awards' respective [Notices of Funding Opportunity]" by "provid[ing] shelter, food, transportation, acute medical care and personal hygiene supplies for individuals released from DHS short-term holding facilities." FEMA's shifting explanation strongly suggest that FEMA's termination stems solely from a policy turnabout unrelated to the City's performance, which at all times was consistent with the policies and purposes for which the grants were made.

## P.  The Termination Letter Sets Up a Sham Closeout Process

202.     The Termination Letter requires that the City "complete all closeout procedures" by submitting specified information within 120 days. FEMA will then "determine the final allowable costs for your awards" by "evaluating whether all submitted costs incurred before [Remedy for Noncompliance Letter] are necessary, allocable, and reasonable." If "FEMA determines that the total allowable costs exceed the amount paid to date, then FEMA will make a final payment for that difference." If FEMA determines that "the payments made exceed the final allowable costs," however, then FEMA will require that the City  "promptly refund the difference." In other words, FEMA intends to re-review payments that the agency already made and—if FEMA determines that it should not have made those payments—require the City to return the money.

203.     The closeout procedures described in the Termination Letter are misleading insofar as they hold open the possibility that FEMA will pay grantees. The Zero Out and Defendants' statements about SSP, described above, make clear Defendants' intent to not pay the City  absent a court order requiring Defendants to do so (i.e., not in connection with a closeout).

204.     Grantees and subrecipients nevertheless must complete the closeout procedures described in the April 1 Letters. *See* 2 C.F.R. § 200.344(b) ("A recipient must submit all reports … no later than 120 calendar days after the conclusion of the period of performance. A subrecipient must submit all reports … to the pass-through entity no later than 90 calendar days after the conclusion of the period of performance of the subaward (or an earlier date as agreed upon by the pass-through entity and subrecipient).").

205.     But this is not a normal close-out process, and, here too, Defendants are simply using the close-out process to put a legal gloss on their extralegal actions. Plaintiffs' Shelter and Services Program grants—and on information and belief all other Shelter and Services Program grants—are no longer visible in the FEMA portal that grantees would typically use to submit closeout information. Nor has FEMA acted on the draw-down requests that Plaintiffs submitted via that system, which, again, are no longer visible in the FEMA portal.

206.     Instead, on April 24, 2025, the City—and on information and belief all other Shelter and Services Program grantees—received closeout instructions from an unsigned FEMA email account. The instructions require Plaintiffs to submit their final closeout documentation via email.

207.     The documentation that FEMA requires includes a "Final Financial Report" using a standard form that is typically used to calculate the final amount of allowable costs incurred. But the April 24 instructions *also* require grantees to concurrently submit a "final request for payment." This makes it impossible to know what the final amount of allowable costs will be because FEMA will not have issued a determination on the final payment requests at the time the Final Financial Report is due. Moreover, because the Remedy for Noncompliance Letter withheld funding based on "potential noncompliance," but did not state whether FEMA will find actual noncompliance, it is unclear whether the City may submit final payment requests or may certify that their costs are allowable.

208.     Moreover, even if the City were to submit all required documentation as directed by the April 24 instructions, there is no reason to believe that it will receive any further payments, because the funds that should be available to pay reimbursement requests have all been zeroed out in FEMA's financial system.

209.     Tellingly, the April 24 instructions do not provide a timeline for when FEMA will decide whether any "final request for payment" will be processed or paid out; the email simply states that once grantees have submitted their close-out documentation, "You will be notified when the award is closed." And once an award is closed, the likelihood of future payment grows even more remote. Once again, Defendants have dangled the possibility of future payment in front of grantees but otherwise acted as though SSP has been eliminated and funds rendered unavailable.

**Q. Defendants Play Hide-the-Ball With the City's SSP Funds**

210.     As noted above, even after the Money Grab, FEMA GO (FEMA's grant administration platform) was continuing to show that the funds awarded to the city remained obligated and available to the City.  However, following the April 1, termination, Defendants removed the City's access to FEMA GO with respect to SSP.  City staff could no longer access FEMA GO and observe the status of SSP funds.

211.     Thus, following the April 1 Termination Letter,  USASpending.gov was the only source of visibility into the availability of SSP funds awarded to the City.  Given that, and that the Zero Out seemed inconsistent with various statements that FEMA was merely temporarily withholding the funds and that the funds remained obligated to the City, the City sought clarification as to the status of the SSP funds awarded to the City.

