UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------

THE CITY OF NEW YORK,

                                        Plaintiff,

                v.

DONALD TRUMP, in his official capacity as President of          Case No. 25-cv-1510
the United States; *et al*.

                                        Defendants.

------------------------------------------------------------------------


### PLAINTIFF CITY OF NEW YORK'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS


Dated: New York, New York          MURIEL GOODE-TRUFANT
      August 25, 2025              Corporation Counsel of
                                     the City of New York
                                   100 Church Street
                                   New York, New York 10007
                                   (212) 356-1000

                                   *Attorney for Plaintiff*

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT ................................................................................ 1

FACTS ....................................................................................................................... 2

    A.   Congress Established SSP to Provide Financial Support to Local Governments Absorbing Migrants Released by DHS ................................................. 2

    B.   FEMA Awarded City OMB Three SSP Grants and Reimbursed Eligible Costs after Thorough Review ................................. 3

    C.   Defendants' Money Grab ................................................................................. 4

    D.   The Zero Out ..................................................................................................... 5

    E.   The "Remedy for Noncompliance" Letter ................................................. 6

    F.   The Termination ............................................................................................... 7

PROCEDURAL HISTORY AND CAUSES OF ACTION ................................... 8

ARGUMENT

    I.   This Court Has Jurisdiction Over the APA Claims ........................................ 9

        A.   This Court Has Jurisdiction Over the Money Grab ............................... 11

        B.   This Court Has Jurisdiction to Hear the City's APA Claims Against the Termination and Zero Out ...................................... 12

    II.   The APA Claims Should Not Be Dismissed .................................................... 13

        A.   Defendants' Grandiose Claims of Agency Discretion Afford No Grounds for Dismissal ......................................... 13

            1.   Clear Standards Guide the Court's Decision-Making ................................................................. 14

            2.   Defendants Do Not Have Unreviewable Discretion to Refuse to Spend or Redirect SSP Funds ....................................................................... 16

        B.   The Challenged Actions Are Final ............................................................ 17

**Page**

      C.    Counts III and IV State Cognizable Claims...........................................19

           1.   Count III States a Viable Claim Against the Money Grab for Violation of the ACH Rules and Grant Administration Regulations ...........................................19

           2.   The City May Bring APA Claims Where Defendants Impounded Appropriated Funds Without Following the Impoundment Control Act...........................................................................21

           3.   Under the APA, the City May Challenge Defendants' Actions That Are Contrary to the Laws Appropriating SSP Funds........................................22

   III.   The Constitutional Claims Should Not Be Dismissed.....................................23

      A.    The City States a Viable Due Process Challenge .................................23

      B.    The Separation of Powers and Spending Clause Claims Are Cognizable ...............................................................25

CONCLUSION.................................................................................................................... 28

CERTIFICATE OF COMPLIANCE WITH LOCAL RULE........................................ 29

# TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                                                                        **<u>Pages</u>**

*United States ex rel. Accardi v. Shaughnessy,*
 347 U.S. 260 (1954) ..........................................................................................................14

*In re Aiken Cty.,*
 725 F.3d 255 (D.C. Cir. 2013) (Kavanaugh, J.) .................................................................12

*Am. Ass'n of Colls. for Tchr. Educ. v. McMahon,*
 770 F. Supp. 3d 822 (D. Md. 2025) ...................................................................................16

*Am. Ctr. for Int'l Lab. Solidarity v. Chavez-DeRemer,*
 25-cv-1128, 2025 U.S. Dist. LEXIS 123993
 (D.D.C. June 30, 2025) ......................................................................................................22

*Am. Forest Res. Council v. United States,*
 77 F.4th 787 (D.C. Cir. 2023) ...........................................................................................27

*Am. Pub. Health Ass'n v. Nat'l Insts. of Health,*
 2025 U.S. Dist. LEXIS 125988 (D. Mass. July 20, 2025) ................................................15

*Anderson National Bank v. Luckett,*
 321 U.S. 233 (1944) ..........................................................................................................25

*Bennett v. Spear,*
 520 U.S. 154 (1997) ..........................................................................................................17

*Bowen v. Massachusetts,*
 487 U.S. 879 (1988) ...................................................................................................9, 10, 11

*Chi. Women in Trades v. Trump,*
 No. 25 C 2005, 2025 U.S. Dist. LEXIS 87121
 (N.D. Ill. May 7, 2025) ......................................................................................................26

*City and Cty. of San Francisco v. Trump,*
 897 F.3d 1225 (9th Cir. 2018) ...........................................................................................26

*Clean Air Council v. Pruitt,*
 862 F.3d 1, 7 (D.C. Cir. 2017) ..........................................................................................18

*Clinton v. City of New York,*
 524 U.S. 417 (1998) ..........................................................................................................26

*Collins v. Yellen,*
 594 U.S. 220 (2021) ..........................................................................................................26

**Cases**                                                  **Pages**

*Dalton v. Specter*,
    511 U.S. 462 (1994)................................................................................27

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019)................................................................................14

*Dep't of Navy v. FLRA*,
    665 F.3d 1339 (D.C. Cir. 2012)................................................................26

*Department of Education v. California*,
    145 S. Ct. 966 (2025)............................................................9, 10, 11, 12, 13

*East St. Louis v. Circuit Court for Twentieth Judicial Circuit*,
    986 F.2d 1142 (7th Cir. 1993) ................................................................24

*General Land Office of State of Tex. v. Biden*,
    722 F. Supp. 3d 710 (S.D. Tex. 2024) ....................................................22

*Global Health Council v. Trump*,
    2025 U.S. App. LEXIS 20495
    (D.C. Cir. Aug. 13, 2025) ...................................................................22, 27

*Hadwan v. U.S. Department of State*,
    139 F.4th 209 (2d Cir. 2025) ..................................................................25

*Healthy Futures of Tex. v. HHS*,
    315 F. Supp. 3d 339 (D.D.C. 2018) (Jackson, J) ....................................14

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)................................................................................23

*Lincoln v. Vigil*,
    508 U.S. 182 (1993)........................................................................14, 16, 17

*Louisiana Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986)................................................................................19

*Lunding v. N.Y. Tax Appeals Tribunal*,
    522 U.S. 287 (1998)................................................................................11

*Lundy v. Catholic Health Sys. of Long Island Inc.*,
    711 F.3d 106 (2d Cir. 2013)....................................................................20

*Megapulse, Inc. v. Lewis*,
    672 F.2d 959 (D.C. Cir. 1982) ................................................................10

**Cases**                                                                 **Pages**

*Merrill v. Milligan*,
    142 S. Ct. 879 (2022) ............................................................................11

*Metro. Transp. Auth. v. Duffy*,
    2025 U.S. Dist. LEXIS 101448
    (S.D.N.Y. May 28, 2025) ...............................................................17, 18

*Miccosukee Tribe of Indians of Fla. v. United States*,
    08-23523-CIV, 2009 WL 10668917
    (S.D. Fla. Sept. 30, 2009)..................................................................23

*Murphy Co. v. Biden*,
    65 F.4th 1122 (9th Cir. 2023) ...........................................................27

*Nat'l Inst. of Health v. Amer. Pub. Health Assn.*,
    No. 25A103, 2025 U.S. LEXIS 2742
    (Aug. 21, 2025) ...............................................................................9, 10

*Nat'l Job Corps Ass'n v. DOL*,
    2025 U.S. Dist. LEXIS 121052
    (S.D.N.Y. June 25, 2025)..................................................................13

*Neeta Thakur v. Trump*,
    No. 25-cv-04737-RFL, 2025 U.S. Dist. LEXIS 118980
    (N.D. Cal. Jun. 23, 2025) ..................................................................16

