**U.S. GOVERNMENT ACCOUNTABILITY OFFICE**

**441 G St. N.W.**
**Washington, DC 20548**

# Decision

**Matter of:**   Department of Homeland Security–Application of the Impoundment Control Act to Federal Emergency Management Agency Prior Year Federal Assistance Appropriations

**File:**   B-337204.2

**Date:**   September 29, 2025

## DIGEST

Congress appropriates various line-item amounts to the Federal Emergency Management Agency (FEMA), a component in the Department of Homeland Security (DHS), to provide federal assistance. Various executive branch directives issued in recent months impacted these appropriations from fiscal years (FYs) 2024 and prior fiscal years by placing funds under review, deobligating awarded funds, or otherwise withholding funds from obligation or expenditure. This decision addresses amounts appropriated in prior fiscal years, including FYs 2021-2024.

Unless Congress has enacted a law providing otherwise, executive branch officials must take care to ensure that they prudently obligate appropriations during their period of availability. The Impoundment Control Act of 1974 (ICA) allows the President to withhold funds from obligation, but only under strictly limited circumstances and only in a manner consistent with that Act. The ICA was enacted to ensure that legislation passed by Congress and signed by the President is faithfully executed.

GAO's institutional role is to support Congress, including in Congress's exercise of its constitutional power of the purse. This includes GAO's responsibilities under the ICA, such as reviewing special messages and reporting impoundments the President has not reported. GAO's role is procedural—to protect congressional prerogatives and help ensure compliance with the ICA and appropriations law—and is not to be interpreted as taking a position on the underlying policies addressed in its decisions. DHS has not responded to GAO's multiple requests for information regarding the potential impoundment of appropriated funds. When reviewing an agency's actions for compliance with the ICA, we look at the discretion afforded to the agency under relevant statutes, the purpose, length, and timing of a funding pause, and the actions taken to make funds available for obligation and expenditure.

Based on publicly available evidence, including sworn testimony, federal court cases, data on USAspending.gov, agency websites, and other information, we have sufficient information to reach conclusions about compliance with the ICA for the programs within our scope of inquiry.

Currently available evidence indicates that FEMA has violated the ICA by improperly withholding, delaying, or effectively precluding the obligation or expenditure of budget authority for the following programs:  Emergency Food and Shelter Program (EFSP), Shelter and Services Program (SSP), and Next Generation Warning System Grants Program (NGWS).

GAO is aware of ongoing litigation involving the termination of FEMA grants in which DHS has taken the position that it was authorized to terminate these grants.  GAO will continue to monitor this and any other litigation related to the delay in the obligation and disbursement of FEMA funds.  If a court makes relevant findings of fact relating to FEMA funds, we will update this decision as necessary.

GAO is not taking a position on the policy implications of the underlying programs and funding at issue in this decision.  This decision addresses compliance with the ICA.

---

**DECISION**

Pursuant to our reporting responsibilities under the Impoundment Control Act of 1974 (ICA), we are issuing this decision[1] addressing whether the Federal Emergency Management Agency (FEMA) complied with the ICA as it implemented various executive branch directives and instructions related to federal assistance programs.[2]  The Administration has not sent a special message under the ICA related to FEMA. As explained below, we conclude that FEMA violated the ICA when it withheld certain funds from obligation and expenditure, including funds that were not eligible for withholding under any circumstance pursuant to the ICA's fourth

---

[1] We issued a decision addressing amounts appropriated in fiscal year 2025.  B-337204.1, Sept. 15, 2025.  We will also be issuing a decision on the funds appropriated and set aside for the Building Resilient Infrastructure and Communities Program.

[2] *See* Congressional Budget and Impoundment Control Act of 1974, Pub. L. No. 93-344, title X, § 1015, 88 Stat. 297, 336 (July 12, 1974), 2 U.S.C. § 686.  Additionally, on March 31, 2025, the Ranking Members of the House and Senate Budget Committees sent a request to GAO to examine several directives, including the Office of Management and Budget's January 27, 2025, Memorandum, which in part directed agencies to "temporarily pause all activities related to obligation or disbursement of all Federal financial assistance."  Letter from Ranking Member Merkley and Ranking Member Boyle to Comptroller General (Mar. 31, 2025).

disclaimer, where an agency is precluded from using its procedures to withhold from obligation or expenditure funds that are "require[d]" by law to be spent.[3]

Our practice when rendering decisions is to contact the relevant agencies to obtain factual information and their legal views on the subject of the request.[4]  Accordingly, we contacted the Department of Homeland Security (DHS) to seek factual information and its legal views.[5]

DHS has not yet responded to our request for factual information and legal views,[6] but an agency's failure to respond does not preclude our issuance of an opinion.[7]  In this case, we have gathered sufficient publicly available evidence from spending data and apportionments, agency statements, and federal court cases to draw conclusions about the programs within our scope of inquiry.  Thus, we have sufficient evidence to reach conclusions about the agency's compliance with the ICA.

When reviewing an agency's actions for compliance with the ICA, we examine the discretion afforded to the agency under relevant statutes to determine actions that are required by law or instances where an agency's discretion is limited with respect to the obligation of funds.[8]  The level of agency discretion over program funding has bearing, from an ICA standpoint, on the reasonableness of a potential delay in obligations or expenditures.  Thus, we have said that while executive branch officials

---

[3] 2 U.S.C. § 681(4).  Section 681 sets out four disclaimers with respect to the application of the ICA.  The first three disclaimers, not relevant to this decision, provide that nothing in the ICA shall be construed as (1) asserting or conceding the constitutional powers or limitations of the Congress or the President; (2) ratifying or approving any impoundment except as pursuant to statutory authority; or (3) affecting the claims or defense of any party to litigation concerning any impoundment.  *See* 2 U.S.C. § 681(1)–(3); *see also* B-337375, June 16, 2025.

[4] GAO, *GAO's Protocols for Legal Decisions and Opinions*, GAO-24-107329 (Washington, D.C.: Feb. 2024), *available at* https://www.gao.gov/products/gao-24-107329.

[5] Letter from General Counsel, GAO, to Acting General Counsel, DHS (June 6, 2025).

[6] We reached out several times to DHS and offered flexibility on extended response deadlines.  However, DHS did not provide a response and did not confirm that it would provide one in a timeframe that would allow for our sufficient review and oversight of funds.

[7] GAO-24-107329, at 10; *see also* B-330107, Oct. 3, 2019.

[8] B-337142, June 16, 2025; *see also* B-335747, Apr. 22, 2024.

must take care to ensure that they prudently obligate and expend appropriations during their period of availability, the amount of time required for prudent obligation and expenditure will vary from one program to another.[9]  The ICA imposes no specific requirements on the executive branch as to the rate at which it must obligate or expend budget authority.[10]  Where an agency shows its actions are within the statutory authority provided for program administration, we will not find an improper impoundment.[11]  We also consider the circumstances regarding the purpose of the pause, the length and timing of the pause, and the actions taken to make funds available for obligation and expenditure.[12]

In the programs involved in this case, we reviewed the underlying program statutes and appropriations to determine what discretion is afforded to the agency with respect to obligations and expenditures, including whether the agency was statutorily mandated to obligate and expend the funds.  We examined the purpose of the pauses, including the actions taken and the rationale provided for such actions.  We also considered evidence of the length and timing of the pause and the agency's subsequent actions.  In addition, we reviewed historical obligational patterns for the programs to assess the timing of such obligations in carrying out the programs.  We also reviewed relevant apportionment documents that the Office of Management and Budget (OMB), as required by law, posted on a public website.[13]

We note that there is ongoing litigation related to FEMA's cancellation of grants, which we discuss throughout this decision where relevant.  Our decision here does not address FEMA's authority to terminate grant agreements nor the processes by

---

[9] B-335747, Apr. 22, 2024; B-330330, Dec. 10, 2018.

[10] B-335747, Apr. 22, 2024; B-319189, Nov. 12, 2010.