212.     On April 24, 2025, counsel for the City wrote to counsel for defendants by email and asked:

> [G]iven that the City no longer has access to FEMA Go, would you advise as to the status of the $80 million that was transferred to the City on February 4 and then subject to an ACH reversal on February 11?  Do the funds remain obligated in an expired account per GOA Redbook 5-67, 5-72 and available pending the outcome of this litigation until September 30, 2029?  We note that the funds

as shown on usaspending.gov appear to have been zeroed out by "revision" on February 12, 2025, even though FEMA GO showed the funds as approved for payment for some time thereafter.  Please advise.

213.    On May 23, 2025, counsel for Defendants wrote back and related to us:

In short, the funds remain available to make any payments that might be required by the court.   When FEMA terminated these awards, it deobligated all of the funds in FEMA's financial management system to make sure that no drawdown of the disputed funds could occur.  When it did that, this caused USASpending to show the obligations as $0.  However, 31 U.S.C. 1501 (the Recording Statute) requires FEMA and DHS to record obligations, which it did for the original grant amount.  Although we have a dispute regarding your claim, until it is resolved, FEMA is still required to maintain – and has maintained -- a recorded obligation for the maximum amount of the claim under the grant.  Consequently, pending resolution of the dispute, these funds remain obligated in the amount of $80,481,861.42.

214.    To the extent the message provided by counsel is an accurate statement of Defendants' position as to the status of the funds, that position is problematic and appears contrary to fact for several reasons.  First, it suggests that the funds were zeroed out of usaspending.gov because the grant awards were "terminated" and the funds "deobligated."  But the funds were zeroed out by February 12, 2025, while the grants were not terminated until April 1, 2025.

215.    Second, to the extent the grant was terminated and the funds "de-obligated" as of February 12, 2025, that is inconsistent with numerous statements made by FEMA that the funds were merely being temporarily withheld.  These include statements by then-Director Cameron on February 11, 2025, the February 18, 2025 Remedy of Noncompliance Letter to the City, the March 11, 2025 noncompliance letters to other jurisdictions.  It is also

inconsistent with the position Defendants took in this litigation that SSP funds remain obligated to the City through September 2029.

216.    Third, the statement that the funds remain available to satisfy a court order directing payment is inconsistent with FEMA's statement in the Termination Letter that FEMA would make any payment to the City warranted by completion of the Closeout process. If the funds are "deobligated," they are presumably not available in the event the City is owed money pursuant to the closeout.

217.    Defendants' position is also confusing and internally contradictory, as it both asserts that FEMA "deobligated" the funds and also that those funds remain "obligated" to the City in the full amount of any claim the City may have under its grants.

**R. DHS Further Threatens SSP Through a Vastly-Overreaching Investigation**

218.    Even after terminating SSP, Defendants have continued setting up pretexts to deny the City SSP funds that were awarded the City, including funds FEMA approved for reimbursement.

219.    Joseph N. Mazzara, Acting General Counsel for defendant DHS, sent City OMB a letter dated June 4, 2025 announcing a "Notice of Investigation and Demand for Records: Shelter and Services Program Grant Awards" ("Notice of Investigation"). Under the guise of investigating the City's expenditure of SSP funds, the Notice of Investigation sets forth a series of document demands and "interrogatories" that reach far beyond the scope of anything related to the City's expenditures of federal SSP funds.

220.    As with the Remedy of Noncompliance Letter, the Notice of Investigation cites "concerns that entities receiving payment under your grant may be guilty of" violating various provisions of 8 U.S.C. § 1324 prohibiting "encouraging or inducing an alien to come to,

enter, or reside in the United States in violation of law, . . . transporting or moving illegal aliens, . . . harboring, concealing, or shielding from detection illegal aliens, . . . or violating applicable conspiracy, aiding or abetting, or attempt provisions" of the statute.

221.    As DHS is aware, when FEMA reviewed and approved reimbursement, FEMA determined that all funds paid to the City were to reimburse for expenditures on immigrants with valid A Numbers that FEMA verified and matched as belonging to an immigrant that DHS encountered and released into the community.

222.    The scope of the demand far exceeds anything related to the administration of SSP. For example, the demand seeks, without apparent limitation or connection to immigrants served under SSP:

- "All documents related to Your compliance with 8 U.S.C. § 1324."

- "All documents related to any instructions, guidance, suggestions, or recommendations for aliens to consider" in completing immigration or other government forms or interacting with any federal or state government officials."

- "All documents related to Your cooperation with law enforcement (including immigration officials) concerning aliens whom You have encountered."

- "All documents related to instructions, guidance, or recommendations, made available to aliens, regarding how to interact with law enforcement."

- A list of all "categories of information You have collected about any aliens."

223.    Despite the exceedingly broad scope of the demands, the Notice of Investigation provides just 30 days within which OMB "must produce" the records and information sought.