*New York v. McMahon*,
    No. 25-10601-MJJ, 2025 U.S. Dist. LEXIS 97722
    (D. Mass. May 22, 2025) ...................................................................27

*New York v. Trump*,
    No. 25-cv-39, 2025 U.S. Dist. LEXIS 17593
    (D.R.I. Jan. 31, 2025)...................................................5, 18, 20, 22

*New York v. United States DOJ*,
    951 F.3d 84 (2d Cir. 2020)............................................................19, 27

*Oregon Council for the Humanities v. US DOGE Service*,
    3:25-cv-829-SI, 2025 U.S. Dist. LEXIS 151192
    (D. Or. Aug. 6, 2025) ....................................................................15, 22

*Pacito v. Trump*,
    772 F. Supp. 3d 1204 (W.D. Wash. 2025) ........................................16

*Pol'y & Rsch., LLC v. HHS*,
    313 F. Supp. 3d 62 (D.D.C. 2018) (Jackson, J.) ..........................14, 16

**Cases**                                                                                    **Pages**

*Pub. Citizen v. Stockman*,
    528 F. Supp. 824 (D.D.C. 1981) ......................................................................22

*Rattlesnake Coalition v. United States EPA*,
    509 F.3d 1095 (9th Cir. 2007) .........................................................................17

*River Vale v. Orangetown*,
    403 F.2d 684 (2d Cir. 1968).............................................................................24

*Rocky Ford Hous. Auth. v. U.S. Dep't of Agriculture*,
    427 F. Supp. 118 (D.D.C. 1977) ....................................................................22

*Rogers v. United States*,
    14 Cl. Ct. 39 (1987),
    *aff'd*, 861 F.2d 729 (Fed. Cir. 1988) ..............................................................22

*Salazar v. King*,
    822 F.3d 61 (2d Cir. 2016)..............................................................................17

*Santa Clara v. Andrus*,
    572 F.2d 660 (9th Cir. 1978) ..........................................................................24

*Service v. Dulles*,
    354 U.S. 363 (1957).........................................................................................14

*South Carolina v. Katzenbach*,
    383 U.S. 301 (1966).........................................................................................24

*State of New York v. Trump*,
    767 F. Supp. 3d 44 (S.D.N.Y. 2025)..............................................................17

*Train v. City of New York*,
    420 U.S. 35 (1975).....................................................................................21, 26

*Trump v. Sierra Club*,
    140 S. Ct. 1 (2019)...........................................................................................23

*Woonasquatucket River Watershed Council v. USDA*,
    778 F. Supp. 3d 440 (D.R.I. 2025)..................................................................16

**Statutes & Regulations**

2 C.F.R. § 200 *et seq.*...........................................................................................15

2 C.F.R. § 200.305(b)(6)........................................................................................15

**Statutes & Regulations**                                                          **Pages**

2 C.F.R. § 200.339 .............................................................................................15

2 C.F.R. § 200.340(a)(2) .......................................................................................7

2 C.F.R. § 200.340(a)(4) ............................................................................... 15-16

2 C.F.R. § 3002.10 ............................................................................................14

31 C.F.R. § 210.2(a) ..........................................................................................19

31 C.F.R. § 210.3(b) ..........................................................................................19

31 C.F.R. § 210.6(f) ...........................................................................................19

Federal Government Participation in the Automated Clearing House,
    87 Fed. Reg. 42 (Jan. 3, 2022) ...................................................................20

5 U.S.C. § 701(a)(2) ..........................................................................................13

5 U.S.C. § 702 ...................................................................................................13

5 U.S.C. § 706(2)(C) ..........................................................................................19

8 U.S.C. § 1324(a)(1)(A)(ii) .................................................................................6

8 U.S.C. § 1324(a)(1)(A)(iii) ................................................................................6

8 U.S.C. § 1324(a)(1)(A)(iv) ................................................................................6

25 U.S.C. § 13 ...................................................................................................17

28 U.S.C. § 1491(a) ...........................................................................................13

28 U.S.C. § 1491(a)(2) ........................................................................................13

ACH Rule § 2.9.1 ...............................................................................................20

ACH Rule § 2.9.5 ...............................................................................................20

ACH Rule § 8.38 ................................................................................................20

**Other Authorities**

U.S. Const., art. I, § 7, cl. 2 .................................................................................26

U.S. Const., art. II, § 3 .......................................................................................26

## PRELIMINARY STATEMENT

Plaintiff the City of New York ("City") first brought this action to challenge Defendants' lawless "Money Grab" of more than $80 million from a City bank account. A week earlier, Defendants had approved and paid that amount to reimburse the City for eligible expenses under Shelter and Services Program ("SSP") grants that defendant Federal Emergency Management Administration ("FEMA") awarded to the New York City Office of Management and Budget ("City OMB"). The Money Grab was executed without notice, in violation of applicable rules and laws, and without adherence to any discernable administrative process.

The Money Grab was the opening salvo in Defendants' focused efforts to deprive the City, by improper means and for illegitimate reasons, of not just $80 million, but potentially all funds FEMA awarded City OMB in three SSP grants. The City's Second Amended Complaint ("SAC") challenges four distinct actions by Defendants. Besides the Money Grab, the City challenges Defendant's February 10 and 12, 2025 deletions of funds shown as available for claiming reimbursement. The City also challenges the withholding, suspension, and/or freeze on SSP funding announced in a letter from FEMA to City OMB dated February 18, 2025, which is both unlawful on its own terms but also, as described in the SAC, part of a *post hoc* effort to engineer a review process to mask Defendants' plan to nullify SSP and deny the City these funds permanently. Finally, the City challenges Defendants' determination, announced in an April 1, 2025 letter, to terminate SSP impermissibly on grounds that the SSP grants no longer "effectuate[] program goals or agency priorities."  Each challenged action is demonstrably motivated by an underlying animus towards the congressionally-authorized SSP. None are the fruit of Defendants acting consistent with their legal obligations or within the bounds of their discretion.

Defendants seek dismissal on grounds the Court should reject. They renew their argument that the Tucker Act deprives this Court of jurisdiction to hear the City's Administrative Procedure

Act ("APA") claims. The SAC affords no new grounds for the Court to revisit its prior determination and two recent Supreme Court stay orders do not alter the outcome as the City's claims do not fall within their analysis. Next Defendants argue that the City cannot challenge the Termination under the APA because "an agency's decision how to allocate and expend funding is 'committed to agency discretion by law." But the City's claims do not challenge allocations; the funds at issue were already allocated, awarded and obligated to the City, and in some cases, approved and paid. Defendants' grandiose claim agencies may do as they will with previously-obligated congressionally-appropriated funds should be rejected. A substantial body of law refutes Defendants' position.

Defendants also challenge the City's claims concerning FEMA's decision to "withhold" the $80 million it took through the Money Grab as not being "final agency action." But the Money Grab was a discrete and final action and cannot be rendered non-final by labeling it after-the-fact a "withholding" pending further review. Defendants' additional arguments to dismiss two of the City's APA claims on grounds that they fail to state causes of action rest on fundamental mischaracterizations of the City's claims and should be rejected. Finally, defendants' arguments to dismiss the City's constitutional challenges all mischaracterize the City's claims and misapply the applicable law.

Accordingly, the motion should be denied in its entirety.

## FACTS

The relevant facts as set forth in the SAC are summarized below.

### A. Congress Established SSP to Provide Financial Support to Local Governments Absorbing Migrants Released by DHS

In 2023, Congress authorized and funded FEMA and U.S. Customs and Border Protection ("CBP"), components of defendant Department of Homeland Security ("DHS"), to establish SSP.