[11] B-335747, Apr. 22, 2024.

[12] *See generally*, B-337233, July 23, 2025, at 8–9.

[13] *See* Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. E, title II, § 204, 136 Stat. 4459, 4667 (Dec. 29, 2022) (requiring public posting of apportionments).  In March 2025, OMB took down the public website containing such statutorily required information, asserting that apportionments are predecisional and deliberative information.  We disagreed with OMB's assertion on the grounds that apportionments are legally binding decisions on agencies under the Antideficiency Act and, as such, cannot be predecisional or deliberative.  In August 2025, the United States Court of Appeals for the District of Columbia Circuit upheld a lower court decision ordering OMB to restore the website and to disclose the information withheld since its removal.  *See* Order, *Citizens for Resp. & Ethics in Wash. v. OMB*, Docket No. 25-5266 (D.C. Cir. Aug. 9, 2025).

B-337204.2

which it terminated them.  Instead, our decision focuses on whether a withholding of budget authority in violation of the ICA occurred.

BACKGROUND

FEMA's primary mission is to "reduce the loss of life and property and protect the Nation from all hazards, including natural disasters, acts of terrorism, and other man-made disasters, by leading and supporting the Nation in a risk-based, comprehensive emergency management system of preparedness, protection, response, recovery, and mitigation."[14]

In furtherance of that mission, FEMA administers a broad variety of federal assistance programs.  Relevant to this decision, FEMA receives line-item appropriations for programs that provide federal assistance "through grants, contracts, cooperative agreements, and other activities."[15]  Congress also directs U.S. Customs and Border Protection (CBP) to transfer a portion of one of its appropriations to FEMA "to support sheltering and related activities provided by non-Federal entities, in support of relieving overcrowding in short-term [CBP] holding facilities."[16]

Beginning on January 20, 2025, the President and other executive-branch officials issued several orders and directives related to federal assistance funding:[17]

- Executive Order No. 14159, *Protecting the American People Against Invasion* (Jan. 20, 2025);
- OMB Memorandum, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs,* M-25-13 (Jan. 27, 2025) (M-25-13), *rescinded by* OMB Memorandum, *Rescission of M-25-13*, M-25-14 (Jan. 29, 2025);

---

[14] 6 U.S.C. § 313.

[15] *See, e.g.,* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. C, title III, 138 Stat. 460, 607–09 (Mar. 23, 2024); *see also* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, div. A, title VII, § 1701, 139 Stat. 9, 27 (Mar. 15, 2025) (appropriating for FY 2025).

[16] *See, e.g.*, Pub. L. No. 118-47, 138 Stat. at 598 (directing CBP to transfer $650 million to FEMA's Federal Assistance account for sheltering activities).

[17] Several of these directives appear as exhibits in court filings across multiple federal district court cases reviewed for this decision. Citations to these cases and exhibits are provided throughout this decision where directives relate to each program at issue.

B-337204.2

- DHS, *Direction on Grants to Non-Governmental Organizations* (Jan. 28, 2025);
- FEMA Office of Grants Administration Emails (Feb. 10–11, 2025);
- FEMA Memorandum, *Grant Processing Guidance* (Feb. 14, 2025);
- DHS Memorandum for All Agencies and Offices, *Restricting Grant Funding for Sanctuary Jurisdictions* (Feb. 19, 2025);
- Executive Order No. 14290, *Ending Taxpayer Subsidization of Biased Media* (May 1, 2025).

In implementing these orders and directives, FEMA placed federal assistance funds appropriated in fiscal year (FY) 2024 and prior fiscal years under review, deobligated awarded funds, and otherwise withheld appropriated funds from obligation or expenditure.  The discussion below includes an overview of the actions relevant to each of the programs addressed in this decision.

DISCUSSION

At issue here is whether FEMA violated the ICA while implementing various executive branch orders and directives related to federal funding.  Currently available evidence indicates that FEMA violated the ICA by improperly withholding, delaying or effectively precluding the obligation or expenditure of budget authority for the Emergency Food and Shelter Program (EFSP), Shelter and Services Program (SSP), and Next Generation Warning System Grants Program (NGWS).

Impoundment Control Act

It is important to understand the constitutional and historical underpinnings of the ICA with respect to the critical role of Congress in exercising its constitutional powers.  The Constitution specifically vests Congress with the power of the purse, providing that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."[18]  The Constitution also gives Congress the exclusive power to legislate and sets forth the procedures of bicameralism and presentment, through which the President may accept or veto a legislative bill passed by both houses of Congress and Congress may subsequently override a presidential veto.[19] This process does not grant the President the authority to pass his own laws or to ignore or amend a law duly enacted by Congress.[20]  Instead, the President must

---

[18] U.S. Const. art. I, § 9, cl. 7.

[19] *Id.* at art. I, § 7, cl. 2, 3.

[20] *See* B-331564, Jan. 16, 2020 (citing *Clinton v. City of New York*, 524 U.S. 417, 438 (1998)).

"faithfully execute" the law as Congress enacts it.[21]  It follows from this that Executive Orders cannot function to repeal or undo legislation.

Once enacted, an appropriation is a law like any other, and the President must implement it by ensuring that appropriated funds are obligated and expended prudently during their period of availability unless and until Congress enacts another law providing otherwise.[22]  In fact, Congress was concerned about the failure to prudently obligate according to its congressional prerogatives when it enacted and later amended the ICA.[23]

The Constitution grants the President no unilateral authority to withhold funds from obligation.[24]  Instead, Congress has vested the President with strictly circumscribed authority to impound, or withhold, budget authority only in limited circumstances as expressly provided in the ICA.[25]  The ICA separates impoundments into two exclusive categories—deferrals and rescissions.  First, the President may seek to temporarily withhold funds by proposing a "deferral."[26]  Second, the President may seek the permanent cancellation of funds for fiscal policy or other reasons, including the termination of programs for which Congress has provided budget authority, by proposing a "rescission."[27]

In either case, the ICA requires the President to first transmit a special message to Congress outlining the amounts in question and the reasons for the proposed deferral or rescission.[28]  These special messages must provide detailed and specific

---

[21] U.S. Const., art. II, § 3.

[22] *See* B-331564, Jan. 16, 2020; B-329092, Dec. 12, 2017 (The ICA operates on the premise that the President is required to obligate funds appropriated by Congress, unless otherwise authorized to withhold).

[23] *See generally,* H.R. Rep. No. 100-313, at 66–67 (1987); *see also* S. Rep. No. 93-688, at 75 (1974) (explaining that the objective was to assure that "the practice of reserving funds does not become a vehicle for furthering Administration policies and priorities at the expense of those decided by Congress").

[24] *See* B-135564, July 26, 1973.

[25] *See* 2 U.S.C. §§ 681–688.

[26] *Id.* § 684.

[27] *Id.* § 683.

[28] 2 U.S.C. §§ 683–684.

reasoning to justify the withholding, as set out in the ICA.[29]  The burden to justify a withholding of budget authority rests with the executive branch.

While the ICA does not circumscribe why funds can be proposed for rescission, it only permits deferral of budget authority in a limited range of circumstances:  to provide for contingencies; to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or as specifically provided by law.[30]  With respect to deferrals, the ICA specifies that the funds at issue are only temporarily withheld and must still be obligated before expiration.[31]  And with respect to proposed rescissions, the funds must still be obligated unless Congress acts within 45 days to pass a new law rescinding them.[32]  The ICA's fourth disclaimer further clarifies that the ICA's proposed deferral and recission mechanisms do not provide any process by which the President may withhold from obligation or expenditure funds that are "require[d]" by law to be spent; rather, such withholdings are categorically prohibited.[33]

GAO's institutional role is to support Congress, including in Congress's exercise of its constitutional power of the purse.  This includes GAO's functions under the ICA, such as reviewing special messages and reporting impoundments the President has not reported.[34]

---

[29] *See id.*; B-237297.4, Feb. 20, 1990 (vague or general assertions are insufficient to justify the withholding of budget authority).