163.224.    The broad and invasive scope of these and other demands makes clear that the Notice of Investigation is aimed at establishing additional grounds improperly to deny the

66

City funds to which it is entitled under SSP. The Notice of Investigation puts funds at risk for not complying (in full and to DHS's satisfaction) with demands that are unrelated to the administration of SSP.

### CLAIMS FOR RELIEF

**Count I**
**Substantive APA Violation: Illegal Money Grab**
**Arbitrary and Capricious; Abuses of Discretion**
**(Against Agency Defendants)**

~~164.~~225.    The City repeats and realleges all paragraphs above as if fully set forth herein.

~~165.~~226.    Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

~~166.~~227.    The ~~FEMA money grab~~Money Grab is agency action subject to review under the APA.

~~167.~~228.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

~~168.~~229.    An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up).

~~169.~~230.    The "reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce* v. *New York*, 588 U.S. 752,

785 (2019). Agencies may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decision-making process." *Id.*

~~170.~~231.   Moreover, "courts may not accept … counsel's post hoc rationalizations for agency action" or otherwise "supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 50. Rather, "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Id.*

~~171.~~232.   Here, Defendants provided the City no reason or basis at all for grabbing $80 million from the City's bank account for costs FEMA has already confirmed through review of extensive documentation were eligible for reimbursement under the SSP grants.

~~172.~~233.   The ~~money grab~~Money Grab also separately violated the rules governing action by the federal government to reverse ACH transactions, as incorporated in and modified by 31 C.F.R. Part 210.

~~173.~~234.   To the extent FEMA officials and other federal officials offered rationales for the ~~money grab~~Money Grab on social media, in public statements, and in lawsuits to which the City is not a party, these rationales are unsupported by fact or law, and offer no legitimate basis for FEMA's action.

~~174.~~235.   To the extent the ~~"noncompliance" letter~~Remedy of Noncompliance Letter purports to offer rationales for the ~~money grab~~Money Grab, it does not add anything, is pretextual, unsupported, and offer no legitimate basis for FEMA's action.

236.   None of these actions require the City to exhaust administrative remedies before seeking judicial relief.

~~175.~~237.   An action is also arbitrary and capricious if the agency "failed to consider . . . important aspects of the problem" before it. *Dep't of Homeland Sec. v. Regents of the Univ. of*

*California*, 591 U.S. 1, 25 (2020) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43). Here,

Defendants demonstrated no consideration of the City's substantial reliance interests in receiving

funds to reimburse the City for monies already spent housing and providing services to non-

citizen migrants in compliance with the grant terms and requirements. Where, as here, "an

agency changes course ... it must 'be cognizant that longstanding policies may have engendered

serious reliance interests that must be taken into account.'" *Id.* (quoting *Encino Motorcars, LLC*

*v. Navarro*, 136 S. Ct. 2117, 2126 (2016)); *see also Perez v. Mortgage Bankers Ass'n*, 575 U.S.

92, 106 (2015) ("[T]he APA requires an agency to provide more substantial justification when its

new policy rests upon factual findings that contradict those which underlay its prior policy; or

when its prior policy has engendered serious reliance interests that must be taken into account.")

176.238.    Under 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a

declaration that the FEMA ~~money grab~~Money Grab violates the APA because it is arbitrary and

capricious.

177.239.    In addition, Plaintiff is entitled to additional appropriate relief under 5

U.S.C. § 705 ordering Defendants to reverse the FEMA ~~money grab~~Money Grab by returning the

$80 million to the City's bank account.

**Count II**
**Substantive APA Violation: Illegal Pause/Suspension ~~of SSP~~ and Withholding of SSP Funds,**
**the Zero Out, and the Termination Letter and Termination of SSP**
**Arbitrary and Capricious; Abuses of Discretion**
**(Against Agency Defendants)**

178.240.    The City repeats and realleges all paragraphs above as if fully set forth

herein.

179.241.    Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

69

~~180.~~242.    The ~~suspension or pause~~following of Defendants' various actions to suspend and terminate SSP ~~and the withholding of SSP24~~ are, individually and ~~SSP23 funding are~~taken together, agency ~~action~~actions subject to review under the APA.~~.~~:

- The pause, suspension, and/or withholding of SSP23 and SSP24 funds
- The Zero Out
- The Termination Letter and termination of SSP.

~~181.~~243.    Defendants have not offered any lawful basis for ~~suspending or pausing SSP or withholding the SSP24 and SSP23 grants.~~these actions. Defendants have not identified any costs that are not reimbursable under the SSP grants and have not identified any proper grounds to suspend or terminate SSP or to withhold or deny payment.