2

SSP reimburses municipalities, non-profits, and others for eligible costs providing shelter and related services to noncitizen migrants who DHS released from custody into the United States. Congress authorized continued funding for SSP in 2024 "to support sheltering and related activities provided by non-Federal entities, in support of relieving overcrowding in short-term holding facilities of [CBP]." SAC ¶¶ 41-42 (citing the 2023 and 2024 DHS Appropriations Acts).

### B.  FEMA Awarded City OMB Three SSP Grants and Reimbursed Eligible Costs after Thorough Review

Pursuant to the appropriations, FEMA issued Notices of Funding Opportunity ("NOFO") offering SSP grants for fiscal years 2023 and 2024. FEMA specified City OMB as one of the entities eligible to apply. The NOFOs for the 2024 grant reiterated the 2024 DHS Appropriations Act language quoted above and emphasized that "the primary purpose of SSP is to 'reliev[e] overcrowding in short-term holding facilities of [CBP]' and that FEMA's "priority" is the "safe, orderly, and humane release of noncitizen migrants from DHS short-term holding facilities." SAC ¶¶ 43-44.

FEMA reviewed and approved City OMB's applications and awarded $106.9 million for the 2023 grant ("SSP23"). FEMA awarded City OMB two grants for 2024, roughly $59.3 million for an allocation grant ("SSP-A") and $22.2 million for a competitive grant ("SSP-C") (together "SSP24") totaling roughly $81.5 million. The grants were awarded on a reimbursement basis, meaning that City OMB would seek reimbursement for costs it already incurred. SAC ¶¶ 68–74.

Following City OMB's detailed submissions and FEMA's thorough review, FEMA approved reimbursement of the City's eligible costs as follows: For the SSP23 grant, FEMA reimbursed the City $25.5 million on July 25, 2024, and, after a compliance review and site visit, approved and paid an additional $45.1 million, leaving $36.3 million in SSP23 funds obligated but not yet claimed. For the SSP24 grants, FEMA reimbursed the City roughly $80.4 million,

transferring that amount to the City on February 4, 2025 by ACH transaction. At that point, $1.1 million remained obligated to City OMB under the SSP24 grants but not yet claimed. SAC ¶¶ 76–83.

### C. Defendants' Money Grab

On February 10, 2025, Elon Musk and Cameron Hamilton[1] posted messages on the social media platform "X" stating that there would be a "clawback demand" for City OMB's SSP funds because the funds were used to provide shelter for "illegal migrants" at "high end hotels" "in violat[ion] of the law." These assertions were facially incorrect and reflected an underlying animus: City OMB's SSP funds were – and could only be – used to reimburse the cost of shelter and services for non-citizen migrants released into the community by DHS, at rates approved by FEMA, and in accordance with the authority Congress gave FEMA to administer SSP. In a subsequent post Hamilton opined that "Congress should never have passed bills asking FEMA to do this work. This stops now." SAC ¶¶ 100–05.

Defendants did not make a "clawback demand." Instead, on February 11, 2025, Defendants removed $80,481,861.42 from a City bank account by effecting a reversal of the February 4, 2025 ACH transfer. SAC ¶¶ 110–12. Defendants provided no notice or opportunity to object before the reversal.

In the following days, various defendants made statements concerning the purported rationales for the Money Grab, including that it was justified by defendant Kristi Noem's January 28, 2025 memo ("Noem Memo") freezing funding for nonprofits assisting immigrants; that the original payments to the City were effectuated by rogue, deep state activists; and that according to

---

[1] At the time, both Musk and Hamilton were serving in federal positions. Hamilton was later replaced by David Richardson as the "Senior Official Performing the Duties of the Administrator" of FEMA.

media reports, the payments went to hotels where migrants who committed crimes stayed. SAC ¶¶ 108–09, 114–20, 123. Notably, Mary Comans, then-FEMA's CFO, said in a court declaration in another case that the February 4 ACH payment to the City was consistent with FEMA and DHS policies, including the Noem Memo, but that the policy "sudden[ly]" changed after Musk's February 10 X posts.  SAC ¶¶ 106–07. In any event, Defendants' competing public statements all reveal an underlying animus to SSP and intent to nullify the SSP grants and permanently deprive the City of SSP funds. SAC ¶¶ 84–90, 100–05, 155–70.

The Money Grab was moreover executed while Defendants were under a TRO against freezing payments issued in a lawsuit filed by 22 states in Rhode Island. *New York v. Trump*, No. 25-cv-39, 2025 U.S. Dist. LEXIS 17593 (D.R.I. Jan. 31, 2025), ECF No. 50 (hereinafter "*New York v. Trump*"). Indeed, hours after the Money Grab, defendants in *New York v. Trump*, including DHS and FEMA, sought relief from that TRO, filing an "Emergency Motion . . . for Permission to Continue Withholding FEMA and Other Funding."  SAC ¶¶ 113–20. The emergency motion stated "FEMA ***seeks*** to withhold [SSP] funding based on concerns regarding the program" and "respectfully ***requests*** confirmation that Defendants may permissibly withhold certain FEMA funding.'" *Id*.  Defendants did not disclose the already-completed Money Grab to that court.

### D.  The Zero Out

On February 10, 2025—the day Elon Musk first posted about the payment—data on USASpending.gov (the official repository of federal government spending data) was revised to delete the funds shown as available for future reimbursement claims under the SSP23 Grant, eliminating the previously-shown balance of $36,307,765. Then, on February 12, USASpending.gov was revised again to delete the 2024 SSP grant funds, including both the $80.4 million taken via the Money Grab and $1.1 million that remained obligated but unreimbursed, with

the result that USASpending showed $0 available on City OMB's SSP grants (collectively, the "Zero Out"). SAC ¶¶ 125–34.

### E.  The "Remedy for Noncompliance" Letter

On February 19, 2025, FEMA sent City OMB a letter dated February 18, 2025, entitled "Remedy for Noncompliance Letter, Shelter and Services Program (SSP)." The letter states "that DHS/FEMA is temporarily withholding payments to [City OMB]" and "recovered two payments completed via direct deposit on February 4, 2025, totaling $80,481,861.42." The letter further claims the Money Grab "constitutes a part of this temporary withholding." The letter prohibits City OMB from incurring expenses under the grant following the letter's date, and requests certain documents in connection with a purported review. SAC ¶¶ 135–38.

As grounds for this action, the letter states that DHS "has significant concerns that SSP funding is going to entities engaged in or facilitating illegal activities." But it does not allege purported illegal activities committed by any entity that might have been paid with funds reimbursed under SSP. Instead, the letter alleges that "a substantial portion of your award goes to funding alien housing at the Roosevelt Hotel in New York City" and "[a]ccording to media reports, the vicious Venezuelan gang Tren De Aragua has taken over the hotel and is using it as a recruiting center and base of operations to plan a variety of crimes... which can reasonably be presumed to be conducted in the hotel itself" – that is, alleged illegal activity *at*, not *by*, the Roosevelt Hotel. SAC ¶ 146.

The "noncompliance" letter goes on to express "concern" that

> entities receiving payment under this program may be guilty of encouraging or inducing an alien to come to, enter, or reside in the United States in violation of law, 8 U.S.C. § 1324(a)(1)(A)(iv); transporting or moving illegal aliens, id. § 1324(a)(1)(A)(ii); harboring, concealing, or shielding from detection illegal aliens, id. § 1324(a)(1)(A)(iii); or applicable conspiracy, aiding or abetting, or attempt liability respecting these statutes.

SAC ¶ 148.