[30] 2 U.S.C. § 684(b).

[31] *Id.* § 684 ("A deferral may not be proposed for any period of time extending beyond the end of the fiscal year in which the special message . . . is transmitted."); B-329092, Dec. 12, 2017 ("Any amount of budget authority deferred must be prudently obligated before the end of the period of availability."); 54 Comp. Gen. 453 (1974) (deferral provision should be used when the withholding is temporary and when prudent obligation of funds within the period of availability is not precluded by the withholding).

[32] 2 U.S.C. § 683(b).

[33] *Id.* § 681(4).  Section 681 sets out four disclaimers with respect to the application of the ICA.  The first three disclaimers, not relevant to the analysis here, provide that nothing in the ICA shall be construed as (1) asserting or conceding the constitutional powers or limitations of Congress or the President; (2) ratifying or approving any impoundment except as pursuant to statutory authority; or (3) affecting the claims or defense of any party to litigation concerning any impoundment. *See* 2 U.S.C. § 681(1)–(3).

[34] 2 U.S.C. §§ 685–686.

Application of the ICA to Interruptions to Prior Year FEMA Appropriations

An impoundment occurs when an agency refuses to obligate or expend budget authority.  However, we have acknowledged that not all delays in obligation or expenditure of budget authority constitute impoundments under the ICA.  For example, when an agency is taking reasonable and necessary steps to implement a program or activity, but the obligation or expenditure of funds is unavoidably delayed, such action constitutes a programmatic delay and is not an impoundment as defined by the ICA.[35]

Under certain facts or circumstances, a delay in the obligation of funds caused by an agency's review to ensure that its financial assistance aligns with the priorities of an incoming administration may also be considered a programmatic delay.  In a 2018 report, we considered this issue with respect to the Department of Energy's (DOE) Advanced Research Projects Agency-Energy (ARPA-E) funds.[36]  Beginning in May 2017, DOE's Chief of Staff initiated a review of ARPA-E financial assistance to determine whether such assistance aligned with the new administration's priorities.[37] New awards were delayed until the review of the underlying financial assistance opportunity was completed.[38]  DOE reviewed and approved ARPA-E's financial assistance on a rolling basis from May through September 2017 and nearly all ARPA-E financial assistance was approved.[39]  We found that the delay in the obligation of ARPA-E funds for such review did not violate the ICA.[40]

Important to our analysis were the procedural steps taken by the agency to achieve its stated intent.  To ensure that DOE's financial assistance aligned with the priorities of the new administration, DOE delayed the obligation of funds toward new awards. But according to DOE officials interviewed by GAO, DOE worked to complete the

---

[35] B-331564.1, Feb. 10, 2022.  "Programmatic delays include delays in the obligation or expenditure of budget authority that result from agency compliance with statutory requirements."  B-337137, May 22, 2025; *see also* B-333110, June 15, 2021.

[36] GAO, *Department of Energy: New Process to Review Financial Assistance for Research Projects Created Uncertainty,* GAO-18-278 (Washington, D.C.: Feb. 2018) at 10–11, *available at* https://www.gao.gov/products/gao-18-278 (GAO-18-278).

[37] *Id.* at 1, 6.

[38] *Id.* at 2.

[39] *Id.* at 6.

[40] *Id.* at 10–11.

B-337204.2

review as quickly as possible to minimize the effects on DOE programs.[41]  By the end of its review, nearly all of the funds had been released.[42]  DOE's actions reflected an intent to obligate funds for ARPA-E assistance once its stated review was complete, which is typical for programmatic delays.

With respect to the interruptions to prior year appropriations for FEMA's EFSP, SSP, and NGWS grants, the facts do not support the finding of a programmatic delay. While it can be argued that FEMA imposed grant reviews to ensure that funds were spent in alignment with the priorities of the new administration, FEMA did not simply delay planned obligations of the funds.  Here, FEMA deobligated planned awards entirely and withdrew previously disbursed funding, and its actions do not indicate that it is taking reasonable and necessary steps to implement these programs moving forward.  Rather, as discussed below, agency actions and Administration policy statements indicate that the agency is taking steps to prevent the implementation of these programs and activities.

Moreover, DOE reviewed ARPA-E awards on an efficient and rolling basis, and by the end of its review had released nearly all of the funds.  In contrast, we have no indication that FEMA is making progress on reviewing awards or implementing the new administration's priorities.  In fact, for each of the programs discussed below, the data shows drastically lowered obligation rates since February 2025 as compared to previous fiscal years, with few to no obligations or outlays recorded since.  The burden to justify withholdings rests with FEMA.  Because FEMA has deobligated and delayed the obligation or expenditure of funds without providing any justification or indicating a plan to implement these programs and move forward with the obligation and expenditure of funds, the withdrawals, holds, and reviews discussed below cannot be considered programmatic delays.  Therefore, we conclude that the withholdings of budget authority for the following programs constitute violations of the ICA.

<u>Emergency Food and Shelter Program</u>

FEMA receives an annual appropriation for the "emergency food and shelter program under title III of the McKinney-Vento Homeless Assistance Act" (EFSP).[43] The McKinney-Vento Homeless Assistance Act establishes an EFSP National

---

[41] GAO-18-278 at 8–9.

[42] *Id.* at 9.

[43] *See, e.g.*, Pub. L. No. 118-47, 138 Stat. at 607–08 (directing $117 million to the program in FY 2024); Pub. L. No. 119-4, 139 Stat. at 10–11, 27 (appropriating levels for FY 2025).  EFSP funds may have a one-year, two-year, or no-year period of availability, depending on when they were appropriated.

Board.[44]  Each year, FEMA is required by statute to "award a grant for the full amount that the Congress appropriates for the program . . . to the National Board for the purpose of providing emergency food and shelter to needy individuals through private nonprofit organizations and local governments" within 30 days after the appropriations are made available.[45]  The National Board must then disburse "[a]ny amount made available by appropriations acts . . . before the expiration of the 3-month period beginning on the date on which such amount becomes available."[46]  The National Board is not permitted to carry out the EFSP directly, and may only provide appropriated funds for "programs undertaken by private nonprofit organizations and local governments" that are "consistent with the purposes" of the Act.[47]

In FY 2024, the full year appropriation providing $117 million in EFSP funds was enacted March 23, 2024.[48]  FEMA published the notice of funding opportunities (NOFOs) awarding the full appropriation amount to the National Board on April 9, 2024,[49] and this obligation was documented in USAspending.gov on April 22, 2024.[50]

---

[44]  42 U.S.C. § 11331.  The National Board is chaired by a Director (by statute, the FEMA Administrator) and composed of members nominated by six private nonprofit organizations.  *Id.* §§ 11331, 11351.

[45] *Id.* § 11341.

[46] *Id.* § 11345.

[47] *Id.* § 11343.

[48] *See* Pub. L. No. 118-47, 138 Stat. at 608.

[49] *See* DHS, *Fiscal Year 2024 Emergency Food and Shelter National Board Program,* No. DHS-24-DAD-024-00-99 (Apr. 9, 2024).

[50] USAspending.gov, *Grant Summary: FAIN EMW-2024-FS-05000, available at* https://www.usaspending.gov/award/ASST_NON_EMW-2024-FS-05000_7022 (last visited Sept. 24, 2025).  USAspending.gov is the official source of federal government spending data.  USAspending.gov, *Mission, available at* https://www.usaspending.gov/about (last visited Sept. 24, 2025).  Federal law holds agencies accountable for the completeness and accuracy of the data submitted to USAspending.gov.  Various laws and regulations, as well as OMB and Treasury guidance, require agencies to report spending information to USAspending.gov, generally on a monthly or quarterly basis.  The Federal Funding Accountability Transparency Act of 2006 (FFATA) established USAspending.gov and required agencies to report data on federal programs equal to or greater than $25,000.  Pub. L. No. 109-282, 120 Stat. 1186 (Sept. 26, 2006), 31 U.S.C. § 6101 note.  The Digital (continued...)