~~182.~~244.    Defendants have not provided any reason – other than the improper rationale of animus to SSP itself – for pausing, suspending, and/or terminating SSP. Defendants purported reasons for suspending or pausing SSP or withholding the SSP24 and SSP23 grants are inconsistent with and directly contrary to the statutory text of the DHS Appropriations Act and the stated goals of the SSP, which include providing funds to local governments that provide food, shelter and other services for migrants recently released by DHS into the community, in order to facilitate the safe, orderly, and humane release of noncitizen migrants from DHS short-term holding facilities. As Defendants had previously determined, the City's expenditures were consistent with the text and intent of the DHS Appropriations Act and the stated goals of the SSP.

~~183.~~245.    The ~~"noncompliance" letter is~~ pause, suspension and/or withholding of SSP23 and SSP24 funds; The Zero Out; and the Termination Letter and termination of SSP are pretextual, unsupported, and ~~offers~~offer no legitimate basis for FEMA's ~~action~~actions.

246.    None of these actions require the City to exhaust administrative remedies before seeking judicial relief.

~~184.~~247.    Under 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that ~~FEMA's~~Defendants' suspension or pause of SSP ~~and its~~ withholding of SSP24 and SSP23 funding ~~violates~~, the Zero Out, and the Termination Letter and termination of SSP, its, violate the APA because ~~it is~~these acts are arbitrary and capricious.

248.    Further, under 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that any subsequent determination by Defendants pursuant to any of these unauthorized actions to withhold or deny SSP funds to Plaintiff or to demand repayment of SSP funds violates the APA because these acts are  arbitrary and capricious.

~~185.~~249.    In addition, Plaintiff is entitled to additional appropriate relief under 5 U.S.C. § 705 enjoining Defendants from pausing ~~or,~~ suspending ~~SSP~~, or terminating SSP, withholding  SSP24 and SSP23 funds, and/or implementing the ~~withholding of SSP24~~Zero Out and ~~SSP23 funds~~the Termination Letter.

**Count III**
**Substantive APA Violations: Illegal Money Grab**
**Contrary to Law, Ultra Vires, and in Excess of Statutory Authority**
**(Against Agency Defendants)**

186.250.    The City repeats and realleges all paragraphs above as if fully set forth herein.

187.251.    Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

188.252.    The ~~FEMA money grab~~Money Grab is agency action subject to review under the APA.

189.253.    Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(B) – (C).

190.254.    Neither the President nor an agency can take any action that exceeds the scope of their constitutional and/or statutory authority.

191.255.    Congress enacted the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *U.S. v. Morton Salt*, 338 U.S. 632, 644 (1950)). Moreover, "Section 706 makes clear that agency interpretations of statutes—like agency interpretations of the Constitution—are *not* entitled to deference." *Id.* at 392 (emphasis in original). Rather, it "remains the responsibility of the court to decide whether the law means what the agency says." *Id.* (quoting *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 109 (2015) (Scalia, J., concurring in judgment)).

192.256.    The DHS Appropriations Act authorizing the SSP grants appropriated

funds for the purpose of providing monies to local governments that provide food, shelter and

other services for migrants recently released by DHS into the community, in order to facilitate

the safe, orderly, and humane release of noncitizen migrants from DHS short-term holding

facilities. Defendants cannot unilaterally grab back or refuse to disburse funds appropriated by

Congress contrary to congressional intent and directive.

193.257.    Moreover, the Impoundment Control Act of 1974 requires the Executive to

make appropriated funds "available for obligation," subject to only two exceptions: rescissions

and deferrals. 2 U.S.C. §§ 683-84. Deferrals may not be made for policy reasons, and rescissions

are subject to congressional approval. *Id.* § 684(b).

258.    None of these actions require the City to exhaust administrative remedies

before seeking judicial relief.

194.259.    The FEMA money grabMoney Grab is neither a lawful rescission nor a

lawful deferral under the Impoundment Control Act. It is not a lawful rescission because lawful

rescissions are subject to congressional approval, *id.* § 684(b) and the President has not sought

congressional approval. It is not a lawful deferral because Defendants made clear that the FEMA

money grabMoney Grab was motivated by a policy disagreement with the SSP. As the D.C.

Circuit has explained, the Executive lacks the statutory authority to engage in policy-based

deferrals that would "negate the will of Congress." *City of New Haven v. United States*, 809 F.2d

900, 901 (D.C. Cir. 1987).

195.260.    The money grabMoney Grab is contrary to law, ultra vires, and in excess

of statutory authority for the additional reason that the ACH reversal was effectuated for reasons

other than those for which reversal is permitted under the C.F.R.