As the SAC sets forth, these allegations were contrived *post hoc* rationalizations for the Money Grab that are different from contemporaneous statements Defendants made when the Money Grab was effectuated. SAC ¶¶ 135–53. Before making payments, Defendants had already vetted every dollar of requested reimbursement to ensure the expenses were eligible, including that the funds were for services to migrants with verified DHS-assigned A Numbers that DHS itself released into the community. SAC ¶¶ 76–83, 153. The letter's allegations appear designed to establish a veneer of administrative process to mask Defendants' unauthorized acts and as a pretext for denying City OMB reimbursement of eligible costs. SAC ¶¶ 135–53. The grounds set forth in the letter for pausing SSP and withholding funds effectively operate to impose new grant conditions on City OMB. SAC ¶¶ 150, 167. The letter does not acknowledge the Zero Out, instead suggesting the funds were being withheld "temporarily."

### F. The Termination

On April 1, 2025, Hamilton sent City OMB a letter announcing that FEMA was terminating each of the SSP awards "effective immediately" ("Termination Letter" or "Termination"). Hamilton appears to have sent substantively identical letters to many other SSP grantees. SAC ¶ 173.

The Termination Letter provide an entirely new rationale: that the grants "no longer effectuate [] the program goals or agency priorities" (quoting 2 C.F.R. § 200.340(a)(2) (2020)), adding "consistent with President Trump's direction, [DHS] is focused on advancing the essential mission of enforcing immigration laws and securing the border. Consequently, grant programs that support, or have the potential to support, illegal immigration through funding illegal activities or support for illegal aliens that is not consistent with DHS's enforcement focus do not effectuate the agency's current priorities." SAC ¶¶ 189–90. Like the Remedy for Noncompliance Letter, the

Termination Letter mischaracterizes the City's efforts funded by SSP to provide "shelter and services" under the "Shelter and Services Program" to noncitizen migrants who DHS itself released from custody into the United States. SAC ¶¶ 197–201.

## PROCEDURAL HISTORY AND CAUSES OF ACTION

The City filed this action on February 20, 2025 and moved for a temporary restraining order ("TRO"). ECF No. 5. On March 5, 2025, the Court ruled on the motion, holding that the Court had jurisdiction to hear the City's claims but denying the TRO on grounds that the City had not met its burden on irreparable harm. ECF No. 42. The City filed the Second Amended Complaint on June 16, 2025. ECF No. 51. Defendants filed the instant motion on July 18. ECF Nos. 52 (Notice of Motion) & 53 (Memorandum of Law or "MTD").

The SAC sets forth eight counts. Counts I through V assert claims under the APA. Count I asserts substantive APA violations in connection with the Money Grab (arbitrary and capricious, abuse of discretion). Count II asserts the same substantive APA violations in connection with the Illegal Pause/Suspension and Withholding of SSP Funds, the Zero Out, and the Termination. Count III asserts substantive APA violations in connection with the Money Grab (contrary to law, ultra vires, and in excess of statutory authority), including that the Money Grab violated the rules issued by the National Automated Clearing House Association ("ACH Rules"), which govern all ACH transactions and which are incorporated into federal regulations that bind Defendants. Count IV asserts similar substantive APA violations in connection with the Illegal Pause/Suspension and Withholding of SSP Funds, the Zero Out, and the Termination. Count V asserts procedural APA violations in connection with all of the challenged actions (without observance of procedure required by law). Counts VI through VIII allege that Defendants' actions violate constitutional requirements of Due Process, Separation of Powers, and the Spending Clause, respectively.

## ARGUMENT

### I.  This Court Has Jurisdiction Over the APA Claims

This Court previously rejected Defendants' assertion that it lacks jurisdiction and that the City must bring its APA claims under the Tucker Act in the Court of Federal Claims ("CFC"). Tr. of Argument, ECF No. 42, at 32-33 (Mar. 5, 2025). As the Court found, "[b]ecause the City structures its claim as a request for equitable relief, as opposed to a claim for money damages, the Court has jurisdiction to address this motion." *Id*. (*citing Bowen v. Massachusetts*, 487 U.S. 879 (1988)). Defendants here seek dismissal of Counts I-V, MTD at 7-14, but there are no grounds for this Court to change its prior holding. The SAC asserts the same APA causes of action as the original complaint, expanded only to cover new administrative actions—the Zero Out and the Termination. *Compare* Compl. (ECF No. 1) ¶¶ 129–193 *with* SAC ¶¶ 225–315. The City does not assert a breach of contract claim or seek a damages remedy in form or in substance. The Court's prior decision is therefore equally applicable to the City's APA claims as pleaded in the SAC. And, as demonstrated below, the Supreme Court's recent *per curiam* order in *Department of Education v. California*, 145 S. Ct. 966 (2025) ("*California*") on which Defendants rely, and the more recent order in *Nat'l Inst. of Health v. Amer. Pub. Health Assn.*, No. 25A103, 2025 U.S. LEXIS 2742 (Aug. 21, 2025) ("*NIH*"), do not alter the analysis. The motion should be denied.

Simply put, this Court has jurisdiction to determine that Defendants violated the APA on each of the four actions Plaintiff challenges here. *Bowen*, which *California* expressly left in place and which the *NIH* stay order does not mention (though accompanying opinions do), remains applicable. In *Bowen*, the Supreme Court wrote:

> Our cases have long recognized the distinction between an action at law for damages – which are intended to provide a victim monetary compensation for an injury to his person, property, or reputation – and an equitable action for specific relief – which may include an order providing for 'the recovery of specific property or

> *monies* … . The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as "money damages."

487 U.S. at 893. *California* reaffirmed *Bowen's* direction that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." 145 S. Ct. at 968 (*quoting Bowen*, 487 U.S. at 910).

In *California*, the Supreme Court stayed a district court's TRO that had enjoined a grant termination and compelled payment thereunder. The stayed TRO had "require[d] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue." 145 S. Ct. at 968.  In *NIH*, plaintiffs challenged new directives that NIH issued concerning grant priorities and NIH's termination—pursuant to the directives—of plaintiffs' grants. The district court granted the relief sought, vacating the directives and the resulting grant terminations, thereby restoring plaintiffs' grant funding. The Supreme Court stayed the district court's orders as to the grant terminations, but not as to the underlying directives. Citing *California*, it held that the APA's waiver of sovereign immunity did not give the district court jurisdiction to "order relief designed to enforce any 'obligation to pay money' pursuant to those grants." *NIH*, 2025 U.S. LEXIS 2742, *1.

These two orders do not rescind this Court's jurisdiction over the APA claims because none of the City's claims seek to compel payment of money withheld due to a grant termination. The stay orders do not meaningfully discuss, let alone overturn, *Bowen*. Nor does either order discuss the widely-followed two-part test articulated in *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) (*cited in Bowen*, 487 U.S. at 916), for determining whether an action against the United States is "at its essence" a contract action: (1) the source of the rights upon which the plaintiff bases its claims, and (2) the type of relief sought. The orders apply only to grant termination claims where relief would necessarily compel payments. Moreover, their precedential

value is limited because they were issued on the emergency docket without full briefing or hearing. *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (stay pending appeal "will allow this Court to decide the merits in an orderly fashion—after full briefing, oral argument, and our usual extensive internal deliberations—and ensure that we do *not* have to decide the merits on the emergency docket.") (Kavanaugh, J. concurring); *Lunding v. N.Y. Tax Appeals Tribunal*, 522 U.S. 287, 307 (1998) (summary orders "do not have the same precedential value . . . as does an opinion of this Court after briefing and oral argument on the merits) (citations omitted). The City's claims do not fall within the ambit of these orders.