On January 20, 2025, Executive Order No. 14159 directed the Secretary of Homeland Security to:

1) "Immediately review and, if appropriate, audit all contracts, grants, or other agreements providing Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens, to ensure that such agreements conform to applicable law and are free of waste, fraud, and abuse, and that they do not promote or facilitate violations of our immigration laws;

2) Pause distribution of all further funds pursuant to such agreements pending the results of the review in subsection (a) of this section;

3) Terminate all such agreements determined to be in violation of law or to be sources of waste, fraud, or abuse and prohibit any such future agreements; . . .

4) Initiate claw-back or recoupment procedures, if appropriate, for any [such] agreements."[51]

On January 28, 2025, the Secretary of Homeland Security issued a "Direction on Grants to Non-Governmental Organizations," which required that "[e]ffective immediately, all Department grant disbursements and assessments of grant applications that:  (a) go to non-profit organizations or for which non-profit organizations are eligible, and (b) touch in any way on immigration, are on hold pending review, except to the extent required by the controlling legal authority."[52]

---

Accountability and Transparency Act of 2014 expanded the requirements of FFATA, requiring agencies to link financial information (*e.g.*, obligations) to the related federal awards and requiring OMB and Treasury to develop government-wide data standards and elements for agencies to use when reporting spending data.  Pub. L. No. 113-101, 128 Stat. 1146 (May 9, 2014).

[51] Exec. Order No. 14159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443, 8447 (Jan. 29, 2025) (numbering added).

[52] Defendants' Status Report Regarding FEMA's Compliance with Preliminary Injunction, *State of New York v. Trump*, 1:25-cv-00039-JJM-PAS, ECF No. 166-2 (D.R.I. Mar. 14, 2025) (Direction on Grants to Non-Governmental Organizations). This directive closely mirrored the language of a preliminarily enjoined and now-rescinded OMB memo issued January 27, 2025, which required all "Federal agencies to identify and review all Federal financial assistance[] programs and supporting activities consistent with the President's policies and requirements."  *See*

(continued...)

This directive explicitly applied to the "Shelter and Services Program, and any similar program."[53]

On February 10, 2025, FEMA's Office of Grants Administration instructed staff to "put financial holds" on "all open awards" for FYs 2021–2024.[54]  The same day, the entire amount of the FY 2024 award to the National Board was deobligated,[55] along

---

OMB Memorandum, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs,* M-25-13 (Jan. 27, 2025) (M-25-13), *available at* https://www.whitehouse.gov/wp-content/uploads/2025/03/M-25-13-Temporary-Pause-to-Review-Agency-Grant-Loan-and-Other-Financial-Assistance-Programs.pdf (last visited Sept. 24, 2025), *rescinded by* OMB Memorandum, *Rescission of M-25-13*, M-25-14 (Aug. 22, 2025), *available at* https://www.whitehouse.gov/wp-content/uploads/2025/03/M-25-14-Rescission-of-M-25-13.pdf (last visited Sept. 24, 2025).  The memo also ordered agencies to "temporarily pause all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by" executive orders related to nongovernmental organizations.  M-25-13.

[53] *State of N.Y.*, ECF No. 166-2.

[54] *State of N.Y.*, ECF No. 166-4 (Feb. 10 Office of Grants Administration Email); ECF No. 166-1 (Declaration of Cameron Hamilton at ¶ 4).

[55] *See* note 50, *supra*.  According to National Finance Center guidance documents, Action Type C revisions recording negative obligations are to be used when (1) "[a]n award was made but later cancelled in full" or (2) "[a]n award was established, and funds were disbursed, but the project was later rescinded/terminated."  National Finance Center, *Deleting Records from USAspending.gov*, *available at* https://www.nfc.usda.gov/FSS/ClientServices/FMS/DATA_Act/documents/USDA_Reporting_Instructions/DeletingRecords_USAspending.pdf (last visited Sept. 24, 2025); National Finance Center, *Reporting a Change in Award Funding*, *available at* https://www.nfc.usda.gov/FSS/ClientServices/FMS/DATA_Act/documents/USDA_Reporting_Instructions/ReportingChange_AwardFunding.pdf (last visited Sept. 24, 2025).

with portions of several prior year awards.[56]  For February 2025, USAspending.gov shows that EFSP deobligations exceeded obligations by $251,590,333.[57]

On February 11, 2025, the agency paused funding and instituted a new manual review process for a number of grant programs, citing its "inherent authority to monitor awards; review its grant records and expenditures; and ensure payments to recipients are used only for allowable, allocable, and reasonable costs under the

---

[56] *See, e.g.*, USAspending.gov, *Grant Summary: FAIN* EMW-2021-FS-00008, *available at* https://www.usaspending.gov/award/ASST_NON_EMW-2021-FS-00008_7022 (last visited Sept. 24, 2025) (2021 EFSP Award 1); USAspending.gov, *Grant Summary: FAIN* EMW-2021-FS-00010, *available at* https://www.usaspending.gov/award/ASST_NON_EMW-2021-FS-00010_7022 (last visited Sept. 24, 2025) (2021 EFSP Award 2); USAspending.gov, *Grant Summary: FAIN* EMW-2022-FS-00001, *available at* https://www.usaspending.gov/award/ASST_NON_EMW-2022-FS-00001_7022 (last visited Sept. 24, 2025) (2022 EFSP Award 1); USAspending.gov, *Grant Summary: FAIN* EMW-2022-FS-00002, *available at* https://www.usaspending.gov/award/ASST_NON_EMW-2022-FS-00002_7022 (last visited Sept. 24, 2025) (2022 EFSP Award 2); USAspending.gov, *Grant Summary: FAIN* EMW-2023-FS-00001, *available at* https://www.usaspending.gov/award/ASST_NON_EMW-2023-FS-00001_7022 (last visited Sept. 24, 2025) (2023 EFSP Award 1); USAspending.gov, *Grant Summary: FAIN* EMW-2023-FS-00007, *available at* https://www.usaspending.gov/award/ASST_NON_EMW-2023-FS-00007_7022 (last visited Sept. 24, 2025) (2023 EFSP Award 2); USAspending.gov, *Grant Summary: FAIN* EMW-2023-FS-00013, *available at* https://www.usaspending.gov/award/ASST_NON_EMW-2023-FS-00013_7022 (last visited Sept. 24, 2025) (2023 EFSP Award 3).

[57] To compile this data, GAO staff searched USAspending.gov for grants under the Assistance Listing associated with the EFSP Program (97.024).  We then downloaded obligation data results over time by year.  This data was last downloaded on September 17, 2025.  *See* USAspending.gov, *Analyst's Guide to Federal Spending Data*, at 2, available at www.usaspending.gov/data/analyst-guide-download.pdf (last visited Sept. 24, 2025) (explaining that "[n]egative obligations, or de-obligations, occur when agencies decrease previous obligations"); National Finance Center, *Deleting Records from USAspending.gov*, note 55, *supra* (explaining that "revisions recording negative obligations are to be used when (1) "[a]n award was made but later cancelled in full" or (2) "[a]n award was established, and funds were disbursed, but the project was later rescinded/terminated; that "deobligated dollar amount[s]" will be reported as "negative number[s];" and that USAspending.gov will use all reported positive and negative amounts to calculate the obligation amounts displayed in the results over time data view).

terms and conditions of the grant award before making payment to the grant recipient."[58]  A follow up email from the Office of Grants Administration on February 11, 2025, affirmed that internal controls would be placed on all awards and that permitted payments "will be made within the allotted 30-day maximum timeline noted by 2 CFR Part 200."[59]