~~196.~~261.   Under 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the FEMA ~~money grab~~Money Grab violates the APA because it is contrary to law, ultra vires, and in excess of statutory authority.

~~197.~~262.   Plaintiff is entitled to additional appropriate relief under 5 U.S.C. § 705 ordering Defendants to reverse the FEMA ~~money grab~~Money Grab by returning the $80 million to the City's bank account.

### Count IV
### Substantive APA Violations: Illegal Pause/Suspension of SSP and Withholding of Funds, Zero Out, and Termination Letter and Termination of SSP
### Contrary to Law, Ultra Vires, and in Excess of Statutory Authority
### (Against Agency Defendants)

~~198.~~263.   The City repeats and realleges all paragraphs above as if fully set forth herein.

~~199.~~264.   Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

265.        The ~~suspension or pause~~following of Defendants' various actions to suspend and terminate SSP ~~and the withholding of SSP24~~ are, individually and ~~SSP23 funding~~ ~~are~~taken together, agency ~~action~~actions subject to review under the APA:

- The pause, suspension, and/or withholding of SSP23 and SSP24 funds

- The Zero Out

~~200.~~• The Termination Letter and termination of SSP.

~~201.~~266.   Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(B) – (C).

202.267.   The DHS Appropriations Act authorizing ~~the SSP grants~~ appropriated funds for the purpose of providing monies to local governments that provide food, shelter and other services for migrants recently released by DHS into the community, in order to facilitate the safe, orderly, and humane release of noncitizen migrants from DHS short-term holding facilities. Defendants cannot unilaterally grab back or refuse to disburse funds appropriated by Congress contrary to congressional intent and directive.  Likewise, Defendants cannot unilaterally terminate grant programs appropriated by Congress merely because they are opposed to the program.  Nor may Defendants use the pretext of a compliance review to effectively accomplish the same result.

203.268.   Moreover, the Impoundment Control Act of 1974 requires the Executive to make appropriated funds "available for obligation," subject to only two exceptions: rescissions and deferrals. 2 U.S.C. §§ 683-84. Deferrals may not be made for policy reasons, and rescissions are subject to congressional approval. *Id.* § 684(b).

204.269.   FEMA's suspension or pause of SSP and withholding of SSP24 and SSP23 funding ~~is~~, the Zero Out, the Termination Letter, and any deprivation of SSP funds pursuant thereto are neither a lawful rescission nor a lawful deferral under the Impoundment Control Act. It is not a lawful rescission because lawful rescissions are subject to congressional approval, and the President has not sought congressional approval. It is not a lawful deferral because Defendants made clear that it was motivated by their hostility to the stated purpose of the congressional appropriation and their determination not to make SSP payments.

270.       None of these actions require the City to exhaust administrative remedies before seeking judicial relief.

205.271.   Under 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that FEMA's Defendants' suspension or pause of SSP and withholding of SSP24 and SSP23 funding violates funds; The Zero Out; and the Termination Letter and termination of SSP violate the APA because it is they are contrary to law, ultra vires, and in excess of statutory authority.

272.     Further, under 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that any subsequent determination by Defendants pursuant to any of these unauthorized actions to withhold or deny SSP funds to Plaintiff or to demand repayment of SSP funds violates the APA because these acts are arbitrary and capricious.

206.273.   In addition, Plaintiff is entitled to additional appropriate relief under 5 U.S.C. § 705 enjoining Defendants from pausing or suspending SSP or implementing the withholding of SSP24 and SSP23 funds and from implementing the Termination Letter and terminating SSP.

## Count V
### Procedural APA Violations: Illegal Money Grab &, Illegal Pause/Suspension of SSP and Withholding of Funds, the Zero Out, and Termination Letter and Termination of SSP Without Observance of Procedure Required by Law
### (Against Agency Defendants)

207.274.   The City repeats and realleges all paragraphs above as if fully set forth herein.

208.275.   Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

209.276.   The FEMA money grab Money Grab is agency action subject to review under the APA.

277.     FEMA's Defendants' pause or suspension of SSP and withholding of SSP24 and SSP23 funding are agency action actions subject to review under the APA.

210.278.   The Zero Out and the Termination Letter and termination of SSP, are agency actions subject to review under the APA.

211.279.   Under the APA, a court "shall . . . hold unlawful and set aside agency action, findings and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

212.280.   Neither the DHS Appropriations Act, the SSP grant Award Letters, the NOFOs nor the Code of Federal Regulations, incorporated into the SSP grant documents, permit Defendants to grab back funds duly disbursed by FEMA to the City pursuant to and in accordance with the SSP grants' terms and conditions. Nor do they allow Defendants to pause or suspend SSP or withhold payment of funds that were approved pursuant to and in accordance with the SSP grants' terms and conditions.