### A. This Court Has Jurisdiction Over the Money Grab

*California* and *NIH* do not jurisdictionally bar the City's APA challenges to the Money Grab (Counts I, III, and V) because the Money Grab did not arise from the SSP Termination, which took place nearly two months later. Defendants lawlessly effected an ACH transfer of the funds from a City bank account—an act that violated the ACH Rules and federal regulations that bind Defendants to those rules. SAC ¶¶ 100–12; Part II.C.1, *infra*. No regulations authorize the Money Grab. The impetus for it arose outside of FEMA, *see* SAC ¶ 100 (Musk tweet), and for impermissible reasons unrelated to grant administration. SAC ¶¶ 104–05, 108–09, 114–20, 123. Accordingly, the SAC alleges that the Money Grab was arbitrary and capricious, an abuse of discretion, ultra vires, and contrary to law and without observance of required procedure. SAC ¶¶ 225–39, 250–62, 274–91 (Counts I, III, V).

The City's claims are therefore within the ambit of *Bowen* as "equitable [claims] for specific relief—which may include an order providing for 'the recovery of specific property or monies.*" 487 U.S. at 893. Since neither *California* nor *NIH* overturn or restrict *Bowen* except for

claims seeking the reinstatement of terminated grants and compelling payment of awards thereunder, the City's APA claims against the Money Grab should proceed in this Court.[2]

### B. This Court Has Jurisdiction to Hear the City's APA Claims Against the Termination and Zero Out

Counts II, IV, and V assert claims the Termination violated the APA as arbitrary and capricious, an abuse of discretion, contrary to law, ultra vires, in excess of statutory authority, and without observance of procedure required by law. *California* and *NIH* do not bar this Court from hearing the City's APA challenges to the Termination because the relief resulting from judgment declaring that the Termination violated the APA would not compel payment of money. Separate and apart from the $80 million taken via the Money Grab, roughly $37.4 million remained obligated to City OMB and not yet claimed for reimbursement when Defendants initiated the events giving rise to this action. SAC ¶¶ 53, 81. The City would not be entitled to payment of those funds upon a determination that the Termination was not justified; rather, grant administration would resume under (and within the bounds of) applicable laws, rules, and grant terms. City OMB would have the opportunity to submit reimbursement claims and Defendants would then review them for eligibility and make payment if warranted under the grant. *See In re Aiken Cty.*, 725 F.3d 255, 267 (D.C. Cir. 2013) (Kavanaugh, J.) (issuing writ of mandamus in light of "deliberate and continued agency disregard of a statutory mandate" and ordering agency to "promptly continue with the legally mandated licensing process"). Whether a money dispute might arise later in the course of proper grant administration is not before this Court.

---

[2] For similar reasons, this Court may hear the APA claims against Defendants' "withholding" of the funds as that act, too, is not related to the Termination. Without the improper Money Grab, these funds would not be within Defendants' possession to withhold; the City's claim to the withheld funds therefore seeks the same equitable recovery as for the Money Grab.

Nothing in *California* and *NIH* preclude this Court from reviewing the Termination under the APA; the City raises equitable claims seeking nonmonetary relief. *See* 28 U.S.C. § 1491(a).[3] Indeed, a court in this district recently held that it had jurisdiction over an APA claim seeking to compel resumption of a program where the relief would not result in an order compelling payment of money. *Nat'l Job Corps Ass'n v. DOL*, 2025 U.S. Dist. LEXIS 121052, at *14 n.5 (S.D.N.Y. June 25, 2025). The court distinguished *California* on grounds that "Plaintiffs' request that the Court order Defendants to resume the statutorily required background checks for new program enrollees is a form of equitable relief that is beyond the ability for the Court of Federal Claims to grant." *Id.* The City's APA claims against the Termination remain squarely within the APA's waiver of sovereign immunity for cases seeking relief "other than money damages."[4] 5 U.S.C. § 702.

## II. The APA Claims Should Not Be Dismissed

### A. Defendants' Grandiose Claims of Agency Discretion Afford No Grounds for Dismissal

Defendants argue that Counts II, IV, and V must be dismissed as unreviewable because, they contend, FEMA's decision "concerning how to allocate and expend funding is 'committed to agency discretion by law' and this [sic] is not subject to APA review." MTD at 14 (quoting 5 U.S.C. § 701(a)(2)). But Defendants invoke a narrow agency-discretion exception to judicial review of APA claims that applies only in two unusual situations not present here: (1) "in those rare circumstances" where "a court would have no meaningful standard against which to judge the

---

[3] The CFC has only limited jurisdiction to fashion specified equitable remedies incidental to a money judgment. *See* 28 U.S.C. § 1491(a)(2).

[4] Similarly, a determination that the Zero Out violated the APA would result in nonmonetary relief—the restoration of fund availability shown on a government website.

agency's exercise of discretion," or (2) in "certain categories of administrative decisions that courts traditionally have regarded as committed to agency discretion." *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (citation modified). Here, Defendants had no authority or discretion to execute the Money Grab; clear standards apply to the remaining challenged actions, and therefore the actions are not committed to unreviewable agency discretion.

### 1.  Clear Standards Guide the Court's Decision-Making

Under bedrock principles of administrative law, DHS, and FEMA as a DHS component, are bound by DHS regulations. *Service v. Dulles*, 354 U.S. 363, 386 (1957); *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267-68 (1954). These include the U.S. Office of Management and Budget Uniform Guidance for Federal Financial Assistance, which DHS adopted and which prescribe the circumstances and procedures pursuant to which grant funds may be suspended or terminated. *See* 2 C.F.R. part 200 (the "Uniform Guidance"), adopted by DHS at 2 C.F.R. § 3002.10.

The Uniform Guidance provides meaningful standards for evaluating those actions. *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019). Regulations that "expressly address—and limit— the agency's discretion to 'terminate' monetary awards" "provide meaningful standards for a court to employ when reviewing agency decisions under the APA." *Pol'y & Rsch., LLC v. HHS*, 313 F. Supp. 3d 62, 76-78 (D.D.C. 2018) (Jackson, J.). In light of those standards, Defendants' decision to terminate the grants was not committed to agency discretion by law. *Id.*; *Healthy Futures of Tex. v. HHS*, 315 F. Supp. 3d 339, 341 (D.D.C. 2018) (Jackson, J). Defendants offer no legitimate basis for the Court to hold unreviewable their decision-making as to the SSP grants.

Defendants did not have unreviewable discretion to execute the Money Grab. Nothing in the Uniform Guidance, or indeed anywhere, permits grants funds to be grabbed back, without any notice or process, after they have been awarded and disbursed to a recipient. *See generally* 2 C.F.R.

§ 200 *et seq*. Grant payments cannot be unilaterally suspended or "withheld … unless required by Federal statute, regulations," or "[t]he recipient … has failed to comply with the terms and conditions of the Federal award…" 2 C.F.R. § 200.305(b)(6); *see also* 2 C.F.R. § 200.339 (allowing withholding or suspension of grant funds as a remedy for "noncompliance" with grant terms). Under "such conditions" "the Federal agency… may, after providing reasonable notice, withhold payments to the recipient… for financial obligations incurred after a specified date until the conditions are corrected." 2 C.F.R. § 200.305(b)(6). Defendants did not identify any federal statute or regulation that requires withholding of SSP grant funds or a failure to comply with any grant terms or conditions–the Remedy for Noncompliance Letter offers at most conjectural allegations–and did not provide notice before suspending SSP. SAC ¶¶ 135–53.