On February 14, 2025, the former Senior Official Performing the Duties of the FEMA Administrator formalized the manual review process initiated by the Office of Grant Administration when he issued a "Grant Processing Guidance" document.[60]  In addition to implementing manual review for certain programs, the guidance document also stated that "[g]rants under the Shelter and Services Program (SSP) . . . and Emergency Food and Shelter Program-Humanitarian (EFSP-H) are on hold," and that for these programs "[n]o new obligation, disbursement, or payment of funds previously obligated may be issued pending additional guidance from Secretary Noem."[61]

On February 28, 2025, FEMA sent grant recipients notice of this review process, stating that "[t]hese actions will ensure that funding is obligated and disbursed in line with the Secretary's direction."[62]

In a March 14, 2025, court filing, FEMA acknowledged that at least 114 grants were "undergoing the manual review."[63]

---

[58] Declaration of Thomas Breslin at ¶ 6, *CPB v. FEMA*, 1:25-cv-00740-TJK, ECF No. 33-1 (D.D.C. June 24, 2025).  Correspondence to FEMA staff and grantees sought to distinguish the payment system "hold" and "manual review" processes from the types of "holds" ordered by OMB memo M-25-13 and prohibited by temporary restraining orders during litigation.  Second Motion to Enforce the Court's January 31, 2025, Temporary Restraining Order, *State of N.Y.*, ECF No. 160-1 at 18–34 (D.R.I. Feb. 28, 2025) (exhibits D–E).

[59] *State of N.Y.*, ECF No. 166-5 (Feb. 11 Office of Grants Administration Email).

[60] *State of N.Y.*, ECF No. 166-1 (Declaration of Cameron Hamilton at ¶ 11); ECF No. 166-7 (Grant Processing Guidance).

[61] *State of N.Y.*, ECF No. 166-7 (Grant Processing Guidance).

[62] *State of N.Y.*, ECF No. 166-1 (Declaration of Cameron Hamilton at ¶ 20); ECF No. 166-9 (FEMA Grant Programs Directorate Message and FEMA Recovery Directorate Email).

[63] *State of N.Y.*, ECF No. 166-1 (Declaration of Cameron Hamilton at ¶ 29).

As noted above, spending data confirms a reduction in obligations for the EFSP following the January and February 2025 DHS and FEMA policy guidance, including deobligation of the entire FY 2024 appropriation and portions of prior year awards.[64] No reobligations for these awards have been recorded since February, and in FY 2025 the agency is deobligating EFSP funds at a rate that exceeds the positive obligations recorded for 11 out of the previous 15 fiscal years for which there is program data in USAspending.gov.[65]

By statute, these appropriated amounts are required to be awarded to the EFSP National Board in full and disbursed to localities by specific deadlines.[66]  As such, these funds are subject to the ICA's fourth disclaimer, which disallows the withholding of funds where a provision of law requires the obligation or expenditure thereof.[67]  Under the fourth disclaimer, the ICA's temporary withholding authority is not available for these funds.[68]  We therefore conclude that FEMA's directive to prevent "new obligation[s], disbursement[s], or payment[s] of funds previously obligated" and the agency's actions taken to deobligate and withhold previously awarded funds from obligation and expenditure constitute an impermissible withholding in violation of the ICA.[69]  Because FEMA retains no discretion as to whether EFSP funds will be obligated or disbursed to the designated recipients, the agency should correct its accounts to reverse impermissible deobligations of awards to the National Board and make all future awards and disbursements of funds as required by statute.

### Shelter and Services Program

FEMA's Federal Assistance account receives a transfer of one-year funds from CBP "to support sheltering and related activities provided by non-Federal entities, in support of relieving overcrowding in short-term holding facilities of [CBP]."[70]  This

---

[64] See notes 55, 56, supra.

[65] See note 57, supra (explaining negative obligation recording and overall obligation rate calculations on USAspending.gov).

[66] 42 U.S.C. §§ 11341, 11345.

[67] See 2 U.S.C. § 681(4).

[68] Id.

[69] State of N.Y., ECF No. 166-7 (Grant Processing Guidance).

[70] See, e.g., Pub. L. No. 118-47, 138 Stat. at 597–98 (directing CBP to transfer $650 million to FEMA's Federal Assistance account for sheltering activities).

program is referred to as the Shelter and Services Program (SSP).[71]  FEMA has historically divided the available funding into an "allocated" portion and "competitive" portion.[72]  The allocated portion is made available to designated recipients based on "release and destination data received from CBP" over certain time periods "along with operational information available to CBP."[73]

Each of the following actions detailed in the previous section also apply to SSP funds:

1)  Executive Order No. 14159, issued January 20, 2025;[74]

2)  Secretary of Homeland Security "Direction on Grants to Non-Governmental Organizations," issued January 28, 2025;[75]

3)  February 10 and 11, 2025, emails from FEMA Office of Grants Administration directing staff to place financial holds and internal controls on awards for grant programs;[76]

4)  February 14, 2025, "Grant Processing Guidance" document issued by former Senior Official Performing the Duties of the FEMA Administrator, Cameron Hamilton;[77] and

---

[71] *See, e.g.*, *DHS, Fiscal Year 2024 2024 Shelter and Services Program – Competitive (SSP-C)*, DHS-24-GPD-141-00-99, *available at* https://www.grants.gov/search-results-detail/353514 (last visited Sept. 24, 2025) ("As stated in the FY 2024 appropriation, the primary purpose of SSP is to "reliev[e] overcrowding in short-term holding facilities of [CBP].").

[72] FEMA, *Shelter and Services Program*, *available at* https://web.archive.org/web/20250510172813/https://www.fema.gov/grants/shelter-services-program (archived May 10, 2025).

[73] *See* DHS, *Fiscal Year 2024 Shelter and Services Program – Allocated,* No. DHS-24-GPD-141-00-98, at 7 (Apr. 12, 2024) (FY2024 SSP-A NOFO).

[74] *See* Exec. Order No. 14159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443, 8447 (Jan. 29, 2025).

[75] *State of N.Y.*, ECF No. 166-2 (Direction on Grants to Non-Governmental Organizations).

[76] *See State of N.Y.*, ECF No. 166-4 (Office of Grants Administration Email); ECF No. 166-1 (Declaration of Cameron Hamilton at ¶ 4).

[77] *State of N.Y.*, ECF No. 166-7 (Grant Processing Guidance).

B-337204.2

5) February 28, 2025, notifications to grant recipients.[78]

The January 28, 2025, DHS directive explicitly placed SSP "grant disbursements and assessments of grant applications" on hold.[79]

The February 14, 2025, FEMA Grant Processing Guidance, in addition to constraining EFSP funds, also put a "hold" on SSP funds and prohibited "new obligation, disbursement, or payment of funds previously obligated" pending "compliance review" and "additional guidance from Secretary Noem."[80]

In addition, a February 19, 2025, DHS memorandum instructed all agencies and offices to "review all federal financial assistance awards to determine if Department funds, directly or indirectly, are going to sanctuary jurisdictions," and, to the extent consistent with law, "cease providing federal funding to sanctuary jurisdictions."[81] A March 20, 2025, memorandum from Cameron Hamilton to the Secretary of Homeland Security then recommended additional "conditions or restrictions be placed on all <u>open</u> and <u>future</u> awards" for several grant programs, including SSP, "to align with Administration and Secretary priorities on non-governmental organizations, immigration, and sanctuary jurisdictions."[82]

At various points since January 2025, SSP recipients experienced interruptions to funding. On February 11, 2025, FEMA removed from New York City's central treasury account approximately $80 million in previously approved and disbursed SSP funding that reimbursed the city for costs incurred providing shelter and

---

[78] *See State of N.Y.*, ECF No. 166-1 (Declaration of Cameron Hamilton at ¶ 20); ECF No. 166-9 (FEMA Grant Programs Directorate Message and FEMA Recovery Directorate Email).

[79] *State of N.Y.*, ECF No. 166-2 (Direction on Grants to Non-Governmental Organizations).

[80] *State of N.Y.*, ECF No. 166-7 (Grant Processing Guidance).