213.281.   In effectuating the money grabMoney Grab, the suspension or pause of SSP and the withholding of funding, Defendants failed to follow the procedures available under the SSP Grant Award Letters, the NOFOs and the Code of Federal Regulations, incorporated into the grant documents.

214.282.   Prior to grabbing back $80 million, Defendants did not provide the City with notice of any agency determination of non-compliance, any specific conditions to be applied to the City SSP grants, nor any grant suspension, pause or termination. 2 C.F.R. §§ 200.208, 200.243; 200.305; 200.339 – 200.342. Nor did FEMA offer the City any opportunity to contest any agency determinations before taking the money. *Id.* § 200.342.

215.283.   FEMA represented to the Rhode Island District Court as of February 11, 2025 that FEMA was already "in the process of requesting information from New York City to further investigate this matter" and would "provide[] notice" to the City and "provide the

information and process required by regulation and the terms and conditions of the award." Hamilton Declaration at ¶¶ 12, 13. But at the time of their filing, FEMA had already grabbed the $80 million from New York City without providing notice, without requesting any information, without announcing any findings, and without following any required process.

216.284.   Defendants' February 18, 2025 ~~"noncompliance" letter~~Remedy of Noncompliance Letter did not identify any noncompliance by the City. Indeed, FEMA issued the letter, purporting to impose on the City "specific conditions" and withholding of funding, before conducting a compliance review and then appeared to collapse multiple steps in the administrative process. It carried out this misuse of administrative procedures without giving the City the opportunity to object and present its own information before implementing the specific conditions, the pause or suspension of SSP and the withholding of funds. 2 CFR 200.305(b)(6), 200.305(b)(7), 200.342.

217.285.   Moreover FEMA's "concerns" are facially pretextual and unsupported. ~~The "noncompliance" letter~~The Remedy of Noncompliance Letter requests information that is not related to the asserted concerns and seeks information that, for the most part, has already been provided by the City, reviewed by FEMA, and determined to be sufficient for payment. This pretextual ~~"noncompliance" letter~~Remedy of Noncompliance Letter does not provide the City with the procedural protections to which it is entitled.

218.286.   Further, the letter creates the impression of a City-specific compliance review when, in fact, Defendants have determined to suspend or pause SSP due to antipathy towards the program itself and with the intent to terminate SSP for that reason, whether as to the City or program-wide.

287.    In effectuating the Zero Out, Defendants failed to follow the procedures available under the SSP Grant Award Letters, the NOFOs and the Code of Federal Regulations, incorporated into the grant documents.  Indeed, Defendants gave no notice and do not appear to have followed any procedure at all.

288.    In issuing the Termination Letter, Defendants failed to follow the procedures available under the SSP Grant Award Letters, the NOFOs and the Code of Federal Regulations, incorporated into the grant documents because those procedures do not allow for termination of SSP for the reasons given by Defendants.

289.    None of these actions require the City to exhaust administrative remedies before seeking judicial relief.

219.290.    Under 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the FEMA money grabMoney Grab, the pausing or suspending of SSP and the withholding of SSP24 and SSP23, funding violates, the Zero Out, and the Termination Letter and termination of SSP violate the APA because it isthey are without observance of procedure required by law.

220.291.    In addition, Plaintiff is entitled to additional appropriate relief under 5 U.S.C. § 705 ordering Defendants to reverse the FEMA money grab Money Grab by returning the $80 million to the City's bank account and to reverse the Zero Out, and enjoining Defendants from pausing or suspending SSP and implementing the withholding of SSP24 and SSP23 funds, and from implementing the Termination Letter and terminating the City's SSP awards.

## ~~:~~Count VI
## Violation of Due Process
## (Against All Defendants)

~~221.~~292.    The City repeats and realleges all paragraphs above as if fully set forth herein.

~~222.~~293.    Under the Due Process Clause of the Fifth Amendment of the United States Constitution, the government may not deprive a person or entity of a protected property interest without due process of law.

~~223.~~294.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).

~~224.~~295.    The City has a protected property interest in the $80 million that Defendants grabbed back from the City's bank account and zeroed out on USASpending.gov, and in the SSP23 funds it has been awarded and which have been disbursed to the City.

296.    The City has a protected property interest in the funds – $36 million – that were awarded and obligated to the City under SSP pending disbursement upon an approved claim but that Defendants zeroed out on USASpending.gov.

~~225.~~297.    Defendants' conduct in implementing the ~~FEMA money grab~~Money Grab deprived the City of its property interest without providing notice or a pre-deprivation opportunity to be heard.