Similarly, the Uniform Guidance cabins discretion to terminate grants. The Termination Letter invokes and relies solely on the rule allowing termination where "an award no longer effectuates the program goals or agency priorities." Defendants vastly overstate the scope of discretion that provision affords. 2 C.F.R. § 200.340(a)(4) does not give Defendants unfettered discretion to simply change their minds and reverse course on how to spend Congressionally-appropriated funds, or suggest that such decisions "are committed entirely to the agency's discretion" (MTD at 16). It only permits termination "to the extent authorized by law" and so cannot be used to terminate grants for reasons contrary to the laws appropriating the funds. Thus "purported grant terminations under § 200.340(a)(4) are only valid to the extent that statutes authorize the terminations." *Oregon Council for the Humanities v. US DOGE Service*, 3:25-cv-829-SI, 2025 U.S. Dist. LEXIS 151192 (D. Or. Aug. 6, 2025) (citing *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 2025 U.S. Dist. LEXIS 125988 (D. Mass. July 20, 2025)). Numerous other courts have held similarly and have roundly rejected Defendants' sweeping take on

§ 200.340(a)(4). *See, e.g.*, *Pacito v. Trump*, 772 F. Supp. 3d 1204, 1221 (W.D. Wash. 2025); *Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, 770 F. Supp. 3d 822, 855 (D. Md. 2025); *Neeta Thakur v. Trump*, No. 25-cv-04737-RFL, 2025 U.S. Dist. LEXIS 118980 * 58 (N.D. Cal. Jun. 23, 2025). Any contrary holding would allow federal agencies to invoke 2 C.F.R. § 200.340(a)(4) to simply ignore appropriations statutes while evading APA review.

### 2. Defendants Do Not Have Unreviewable Discretion to Refuse to Spend or Redirect SSP Funds

Apart from Defendants' invocation of 2 C.F.R. § 200.340(a)(4), Defendants claim generally that they have unreviewable discretion to do what they wish with SSP funds, including terminate the grant, because grant funding is "discretionary" and the grant awards at issue here "are not prescribed by any federal statute or regulation." MTD at 14. This argument is fatally flawed because Congress, in appropriating funds for specified purposes, does not give agencies *carte blanche* to refuse to spend those funds if they dislike the policy reflected in the appropriation. *See* Part II.C.3, *infra*.

Grant terminations are far from unreviewable. Construing and applying regulatory suspension and termination provisions "involve the type of legal analysis that courts routinely perform." *Pol'y & Rsch.*, 313 F. Supp. 3d at 83. *Lincoln*, on which Defendants rely, is inapposite. MTD at 14–16. *Lincoln* involved the Indian Health Service's decision to terminate a health program that it operated using "lump sum" funding Congress appropriated generally "for the benefit, care, and assistance of the Indians," for the "relief of distress and conservation of health" but which program was not specified by law. 508 U.S. at 185 (citing 25 U.S.C. § 13). By contrast, the funds here are not "lump sum" but were appropriated specifically for costs borne by municipalities and others in providing "shelter and related services" to migrants DHS released into the U.S. *Woonasquatucket River Watershed Council v. USDA*, 778 F. Supp. 3d 440 (D.R.I. 2025)

("agencies may have discretion to allocate "appropriated but not-yet-awarded funds," but "because the funds at issue here were already awarded… more obligations apply").  Defendants, having made the grants, must act within the reviewable discretion afforded under the Uniform Guidance, as shown above. The claims should not be dismissed.

### B.  The Challenged Actions Are Final

Defendants argue that the Money Grab and subsequent withholding (which they portray as one combined act, not two) are not final and therefore not reviewable.  MTD at 16.  They are wrong as to both actions.  Agency action is "final" if: (1) the action "mark[s] the consummation of the agency's decisionmaking process"; and (2) the action determines the parties' "rights or obligations" or otherwise triggers "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177-178 (1997) (cleaned up). Because the test is "pragmatic and practical," *Salazar v. King*, 822 F.3d 61, 82 (2d Cir. 2016), courts often "focus on the concrete consequences an agency action has or does not have," *State of New York v. Trump*, 767 F. Supp. 3d 44, 76 (S.D.N.Y. 2025). "For the second prong, the core question is whether the result of the agency's decisionmaking process is one that will directly affect the parties." *Metro. Transp. Auth. v. Duffy*, 2025 U.S. Dist. LEXIS 101448, *54 (S.D.N.Y. May 28, 2025).

Here, both prongs are satisfied. First, the Money Grab marked the consummation of Defendants' decision-making process, the complete reversal of a previous act that itself was "final." *See Rattlesnake Coalition v. United States EPA*, 509 F.3d 1095, 1103 (9th Cir. 2007) (action was final once EPA "reviewed a grant application and decided to disburse the funds"). The Money Grab—the seizure of $80 million – cannot by any stretch be characterized as of a "tentative or interlocutory nature." *Bennett*, 520 U.S. at 178.

Second, the Money Grab is final because it determines the parties' "rights or obligations" or otherwise triggers "legal consequences." The Money Grab is a quintessential example of an

agency action with real-world, "concrete consequences," *New York v. Trump*, 767 F. Supp.3d at 76, as it "directly affect[ed]" the City in an immediate and tangible way, *Duffy*, 2025 U.S. Dist. LEXIS 101448 at *54.

Defendants blur the Money Grab's finality by coupling it with Defendants' later announcement that FEMA was "withholding" SSP funds. They argue that because Defendants might someday, in further administrative proceedings, release the withheld funds, the Money Grab and withholding are not "final agency action." MTD at 16. But "[t]he applicable test is not whether there are further administrative proceedings available, but rather whether the impact of the order is sufficiently final to warrant review in the context of the particular case." *Clean Air Council v. Pruitt*, 862 F.3d 1, 7 (D.C. Cir. 2017).[5] The Money Grab is a discrete and final reviewable action under this standard.

The subsequent withholding and Remedy for Noncompliance Letter were an after-the fact mechanism to attempt to justify the Money Grab and create a veneer of administrative process. This action is final and reviewable because it immediately barred the City from continuing to participate in SSP—imposing real-word consequences to the City by preventing it from incurring any reimbursable costs during the suspension.  Remedy for Noncompliance Letter (ECF No. 53-5) at 2. In any event, the Complaint challenges the Money Grab and subsequent withholding as separate actions, and Defendants may not rewrite the pleadings to suit their arguments on a motion to dismiss.[6]

---

[5] The SAC also alleges that further proceedings following the withholding would be a sham. SAC ¶¶ 202–24.

[6] Defendants do not address the Zero Out and the Termination on this point and thereby concede that those actions are reviewable as final.

### C. Counts III and IV State Cognizable Claims

Counts III and IV allege that Defendants acted contrary to law, ultra vires, and in excess of statutory authority. Defendants urge that these two counts do not state a "justiciable and plausible claim for relief" under the APA. MTD at 17. Their argument rests on mischaracterizing these claims.

An executive department or agency "literally has no power to act... unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374, (1986). "Thus, the APA requires that executive action taken in the absence of statutory authority be declared invalid." *New York v. United States DOJ*, 951 F.3d 84, 100 (2d Cir. 2020); 5 U.S.C. § 706(2)(C). The SAC alleges that each of the challenged actions was taken without statutory authority and contrary to law, and therefore they violate the APA.

#### 1. Count III States a Viable Claim Against the Money Grab for Violation of the ACH Rules and Grant Administration Regulations

Defendants portray the Money Grab as within their authority to withhold grant funds. MTD at 21–22. But the Money Grab involved taking back funds already approved and paid, not withholding funds not yet disbursed. As alleged, the Money Grab not only circumvented the rules governing the steps that must be followed before grant payments may be disallowed and recovered, it violated the APA for the additional reason that Defendants violated the ACH Rules that govern all ACH transactions and are incorporated into federal regulations that bind Defendants. SAC ¶¶ 161–70; 31 C.F.R. §§ 210.2(a), 210.3(b), 210.6(f); *see also* Federal Government Participation in the Automated Clearing House, 87 Fed. Reg. 42, 44 (Jan. 3, 2022) (the "Fiscal Service is adopting" the Reversals Rule, which prohibits reversals "for any reason other than those explicitly permissible under" the ACH Rules).