[81] DHS, Memorandum for All Agencies and Offices, *Restricting Grant Funding for Sanctuary Jurisdictions*, at 5 (Feb. 19, 2025). While "sanctuary jurisdiction" does not have a single legal definition, the memorandum generally defines the term to include jurisdictions that fail to comply with various federal immigration enforcement information sharing, cooperation, detention, and access requests, or jurisdictions that violate or facilitate the violation of other enumerated federal immigration statutes. *Id.* at 4–5.

[82] FEMA, Memorandum for the Secretary of the Department of Homeland Security, *Approval of FEMA-Administered Grant Disbursements* (Mar. 20, 2025), at 1–2.

services to individuals released from DHS custody.[83]  FEMA later notified SSP grant recipients, including New York City, Colorado, and Wisconsin, that funding would be withheld pending a response to federal inquiries, a review of services provided, and the satisfaction of specific conditions on their awards.[84]

A March 14, 2025, declaration from the former Senior Official Performing the Duties of the FEMA Administrator indicated that the agency continued to "pause[] funding to the Shelter and Services Program based on significant concerns that the funding is going to entities engaged in or facilitating illegal activities," and that the allegations are under investigation.[85]

USAspending.gov data confirms that deobligations exceed obligations by $887,448,613.94 for SSP funds in FY 2025, as compared to obligations exceeding deobligations by $363,800,000 in FY 2023 and $640,900,000 in FY 2024.[86] Approximately 99 percent of that FY 2025 deobligation data is recorded as occurring

---

[83] Complaint at 1, *City of New York v. Trump*, 1:25-cv-01510-JHR, ECF No. 1 (S.D.N.Y. Feb. 21, 2025); Declaration of Jacques Jiha at ¶ 41–45, ECF No. 9 (Feb. 21, 2025); Memorandum of Law in Opposition to Plaintiffs' Motion For Preliminary Injunction and Temporary Restraining Order at 5–7, ECF No. 17 (Feb. 28, 2025).

[84] *See, e.g.*, *State of N.Y.*, ECF No. 166-1 (Declaration of Cameron Hamilton at ¶ 30–31); *City of New York*, ECF No. 9-20 (Remedy for Noncompliance Letter to New York City Office of Management and Budget); Letter from Senior Official Performing the Duties of the Administrator to City & County of Denver, *Re: Remedy for Noncompliance Letter, Shelter and Services Program (SSP)* (Mar. 11, 2025), *available at* https://wp-denverite.s3.amazonaws.com/wp-content/uploads/sites/4/2025/03/FINAL-Noncompliance-Letter-SSP-City-County-of-Denver_SIGNED.pdf (last visited Sept. 24, 2025).

[85] *State of N.Y.*, ECF No. 166-3 (Declaration of Cameron Hamilton at ¶ 5–12).  New York City notes in sworn declarations and litigation exhibits that these concerns were not identified in the results of a 2024 financial and programmatic site visit conducted by FEMA to review New York City's SSP awards and shelter locations.  *See City of N.Y.*, ECF No. 9 (Declaration of Jacques Jiha at ¶ 21–23); ECF No. 9-8 (Exhibit, Notice and Results of SSP Financial and Programmatic Monitoring Results).

[86] To compile this data, GAO staff searched USAspending.gov for grants under the Assistance Listings associated with the SSP (97.141 and 97.149).  We then downloaded obligation data results over time by month and year.  This data was last downloaded on September 17, 2025.  SSP has been active as a stand-alone program since FY 2023; similar services were previously provided under the EFSP appropriation.  *See* GAO, *Southwest Border: DHS Coordinates with and Funds Nonprofits Serving Noncitizens*, GAO-23-106147 (Apr. 2023).

in February 2025, with the most recent monthly data recording deobligations of $1,824,027 in July 2025.  No new awards are recorded for SSP since the agency's February 10, 2025, direction to place financial holds on awards.[87]

We have rejected the assertion that reviews undertaken "to ensure compliance with presidential policy prerogatives" constitute a permissible programmatic delay.[88]  The ICA does not permit deferrals for policy reasons, and FEMA has made clear that SSP funds were placed on hold and prohibited from "obligation, disbursement, or payment" pending a review for compliance with the DHS "Direction on Grants to Non-governmental Organizations," which explicitly applied to the SSP and stated that "grant disbursements and assessment of grant applications that . . . go to non-profit organizations or for which non-profit organizations are eligible, and [] touch in any way on immigration, are on hold pending review."[89]

Spending data confirms a corresponding reduction in obligations for the SSP, specifically indicating that deobligations exceed obligations by $887,448,613.94 for SSP funds in FY 2025, as compared to obligations exceeding deobligations by $363,800,000 in FY 2023 and $640,900,000 in FY 2024.[90]

DHS has not responded to GAO's requests for information, and there is no evidence indicating whether FEMA deobligated SSP funds with the intent to recompete or allocate these funds to new recipients based on its concerns about the legality of recipient operations or purposes.  However, to the extent that FEMA has deobligated SSP funds with the intent to do so, the funds have since expired and are unavailable

---

[87] To compile this data, GAO staff searched USAspending.gov for grants under the Assistance Listings associated with the SSP (97.141 and 97.149). We then reviewed award results and obligation data results over time by month with a date filter starting on February 10, 2025, and the "Show New Awards Only" filter selected. This data was last reviewed on September 17, 2025.  *See also*, *State of N.Y.*, ECF No. 166-4 (Office of Grants Administration Email).

[88] B-331564, Jan. 16, 2020.

[89] *State of N.Y.,* ECF No. 166-2 (Direction on Grants to Non-Governmental Organizations); ECF No. 166-7 (Grant Processing Guidance).

[90] To compile this data, GAO staff searched USAspending.gov for grants under the Assistance Listing associated with the SSP (97.141).  We then downloaded obligation data results over time by month and year.  Approximately 99 percent of FY 2025 deobligation data is recorded as occurring in February 2025, with the most recent monthly data also showing negative obligations in July 2025.  This data was last downloaded on September 17, 2025.

for new obligations.[91]  As a general proposition, a grant amendment that changes the scope of the grant or makes the award to an entirely different grantee and which is executed after the appropriation under which the original grant was made has ceased to be available for obligation and may not be charged to the original appropriation.[92]  Further, funds deobligated after the expiration of the original period of obligational availability are not available for new obligations.[93]  This means that if an agency has terminated grants or deobligated grant funds that are no longer available for obligation, the agency has "effectively preclude[d] the obligation or expenditure of budget authority."[94]

In certain limited situations, we acknowledge it is possible to make an award to an alternative grantee after funds have expired where the alternative award amounts to a "replacement grant" and is substantially identical in scope and purpose to the original grant.[95]  For example, in one case, expired but unexpended grant funds originally awarded to one university were awarded to a second university in a new fiscal year to complete an unfinished project.[96]  GAO held that it was proper to award this replacement grant because the project director had transferred from the first university to the second, and he was viewed by all parties as the only person capable of completing the work.[97]  But here, FEMA has not made and we are unaware of a "replacement grant" justification where the initial deobligations or grant terminations are predicated on the agency's disavowal of the policies, scope, and purpose for which the award was originally made.[98]

---

[91] *See* Pub. L. No. 118-47, 138 Stat. at 597–98 (appropriating one-year funds expiring at the end of FY 2024); Pub. L. No. 117-328, 136 Stat. at 4729–30 (appropriating one-year funds expiring at the end of FY 2023).

[92] B-195163, July 25, 1979.

[93] *See* B-286929, Apr. 25, 2001; 64 Comp. Gen. 410 (1985).

[94] *See* 2 U.S.C. § 682(1)(B).

[95] 57 Comp. Gen. 205 (1978); B-157179, Sept. 30, 1970.

[96] B-157179, Mar. 19, 1979.