~~226.~~298.    While a post-deprivation opportunity to be heard would not be sufficient under the circumstances, Defendants have not in fact provided a genuine post-deprivation opportunity to be heard because the process being offered is pretextual and illusory. ~~For example, while the "noncompliance" letter~~For example, by the time Defendants issued the Remedy for

Noncompliance Letter, the Zero Out had already been effectuated.  Also, while the Remedy for Noncompliance Letter requests more information, that information is largely identical to the information that FEMA already reviewed and approved in connection with approving disbursements to the City for the SSP24 and SSP23 grants. Additionally, the information requested does not speak to the purported "concerns" articulated in the letter. As is clear from Defendants' statements and actions, they have determined to suspend and terminate SSP and not make SSP payments and are using the noncompliance letter (and similar letters to other grant recipients) to accomplish that aim.

227.299.    Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the FEMA money grabMoney Grab, the pausing or suspending of SSP, and the withholding of SSP24 and SSP23 funding., the Zero Out, and the Termination Letter and termination of SSP are contrary to law.

228.300.    In addition, Plaintiff is entitled to additional appropriate relief including (1) ordering Defendants to reverse the FEMA money grabMoney Grab by returning the $80 million to the City's bank account; (2) enjoining Defendants from taking any further money from any City bank account in connection with the SSP24 and SSP23 FEMA grants; (3) ordering Defendants to reverse the Zero Out; and (34) enjoining Defendants from suspending or pausing SSP or implementing the withholding of SSP24 and SSP23 funds and from implementing the Termination Letter and terminating SSP.

### Count VII
### Separation of Powers
### (Against All Defendants)

229.301.    The City repeats and realleges all paragraphs above as if fully set forth herein.

230.302.    Article I, Section 1 of the United States Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives." U.S. Const. Art. I, Sec. 1.

231.303.    "As Chief Justice Marshall put it, this means that 'important subjects . . . must be entirely regulated by the legislature itself,' even if Congress may leave the Executive 'to act under such general provisions to fill up the details.'" *West Virginia v. EPA*, 597 U.S. 697, 737 (2022) (Gorsuch, J., concurring) (quoting *Wayman v. Southard*, 10 Wheat. 1, 42-43, 6 L.Ed. 253 (1825)).

232.304.    The separation of powers doctrine thus represents perhaps the central tenet of our constitution. *See, e.g., Trump v. United States*, 603 U.S. 593, 637-38 (2024); *West Virginia v. EPA*, 597 U.S. at 723-24. Consistent with these principles, the executive acts at the lowest ebb of his constitutional authority and power when he acts contrary to the express or implied will of Congress. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

233.305.    ~~FEMA's money grab,~~Defendants' Money Grab, Zero Out, withholding, pausing and/or suspension ~~and apparent~~ of SSP pursuant to the Remedy for Noncompliance Letter, and Termination Letter and termination of SSP, ~~and withholding of SSP24 and SSP23 funds violates~~together and each separately violate the separation of powers because the executive branch has overridden the careful judgments of Congress by acting without legitimate basis or justification in taking back funding and withholding funding, and suspending and terminating programs without legitimate basis or justification, that were specifically authorized and appropriated under the DHS Appropriations Act and was used by the City for the purposes set

forth in that Act. Indeed, FEMA officials have acknowledged that they are refusing and will continue to refuse to effectuate the DHS Appropriations Act, thus acting contrary to law.

234.306.    Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that ~~the FEMA money grab~~Defendants' Money Grab, the Zero Out, the pausing or suspending of SSP and the withholding of SSP24 and SSP23 funding, and the Termination Letter and termination of Plaintiff's SSP awards are contrary to law.

235.307.    In addition, Plaintiff is entitled to additional appropriate relief including (1) ordering Defendants to reverse the ~~FEMA money grab~~Money Grab by returning the $80 million to the City's bank account; (2) enjoining Defendants from taking any further money from any City bank account in connection with the SSP24 and SSP23 FEMA grants; ~~and (3~~(3) ordering Defendants to reverse the Zero Out; and (4) enjoining Defendants from suspending or pausing SSP or implementing the withholding of SSP24 and SSP23 funds and from implementing the Termination Letter and terminating SSP.

### Count VIII
### Spending Clause
### (Against All Defendants)

236.308.    The City repeats and realleges all paragraphs above as if fully set forth herein.

237.309.    The Spending Clause provides that Congress—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . . ." U.S. Const. Art. I, Sec. 8, clause 1.