Under the ACH Rules, a transaction may *only* be reversed if it was an "Erroneous Entry," which the ACH Rules define *exclusively* as a "(a) a duplicate [of a previous entry]…(b) a payment to or from a Receiver [who is not the] … Receiver … intended … by the Originator; (c) a payment in a dollar amount different than was intended by the Originator … ; or (d) [a] payment of a debit Entry on a date earlier" than intended by the Originator or a "Credit Entry on a date later" than intended by the Originator. ACH Rule § 8.38. An ACH reversal is improper if initiated "for any reason other than" to correct an "erroneous entry." ACH Rules §§ 2.9.1 & 2.9.5. Thus, federal regulations prohibit Defendants from initiating reversals for any reason that is not expressly permitted under the ACH Rules, *i.e.*, for any reason other than to correct an "Erroneous Entry" as defined therein.

To justify the Money Grab under the ACH Rules, Defendants portrayed the February 4 transfer of funds to the City's bank account as an "Erroneous Entry," even though it was nothing of the sort: it was not a duplicate, not misdirected, not in the wrong amount, and not sent on the wrong date. Defendants ignore the ACH Rules, use the word "error" colloquially, and explain that their purported "error" was that they intended that the funds be frozen. MTD at 3-4. That rationale is plainly outside the definition.  Moreover, fact questions abound as to whether, even colloquially, the payment was "erroneous" when it was made.[7] *See Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013) (courts must construe a complaint liberally, "accepting all factual allegations... as true, and drawing all reasonable inferences in the plaintiff's favor").  If Defendants believed the funds transferred on February 4 were subject to recoupment, they had to

---

[7] Factual questions include whether Defendants' "freeze" applied to the City as of February 4, whether the TRO in *New York v. Trump* enjoined that freeze, and whether, given contemporaneous statements, the payment was "erroneous" in merely a political sense.

follow applicable procedures, which the SAC alleges they did not do.  Rather, they grabbed the

money back in violation of the ACH Rules.

### 2.  The City May Bring APA Claims Where Defendants Impounded Appropriated Funds Without Following the Impoundment Control Act

As but one aspect of Counts III and IV, the City describes Defendants' actions as

effectively an unconstitutional "impoundment" without following the procedures of the

Impoundment Control Act ("ICA"), the exclusive statutory mechanism for effectuating the

impoundment of obligated grant funds appropriated by Congress. Defendants seek dismissal of

these counts on grounds that the City is not empowered to sue to enforce the ICA and is not within

the "zone of interests" the ICA protects. MTD at 17-19. But the City does not seek to enforce the

ICA or ask the Court to order Defendants to follow the ICA's procedures. Nor does the City seek

an order directing the Comptroller General to enforce the ICA. Instead, the City asserts that

Defendants' actions were only permitted through the ICA's mechanisms and were therefore

"contrary to law" under the APA.[8]

The ICA "operates on the constitutional premise that the President must obligate funds

appropriated by Congress, unless otherwise authorized to withhold them." GAO, *Impoundment*

*Control Act*, https://www.gao.gov/legal/appropriations-law/impoundment-control-act; *Train v.*

*City of New York*, 420 U.S. 35, 41 (1975). Numerous courts have held that "[t]here is a meaningful

distinction between direct challenges under the ICA and an APA challenge asserting that an agency

action is contrary to law because it violates the ICA." *Oregon Council for the Humanities v. United*

*States DOGE Service*, 3:25-cv-00829-SJ, 2025 U.S. Dist. LEXIS 151192, * 66 (D. Or. Aug. 6,

---

[8] A ruling for Defendants on this point would not in any event result in dismissal because the ICA is only one of the statutes and regulations undergirding the APA claims set forth in Counts III and IV.

2025). For example, in *New York v. Trump*, 769 F. Supp. 3d 119 (D.R.I. 2025), the court found that impoundment-based APA claims may go forward because "'not in accordance with law,' refers to *any* law" including the ICA. *Id*. at 138 n. 13 (emphasis in original; citation omitted).

Cases cited by Defendants (MTD at 18-19) are inapposite because they involve attempts to directly enforce the ICA against the federal government, which the City is not doing here, s*ee Rogers v. United States*, 14 Cl. Ct. 39, 50 (1987), *aff'd*, 861 F.2d 729 (Fed. Cir. 1988); *Rocky Ford Hous. Auth. v. U.S. Dep't of Agriculture*, 427 F. Supp. 118, 134 (D.D.C. 1977)*; Pub. Citizen v. Stockman*, 528 F. Supp. 824 (D.D.C. 1981), and/or incorrectly collapse the distinction between direct enforcement of the ICA and APA challenges invoking the ICA. *See id. at n. 1; General Land Office of State of Tex. v. Biden*, 722 F. Supp. 3d 710, 734-35 (S.D. Tex. 2024); *see also Global Health Council v. Trump*, 2025 U.S. App. LEXIS 20495, *29-30 (D.C. Cir. Aug. 13, 2025) (finding no private right of action to enforce the ICA, and therefore no claim under the APA). As explained above, under the APA, the City is entitled to challenge the Defendant agencies' actions as contrary to law under any law, including the ICA.

### 3. Under the APA, the City May Challenge Defendants' Actions That Are Contrary to the Laws Appropriating SSP Funds

The City alleges that Defendants' actions violate the APA because they are contrary to the DHS Appropriation Acts that established and funded SSP. Defendants argue that the City is not within the zone of interests of the Appropriations Acts, MTD at 20, because these acts "appropriate funds to DHS." Again, the City is not suing under the Appropriations Acts but under the APA, citing Defendants' flouting of those acts as grounds for APA violations. Further, Defendants acknowledge, as they must, that the purpose of the appropriations was "to support sheltering and related activities provided by non-Federal entities, including facility improvement and construction in support of relieving overcrowding in short-term holding facilities of [CBP]." *Id.*

The City was of course one of the "non-Federal entities" that Congress intended DHS to support by appropriating funds to DHS for exactly those purposes. It is hard to think of an entity more squarely within the zone of interest of the SSP appropriations.

Defendants rely on "zone of interest" cases that are inapposite, *see* MTD at 20-21, because those cases do not assert claims by grant recipients. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) concerns the Lanham Act, not federal grants.  In both *Trump v. Sierra Club,* 140 S. Ct. 1 (2019) and *Miccosukee Tribe of Indians of Fla. v. United States*, 08-23523-CIV, 2009 WL 10668917 (S.D. Fla. Sept. 30, 2009) plaintiffs sought to block spending on projects they opposed; they were not grant recipients and do not have the same interest in an appropriation as the City does here.

Defendants further posit that the Acts "regulate and protect the interest of DHS and Congress in the federal spending and appropriations process... [and not] the interests of a city government who asserts that discretionary federal spending decisions harm its fisc." *Id*. Here again, Defendants miss the mark. The Appropriations Acts were intended to and did provide SSP funding for non-Federal entities like the City to alleviate the financial burden of providing shelter and services to migrants released by DHS into the U.S. Grantees like the City are the clear beneficiaries of these laws.  Defendants' actions—grabbing money back from the City, freezing reimbursements and terminating the grants, because Defendants no longer think this is good policy—are a violation of the APA as contrary to the Appropriations Acts.

## III.    The Constitutional Claims Should Not Be Dismissed

### A.  The City States a Viable Due Process Challenge

Defendants do not dispute that the SAC describes a failure to provide due (or indeed any) process in executing the Money Grab. Instead, Defendants seek to dismiss Count VI on grounds

that states lack due process rights, that the City lacks a protected property interest, and that the City failed to exhaust administrative remedies. MTD at 22-25. These arguments fail.