[97] *Id.*

[98] *See, e.g.*, DHS, *Statement from a DHS Spokesperson on Termination of 4 FEMA Employees Who Made Payments to Luxury Hotels for Migrants* (Feb. 11, 2025), *available at* https://www.dhs.gov/news/2025/02/11/statement-dhs-spokesperson-termination-4-fema-employees-who-made-payments-luxury (last visited Sept. 24, 2025).

Given the agency's targeted policy directives, corresponding spending data, and failure to otherwise justify withholdings for this program, we find that FEMA has impermissibly withheld and precluded the obligation and expenditure of prior year budget authority for SSP in violation of the ICA.

*Next Generation Warning System*

Each year since FY 2022, FEMA has received an annual appropriation of one-year funds for the Next Generation Warning System (NGWS) grant program.[99]  NGWS improvements enable broadly accessible and authenticated emergency information via national alert and warning systems,[100] and grants were intended to support "investments that improve resiliency, continuity of broadcast operations, and security of public broadcasting networks and systems."[101]  In FYs 2022–2024, FEMA's NOFOs for the program stated that "[t]he Corporation for Public Broadcasting [CPB] is the only eligible applicant" for the award,[102] noting at the program's inception that "Congress intended that FEMA work with [CPB] to implement the [NGWS program] for public broadcast entities."[103]

---

[99] *See* Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, 136 Stat. 49, 328 (Mar. 15, 2022); Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459, 4741 (Dec. 29, 2022); Pub. L. No. 118-47, 138 Stat. at 608; Pub. L. No. 119-4, 139 Stat. at 10–11, 27.

[100] *See* FEMA, *Next Generation Warning System Grant Program* (last updated Aug. 12, 2024), *available at* https://www.fema.gov/emergency-managers/practitioners/integrated-public-alert-warning-system/broadcasters-wireless/ngwsp (last visited Sept. 24, 2025).

[101] DHS, *Fiscal Year 2024 Next Generation Warning System Grant Program,* DHS-24-IPAWS-138-00-99, at 6 (Aug. 20, 2024) (FY 2024 NGWS NOFO).

[102] FY 2024 NGWS NOFO, at 11; DHS, *Fiscal Year 2023 Next Generation Warning System Grant,* DHS-23-IPAWS-138-00-01, at 8 (Aug. 18, 2023) (FY 2023 NGWS NOFO).  The FY 2025 NGWS, published August 6, 2025, does not discuss CPB and indicates the agency's intent to administer the program through cooperative agreements with state and tribal partners.  See DHS, *Fiscal Year 2025 Next Generation Warning System Grant Program*, DHS-25-IPAWS-138-00-99 (Aug. 6, 2025) (FY 2025 NGWS NOFO).

[103] DHS, *Next Generation Warning System Grant,* DHS-22-IPAWS-138-00-01, at 6 (Sept. 1, 2022) (FY2022 NGWS NOFO).

The grants to CPB were "made on a cost reimbursement basis,"[104] whereby CPB receives the award from FEMA and "manage[s] a competitive process to solicit sub-grant applications from eligible subrecipients to use these funds in accordance with the requirements and priorities" set forth in the NOFO.[105]  Sub-grantees incur costs and submit them for reimbursement from CPB,[106] and CPB then requests withdrawals of funds for these reimbursements from its award through the "Payment and Reporting System" (PARS).[107]

Each of the following actions detailed in the previous sections also apply to NGWS funds:

1) February 10 and 11 emails from FEMA Office of Grants Administration directing staff to place financial holds and internal controls on awards for grant programs;[108]

2) February 14, 2025, "Grant Processing Guidance" document issued by former Senior Official Performing the Duties of the FEMA Administrator, Cameron Hamilton;[109] and

3) February 28, 2025, notifications to grant recipients.[110]

---

[104] *See* Complaint at 11, *CPB v. FEMA*, 1:25-cv-00740-TJK, ECF No. 1 (Mar. 13, 2025); *see also* Defendants' Memorandum in Opposition to Plaintiff's Motion for Temporary Restraining Order at 2, *CPB v. FEMA*, 1:25-cv-00740-TJK, ECF No. 14 (Mar. 15, 2025).

[105] FY2024 NGWS NOFO, at 6.

[106] *See* Complaint at 11, *CPB v. FEMA*, ECF No. 1 (Mar 13, 2025).

[107] *Id.*; Defendants' Memorandum in Opposition to Plaintiff's Motion for Temporary Restraining Order at 2, *CPB v. FEMA*, ECF No. 14; Plaintiff's Motion for a Temporary Restraining Order, *CPB v. FEMA*, Exhibit 1 at 8, ECF No. 4-2 (Declaration of Daryl Mintz) (Mar. 13, 2025).

[108] *See State of N.Y.*, ECF No. 166-1 (Declaration of Cameron Hamilton at ¶ 4); ECF No. 166-4 (Office of Grants Administration Email).

[109] *See State of N.Y.*, ECF No. 166-7 (Grant Processing Guidance).

[110] *See State of N.Y.*, ECF No. 166-1 (Declaration of Cameron Hamilton at ¶ 20); ECF No. 166-9 (FEMA Recovery Directorate Email).

B-337204.2

CPB noticed a "hold" on its FY 2022 NGWS funds in PARS on February 19, 2025, which showed remaining grant funding as unavailable for draw down.[111]  While CPB noted that reimbursement requests through PARS were typically processed in two days, by March 13, 2025, CPB had received no communication from FEMA indicating that the "hold" status had changed, preventing $1.88 million of reimbursements to "sub-awardee public media stations [that] . . . purchase[d] critical equipment for NGWS program upgrades and enhancements."[112]

FEMA confirmed that its February 10, 2025, email guidance implemented "a process for the manual review of requests for payment," but that the "hold" placed on CPB grant funds in PARS was "not a freeze on the funds" but a mechanism to allow the agency to "protect the integrity of government funding programs" and "review[] grant projects, activities, and source documentation" before releasing funds.[113]

After FEMA initiated its manual review, the U.S. District Court for the District of Rhode Island entered a preliminary injunction on March 6, 2025, enjoining FEMA from "pausing, freezing, blocking, canceling, suspending, terminating, or otherwise impeding the disbursement of appropriated federal funds" to certain named plaintiffs.[114]  FEMA states that it complied with the preliminary injunction by allowing grant recipients, including CPB, to draw down grant funds.[115]  A CPB press statement confirmed that it made five sub-awards in April when FEMA lifted the

---

[111] Plaintiff's Motion for a Temporary Restraining Order, Exhibit 1 at 8, *CPB v. FEMA,* ECF No. 4-2 (Mar. 13, 2025) (Declaration of Daryl Mintz).

[112] Complaint at 2, 12, 18, ECF No. 1 (Mar. 13, 2025).

[113] Defendants' Memorandum in Opposition to Plaintiff's Motion for Temporary Restraining Order at 1–2, *CPB v. FEMA,* ECF No. 14 (Mar. 15, 2025).

[114] *New York v. Trump*, 769 F. Supp. 3d 119, 146 (D.R.I. Mar. 6, 2025).

[115] Defendants' Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction, *CPB v. FEMA*, ECF No. 33-1 (June 24, 2025) (Declaration of Thomas Breslin at ¶ 7).

PARS hold.[116]  Four of these five awards are reflected in the sub-award history section of the FY 2022 NGWS grant summary on USAspending.gov.[117]

On May 1, 2025, Executive Order No. 14290, "Ending Taxpayer Subsidization of Biased Media," prompted agencies to "identify and terminate, to the maximum extent consistent with applicable law, any direct or indirect funding of [National Public Radio (NPR)] and [Public Broadcasting Service (PBS)]."[118]  The Order also directed "[t]he [Corporation for Public Broadcasting] Board [to] cease indirect funding to NPR and PBS, including by ensuring that licensees and permittees of public radio and television stations, as well as any other recipients of CPB funds, do not use Federal funds for NPR and PBS."[119]

Because NPR and PBS affiliate stations receive subgrants from CPB through the NGWS grant program, FEMA again turned off CPB's ability to draw down NGWS funds on May 8, 2025, while the agency "conduct[ed] the review to ensure compliance with the Biased Media [Executive Order]."[120]

USAspending.gov records for the NGWS awards for FYs 2022, 2023, and 2024 show revisions on May 8, 2025, deobligating almost the entire unexpended amount

---

[116] CPB, *FEMA Lifts Hold on Funds for Next Generation Warning System Grants* (Apr. 24, 2025), *available at* https://cpb.org/pressroom/CPB-Announces-Five-New-Grants-Totaling-96-Million-Rural-Public-Broadcasters-Upgrade (last visited Sept. 24, 2025).