238.310.    "Congress' power to legislate under the spending power is broad," but conditions on funding must be "unambiguous[]" and they cannot "surprise[] participating States

[or localities] with post acceptance or 'retroactive' conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981). States and localities must have fair notice of conditions, and once funds have been accepted pursuant to a federal spending program, the Federal government cannot alter the conditions attached to those funds so significantly as to "accomplish[ ] a shift in kind, not merely degree." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 583-84 (2012).

239.311.    Furthermore, conditions must be "reasonably related to the purpose of the expenditure." *New York v. United States*, 505 U.S. 144, 172 (1992) (*citing Mass. v. United States*, 435 U.S. 444 (1978)).

240.312.    FEMA's money grabDefendants' Money Grab, suspension of SSP, pause, and withholding of SSP, Zero Out, and subsequent Termination Letter and termination of SSP violate the Spending Clause because the executive branch has overridden the careful judgments of Congress by imposing purported new conditions and requirements on SSP funding that are inconsistent with the DHS Appropriations Act, the SSP Award Letters, the NOFOs and the Code of Federal Regulations as incorporated by reference into the SSP grant documents.

241.313.    Defendants have made clear their animus towards and intent to thwart and terminate SSP. The concerns Defendants put forth as rationales for compliance review impose new terms and conditions that are effectively grant-negating inasmuch as they describe as unlawful the exact acts that the grant funds the city to do: provide shelter and services to noncitizen migrants released into the United States by DHS. .

242.314.    Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the money grabMoney Grab, the pausing or suspension of SSP, and the withholding of SSP24 and SSP23 funding, the Zero Out, and the termination of SSP are contrary to law.

~~243.~~315.   In addition, Plaintiff is entitled to additional appropriate relief including (1) ordering Defendants to reverse the FEMA ~~money grab~~Money Grab by returning the $80 million to the City's bank account; (2) enjoining Defendants from taking any further money from any City bank account in connection with the SSP24 and SSP23 FEMA grants; ~~and (3~~(3) ordering Defendants to reverse the Zero Out; and (4) enjoining Defendants from suspending or pausing SSP or implementing the withholding of SSP24 and SSP23 funds~~.~~ and the Termination Letter and termination of SSP.

## PRAYER FOR RELIEF

**WHEREFORE**, the City demands judgment against Defendants:

(a) Declaring unlawful and setting aside the SSP24 $80 million ~~money grab~~Money Grab as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A); as contrary to constitutional right, power, privilege, or immunity under 5 U.S.C. § 706(2)(B); as in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C); and without observance of procedure required by law under 5 U.S.C § 706(2)(D) and a violation of the Due Process Clause, the separation of powers, and the Spending Clause of the United States Constitution;

(b) Declaring unlawful and setting aside the SSP24 $80 million ~~money grab~~Money Grab as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A); as violating the law governing ACH transfers and reversals.

(c) Issuing a permanent injunction ordering Defendants to ~~ordering Defendants to return the SSP24 $80 million money grab funds to the City's bank account;~~

reverse the SSP24 $80 million ~~money grab~~Money Grab by returning the $80 million to the City's bank account;

(d) Declaring unlawful and setting aside, and enjoining ~~Defendants' suspension or pause of SSP and the February 18, 2025 FEMA Remedy for Noncompliance Letter withholding funding~~the following, collectively and each individually as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A); as contrary to constitutional right, power, privilege, or immunity under 5 U.S.C. § 706(2)(B); as in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C); and without observance of procedure required by law under 5 U.S.C § 706(2)(D) and a violation of the Due Process Clause, the separation of powers, and the Spending Clause of the United States Constitution~~,~~:

   i.   Defendants' suspension or pause of SSP and withholding of SSP funds;

   ii.  Defendants' zeroing out of funds awarded to the City as indicated on USASPending.gov

   iii. Defendants' Termination Letter and termination of SSP;

   iv.  Any resulting determination pursuant to the Remedy for Noncompliance Letter, the Termination Letter, or any proceedings in furtherance thereof, that the City is not entitled to receive or retain SSP funds that reimburse the City for costs the City incurred that were consistent with SSP;

(e) Awarding Plaintiff its costs and attorneys' fees in this action, and other

disbursements as appropriate; and

(f) Granting such other relief as this Court may deem just and proper.

Dated:     New York, New York
           June 13, 2025

**MURIEL GOODE-TRUFANT**
Corporation Counsel of
the City of New York
*Attorney for Plaintiff The City of New York*
100 Church Street
New York, NY 10007
(212) 356-1000

By:     _____

Joshua Rubin
Doris Bernhardt
Melanie Ash
June R. Buch
Aatif Iqbal
Gail Rubin
Elizabeth Slater

Assistant Corporation Counsels

87