The City is a "person" within the Fifth Amendment and may therefore assert a due process claim. The Second Circuit's decision in *River Vale v. Orangetown*, 403 F.2d 684 (2d Cir. 1968), controls here. The Second Circuit held in the Fourteenth Amendment context that "a municipal corporation like any other corporation is a 'person' ... and is entitled to [the Fourteenth Amendment's] protection." 403 F.2d at 686. This principle has its origin in the distinction between states and municipalities: although states are sovereigns—and therefore are not "persons" under the Fifth or Fourteenth Amendments, *see South Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966)—municipalities are distinct legal entities more akin to private corporations, which are unquestionably "persons" for constitutional purposes. *See also Santa Clara v. Andrus*, 572 F.2d 660, 675 (9th Cir. 1978) (citing *River Vale* and suggesting, although not expressly deciding, that a municipality is a "person"); *but see East St. Louis v. Circuit Court for Twentieth Judicial Circuit*, 986 F.2d 1142, 1144 (7th Cir. 1993) (holding, in a municipal challenge to state action, that a municipality "is not a 'person'" and therefore "cannot invoke the protection of the Fifth or Fourteenth Amendments").

That the City has a protected property interest here is unmistakable. Defendants reviewed the City's reimbursement request, determined that the City was entitled to receive the funds as reimbursement for expenses Defendants determined were eligible for reimbursement, and completed an ACH transaction transferring the funds into the City's bank account. SAC ¶¶ 68–83; *Anderson National Bank v. Luckett*, 321 U.S. 233, 240 (1944) ("bank accounts" are "property" subject to due process). That Defendants could manage to engineer the ACH reversal did not give them the right to do so and does not negate that the funds belonged to the City and were in the

City's bank account—indeed, Defendants had to violate the rules governing the grounds for ACH reversals to take the money back. SAC ¶¶ 161–70, 233, 260; Part II.C.1, *supra*.

Finally, Defendants do not, and cannot, identify any applicable requirement that the City exhaust administrative remedies before asserting a due process claim. Defendants' citation to *Hadwan v. U.S. Department of State*, 139 F.4th 209, 227 (2d Cir. 2025) is misplaced as the Second Circuit expressly clarified in that case that the plaintiff "was *not* required to raise his constitutional due process claim before the agency" because "when constitutional questions are in issue, the availability of judicial review is presumed." *Id.* (emphasis added).

### B. The Separation of Powers and Spending Clause Claims Are Cognizable

The crux of Counts VII and VIII is that Defendants' actions seek to override and nullify Congress's careful judgment in creating and funding SSP by refusing to administer the program and imposing new conditions on the City. *See, e.g.*, SAC ¶¶ 305, 312. Defendants argue that these counts should be dismissed as duplicative of the APA claims, but here the City states distinct Constitutional claims in addition to its APA claims.

The Constitution vests Congress, not the Executive, with "exclusive power over the federal purse." *Dep't of Navy v. FLRA*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (citation omitted).[9] "Absent congressional authorization, [an agency] may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *City and Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018). Withholding or conditioning appropriated funds without statutory authorization thus "violates the constitutional principle of the Separation of Powers." *Train v. City*

---

[9] Multiple structural features of the Constitution further affirm the exclusivity of Congress's spending power. For example, bicameralism and presentment ensure that the President cannot pick and choose some appropriations while rejecting others. U.S. Const., art. I, § 7, cl. 2; *Clinton v. City of New York*, 524 U.S. 417, 438 (1998); U.S. Const., art. II, § 3.

*of New York*, 420 U.S. 35, 41 (1975). And where "a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021).

Defendants repeatedly expressed their intention to thwart the very purpose for which Congress appropriated SSP funds. SAC ¶¶ 90, 96-105, 158. The challenged actions were each effectuated in furtherance of Defendants' unlawful efforts to wrest control of the federal purse from Congress and vest it in themselves. SAC ¶ 305. The City therefore alleges cognizable claims under the Separation of Powers, which does not allow the executive to direct "the payment of grants based on its political priorities absent a congressional delegation of such authority." *Chi. Women in Trades v. Trump*, No. 25 C 2005, 2025 U.S. Dist. LEXIS 87121, at *14 (N.D. Ill. May 7, 2025).

Through their actions, Defendants also sought to impose post award conditions on the City that are inconsistent with and negate the grants' purpose, such as by "paus[ing]" SSP on grounds that "it touches on immigration" and, further, demanding the City provide information to support an ostensible inquiry into whether the City was "encouraging or inducing" immigration in violation of law. SAC ¶¶ 150, 167. These new requirements—which Defendants leveraged to suspend SSP—were not included in the SSP grants and indeed are antithetical to the SSP.

Defendants misread *Dalton v. Specter* to argue that constitutional challenges to executive branch actions are tenable "only if executive officers rely on [the Constitution] as '[t]he only basis of authority' or… rely on an unconstitutional statute." MTD at 25. But *Dalton* merely stands for the unremarkable proposition that not every presidential or executive branch action in excess of statutory authority "is *ipso facto* in violation of the Constitution." *Dalton v. Specter*, 511 U.S. 462, 464, 469 & 472-76 (1994); *New York v. United States DOJ*, 951 F.3d 84, 101 & n.16 (2d Cir. 2020) (agency action "intrusive on power constitutionally committed to a coordinate branch" may

26

violate the separation of powers, but noting *Dalton* as a caveat); *New York v. McMahon*, No. 25-10601-MJJ, 2025 U.S. Dist. LEXIS 97722 * 80 (D. Mass. May 22, 2025) ("*Dalton* does not stand for the proposition that action outside the scope of statutory authority can never give rise to a constitutional violation.").[10] *Dalton* does not foreclose lawsuits, like the City's here, that challenge executive agency action on statutory and constitutional grounds and allege that federal officials and agencies violated the Constitution by usurping Congressional power for themselves, not merely misusing discretion granted to them by statute.

---

[10] Indeed, courts have upheld separation-of-powers claims under *Dalton* as long as the challenged action allegedly lacked both "statutory authority" and "background constitutional authority." *Murphy Co. v. Biden*, 65 F.4th 1122, 1130 (9th Cir. 2023) (upholding claim that "the President violated separation of powers by directing the Secretary to act in contravention of a duly enacted law"). Although the D.C. Circuit very recently held otherwise, *Global Health Council v. Trump*, 2025 U.S. App. LEXIS 20495, *21-30 (D.C. Cir. Aug. 13, 2025), that decision addressed a Presidential executive order, and its reading of *Dalton* contradicts other circuits and even the D.C. Circuit itself. *See, e.g., Am. Forest Res. Council v. United States*, 77 F.4th 787, 797 (D.C. Cir. 2023) (interpreting *Dalton* as barring review only "when a statute entrusts a discrete specific decision to the President and contains no limitations on the President's exercise of that authority") (cleaned up); *see generally Glob. Health Council*, 2025 U.S. App. LEXIS 20495, at *75–84 (Pan, J., dissenting).

## <u>CONCLUSION</u>

For all of the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.

Respectfully submitted,

**MURIEL GOODE-TRUFANT**
Corporation Counsel of
  the City of New York
*Attorney for Plaintiff The City of New York*
100 Church Street
New York, NY 10007
(212) 356-1000


By:    <u>/s/ *Joshua P. Rubin*       </u>
       Joshua P. Rubin
       Doris Bernhardt
       June R. Buch
       Aatif Iqbal
       Elizabeth Slater
       Otis Comorau
       Gail Rubin
       Assistant Corporation Counsels

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE</u>

As required by Local Civil Rule 7.1(c), I certify that the document contains 8,665 words, excluding the parts of the document that are exempted by Local Civil Rule 7.1(c) ("These limits do not include the caption, any index, table of contents, table of authorities, signature blocks, or any required certificates, but do include material contained in footnotes or endnotes.").

*s/Joshua P. Rubin*
Joshua P. Rubin