[117] *See* USAspending.gov, *Grant Summary: FAIN EMW-2022-OS-00001, available at* https://www.usaspending.gov/award/ASST_NON_EMW-2022-OS-00001_070 (last visited Sept. 24, 2025).

[118] Exec. Order No. 14290, Ending Taxpayer Subsidization of Biased Media, 90 Fed. Reg. 19415 (May 1, 2025).

[119] *Id.*

[120] *CPB v. FEMA*, ECF No. 33-1 (Declaration of Thomas Breslin at ¶ 9).

for each year's appropriation and award to CPB.[121]  These totals were reobligated on June 5, 2025.[122]

As of June 24, 2025, FEMA stated in litigation that while its review continues in order "to ensure that the program's design effectively serves its statutory purpose, program goals, and agency priorities" and while the agency considers "whether the NGWS grant awards to [CPB] are effectuating program goals or agency priorities," the agency restored CPB's ability to draw down funds on June 6, 2025.[123]  CPB press statements do not indicate whether any sub-awards have been made since this date, and no additional sub-awards since this date are recorded in USAspending.gov grant summaries.

Declarations from FEMA officials confirm that NGWS funding was unavailable to CPB pursuant to executive branch orders and reviews between February 11 and March 6, 2025, and again between May 8 and June 6, 2025.[124]

There was nothing unavoidable about FEMA's withholdings in this instance, nor was FEMA withholding funds to comply with statutory requirements.[125]  As both FEMA's sworn declarations and spending data make clear, the agency withheld funds awarded to CPB under the NGWS grant to comply with various policy directives. Most clearly, the agency deobligated NGWS awards to CPB from May 8, 2025, to June 5, 2025, and withheld disbursements of funds in PARS until June 6, 2025, in order to "ensure compliance with" Executive Order No. 14290, "Ending Taxpayer

---

[121] For FY 2022 funds, this was a deobligation of $37,056,658 of the $40 million appropriation.  USAspending.gov, *Grant Summary: FAIN EMW-2022-OS-00001, available at* https://www.usaspending.gov/award/ASST_NON_EMW-2022-OS-00001_7022 (last visited Sept. 24, 2025).  For FY2023 funds, this was a deobligation of $55,654,471 of the $56 million total appropriation.  USAspending.gov, *Grant Summary: FAIN EMW-2023-OS-00003, available at* https://www.usaspending.gov/award/ASST_NON_EMW-2023-OS-00003_7022 (last visited Sept. 24, 2025).  In FY 2024, no expenditures had been made yet and this was a deobligation of the entire $40 million appropriation.  USAspending.gov, *Grant Summary: FAIN EMW-2024-OS-05000, available at* https://www.usaspending.gov/award/ASST_NON_EMW-2024-OS-05000_7022 (last visited Sept. 24, 2025).  These were Action Type C revisions.  *See* note 55, *supra* (outlining FINCEN revision codes).

[122] *See id.*

[123] *CPB v. FEMA*, ECF No. 33-1 (Declaration of Thomas Breslin at ¶ 10–12).

[124] *See CPB v. FEMA*, ECF No. 33-1 (Declaration of Thomas Breslin at ¶ 7, 9).

[125] *See* B-337375, June 16, 2025.

Subsidization of Biased Media," which "instructed" the CPB Board to "cease direct" and "indirect funding to NPR and PBS."[126]

USAspending.gov records for FYs 2022, 2023, and 2024 NGWS awards show revisions on May 8, 2025, deobligating almost the entire unexpended amount of each year's appropriation for the program.[127]  The complete deobligation of CPB's NGWS awards aligns with the date on which FEMA placed its second PARS hold to implement Executive Order No. 14290.[128]  The agency claims that the PARS hold is simply a "system term" allowing the agency to manually review each request for allowable expenses prior to reimbursement.[129]  Whereas there are no deobligations recorded for NGWS awards during the initial PARS hold placed on funds from February 11, 2025, to March 6, 2025,[130] later holds from May 8, 2025, to June 6, 2025, were coupled with deobligations and temporally aligned with the signing of Executive Order No. 14290, which sought to prohibit the disbursement of funds to specific entities.

These circumstances indicate that that the latter withholding from May 8, 2025, to June 6, 2025, was undertaken with an intent to withdraw the entire amount from the awardee and withhold the budget authority from obligation or expenditure, rather than merely reviewing the propriety of individual reimbursement requests.  Although the funds were ultimately reobligated on June 5, 2025, and released in PARS the

---

[126] *See CPB v. FEMA*, ECF No. 33-1 (Declaration of Thomas Breslin at ¶ 9).  This Executive Order prompted agencies to "identify and terminate, to the maximum extent consistent with applicable law, any direct or indirect funding of NPR and PBS" and directed "[t]he CPB Board [to] cease direct" and "indirect funding to NPR and PBS, including by ensuring that licensees and permittees of public radio and television stations, as well as any other recipients of CPB funds, do not use Federal funds for NPR and PBS."  Exec. Order No. 14290, *Ending Taxpayer Subsidization of Biased Media*, 90 Fed. Reg. 19415 (May 7, 2025).

[127] *See* note 55, *supra*.

[128] *See CPB v. FEMA*, ECF No. 33-1 (Declaration of Thomas Breslin at ¶ 9).

[129] *See* Defendants' Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction at 8, *CPB v. FEMA*, ECF No. 33 (June 24, 2025).

[130] *See* note 121, *supra*.  Transaction histories for each award show no deobligation transactions during the dates of the PARS hold between February and March.

following day,[131] the purpose of this withholding and the agency's failure to comply with the procedures of the ICA constitute a violation.[132]

We therefore find violations of the ICA with respect to FEMA's interruptions and withholdings of prior year funding for the EFSP, SSP, and NGWS grants.

CONCLUSION

GAO's institutional role is to support Congress, including in Congress's exercise of its constitutional power of the purse. This includes GAO's responsibilities under the ICA, such as reviewing special messages and reporting impoundments the President has not reported. Our analysis and conclusions regarding FEMA help ensure compliance with the ICA and appropriations law. GAO does not take a position on the policy goals of DHS or FEMA, and this decision is not to be interpreted as taking a position on the underlying policies entailed. Changes to FEMA's grant administration functions can be addressed through the legislative process with Congress and the Administration.

The publicly available information, obtained from policy statements and sworn testimony from DHS and FEMA officials, federal court cases, data on USAspending.gov, and other sources, indicates that FEMA impermissibly withheld or delayed the obligation and expenditure of funds that Congress appropriated for the EFSP, SSP, and NGWS grants without regard for the procedures and constraints set forth in the ICA. The burden to justify withholdings rests with the executive branch, and GAO has a statutory duty to report impoundments to Congress.

If FEMA wishes to make changes to the budget authorities provided to it, it must propose funds for rescission or otherwise propose legislation to make changes to the law for consideration by Congress.

*Edda Emmanuelle Perez*

Edda Emmanuelli Perez
General Counsel

---

[131] *See* note 121, *supra*; *CPB v. FEMA*, ECF No. 33-1 (Declaration of Thomas Breslin at ¶ 9).

[132] *See* B-329092, Dec. 12, 2017 (finding that an impoundment occurred though funds had since been released).